# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| HARRIS COUNTY, TEXAS<br><br>     *Plaintiff,*<br><br>v.<br><br>TEVA PHARMACEUTICALS USA, INC.; ACTAVIS HOLDCO US, INC.; ACTAVIS PHARMA, INC.; AKORN, INC.; AMNEAL PHARMACEUTICALS, INC.; AMNEAL PHARMACEUTICALS LLC; AMNEAL PHARMACEUTICALS OF NEW YORK, LLC; APOTEX CORP.; AUROBINDO PHARMA U.S.A., INC.; BRECKENRIDGE PHARMACEUTICAL, INC.; CAMBER PHARMACEUTICALS, INC.; DR. REDDY'S LABORATORIES, INC.; ENDO INTERNATIONAL PLC; ENDO HEALTH SOLUTIONS, INC.; ENDO PHARMACEUTICALS, INC.; FOUGERA PHARMACEUTICALS INC.; GLENMARK PHARMACEUTICALS, INC., USA; GREENSTONE LLC; HERITAGE PHARMACEUTICALS INC.; HIKMA PHARMACEUTICALS USA, INC.; HI-TECH PHARMACAL CO., INC.; KAVOD PHARMACEUTICALS, LLC; KAVOD HEALTH LLC; LANNETT COMPANY, INC.; LUPIN PHARMACEUTICALS, INC.; MAYNE PHARMA, INC.; MORTON GROVE PHARMACEUTICALS, INC.; MYLAN INC.; MYLAN PHARMACEUTICALS INC.; MYLAN INSTITUTIONAL INC; MYLAN SPECIALITY L.P.; PAR PHARMACEUTICAL COMPANIES, INC.; PAR PHARMACEUTICAL, INC.; PERRIGO NEW YORK, INC.; PFIZER, INC.; SANDOZ, INC.; SUN PHARMACEUTICALS, INC.; TARO PHARMACEUTICALS USA, INC.; TELIGENT PHARMA, INC.; UPSHER-SMITH LABORATORIES, LLC; VERSAPHARM, INC.; WOCKHARDT USA LLC; ZYDUS PHARMACEUTICALS (USA), INC.<br>     *Defendants.* | Civil Action No.<br><br><br>JURY TRIAL DEMANDED |

## ORIGINAL COMPLAINT

**TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................1

II.     JURISDICTION AND VENUE ........................................................ 7

III.    PARTIES ........................................................................................... 9

        A.      Plaintiff ................................................................................. 9

        B.      Defendants........................................................................10

IV.     INTERSTATE AND INTRASTATE TRADE AND COMMERCE.............44

V.      FACTUAL ALLEGATIONS ...........................................................45

        A.      The Generic Drug Market...............................................45

                i.      Generic Drugs Should Provide Lower-Priced Options for
                        Consumers ...................................................................45

                ii.     The Prescription Drug Pricing System...............................49

                iii.    Generic Drug Market is Highly Susceptible To Collusion ...............51

        B.      Government Investigations of Defendants' Conspiracy ...........................53

                i.      Congress Launched an Investigation into Generic Price Hikes ......53

                ii.     The DOJ Investigates Criminal Generic Drug Collusion.................55

                iii.    State Attorneys General Launch Their Own Investigation .............57

        C.      Defendants' Overarching Conspiracy ......................................... 60

                i.      Defendants Are Competitors or Potential Competitors for All At
                        Issue Drugs .................................................................. 60

                ii.     Defendants' "Fair Share" Agreement................................63

                iii.    Defendants' Agreement to "Play Nice in the Sandbox"..................67

                iv.     Defendants' Cartel Agreement Includes All Generic Products .......69

        D.      Defendants' Extensive Inter-Firm Communications................................74

                i.      Trade Association Meetings and Conferences..................................74

                ii.     Industry Dinners and Private Meetings...........................................75

                iii.    Private Communications.................................................................76

        E.      The Overarching Conspiracy In Operation: Market Allocation And Price
                Fixing Agreements........................................................................79

                i.      Acetazolamide ........................................................... 80

                ii.     Amiloride HCL/HCTZ, Clemastine Fumarate, Diclofenac, Diltiazem
                        HCL, Tolmetin Sodium Capsules....................................................87

                iii.    Amitriptyline ...............................................................................93

i

iv.     Cimetidine Tablets, Desmopressin Acetate, Fluvastatin Sodium and Prazosin HCL......................................................................................96

v.     Azithromycin Suspension, Bumetanide Tablets, Clarithromycin ER Tablets, Cyproheptadine HCL Tablets, Estazolam Tablets, Ethosuximide, Hydroxyzine, Medroxyprogesterone Tablets and Pentoxifylline Tablets ....................................................................... 101

vi.     Baclofen ............................................................................................ 114

vii.     Benazepril HCTZ .............................................................................. 116

viii.     Bethanechol Chloride ........................................................................120

ix.     Budesonide DR Capsules ................................................................. 121

x.     Budesonide Inhalation ..................................................................... 123

xi.     Buspirone HCL Tablets, Estradiol Tablets, Labetalol Tablets, Loperamide HCL Capsules, Mimvey Tablets, Nadolol Tablets, Nitrofurantoin MAC Capsules and Tamoxifen Citrate Tablets ..... 125

xii.     Cabergoline....................................................................................... 133

xiii.     Capecitabine ..................................................................................... 134

xiv.     Celecoxib .......................................................................................... 137

xv.     Clobetasol ......................................................................................... 139

xvi.     Clomipramine................................................................................... 144

xvii.     Clonidine TTS Patch and Doxazosin Mesylate ............................. 147

xviii.     Desogestrel/Ethinyl Estradiol Tablets........................................... 153

xix.     Desonide ........................................................................................... 154

xx.     Dexmethylphenidate HCL Extended Release.................................158

xxi.     Amphetamine/Dextroamphetamine ...............................................160

xxii.     Dextroamphetamine Sulfate Extended Release ............................162

xxiii.     Diflunisal .......................................................................................... 164

xxiv.     Digoxin.............................................................................................. 165

xxv.     Divalproex ........................................................................................ 169

xxvi.     Doxycycline....................................................................................... 172

xxvii.     Drospirenone/EE ............................................................................. 185

xxviii.     Econazole..........................................................................................188

xxix.     Enalapril Maleate ........................................................................... 191

xxx.     Entecavir........................................................................................... 195

xxxi.     Etodolac ER ...................................................................................... 197

ii

xxxii.   Fenofibrate ............................................................................ 199

xxxiii. Fluocinonide .......................................................................... 204

xxxiv. Fosinopril-HCTZ ....................................................................207

xxxv.  Gabapentin ............................................................................ 209

xxxvi. Glipizide-Metformin............................................................... 210

xxxvii. Glyburide ............................................................................... 212

xxxviii.  Glyburide-Metformin .......................................................... 216

xxxix. Griseofulvin ........................................................................... 219

xl.       Irbesartan .............................................................................. 220

xli.      Ketoprofen, Ketorolac and Methotrexate .....................................222

xlii.     Ketoconazole ......................................................................... 226

xliii.    Leflunomide............................................................................ 229

xliv.     Levothyroxine .........................................................................233

xlv.      Lidocaine ............................................................................... 237

xlvi.     Moexipril Hydrochloride Tablets...........................................239

xlvii.    Nabumetone,   Ranitidine,   Cefdinir,   Cefprozil,   Cephalexin, Oxybutynin and Adapalene Gel .................................................. 241

xlviii.  Niacin ER...............................................................................247

xlix.     Nimodipine............................................................................ 249

l.         Norethindrone/EE .................................................................254

li.        Nortriptyline Hydrochloride ....................................................255

lii.       Nystatin .................................................................................259

liii.      Omega-3-Acid Ethyl Esters ........................................................ 268

liv.      Oxaprozin ...............................................................................270

lv.       Paricalcitol .............................................................................272

lvi.      Paromomycin ......................................................................... 275

lvii.     Piroxicam ............................................................................... 277

lviii.    Pravastatin..............................................................................279

lix.      Propranolol............................................................................ 283

lx.       Temozolomide ....................................................................... 290

lxi.      Tolterodine ER ....................................................................... 292

lxii.     Tolterodine Tartrate ............................................................... 296

lxiii.    Tizanidine ............................................................................... 299

iii

|  | lxiv. | Theophylline ......................................................................301 |
|  | lxv. | Tobramycin......................................................................... 305 |
|  | lxvi. | Ursodiol ..............................................................................307 |
|  | lxvii. | Valsartan............................................................................ 309 |
|  | lxviii. | Verapamil ...........................................................................310 |
|  | lxix. | Warfarin, Carbamazepine and Clotrimazole ................. 314 |
|  | lxx. | Zoledronic Acid ............................................................... 321 |

**VI.**    **PLAINTIFF HARRIS COUNTY'S ANTITRUST INJURY** ....................324

**VII.**    **TOLLING AND FRAUDULENT CONCEALMENT** ............................327

    A.    Plaintiff Did Not and Could Not Discover Defendants' Unlawful Conspiracy .......................................................................327

    B.    Fraudulent Concealment........................................................ 330

    C.    Continuing Violations...............................................................333

**VIII.**  **CAUSES OF ACTION** .....................................................................334

    1.    Violations of § 1 of the Sherman Act, 15 U.S.C. § 1, et. seq (Against All Defendants) ......................................................................334

    2.    Violations of the Texas Free Enterprise and Antitrust Act ("TFEAA") (Against All Defendants) .........................................................337

    3.    Violations of State Antitrust Statutes (Against All Defendants) .............339

    4.    Texas Deceptive Trades Practices Act (Against All Defendants)..............359

    5.    Money Had and Received (Against All Defendants) ................................ 361

    6.    Unjust Enrichment (Against All Defendants).........................................362

    7.    Civil Conspiracy (Against All Defendants).............................................365

**IX.**    **APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION** ...366

**X.**     **CONDITIONS PRECEDENT**............................................................ 366

**XI.**    **PRAYER FOR RELIEF** ................................................................... 367

**XII.**   **JURY DEMAND**............................................................................ 367

iv

Plaintiff Harris County, Texas ("Plaintiff" or "Harris County") brings this action against the above-captioned Defendants (collectively "Defendants") and alleges on personal knowledge as to the facts pertaining to it, information made public during ongoing government investigations and upon information and belief, as follows:

## I.    INTRODUCTION

1.    Harris County brings this action to hold accountable the billion-dollar pharmaceutical companies that are responsible for one of the most egregious price-fixing conspiracies in the history of the United States. For years numerous generic drug manufacturers, named herein as Defendants, leveraged the culture of cronyism within their industry to avoid price erosion and artificially inflate prices across the entire generic pharmaceutical industry.

2.    This Complaint alleges that Defendants: (1) participated in a series of price fixing and market allocation conspiracies involving individual or groups of generic drugs and (2) leveraged these discrete conspiracies to create an overarching conspiracy to significantly reduce competition and increase prices across all generics. This overarching conspiracy encompassed an agreement between all Defendants, covering all generic drugs manufactured and sold by Defendants during the relevant time period.

3.    This conspiracy resulted in massive profits for Defendants and caused the prices of generic drugs to skyrocket at unprecedented rates—many by more than 1000%—costing Plaintiff Harris County millions and the United States healthcare system billions of dollars. The following Figures 1–3 are representative examples demonstrating the price increase that resulted from Defendants' illicit activities for three of the At Issue generic drugs.

1

**Figure 1: Drug Price Increase for Generic Drug Clomipramine**



**Figure 2: Drug Price Increase for Generic Drug Amitriptyline**



**Figure 3: Drug Price Increase for Generic Drug Ursodiol**



4.     In the pharmaceutical industry, generic drug entry predictably and typically results in increased competition, which leads to price reductions and significant savings to consumers and health plans, such as Harris County.

5.     As has been recently uncovered, however, beginning in or around 2010 Defendants conspired to thwart these price reductions by agreeing to manipulate the relevant markets, allocate these markets amongst themselves and obstruct generic competition in an ongoing scheme to fix, increase, stabilize and/or maintain the price of generic drugs.

6.     Defendants effectuated their plan by agreeing not to compete and instead to settle for what these competitors refer to as their "fair share" of the relevant markets. This understanding permeates every segment of the generic drug industry.

7.     This "fair share" understanding did not arise from independent decision making by individual companies. Rather, Defendants routinely and systematically

communicated with one another to determine and agree on how much market share, and to which customers, each conspirator was entitled.

8.    Defendants understood and acted upon this widespread code of conduct: any time a competitor entered a particular drug market, Defendant conspirators would allocate the market by either refusing to bid for agreed-upon customers or providing outrageously high cover bids. This created an artificial equilibrium that enabled Defendants to then collectively maintain and/or artificially raise prices for a particular generic drug or agreed upon set of drugs.

9.    The market for each of the At Issue Drugs was small enough to foster collusion, but still large enough that prices should have remained at their historical, near marginal cost levels. Defendants overcame this obstacle and produced extraordinary price increases, as reflected in industry-wide data, by engaging in a concerted effort to grow their conspiracy and dominate the market for generic drugs.

10.    While not all Defendants competed in each individual market for the At Issue Drugs, this conspiracy was pervasive throughout the entire generic drug industry, connecting all Defendants and creating a web of interlocking conspiracies that artificially inflated the prices for all generic drugs.

11.    These extreme and unprecedented price increases in the generic drug industry prompted close scrutiny by the U.S. Congress and federal and state enforcement agencies.

12.    An ongoing criminal investigation by the Antitrust Division of the U.S. Department of Justice ("DOJ") has resulted in price fixing charges and guilty pleas involving numerous Defendants, including: federal charges against Defendant Heritage for "conspiring with its competitors to fix prices, rig bids and allocate customers," a

federal indictment of a former Taro marketing executive, guilty pleas to federal charges by two Heritage executives and a guilty plea by a former senior executive at Sandoz to federal conspiracy charges.[1]

13.    In addition, numerous other Defendants have received subpoenas in connection with the DOJ investigation, including: Actavis Holdco U.S., Inc.; Aurobindo Pharma USA, Inc.; Dr. Reddy's Laboratories, Inc.; Lannett Company, Inc.; Hikma Pharmaceuticals USA, Inc. (West-Ward); Mayne Pharma, Inc.; Mylan Pharmaceuticals, Inc; Par Pharmaceutical, Inc.; Pfizer, Inc.; Sandoz, Inc.; Sun Pharmaceutical Industries, Inc.; Taro Pharmaceuticals USA, Inc.; Teva Pharmaceuticals USA, Inc; and Zydus Pharmaceuticals USA, Inc.

14.    The DOJ has made clear that this "investigation is ongoing" and that the evidence uncovered implicates a significant number of additional Defendants.[2]

15.    The Office of the Attorney General for the State of Connecticut ("Connecticut AG") also began an investigation in July 2014 of the generic drug industry in parallel to that of the DOJ. This investigation has now been joined by the Attorney Generals of forty-five (45) states, Puerto Rico and the District of Columbia ("State AGs").

16.    In 2017, the State AGs filed a civil enforcement action against nearly all of the Defendants named herein, alleging agreements to fix the prices of fifteen (15) drugs.[3]

17.    After filing this initial lawsuit, the Connecticut AG noted that the State AGs' continuing investigation had "exploded into wide-ranging conduct in all areas of the

---

[1] DOJ, Press Release May 31, 2019, https://www.justice.gov/opa/pr/pharmaceutical-company-admits-price-fixing-violation-antitrust-law-resolves-related-false;                 see                 also https://www.fiercepharma.com/pharma/former-novartis-sandoz-exec-pleads-guilty-generics-price-fixing-investigation.
[2] *Id.*
[3] Plaintiff States' Consolidated Amended Complaint, Case No. 2:17-cv-03768-CMR, ECF No. 14 (E.D. Pa.).

generic drug industry" and that the existing litigation "is essentially dwarfed by the conduct we're seeing in the rest of our investigation."[4]

18.     Indeed, on May 10, 2019, a total of forty-three (43) states, led by the Connecticut AG, brought a second lawsuit against twenty (20) of the nation's largest generic drug manufacturers, alleging a broad conspiracy to artificially inflate and manipulate prices, reduce competition and unreasonably restrain trade for more than one-hundred (100) generic drugs.[5]

19.     Both AG Complaints are the result of information gathered in response to confidential Civil Investigative Demands that would otherwise remain undisclosed. The AG Complaints, on their face, explain they are not yet exhaustive of the generic drugs and manufacturers involved in the price-fixing conspiracy. Rather, the State AGs' investigation remains ongoing as to other drugs and manufacturers.

20.     Defendants' scheme to fix and artificially inflate prices, allocate markets, and otherwise stifle competition within the generic pharmaceutical industry caused, and continues to cause, significant harm to Plaintiff Harris County, as well as to the entire United States healthcare system.

21.     As a direct result of the conspiracy, Harris County has paid and continues to pay substantially inflated and anticompetitive prices for generic prescriptions, and Defendants illegally profited and continue to profit as a result.

---

[4] *See* https://www.courant.com/nation-world/hc-pol-generic-drug-cartel-20181210-story.html.
[5] Plaintiff States' Complaint, Case No. 3:19-cv-00710-MPS (E.D. Pa.).
[5] *See* https://www.courant.com/nation-world/hc-pol-generic-drug-cartel-20181210-story.html.

22.     Defendants' antitrust conspiracy implicated in this Complaint relates to overcharges for all generic drugs produced, manufactured or sold by Defendants that were purchased by Harris County during the relevant time period ("At Issue Drugs").[6]

23.     Since 2013, Harris County has spent over $26 million on the At Issue Drugs.[7]

24.     The relevant time period for this Complaint is 2010 until present.

25.     Harris County brings this action against Defendants on account of their past and ongoing violations of the Sherman Act, the Texas Free Enterprise and Anti-Trust Act, the antitrust statutes of various states where Harris County reimbursed for the purchase of the At Issue Drugs,[8] the Texas Deceptive Trade Practices Act and various Texas common laws, as set forth below.

26.     Harris County seeks damages, damage multipliers, attorney's fees, costs and injunctive relief on account of Defendants' unlawful scheme.

## II.     JURISDICTION AND VENUE

27.     Plaintiff Harris County brings this action under §1 of the Sherman Act, 15 U.S.C. § 1, and §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Defendants' antitrust conspiracy.

---

[6] *See infra* ¶¶ 40-225.

[7] *See* Appendix A hereto for a chart detailing Harris County's spends on the At Issue Drugs from 2013-2018. To note, 2013-2018 is only a subset of the damages period alleged in this Complaint.

[8] In this Complaint, Harris County asserts violations of the antitrust laws of Arizona, California, Connecticut, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

28.     This Court has jurisdiction over this action pursuant to 15 U.S.C. §§ 15 & 26, and under 28 U.S.C. §§ 1331 and 1337.

29.     In addition to pleading violations of federal law, Harris County also alleges violations of various states' antitrust laws and the Texas consumer protection and common laws for damages. All claims under federal and state law are based on a common nucleus of operative fact, and the entire action commenced by this Complaint constitutes a single case that would ordinarily be tried in one judicial proceeding. The Court has jurisdiction over the non-federal claims under 18 U.S.C. § 1367(a), as well as under principles of pendent jurisdiction. Pendent jurisdiction will avoid unnecessary duplication and multiplicity of actions and should be exercised in the interests of judicial economy, convenience and fairness.

30.     This Court may exercise personal jurisdiction over all of the Defendants because they either transact business in this District where this action was commenced, or they have engaged in anticompetitive and illegal conduct that has had an impact in this District. Specifically, Defendants market and sell generic pharmaceutical drugs in interstate and intrastate commerce to consumers nationwide and throughout Texas, including in Harris County. The acts complained of have, and will continue to have, substantial effects in the District.

31.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b)-(c). At all times relevant to the Complaint, Defendants resided, transacted business, were found, or had agents in this District, and a portion of the affected interstate trade and commerce described below has been carried out in this District.

### III.    PARTIES

#### A. Plaintiff

32.    Plaintiff, Harris County, is a body corporate and politic under the laws of the State of Texas.

33.    The Harris County government serves its almost five (5) million residents by providing vital services throughout the County. As a large government employer, Harris County provides health benefits to approximately 38,000 employees, retirees and their dependents ("Beneficiaries"). One of the benefits that Harris County offers its Beneficiaries is subsidizing their purchases of necessary prescription drugs, including generic drugs. Harris County also purchases generic drugs to administer directly to inmates in Harris County jails.

34.    Harris County is a self-funded health plan that subsidizes its Beneficiaries' prescription drug purchases. During the relevant time period, Harris County was (and is) contractually responsible to pay for generic drugs dispensed to its Beneficiaries and in the Harris County jail system.

35.    As detailed in **Appendix A**, since 2013, Harris County has spent over $26 million on the At Issue Drugs.

36.    Plaintiff Harris County has made payments and/or reimbursements for at least one At Issue Drug in all fifty (50) states in the United States, including Arizona, California, Connecticut, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin, thereby suffering injury to its business and property in these states.

9

37.     Any increase in spending can have a detrimental effect on Harris County's overall budget and, in turn, negatively impact its ability to provide necessary services to the community.

38.     Defendants' scheme to artificially inflate the price of generic drugs has had such an effect.

**B. Defendants**

39.     **Defendant Teva Pharmaceuticals USA, Inc. ("Teva")** is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in North Wales, Pennsylvania.

40.     Teva may be served through its registered agent: Corporate Creations Network Inc., 3411 Silverside Road, Tatnall Building Suite 104, New Castle, Delaware 19810.

41.     In Texas and nationally, Teva manufactures, promotes and distributes several At Issue Drugs paid for by Plaintiff Harris County:

| | |
|---|---|
| Abacavir-Lamivudine | Glyburide |
| Acetaminophen | Glyburide-Metformin |
| Acetazolamide | Griseofulvin |
| Adapalene | Hydralazine |
| Albuterol | Hydroxyurea |
| Amiloride | Hydroxyzine |
| Amiodarone | Ibuprofen |
| Amoxicillin | Irbesartan |
| Amphetamine/Dextroamphetamine aka Amphetamine Salts ("MAS") [Adderall] | Isoniazid |
| Atenolol | Ketoconazole |
| Azithromycin | Ketoprofen |
| Baclofen | Ketorolac |
| Benazepril | Labetalol |
| Budesonide | Lamivudine |
| Bumetanide | Leflunomide |

| | |
|---|---|
| Buspirone | Levalbuterol |
| Cabergoline | Loperamide |
| Capecitabine | Medroxyprogesterone |
| Carbamazepine [Epitol] | Methotrexate |
| Cefdinir | Methylphenidate |
| Cefprozil | Metoprolol Tartrate |
| Celecoxib | Metronidazole |
| Cephalexin | Moexipril |
| Cimetidine | Mupirocin |
| Ciprofloxacin | Nabumetone |
| Clarithromycin | Nadolol |
| Clemastine Fumarate | Naproxen |
| Clindamycin | Niacin ER |
| Clonidine | Nitrofurantoin |
| Cyproheptadine | Nortriptyline Hydrochloride |
| Desmopressin | Nystatin |
| Desogestrel/Ethinyl Estradiol [Kariva] | Ofloxacin |
| Dexmethylphenidate | Olopatadine |
| Dextroamphetamine | Omega-3-Acid Ethyl Esters |
| Diclofenac | Ondansetron |
| Dicloxacillin | Oxaprozin |
| Diflunisal | Oxybutynin |
| Diltiazem | Paricalcitol |
| Divalproex | Penicillin V Potassium |
| Doxazosin Mesylate | Pentoxifylline |
| Doxycycline | Piroxicam |
| Enalapril | Pravastatin Sodium |
| Entecavir | Prazosin |
| Estazolam | Prochlorperazine |
| Estradiol | Propranolol |
| Ethinyl Estradiol/Levonorgestrel [Portia and Jolessa] | Raloxifene HCL |
| Ethinyl Estradiol/Norethindrone Acetate [Mimvey] [Balziva] | Ranitidine |
| Ethosuximide | Tamoxifen |
| Etodolac | Temozolomide |
| Famotidine | Theophylline |
| Fenofibrate | Tobramycin |
| Fluconazole | Tolmetin Sodium |
| Fluocinonide | Tolterodine Tartrate |

11

| Fluoxetine | Topiramate |
| Flurbiprofen | Triamcinolone |
| Fluvastatin | Ursodiol |
| Fosinopril | Valsartan |
| Gabapentin | Verapamil |
| Glimepiride | Warfarin Sodium |
| Glipizide-Metformin | |

42.     Teva transacts business throughout the United States, including in Texas, targeting the Harris County market for its products, including Teva's At Issue Drugs.

43.     Between 2013-2018 alone (a subset of the total damages period at issue), Harris County spent over $3.65 million on Teva's At Issue Drugs.

44.     **Defendant Actavis Holdco US, Inc.,** is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Parsippany, New Jersey.

45.     Actavis Holdco US, Inc. may be served through its registered agent: Corporate Creations Network Inc., 3411 Silverside Road, Tatnall Building Suite 104, New Castle, Delaware 19810.

46.     In August 2016, Teva acquired the Actavis generics business of Allergan plc, including Actavis, Inc. Upon the acquisition, Actavis, Inc.—the acquired Allergan plc generics operating company (formerly known as Watson Pharmaceuticals)—was renamed Allergan Finance, LLC, which in turn assigned all of the assets and liabilities of the former Allergan plc generic business to the newly formed Actavis Holdco, including subsidiaries Actavis Pharma, Inc. and Actavis Elizabeth LLC (a research and development and manufacturing entity for Actavis generic operations), among others.

47.     Actavis Holdco is now a wholly-owned subsidiary of Teva.

48.     **Defendant Actavis Pharma, Inc.** is a Delaware corporation with its principal place of business in Parsippany, New Jersey. It is a wholly-owned subsidiary of Actavis Holdco and is a principal operating company in the U.S. for Teva's generic products acquired from Allergan plc.

49.     Actavis Pharma, Inc. may be served through its registered agent: CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

50.     Collectively, Defendants Actavis Holdco US, Inc. and Actavis Pharma, Inc. are referred to as "Actavis."

51.     In Texas and nationally, Actavis manufactures, promotes and distributes several At Issue Drugs paid for by Plaintiff Harris County:

| | |
|---|---|
| Acetaminophen | Glyburide-Metformin |
| Adapalene | Griseofulvin |
| Albuterol | Hydroxyzine |
| Allopurinol | Ibuprofen |
| Amantadine | Labetalol |
| Amphetamine/Dextroamphetamine aka Amphetamine Salts ("MAS") | Levalbuterol |
| Atenolol | Lidocaine |
| Betamethasone | Metformin |
| Budesonide | Methylphenidate |
| Buspirone | Methylprednisolone |
| Celecoxib | Metoprolol Tartrate |
| Ciclopirox | Metronidazole |
| Ciprofloxacin | Nabumetone |
| Clarithromycin | Naproxen |
| Clindamycin | Nitrofurantoin |
| Clobetasol | Nortriptyline Hydrochloride |
| Clonidine | Nystatin |
| Clotrimazole | Ondansetron |
| Cyproheptadine | Permethrin |
| Desmopressin | Pilocarpine |
| Desonide | Potassium Chloride |
| Dexmethylphenidate | Pravastatin Sodium |

| Dextroamphetamine | Prednisone |
| Diclofenac | Promethazine |
| Diltiazem | Propranolol |
| Doxycycline | Raloxifene HCL |
| Estazolam | Tamoxifen |
| Estradiol | Tizanidine |
| Ethinyl Estradiol/Norethindrone Acetate | Triamterene HCTZ |
| Fluocinolone | Ursodiol |
| Fluocinonide | Valsartan |
| Gabapentin | Vancomycin |
| Glipizide-Metformin | Verapamil |

52.     Actavis transacts business throughout the United States, including in Texas, targeting the Harris County market for its products, including Actavis' At Issue Drugs.

53.     Between 2013-2018 alone (a subset of the total damages period at issue), Harris County spent over $2.91 million on Actavis' At Issue Drugs.

54.     **Defendant Akorn, Inc.** (doing business as Akorn Pharmaceuticals, Inc.) is a corporation organized and existing under the laws of the state of Louisiana with its principal place of business in Lake Forest, Illinois.

55.      Akorn, Inc. may be served through its registered agent: Corporation Service Company, d/b/a CSC - Lawyers Inco., 211 E. 7th Street, Suite 620 Austin, Texas 78701.

56.     **Defendant VersaPharm Incorporated** is a corporation organized and existing under the laws of the state of Georgia with its principal place of business in Lake Forest, Illinois. VersaPharm Incorporated is a wholly-owned subsidiary of Akorn, Inc.

57.      VersaPharm Incorporated may be served through its registered agent: Corporate Service Company, 40 Technology Parkway South, #300, Norcross, Georgia 30092.

58.     **Defendant Hi-Tech Pharmacal Co., Inc.** is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in

Lake Forest, Illinois.  Hi-Tech Pharmacal Co., Inc. is a wholly-owned subsidiary of Akorn, Inc.

59.     Collectively, Defendants Akorn, Inc., VersaPharm Inc. and Hi-Tech Pharmacal Co., Inc. are referred to as "Akorn."

60.     In Texas and nationally, Akorn manufactures, promotes and distributes several At Issue Drugs paid for by Plaintiff Harris County:

| | |
|---|---|
| Acetaminophen | Ketorolac |
| Albuterol | Lidocaine |
| Amantadine | Nystatin |
| Atropine | Ofloxacin |
| Ciclopirox | Olopatadine |
| Cimetidine | Phenylephrine |
| Ciprofloxacin | Pilocarpine |
| Clindamycin | Promethazine |
| Clobetasol | Ranitidine |
| Diclofenac | Timolol |
| Ethosuximide | Tobramycin |
| Gabapentin | Triamcinolone |
| Gentamicin [Gentak] | Tropicamide |
| Hydroxyzine | Vancomycin |
| Isoniazid | |

61.     Akorn transacts business throughout the United States, including in Texas, targeting the Harris County market for its products, including Akorn's At Issue Drugs.

62.     Between 2013-2018 alone (a subset of the total damages period at issue), Harris County spent over $549,000 on Akorn's At Issue Drugs.

63.     **Defendant Amneal Pharmaceuticals, Inc.** is a corporation organized and existing under the laws of the state of Delaware, with a principal place of business in Bridgewater, New Jersey.

64.     Amneal Pharmaceuticals, Inc. may be served through its registered agent: Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

65.     In October 2017, Amneal Pharmaceuticals LLC announced their intent to merge with Impax Pharmaceuticals, Inc. ("Impax") creating the fifth largest United States generics company.

66.     **Defendant Amneal Pharmaceuticals LLC** is a limited liability company organized and existing under the laws of the state of Delaware, with a principal place of business in Bridgewater, New Jersey.  Amneal Pharmaceuticals LLC is an indirect wholly-owned subsidiary of Amneal Pharmaceuticals, Inc.

67.     Amneal Pharmaceuticals LLC may be served through its registered agent: The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

68.     **Defendant Amneal Pharmaceuticals of New York, LLC** is a limited liability company organized and existing under the laws of the state of Delaware, with a principal place of business in Bridgewater, New Jersey. Amneal Pharmaceuticals LLC is an indirect wholly-owned subsidiary of Amneal Pharmaceuticals, Inc.

69.     Amneal Pharmaceuticals of New York, LLC may be served through its registered agent: The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

70.     Collectively, Impax, Amneal Pharmaceuticals, Inc., Amneal Pharmaceuticals LLC and Amneal Pharmaceuticals of New York LLC are referred to as "Amneal."

71.     In Texas and nationally, Amneal manufactures, promotes and distributes several At Issue Drugs paid for by Plaintiff Harris County:

| | |
|---|---|
| Acetaminophen | Ibuprofen |
| Amphetamine/Dextroamphetamine aka Amphetamine Salts ("MAS") | Levothyroxine |
| Benazepril | Lidocaine |
| Betamethasone | Methylphenidate |
| Bethanechol | Metronidazole |
| Budesonide | Nabumetone |
| Bumetanide | Nadolol |
| Buspirone | Naproxen |
| Capecitabine | Niacin ER |
| Clindamycin | Nitrofurantoin |
| Cyproheptadine | Omega-3-Acid Ethyl Esters |
| Desmopressin | Ondansetron |
| Dexmethylphenidate | Oxaprozin |
| Diclofenac | Oxybutynin |
| Digoxin | Phenytoin Sodium |
| Divalproex | Pilocarpine |
| Doxycycline | Potassium Chloride |
| Epinephrine | Promethazine |
| Estradiol | Propranolol |
| Ethinyl Estradiol/Norethindrone Acetate | Raloxifene HCL |
| Etodolac | Ranitidine |
| Fenofibrate | Temozolomide |
| Fluocinolone | Tobramycin |
| Gabapentin | Ursodiol |
| Griseofulvin | Valsartan |
| Hydroxyzine | Warfarin Sodium |

72.     Amneal transacts business throughout the United States, including in Texas, targeting the Harris County market for its products, including Amneal's At Issue Drugs.

73.     Between 2013-2018 alone (a subset of the total damages period at issue), Harris County spent over $3.86 million on Amneal's At Issue Drugs.

74.     **Defendant Apotex Corp. ("Apotex")** is a corporation organized and existing under the laws of the State of Delaware. Its principal place of business is in Weston, Florida.

75.     Apotex may be served through its registered agent: Corporate Creations Network Inc., 3411 Silverside Road, Tatnall Building Suite 104, New Castle, Delaware 19810.

76.     In Texas and nationally, Apotex manufactures, promotes and distributes several At Issue Drugs paid for by Plaintiff Harris County:

| | |
|---|---|
| Abacavir-Lamivudine | Fosinopril |
| Acetaminophen | Gabapentin |
| Azithromycin | Irbesartan |
| Balsalazide Disodium | Ketorolac |
| Benazepril | Lamivudine |
| Budesonide | Leflunomide |
| Butorphanol | Ofloxacin |
| Cabergoline | Olopatadine |
| Carbamazepine | Omega-3-Acid Ethyl Esters |
| Ceftriaxone | Ondansetron |
| Celecoxib | Pentoxifylline |
| Ciprofloxacin | Potassium Chloride |
| Desmopressin | Pravastatin Sodium |
| Diclofenac | Ranitidine |
| Diltiazem | Timolol |
| Doxazosin Mesylate | Tizanidine |
| Drospirenone/Ethinyl Estradiol | Tolterodine Tartrate |
| Enalapril | Triamterene HCTZ |
| Etodolac | Valsartan |
| Fenofibrate | Verapamil |

77.     Apotex transacts business throughout the United States, including in Texas, targeting the Harris County market for its products, including Apotex's At Issue Drugs.

78.     Between 2013-2018 alone (a subset of the total damages period at issue), Harris County spent over $416,000 on Apotex's At Issue Drugs.

79.     **Defendant Aurobindo Pharma U.S.A., Inc. ("Aurobindo")** is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in Dayton, New Jersey.

80.     Aurobindo may be served through its registered agent: Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

81.     In Texas and nationally, Aurobindo manufactures, promotes and distributes several At Issue Drugs paid for by Plaintiff Harris County:

| | |
|---|---|
| Abacavir-Lamivudine | Fluoxetine |
| Amiodarone | Fosinopril |
| Amoxicillin | Gabapentin |
| Atenolol | Glyburide |
| Azithromycin | Glyburide-Metformin |
| Benazepril | Irbesartan |
| Cefdinir | Lamivudine |
| Cefprozil | Metoprolol Tartrate |
| Cefuroxime Axetil | Metronidazole |
| Celecoxib | Naproxen |
| Cephalexin | Niacin ER |
| Ciprofloxacin | Olopatadine |
| Clarithromycin | Ondansetron |
| Clindamycin | Paricalcitol |
| Divalproex | Penicillin V Potassium |
| Entecavir | Phenytoin Sodium |
| Famotidine | Ranitidine |
| Fenofibrate | Valsartan |

82.     Aurobindo transacts business throughout the United States, including in Texas, targeting the Harris County market for its products, including Aurobindo's At Issue Drugs.

83.     Between 2013-2018 alone (a subset of the total damages period at issue), Harris County spent over $517,000 on Aurobindo's At Issue Drugs.

84.     **Defendant Breckenridge Pharmaceutical, Inc. ("Breckenridge")** is a corporation organized and existing under the laws of the states of Florida with its principal place of business in Berlin, Connecticut.

85.     Breckenridge may be served through its registered agent: Todd Ruonavaara, 15 Massirio Drive, Suite 201, Berlin, Connecticut 06037.

86.     In Texas and nationally, Breckenridge manufactures, promotes and distributes several At Issue Drugs paid for by Plaintiff Harris County:

| Acetaminophen | Methylphenidate |
|---|---|
| Cyproheptadine | Methylprednisolone |
| Estradiol | Propranolol |
| Gabapentin | |

87.     Breckenridge transacts business throughout the United States, including in Texas, targeting the Harris County market for its products, including Breckenridge's At Issue Drugs.

88.     Between 2013-2018 alone (a subset of the total damages period at issue), Harris County spent over $118,000 on Breckenridge's At Issue Drugs.

89.     **Defendant Camber Pharmaceuticals, Inc. ("Camber")** is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in Piscataway, New Jersey.  Camber is a subsidiary of Hetero Drugs, an Indian company based in Hyderabad, India.

90.     Camber may be served through its registered address: 1031 Centennial Avenue, Piscataway, New Jersey 08854.

91.     In Texas and nationally, Camber manufactures, promotes and distributes several At Issue Drugs paid for by Plaintiff Harris County:

| | |
|---|---|
| Abacavir-Lamivudine | Irbesartan |
| Acetaminophen | Lamivudine |
| Entecavir | Methylphenidate |
| Fenofibrate | Naproxen |
| Fluoxetine | Raloxifene HCL |
| Fosinopril | Topiramate |
| Gabapentin | Valsartan |
| Hydralazine | Warfarin Sodium |

92.     Camber transacts business throughout the United States, including in Texas, targeting the Harris County market for its products, including Camber's At Issue Drugs.

93.     Between 2013-2018 alone (a subset of the total damages period at issue), Harris County spent over $193,000 on Camber's At Issue Drugs.

94.     **Defendant Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's")** is a corporation organized and existing under the laws of the state of New Jersey with its principal place of business in Princeton, New Jersey.  Dr. Reddy's is an indirect, wholly-owned subsidiary of Dr. Reddy's Laboratories Ltd., a public Indian company based in Hyderabad, India.

95.     Dr. Reddy's may be served through its registered agent: Mack Kikuchi, 107 College Road East, Princeton, New Jersey, 08540.

96.     In Texas and nationally, Dr. Reddy's manufactures, promotes and distributes several At Issue Drugs paid for by Plaintiff Harris County:

| | |
|---|---|
| Allopurinol | Levalbuterol |
| Amoxicillin | Meprobamate |
| Ciprofloxacin | Naproxen |
| Divalproex | Ondansetron |

| | |
|---|---|
| Famotidine | Oxaprozin |
| Fenofibrate | Pravastatin Sodium |
| Fluconazole | Raloxifene HCL |
| Fluoxetine | Ranitidine |
| Glimepiride | Tizanidine |
| Glycopyrrolate | Zoledronic Acid |

97.     Dr. Reddy's transacts business throughout the United States, including in Texas, targeting the Harris County market for its products, including Dr. Reddy's At Issue Drugs.

98.     Between 2013-2018 alone (a subset of the total damages period at issue), Harris County spent over $188,000 on Dr. Reddy's At Issue Drugs.

99.     **Defendant Glenmark Pharmaceuticals Inc., USA ("Glenmark")** is a corporation organized and existing under the laws of the state of Delaware with a principal place of business in Mahwah, New Jersey.

100.     Glenmark may be served through its registered agent: Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

101.     In Texas and nationally, Glenmark manufactures, promotes and distributes several At Issue Drugs paid for by Plaintiff Harris County:

| | |
|---|---|
| Adapalene | Hydroxyzine |
| Alclometasone Dipropionate | Lidocaine |
| Betamethasone | Moexipril |
| Ciclopirox | Mupirocin |
| Clobetasol | Nabumetone |
| Clotrimazole | Naproxen |
| Desmopressin | Norethindrone Acetate |
| Desonide | Nystatin |
| Diclofenac | Ondansetron |
| Drospirenone/Ethinyl Estradiol | Potassium Chloride |
| Estradiol | Pravastatin Sodium |
| Ethinyl Estradiol/Levonorgestrel | Raloxifene HCL |

| | |
|---|---|
| Ethinyl Estradiol/Norethindrone Acetate | Ranitidine |
| Fenofibrate | Theophylline |
| Fluconazole | Topiramate |
| Fluocinonide | Triamcinolone |
| Fosinopril | Ursodiol |
| Gabapentin | Verapamil |
| Hydralazine | |

102.    Glenmark transacts business throughout the United States, including in Texas, targeting the Harris County market for its products, including Glenmark's At Issue Drugs.

103.    Between 2013-2018 alone (a subset of the total damages period at issue), Harris County spent over $1.12 million on Glenmark's At Issue Drugs.

104.    **Defendant Heritage Pharmaceuticals Inc.** (now doing business as Avet Pharmaceuticals Inc.) ("Heritage") is a Delaware corporation with its principal place of business in Eatontown, New Jersey. Heritage is a wholly-owned subsidiary of Emcure Pharmaceuticals Limited, an Indian company with its principal place of business in Pune, India.

105.    Heritage may be served through its registered agent: Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

106.    In Texas and nationally, Heritage manufactures, promotes and distributes several At Issue Drugs paid for by Plaintiff Harris County:

| | |
|---|---|
| Acetazolamide | Hydroxyzine |
| Amantadine | Leflunomide |
| Doxycycline | Metronidazole |
| Ethosuximide | Nystatin |
| Fosinopril | Propranolol |
| Glipizide-Metformin | Ranitidine |
| Glyburide | Theophylline |
| Glyburide-Metformin | Verapamil |
| Glycopyrrolate | Zoledronic Acid |

| Hydralazine | |

107.    Heritage transacts business throughout the United States, including in Texas, targeting the Harris County market for its products, including Heritage's At Issue Drugs.

108.    Between 2013-2018 alone (a subset of the total damages period at issue), Harris County spent over $159,000 on Heritage's At Issue Drugs.

109.    **Defendant Hikma Pharmaceuticals USA, Inc.** (formerly known as West-Ward Pharmaceutical Corp.) ("Hikma") is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in Eatontown, New Jersey.  Hikma is a subsidiary of Hikma Pharmaceuticals plc, a public liability company based in London, England.

110.    Hikma may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

111.    In Texas and nationally, Hikma manufactures, promotes and distributes several At Issue Drugs paid for by Plaintiff Harris County:

| Acetaminophen | Fluconazole |
| --- | --- |
| Amoxicillin | Glyburide |
| Atropine | Irbesartan |
| Balsalazide Disodium | Isoniazid |
| Butorphanol | Isosorbide Dinitrate |
| Capecitabine | Lidocaine |
| Captopril | Methadone HCL |
| Ceftriaxone | Methotrexate |
| Cephalexin | Midazolam HCL |
| Ciprofloxacin | Naproxen |
| Clarithromycin | Ondansetron |
| Clotrimazole | Pilocarpine |
| Dexamethasone | Prednisone |
| Digoxin | Propranolol |

| Doxycycline | |
|---|---|

112.   Hikma transacts business throughout the United States, including in Texas, targeting the Harris County market for its products, including Hikma's At Issue Drugs.

113.   Between 2013-2018 alone (a subset of the total damages period at issue), Harris County spent over $241,000 on Hikma's At Issue Drugs.

114.   **Defendant   Kavod   Pharmaceuticals   LLC**   (f/k/a   Rising Pharmaceuticals, LLC and Rising Pharmaceuticals, Inc. and d/b/a Rising Pharmaceuticals) **("Kavod")** is a limited liability company organized and existing under the laws of the state of Delaware with its principal place of business in East Brunswick, New Jersey.

115.   Kavod may be served through its registered agent: United Corporate Services, Inc., 874 Walker Road, Suite C, Dover, Delaware 19904.

116.   **Defendant Kavod Health LLC** (f/k/a Rising Health, LLC) **("Kavod Health")** is a limited liability company organized and existing under the laws of the state of Delaware with its principal place of business in East Brunswick, New Jersey.

117.   Kavod Health may be served through its registered agent: United Corporate Services, Inc., 874 Walker Road, Suite C, Dover, Delaware 19904.

118.   Kavod and Kavod Health were once subsidiaries of Aceto Corporation, a New York corporation headquartered in Port Washington, New York. When Aceto Corporation filed for Chapter 11 bankruptcy, Kavod and Kavod Health were sold to Shore Suven Pharma Inc. (n/k/a Rising Pharma Holding, Inc.) for $15 million.

119.   Prior to this, on December 21, 2016, Aceto completed the acquisition of certain generic products and related assets of entities that were formerly known as Citron Pharma, LLC.

120.   Collectively, Kavod and Kavod Health are referred to as "Rising."

121.   In Texas and nationally, Rising manufactures, promotes and distributes several At Issue Drugs paid for by Plaintiff Harris County:

| | |
|---|---|
| Amiloride | Fosinopril |
| Amoxicillin | Glyburide |
| Atenolol | Glyburide-Metformin |
| Benazepril | Glycopyrrolate |
| Bethanechol | Griseofulvin |
| Budesonide | Hydroxyzine |
| Cefdinir | Metoprolol Tartrate |
| Cefprozil | Metronidazole |
| Cefuroxime Axetil | Ofloxacin |
| Clarithromycin | Olopatadine |
| Clindamycin | Ondansetron |
| Cyproheptadine | Oxybutynin |
| Dexamethasone | Penicillin V Potassium |
| Diflunisal | Pravastatin Sodium |
| Divalproex | Timolol |
| Doxycycline | Triamcinolone |
| Fluconazole | Warfarin Sodium |
| Fluocinolone | |

122.   Rising transacts business throughout the United States, including in Texas, targeting the Harris County market for its products, including Rising's At Issue Drugs.

123.   Between 2013-2018 alone (a subset of the total damages period at issue), Harris County spent over $124,000 on Rising's At Issue Drugs.

124.   In December of 2019, Rising agreed to pay over $3 million to resolve criminal and civil charges related to a price fixing scheme related to the drug Benazepril HCTZ.

125.   **Defendant Lannett Company, Inc. ("Lannett")** is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in Philadelphia, Pennsylvania.

126.    Lannett may be served through its registered agent: Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

127.    In Texas and nationally, Lannett manufactures, promotes and distributes several At Issue Drugs paid for by Plaintiff Harris County:

| | |
|---|---|
| Acetazolamide | Hydroxyzine |
| Amantadine | Isoniazid |
| Atropine | Levothyroxine |
| Baclofen | Methylphenidate |
| Bethanechol | Niacin ER |
| Clarithromycin | Ondansetron |
| Clindamycin | Oxybutynin |
| Diclofenac | Pilocarpine |
| Digoxin | Ranitidine |
| Doxycycline | Triamterene HCTZ |
| Fluoxetine | Ursodiol |
| Haloperidol | Verapamil |

128.    Lannett transacts business throughout the United States, including in Texas, targeting the Harris County market for its products, including Lannett's At Issue Drugs.

129.    Between 2013-2018 alone (a subset of the total damages period at issue), Harris County spent over $545,000 on Lannett's At Issue Drugs.

130.    **Defendant Lupin Pharmaceuticals, Inc. ("Lupin")** is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in Baltimore, Maryland. Lupin is a wholly-owned subsidiary of Lupin Limited, an Indian company with its principal place of business in Mumbai, India.

131.    Lupin may be served through its registered agent: CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

132.    In Texas and nationally, Lupin manufactures, promotes and distributes several At Issue Drugs paid for by Plaintiff Harris County:

27

| | |
|---|---|
| Abacavir-Lamivudine | Ethinyl Estradiol/Norethindrone Acetate |
| Azithromycin | Famotidine |
| Cefdinir | Fenofibrate |
| Cefprozil | Irbesartan |
| Ceftriaxone | Lamivudine |
| Cefuroxime Axetil | Metformin |
| Celecoxib | Methylergonovine |
| Cephalexin | Nabumetone |
| Ciprofloxacin | Niacin ER |
| Clobetasol | Norethindrone Acetate |
| Clonidine | Potassium Chloride |
| Divalproex | Pravastatin Sodium |
| Doxycycline | Tobramycin |
| Drospirenone/Ethinyl Estradiol | Valsartan |
| Ethinyl Estradiol/Levonorgestrel | Vancomycin |

133.   Lupin transacts business throughout the United States, including in Texas, targeting the Harris County market for its products, including Lupin's At Issue Drugs.

134.   Between 2013-2018 alone (a subset of the total damages period at issue), Harris County spent over $2.84 million on Lupin's At Issue Drugs.

135.   **Defendant Mayne Pharma, Inc.** ("Mayne") is a North Carolina corporation with its principal place of business in Raleigh, North Carolina.  Mayne is a wholly-owned subsidiary of Mayne Pharma Group Limited, an Australian company with its principal place of business in Salisbury, Australia.  In 2012, Mayne acquired Metrics, Inc. and its division of Midlothian Laboratories and operated Midlothian since that time.

136.   Mayne may be served through its registered agent: CT Corporation System, 160 Mine Lake Ct., Ste 200, Raleigh, NC 27615-6417.

137.   In Texas and nationally, Mayne manufactures, promotes and distributes several At Issue Drugs paid for by Plaintiff Harris County:

| | |
|---|---|
| Acetaminophen | Fluocinonide |
| Amiodarone | Methylphenidate |
| Budesonide | Nortriptyline Hydrochloride |
| Clarithromycin | Nystatin |

| Clonidine | Potassium Chloride |
|---|---|
| Dextroamphetamine | Tamoxifen |
| Doxycycline | Temozolomide |
| Estradiol | |

138.    Mayne transacts business throughout the United States, including in Texas, targeting the Harris County market for its products, including Mayne's At Issue Drugs.

139.    Between 2013-2018 alone (a subset of the total damages period at issue), Harris County spent over $197,000 on Mayne's At Issue Drugs.

140.    **Defendant Mylan Inc.** is a corporation organized and existing under the laws of the state of Pennsylvania with its principal place of business in Canonsburg, Pennsylvania.  Mylan Inc. is an indirect, wholly-owned subsidiary of Mylan N.V., a Dutch company with its principal place of business in Hatfield, England.

141.    Mylan Inc. may be served at its registered address: 201 Woolston Drive, Suite 2-D, Morrisville, Pennsylvania 19067.

142.    **Defendant Mylan Pharmaceuticals Inc.** is a corporation organized and existing under the laws of the state of West Virginia with its principal place of business in Canonsburg, Pennsylvania. Mylan Pharmaceuticals Inc. is a wholly owned subsidiary of Defendant Mylan Inc.

143.    Mylan Pharmaceuticals Inc. may be served through its registered agent: CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

144.    **Defendant Mylan Institutional Inc.** is a corporation organized and existing under the laws of the state of Illinois with its principal place of business in Canonsburg, Pennsylvania. Mylan Institutional Inc. is a wholly owned subsidiary of Defendant Mylan Inc.

145.    Mylan Institutional Inc. may be served through its registered agent: CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

146.    **Defendant Mylan Specialty L.P.** is a limited partnership organized and existing under the laws of the state of Delaware with its principal place of business in Canonsburg, Pennsylvania. Mylan Specialty L.P. is a wholly owned subsidiary of Defendant Mylan Inc.

147.    Mylan Specialty L.P. may be served through its registered agent: CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

148.    Collectively, Defendants Mylan Inc., Mylan Pharmaceuticals Inc., Mylan Intuitional Inc. and Mylan Specialty L.P. are referred to as "Mylan."

149.    In Texas and nationally, Mylan manufactures, promotes and distributes several At Issue Drugs paid for by Plaintiff Harris County:

| | |
|---|---|
| Abacavir-Lamivudine | Glimepiride |
| Acetaminophen | Glipizide-Metformin |
| Albuterol | Glyburide |
| Allopurinol | Haloperidol |
| Amantadine | Hydroxyzine |
| Amiloride | Irbesartan |
| Amiodarone | Ketoconazole |
| Amitriptyline | Ketoprofen |
| Amoxicillin | Ketorolac |
| Amphetamine/Dextroamphetamine aka Amphetamine Salts ("MAS") | Lamivudine |
| Atenolol | Levalbuterol |
| Atropine | Levothyroxine |
| Benazepril | Lidocaine |
| Betamethasone | Loperamide |
| Bromocriptine | Metformin |
| Budesonide | Methotrexate |
| Buspirone | Methylphenidate |
| Butorphanol | Metoprolol Tartrate |
| Cabergoline | Metronidazole |
| Capecitabine | Nabumetone |
| Captopril | Nadolol |

| | |
|---|---|
| Carbamazepine | Naproxen |
| Celecoxib | Nitrofurantoin |
| Cimetidine | Norethindrone Acetate |
| Ciprofloxacin | Olopatadine |
| Clarithromycin | Ondansetron |
| Clindamycin | Oxybutynin |
| Clobetasol | Perphenazine |
| Clomipramine | Phenytoin Sodium |
| Clonidine | Piroxicam |
| Desogestrel/Ethinyl Estradiol | Potassium Chloride |
| Dexmethylphenidate | Pravastatin Sodium |
| Diclofenac | Prazosin |
| Diltiazem | Prochlorperazine |
| Divalproex | Propranolol |
| Doxazosin Mesylate | Sodium Chloride |
| Doxycycline | Spironolactone HCTZ |
| Drospirenone/Ethinyl Estradiol | Tamoxifen |
| Enalapril | Temozolomide |
| Epinephrine | Timolol |
| Estradiol | Tizanidine |
| Ethinyl Estradiol/Levonorgestrel | Tolmetin Sodium |
| Ethinyl Estradiol/Norethindrone Acetate | Tolterodine Tartrate |
| Famotidine | Triamterene HCTZ |
| Fenofibrate | Trifluoperazine |
| Fluoxetine | Ursodiol |
| Flurbiprofen | Valsartan |
| Fluvastatin | Verapamil |

150.    Mylan transacts business throughout the United States, including in Texas, targeting the Harris County market for its products, including Mylan's At Issue Drugs.

151.    Between 2013-2018 alone (a subset of the total damages period at issue), Harris County spent over $2.48 million on Mylan's At Issue Drugs.

152.    **Defendant Endo International plc** is an Irish company with global headquarters in Dublin, Ireland, and U.S. headquarters in Malvern, Pennsylvania. Endo is the parent company of Defendants Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. In August 2014, Endo's subsidiary, Generics International (US), Inc. d/b/a Qualitest Pharmaceuticals, acquired co-conspirator, DAVA Pharmaceuticals, Inc.

("DAVA"). In September 2015, Endo completed the acquisition of Par Pharmaceuticals Holdings, Inc. and its subsidiaries, including Defendants Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc., and merged Par's business with Endo's subsidiary co-conspirator Qualitest Pharmaceuticals, Inc. ("Qualitest"), naming the segment Par Pharmaceutical, Inc. Par is thus the successor in interest to both DAVA and Qualitest.

153.    **Defendant Endo Health Solutions, Inc.** is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in Malvern, Pennsylvania.

154.    **Defendant Endo Pharmaceuticals, Inc.** is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in Malvern, Pennsylvania. Endo Pharmaceuticals, Inc. is a wholly owned subsidiary of Endo Health Solutions, Inc., and both are incorporated in the state of Delaware. Both of their principal places of business are in Malvern, Pennsylvania. Both may also be served through their registered agent.

155.    Collectively, Endo International plc, Endo Health Solutions, Inc. and Endo Pharmaceuticals, Inc. are referred to as "Endo."

156.    Endo may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

157.    **Defendant Par Pharmaceutical Companies, Inc.** is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in Chestnut Ridge, New York.  Par Pharmaceutical Companies, Inc. is an indirect, wholly-owned subsidiary of Endo International plc, an Irish company with its principal place of business in Dublin, Ireland.

158.    Par Pharmaceutical Companies, Inc. may be served through its registered agent: Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

159.    **Defendant Par Pharmaceutical, Inc.** is a corporation organized and existing under the laws of the state of New York with its principal place of business at One Ram Ridge Road, Chestnut Ridge, New York. Par Pharmaceutical, Inc. is an indirect, wholly-owned subsidiary of Endo International plc, an Irish company with its principal place of business in Dublin, Ireland.

160.    Par Pharmaceutical, Inc. may be served through its registered agent: CT Corporation, 28 Liberty Street, New York, New York 10005.

161.    Collectively, Endo, Par Pharmaceutical Companies, Inc. and Par Pharmaceutical, Inc. are referred to as "Par."

162.    In Texas and nationally, Par manufactures, promotes and distributes several At Issue Drugs paid for by Plaintiff Harris County:

| | |
|---|---|
| Acetaminophen | Griseofulvin |
| Albuterol | Hydralazine |
| Allopurinol | Hydroxyurea |
| Amiloride | Hydroxyzine |
| Amitriptyline | Ibuprofen |
| Baclofen | Irbesartan |
| Budesonide | Isosorbide Dinitrate |
| Buspirone | Labetalol |
| Cabergoline | Lidocaine |
| Cholestyramine | Methylphenidate |
| Ciprofloxacin | Methylprednisolone |
| Clindamycin | Nystatin |
| Clonidine | Omega-3-Acid Ethyl Esters |
| Dexamethasone | Oxybutynin |
| Dexmethylphenidate | Perphenazine |
| Diclofenac | Potassium Chloride |
| Digoxin | Prednisone |
| Diltiazem | Promethazine |

| Divalproex | Propranolol |
| Doxycycline | Ranitidine |
| Entecavir | Tizanidine |
| Fluoxetine | Triamcinolone |
| Glimepiride | Ursodiol |
| Glycopyrrolate | Valsartan |

163.   Par transacts business throughout the United States, including in Texas, targeting the Harris County market for its products, including Par's At Issue Drugs.

164.   Between 2013-2018 alone (a subset of the total damages period at issue), Harris County spent over $976,000 on Par's At Issue Drugs.

165.   **Defendant Perrigo New York, Inc. ("Perrigo")** is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in Allegan, Michigan. Perrigo is a subsidiary of Perrigo Company plc, an Irish public liability company based in Dublin, Ireland.

166.   Perrigo may be served through its registered agent: The Prentice-Hall Corporation System, Inc., 251 Little Falls Drive, Wilmington, Delaware 19808.

167.   In Texas and nationally, Perrigo manufactures, promotes and distributes several At Issue Drugs paid for by Plaintiff Harris County:

| Adapalene | Griseofulvin |
| Betamethasone | Halobetasol Proprionate |
| Ciclopirox | Hydrocortisone Valerate |
| Clindamycin | Ketoconazole |
| Clobetasol | Mupirocin |
| Desonide | Nystatin |
| Econazole | Olopatadine |
| Ethinyl Estradiol/Levonorgestrel | Permethrin |
| Fenofibrate | Prednisone |
| Fluocinolone | Promethazine |
| Fluocinonide | Scopolamine |
| Gentamicin | Triamcinolone |
| Glimepiride | |

168.     Perrigo transacts business throughout the United States, including in Texas, targeting the Harris County market for its products, including Perrigo's At Issue Drugs.

169.     Between 2013-2018 alone (a subset of the total damages period at issue), Harris County spent over $993,000 on Perrigo's At Issue Drugs.

170.     **Defendant Pfizer, Inc.** is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in New York, New York.

171.     Pfizer may be served through its registered agent: CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

172.     **Defendant Greenstone LLC** is a limited liability company organized and existing under the laws of Delaware, with its principal place of business in Peapack, New Jersey.

173.     Greenstone LLC is a wholly-owned subsidiary of Defendant Pfizer, Inc. and has at all relevant times operated as the generic drug division of Pfizer, Inc. Greenstone LLC operates out of Pfizer Inc.'s Peapack, New Jersey campus, and a majority of Greenstone LLC's employees are also employees of Pfizer Inc.'s Essential Health Division, including Greenstone LLC's President. Greenstone LLC's employees also use Pfizer, Inc. for financial analysis, human resources and employee benefit purposes, making the two companies essentially indistinguishable. At all times relevant to the Complaint, Greenstone LLC has—under the direction and control of Pfizer, Inc.—marketed and sold generic pharmaceuticals in Harris County and throughout the United States.

174.     Greenstone LLC may be served through its registered agent: CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

175.     Unless addressed individually, Pfizer, Inc. and Greenstone LLC are referred to as "Pfizer."

35

176.    In Texas and nationally, Pfizer manufactures, promotes and distributes several At Issue Drugs paid for by Plaintiff Harris County:

| | |
|---|---|
| Amoxicillin | Glyburide |
| Atropine | Glyburide-Metformin |
| Azithromycin | Medroxyprogesterone |
| Cabergoline | Methylprednisolone |
| Cefdinir | Metoprolol Tartrate |
| Celecoxib | Nadolol |
| Clindamycin | Oxaprozin |
| Diclofenac | Penicillin V Potassium |
| Doxazosin Mesylate | Piroxicam |
| Doxycycline | Prazosin |
| Ethosuximide | Silvadene |
| Fluconazole | Spironolactone HCTZ |
| Fosinopril | Tolterodine Tartrate |
| Gabapentin | |

177.    Pfizer transacts business throughout the United States, including in Texas, targeting the Harris County market for its products, including Pfizer's At Issue Drugs.

178.    Harris County spent over $257,000 on Pfizer's At Issue Drugs.

179.    **Defendant Sandoz Inc.** is a corporation organized and existing under the laws of the state of Colorado, with its principal place of business in Princeton, New Jersey. Sandoz Inc. is a subsidiary of Novartis AG, a global pharmaceutical company based in Basel, Switzerland.

180.    Sandoz Inc. may be served through its registered agent: RX America, 5450 Riverside Drive, Fort Worth, Texas 76137.

181.    **Defendant Fougera Pharmaceuticals Inc.** is a corporation organized and existing under the laws of the state of New York, with its principal place of business in Princeton, New Jersey. Fougera Pharmaceuticals Inc. is a subsidiary of Defendant Sandoz Inc.

182.    Fougera Pharmaceuticals Inc. may be served through its registered agent: Corporation Service Company, 80 State Street, Albany, New York 12207.

183.    Unless addressed individually, Sandoz Inc. and Fougera Pharmaceuticals Inc. are referred to as "Sandoz."

184.    In Texas and nationally, Sandoz manufactures, promotes and distributes several At Issue Drugs paid for by Plaintiff Harris County:

| | |
|---|---|
| Adapalene | Fluvastatin |
| Albuterol | Gentamicin |
| Alclometasone Dipropionate | Griseofulvin |
| Amantadine | Halobetasol Proprionate |
| Amitriptyline | Haloperidol |
| Amoxicillin | Isosorbide Dinitrate |
| Amphetamine/Dextroamphetamine aka Amphetamine Salts ("MAS") | Ketoconazole |
| Atenolol | Ketorolac |
| Azithromycin | Levothyroxine |
| Betamethasone | Lidocaine |
| Bromocriptine | Methylphenidate |
| Budesonide | Methylprednisolone |
| Captopril | Metronidazole |
| Carbamazepine | Mupirocin |
| Cefdinir | Nadolol |
| Cefprozil | Naproxen |
| Ceftriaxone | Nystatin |
| Chlorpromazine | Ofloxacin |
| Ciclopirox | Olopatadine |
| Ciprofloxacin | Ondansetron |
| Clarithromycin | Penicillin V Potassium |
| Clemastine Fumarate | Perphenazine |
| Clindamycin | Pilocarpine |
| Clobetasol | Potassium Chloride |
| Clotrimazole | Pravastatin Sodium |
| Desonide | Prednisone |
| Dexamethasone | Prochlorperazine |
| Dexmethylphenidate | Promethazine |
| Diclofenac | Ranitidine |

| Dicloxacillin | Temozolomide |
| Diltiazem | Timolol |
| Drospirenone/Ethinyl Estradiol | Tobramycin |
| Econazole | Triamcinolone |
| Estradiol | Triamterene HCTZ |
| Fluocinolone | Tropicamide |
| Fluocinonide | Valsartan |
| Fluoxetine | |

185.    Sandoz transacts business throughout the United States, including in Texas, targeting the Harris County market for its products, including Sandoz's At Issue Drugs.

186.    Between 2013-2018 alone (a subset of the total damages period at issue), Harris County spent over $2 million on Sandoz's At Issue Drugs.

187.    **Defendant Sun Pharmaceutical Industries, Inc. ("Sun")** is a corporation organized and existing under the laws of the state of Michigan, with its principal place of business in Cranbury, New Jersey. Until February 2011, Sun was known as Caraco Pharmaceutical Laboratories, Ltd. Since 2011, Sun has been a wholly-owned subsidiary of Sun Pharmaceutical Industries Ltd., an Indian company with its principal place of business in Mumbai, India, which also owns, and owned throughout the relevant period, a large majority stake of Defendants Taro Pharmaceutical Industries Ltd. and Taro Pharmaceuticals USA, Inc. In late 2012, Sun acquired URL Pharma, Inc. ("URL") and its subsidiary, Mutual Pharmaceutical Company, Inc. ("Mutual"), both of which have their principal place of business in Philadelphia, Pennsylvania. Sun also does business under the name Caraco Pharmaceutical Laboratories ("Caraco"), a company Sun acquired in 1997.

188.    Unless addressed individually, Sun, URL, Mutual and Caraco are collectively referred to herein as "Sun."

38

189.    Sun may be served through its registered agent: CT Corporation System, 701 Brazos Street, Suite 360 Austin, Texas 78701.

190.    In Texas and nationally, Sun manufactures, promotes and distributes several At Issue Drugs paid for by Plaintiff Harris County:

| | |
|---|---|
| Acetaminophen | Isosorbide Dinitrate |
| Albuterol | Ketorolac |
| Allopurinol | Metformin |
| Amitriptyline | Methotrexate |
| Amphetamine/Dextroamphetamine aka Amphetamine Salts ("MAS") | Methylphenidate |
| Atenolol | Metoprolol Tartrate |
| Benazepril | Midazolam HCL |
| Bromocriptine | Niacin ER |
| Cephalexin | Nitrofurantoin |
| Clarithromycin | Nystatin |
| Clindamycin | Ondansetron |
| Clonidine | Oxaprozin |
| Desmopressin | Phenytoin Sodium |
| Dexmethylphenidate | Promethazine |
| Digoxin | Ranitidine |
| Diltiazem | Spironolactone HCTZ |
| Divalproex | Temozolomide |
| Doxycycline | Tizanidine |
| Fenofibrate | Tolmetin Sodium |
| Fluoxetine | Topiramate |
| Gabapentin | Verapamil |

191.    Sun transacts business throughout the United States, including in Texas, targeting the Harris County market for its products, including Sun's At Issue Drugs

192.    Between 2013-2018 alone (a subset of the total damages period at issue), Harris County spent over $269,000 on Sun's At Issue Drugs.

193.    **Defendant Taro Pharmaceuticals U.S.A., Inc. ("Taro")** is a corporation organized and existing under the laws of the state of New York, with its principal place of business in Hawthorne, New York.

194.   Taro may be served through its registered agent: Corporation Service Company, 80 State Street, Albany, New York 12207.

195.   In Texas and nationally, Taro manufactures, promotes and distributes several At Issue Drugs paid for by Plaintiff Harris County:

| | |
|---|---|
| Acetazolamide | Fluocinolone |
| Adapalene | Fluocinonide |
| Alclometasone Dipropionate | Halobetasol Proprionate |
| Amiodarone | Hydrocortisone Valerate |
| Betamethasone | Ketoconazole |
| Carbamazepine | Lidocaine |
| Ciclopirox | Metronidazole |
| Clindamycin | Mupirocin |
| Clobetasol | Nortriptyline Hydrochloride |
| Clomipramine | Nystatin |
| Clotrimazole | Ondansetron |
| Desonide | Phenytoin Sodium |
| Diclofenac | Promethazine |
| Econazole | Triamcinolone |
| Enalapril | Warfarin Sodium |
| Etodolac | |

196.   Taro transacts business throughout the United States, including in Texas, targeting the Harris County market for its products, including Taro's At Issue Drugs.

197.   Between 2013-2018 alone (a subset of the total damages period at issue), Harris County spent over $870,000 on Taro's At Issue Drugs.

198.   **Defendant Teligent Pharma, Inc.** (f/k/a/ IGI Laboratories, Inc.) ("Teligent") is a Delaware corporation with its principal place of business in Buena, New Jersey.

199.   Teligent may be served through its registered agent: Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

200.   In Texas and nationally, Teligent manufactures, promotes and distributes several At Issue Drugs paid for by Plaintiff Harris County:

| Ciclopirox | Fluocinolone |
|------------|--------------|
| Clindamycin | Halobetasol Proprionate |
| Clobetasol | Lidocaine |
| Diclofenac | Triamcinolone |
| Econazole | |

201.    Teligent transacts business throughout the United States, including in Texas, targeting the Harris County market for its products, including Mayne's At Issue Drugs.

202.    Between 2013-2018 alone (a subset of the total damages period at issue), Harris County spent over $139,000 on Teligent's At Issue Drugs.

203.    **Defendant Upsher-Smith Laboratories, LLC** (formerly known as Upsher-Smith Laboratories, Inc.) ("Upsher-Smith"), is a limited liability company organized and existing under the laws of the state of Minnesota, with its principal place of business in Maple Grove, Minnesota. Upsher-Smith is a subsidiary of Sawai Pharmaceutical Co., Ltd., a large generics company in Japan.

204.    Upsher-Smith may be served through its registered agent: CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

205.    In Texas and nationally, Upsher-Smith manufactures, promotes and distributes several At Issue Drugs paid for by Plaintiff Harris County:

| Amantadine | Chlorpromazine |
|------------|----------------|
| Atropine | Cholestyramine |
| Baclofen | Divalproex |
| Benazepril | Oxybutynin |
| Bethanechol | Propranolol |
| Bumetanide | Topiramate |

206.    Upsher-Smith transacts business throughout the United States, including in Texas, targeting the Harris County market for its products, including Upsher-Smith's At Issue Drugs.

41

207. Between 2013-2018 alone (a subset of the total damages period at issue), Harris County spent over $122,000 on Upsher-Smith's At Issue Drugs.

208. **Defendant Morton Grove Pharmaceuticals, Inc.** is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in Morton Grove, Illinois.  Morton Grove Pharmaceuticals, Inc. is an indirect, wholly owned subsidiary of Wockhardt Limited, an Indian company headquartered in Mumbai, India.

209. Morton Grove Pharmaceuticals, Inc. may be served through its registered agent: Corporation Service Company, d/b/a CSC – Lawyers Inco, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

210. **Defendant Wockhardt USA LLC** is a limited liability company organized and existing under the laws of the state of Delaware, with its principal place of business in Parsippany, New Jersey.  Wockhardt USA LLC is a wholly owned subsidiary of Defendant Morton Grove Pharmaceuticals, Inc.

211. Wockhardt USA LLC may be served through its registered agent: Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

212. Collectively, Morton Grove Pharmaceuticals, Inc. and Wockhardt USA LLC are referred to as "Wockhardt."

213. In Texas and nationally, Wockhardt manufactures, promotes and distributes several At Issue Drugs paid for by Plaintiff Harris County:

| | |
|---|---|
| Acetaminophen | Divalproex |
| Amoxicillin | Enalapril |
| Azithromycin | Famotidine |
| Bethanechol | Hydroxyzine |
| Captopril | Lidocaine |
| Carbamazepine | Nystatin |
| Ceftriaxone | Oxybutynin |

| Cefuroxime Axetil | Phenytoin Sodium |
| Clarithromycin | Promethazine |
| Clobetasol | Ranitidine |
| Dexamethasone | Triamcinolone |

214.    Wockhardt transacts business throughout the United States, including in Texas, targeting the Harris County market for its products, including Wockhardt's At Issue Drugs.

215.    Between 2013-2018 alone (a subset of the total damages period at issue), Harris County spent over $47,000 on Wockhardt's At Issue Drugs.

216.    **Defendant Zydus Pharmaceuticals (USA) Inc. ("Zydus")** is a corporation organized and existing under the laws of the state of New Jersey with its principal place of business in Pennington, New Jersey.

217.    Zydus may be served through its registered agent: CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

218.    In Texas and nationally, Zydus manufactures, promotes and distributes several At Issue Drugs paid for by Plaintiff Harris County:

| Acetaminophen | Gabapentin |
| Acetazolamide | Glipizide-Metformin |
| Allopurinol | Glyburide-Metformin |
| Amiodarone | Labetalol |
| Amitriptyline | Methotrexate |
| Atenolol | Methylprednisolone |
| Budesonide | Metronidazole |
| Bumetanide | Nadolol |
| Buspirone | Niacin ER |
| Clarithromycin | Oxybutynin |
| Divalproex | Paricalcitol |
| Doxazosin Mesylate | Potassium Chloride |
| Doxycycline | Pravastatin Sodium |
| Entecavir | Promethazine |
| Etodolac | Tamoxifen |
| Famotidine | Tizanidine |
| Fenofibrate | Topiramate |

| Fluconazole | Warfarin Sodium |
|---|---|

219.    Zydus transacts business throughout the United States, including in Texas, targeting the Harris County market for its products, including Zydus's At Issue Drugs.

220.    Between 2013-2018 alone (a subset of the total damages period at issue), Harris County spent over $320,000 on Zydus's At Issue Drugs.

### IV.    INTERSTATE AND INTRASTATE TRADE AND COMMERCE

221.    During the relevant period, Defendants sold and distributed the At Issue Drugs in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States, including throughout the State of Texas and in Harris County.

222.    Defendants' conduct, including the marketing and sale of the At Issue Drugs, took place within the United States and has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States, and in particular in the State of Texas, including Harris County.

223.    Defendants' anticompetitive conduct occurred in part in trade and commerce within the states set forth herein, and had substantial intrastate effects in that, *inter alia*, retailers within the states of Texas, including within Harris County, as well as in Arizona, California, Connecticut, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin were foreclosed from offering less expensive generic drugs to Plaintiff. The foreclosure of these less-expensive generic products directly impacted and disrupted commerce for Plaintiff

Harris County within all of these states and forced Plaintiff to pay supra-competitive prices.

## V.    FACTUAL ALLEGATIONS

### A. The Generic Drug Market

i.    <u>Generic Drugs Should Provide Lower-Priced Options for Consumers</u>

224.   Generic drugs, like their branded counterparts, are used in the diagnosis, cure, mitigation, treatment or prevention of disease and, thus, are integral components in modern healthcare, improving health and quality of life for nearly all people in the United States. Recent studies confirm the generic pharmaceutical industry accounts for nearly 90% of all prescriptions written in the United States.[9]

225.   Typically, a branded drug manufacturer first develops an innovative drug and is rewarded with a patent granting a period of exclusivity to sell the drug. During this period of patent protection, the manufacturer markets and sells its drug under a brand name and the lack of competition permits the manufacturer to set its prices accordingly.

226.   Once the brand-name drug's exclusivity period ends, additional firms that receive FDA approval are permitted to manufacture and sell "generic" versions of the brand-name drug.

227.   Generic drugs provide a therapeutically equivalent substitute for brand-name drugs. A generic drug has the molecularly identical active pharmaceutical ingredient ("API") as the equivalent brand name drug, and thus is "the same as a brand

---

[9] *See, for example,* GPhA, *Generic Drug Savings in the U.S.* (2015) ("GPhA Report") at 1, available at http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

name drug in dosage, safety, strength, how it is taken, quality, performance and intended use."[10]

228.   In a competitive market, generic drugs cost substantially less than branded drugs.  The U.S. Congressional Budget Office ("CBO") estimates that, "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name counterpart."[11]  And that may be conservative. According to the Federal Trade Commission ("FTC") study, in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug price."[12] Mature generic markets typically have several manufacturers that compete for sales.

229.   Each generic is readily substitutable for another generic of the same brand drug.  As recognized by the FTC, "generic drugs are commodity products" and, as a consequence of that, are marketed "primarily on the basis of price."[13]

230.   In a competitive market, generic manufacturers cannot significantly increase prices (or maintain high prices in the face of a competitor's lower price) without losing a significant volume of sales.

231.   Over time, the price of a generic drug approaches the manufacturers' marginal costs.

---

[10] FDA Website, http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G.
[11] CBO, Effects of Using Generic Drugs on Medicare's Prescription Drug Spending (Sep. 15, 2010), available at https://www.cbo.gov/publication/21800.
[12] FTC, *Pay-For-Delay: How Drug Company Pay-offs Cost Consumers Billions*, (Jan. 2010), available at http://www.ftc.gov/os/2010/01/100112payfordelayrpt.pdf.
[13] FTC, Authorized Generic Drugs: Short-Term Effects and Long-Term Impact (Aug. 2011), available at http://www.ftc.gov/os/2011/08/2011genericdrugreport.pdf.

232.   As a result, a competitive generic market produces substantial savings for health plans and insurers, as well as lower costs to government health care programs like Medicare and Medicaid. This, in turn, translates to greater value for taxpayers.

233.   The significant cost savings provided by generic drugs motivated Congress to enact the Drug Price Competition and Patent Term Restoration Act of 1984, commonly known as the "Hatch-Waxman Act."

234.   The Hatch-Waxman Act streamlines the regulatory hurdles that generic drug makers must clear to market and sell generic drugs. Under Hatch-Waxman, generic drug manufacturers may obtain FDA approval in an expedited fashion through the filing of an Abbreviated New Drug Application ("ANDA") that establishes that its product is bioequivalent to the branded counterpart.

235.   Since passage of the Hatch-Waxman Act, every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents for branded drug prescriptions unless the prescribing physician designates the prescription as "dispense as written."

236.   In addition, each generic is also required by law to be substitutable for another generic version of the same drug. As a result of this legally mandated fungibility, pricing is the main—if not the only—differentiating feature between generic drugs.

237.   It is well established that in a healthy market competition among generic manufacturers drives down prices. Figure 4 illustrates how the price of a generic drug typically decreases as more generic drug manufacturers enter the market:

**Figure 4: Generic Competition and Drug Prices**



Source: FDA analysis of retail sales data from IMS Health, IMS National Sales
Perspective (TM), 1999-2004, extracted February 2005

238.    A recent government report confirmed this phenomenon in interviews with generic manufacturers: "manufacturers said that if a company is bringing a generic drug into an established drug market, it typically offers a price that is lower than the current market price in order to build its customer base. Manufacturers also said that as each new manufacturer enters an established generic drug market the price of that generic will fall, with one manufacturer noting that it is typically a 20 percent price decline per entrant."[14]

239.    When there are multiple generic manufacturers in an established generic market, prices should remain low and stable, and should not increase absent a market disruption. That, however, is not what has been happening in the United States, including within Texas, since at least 2010, where the price for generic drugs has been on the rise.

---

[14] U.S. Government Accountability Office Report: Generic Drugs Under Medicare ("GAO Report") at 23, (August 2016), available at https://www.gao.gov/assets/680/679022.pdf

ii.       The Prescription Drug Pricing System

240.   Drug manufacturers supply drug products. Rather than develop innovative drugs, generic manufacturers focus on manufacturing drugs that can be substituted for the brand drug product.

241.   Generic manufacturers operate facilities and compete with one another to sell the drugs they produce to wholesalers, distributors, retail pharmacy chains, mail-order and specialty pharmacies, hospital chains and some health plans.

242.   Wholesalers and distributors purchase pharmaceutical products from manufacturers and distribute them to a variety of customers.

243.   Pharmacies purchase drugs, either directly from manufacturers or from wholesalers/distributors. Pharmacies may be traditional retail pharmacies, specialty pharmacies or mail-order pharmacies.

244.   Competition among generic drug manufacturers is dictated by price; as such generic manufacturers do not differentiate their products. Consequently, generic drugs are usually marketed only by the name of the active ingredient.

245.   Because the prices paid by purchasers of generic drugs differ by market segment and most of the transactions occur between private parties according to terms that are not publicly disclosed, the price of a given drug is not always obvious.

246.   Market-wide pricing for a given drug, however, may be observed through the Centers for Medicare & Medicaid Services ("CMS") survey of National Average Drug Acquisition Cost ("NADAC"). NADAC was "designed to create a national benchmark that

is reflective of the prices paid by retail community pharmacies to acquire prescription . . . drugs."[15]

247.   NADAC is an average of the drug acquisition costs submitted by retail community pharmacies."[16] In effect, NADAC is "a single national average."[17] Thus, NADAC is a reliable way to track general price trends in the marketplace.

248.   Other reports are more easily manipulated by generic drug manufacturers to mislead purchasers and reimbursors who bear the ultimate economic burden of higher drug prices, such as Plaintiff Harris County. Generic manufacturers self-report certain prices for each generic drug that they offer, including the average wholesale price ("AWP") and wholesale acquisition cost ("WAC"). The amount that an end-payer will pay for a generic drug is typically determined by reference to the AWP or WAC price. Manufacturers may supply the same generic drug at several different prices depending on the customer or type of customer.

249.   Generic manufacturers must also report their average manufacturer prices ("AMP") to the Centers for Medicare and Medicaid if they enter into a Medicaid rebate agreement. AMP is the average price paid to the manufacturer for the drug in the United States by (a) wholesalers for drugs distributed to retail community pharmacies and (b) retail community pharmacies that purchase drugs directly from the manufacturer.

---

[15] CMS, *Methodology for Calculating the National Average Drug Acquisition Cost (NADAC) for Medicaid Covered Outpatient Drugs* at 5, available at https://www.medicaid.gov/medicaid-chip-program- information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf
[16] *Id*. at 15.
[17] *Id*.

### iii. Generic Drug Market is Highly Susceptible To Collusion

250. There are certain features characteristic of the generic drug market which make it susceptible to collusion, including:

  a. High level of industry concentration: A small number of competitors control roughly 100% of the market for each of the At Issue Drugs. Beginning in 2005, the generic pharmaceutical market has undergone remarkable and extensive consolidation, rendering it ripe for collusion. As a result, for most of the At Issue Drugs, there were between two and four manufacturers providing that drug for sale in the United States and Texas during the relevant time period, rendering each market sufficiently concentrated to permit collusive activities.

  b. Sufficient numbers to drive competition: While the market for each of the At Issue Drugs had a small enough number of competitors to foster collusion, the number of sellers or potential sellers was large enough that prices should have remained at their historical, near marginal cost levels absent collusion.

  c. High inelasticity of demand and lack of substitutes: Each of the At Issue Drugs are generally a necessity for each patient for whom it is prescribed, regardless of price. Substituting non-AB rated drugs[18] presents challenges, and both patients and physicians are unwilling to sacrifice patient wellbeing for cost savings. For many patients, the particular At Issue Drug they are prescribed is the only effective treatment.

---

[18] Non-AB rated drugs are drugs first marketed between 1938 and 1962 which were approved as safe, but not required to show effectiveness for FDA product approval.

d.     Commoditized     market:     Defendants'     products     are     fully interchangeable because they are bioequivalent. Thus, pharmacists may freely substitute one for another. The only differentiating feature, and therefore the only way a Defendant can gain market share, is by competing on price.

e.     Absence of departures from the market: There were no departures from the market during the relevant period that could explain the drastic price increases.

f.     Absence of non-conspiring competitors: Defendants have maintained all or virtually all of the market share for each of the At Issue Drugs between 2010 and the present. Thus, Defendants have market power in the market for each of the At Issue Drugs, which enables them to increase prices without loss of market share to non-conspirators.

g.     Opportunities for contact and communication among competitors: Defendants participate in the committees and events of numerous industry groups, as set forth below, which provide and promote opportunities to communicate. Further, Defendants participated in numerous conferences and trade shows that broadly covered the entire generic pharmaceutical industry and allowed Defendants to engage in discussions in furtherance of the overarching conspiracy. The grand jury subpoenas to Defendants targeting inter-Defendant communications further support the existence of communication lines between competitors with respect to generic pricing and market allocation.

h.     Size of Price Increases: The magnitude of the price increases involved in this case further differentiates it from examples of parallelism. Oligopolists testing price boundaries must take a measured approach. But, the increases here

are not 5% or even 10% jumps—they are of far greater magnitude. A rational company would not implement such large increases unless it was certain that its conspirator-competitors would follow.

**B. Government Investigations of Defendants' Conspiracy**

251.    Beginning in at least 2010, the prices for a large number of generic pharmaceutical drugs began to significantly increase without any obvious explanation— there were no large-scale production issues or ingredient supply shortages.

252.    These unexplained price increases set off extensive and widespread scrutiny by federal and state regulators, including the DOJ Antitrust Division, the United States Senate, the United States House of Representatives, and the State AGs.

253.    The DOJ's and State AGs' investigations followed a Congressional hearing and investigation, which itself was prompted by a January 2014 letter from the National Community Pharmacists Association ("NCPA") to the United States Senate Committee on Health, Education, Labor and Pensions ("Senate HELP Committee") and the United States House Energy and Commerce Committee highlighting nationwide spikes in prices for generic drugs.

i.    Congress Launched an Investigation into Generic Price Hikes

254.    In January 2014, the NCPA urged the Senate HELP Committee and the House Energy and Commerce Committee to hold hearings on significant generic pharmaceutical price spikes, citing surveys and data from over 1,000 community pharmacists who reported price hikes on essential generic pharmaceuticals exceeding 1,000%.

255.    On October 2, 2014, Senator Bernie Sanders, then Chair of the Subcommittee on Primary Health and Retirement Security of the Senate HELP

53

Committee and Representative Elijah E. Cummings, Ranking Member of the House Committee on Oversight and Government Reform, sent letters to fourteen (14) drug manufacturers, including Defendants Actavis, Apotex, Dr. Reddy's, Lannett, Mylan, Par, Sun, Teva and Zydus, requesting information about the escalating prices of generic drugs.[19]

256.    More recently on August 13, 2019, Senator Sanders and Rep. Cummings sent letters to executives of Mylan and Teva – companies that did not produce documents in response to the 2014 letters – asking for drug pricing information as part of their ongoing probe into the rising cost of generics.

257.    On February 24, 2015, Senator Sanders and Rep. Cummings sent a letter requesting that the Office of the Inspector General ("OIG") of the Department of Health and Human Services ("HHS") "examine recent increases in the prices being charged for generic drugs and the effect these price increases have had on generic drug spending within the Medicare and Medicaid programs."[20]

258.    The OIG responded to the request on April 13, 2015, advising it would examine pricing for the top 200 generic drugs to "determine the extent to which the quarterly [AMP] exceeded the specified inflation factor."[21]

259.    In August 2016, the Government Accountability Office ("GAO") issued the GAO Report, a study examining Medicare Part D prices for 1,441 generic drugs between

---

[19] Press Release, U.S. Senator Bernie Sanders, Congress Investigating Why Generic Drug Prices Are Skyrocketing (Oct. 2, 2014), available at https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

[20] Letter from Bernie Sanders, United States Senator, and Elijah Cummings, United States Representative, to Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs. (Feb. 24, 2015), available at https://www.sanders.senate.gov/download/sanders-cummings- letter?inline=file.

[21] Letter from Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs., to Bernie Sanders, United States Senator (Apr. 13, 2015), available at https://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.

2010 and 2015. The study found that 300 of the 1,441 drugs experienced at least one "extraordinary price increase" of 100% or more. Among the drugs with extraordinary price increases were thirty-one (31) of the listed At Issue Drugs: Amiloride HCL/HCTZ, Bumetanide, Carbamazepine, Cephalexin, Cimetidine, Ciprofloxacin HCL, Clarithromycin ER, Clotrimazole, Dextroamphetamine Sulfate ER, Diltiazem HCL, Doxazosin Mesylate, Enalapril Maleate, Ethosuximide, Etodolac, Fluconazole, Fluoxetine HCL, Haloperidol, Ketoconazole, Labetalol HCL, Methotrexate, Nadolol, Nitrofurantoin MAC, Oxaprozin, Oxybutynin Chloride, Piroxicam, Prazosin HCL, Prochlorperazine, Ranitidine HCL, Tobramycin, and Trifluoperazine HCL.[22]

ii.     The DOJ Investigates Criminal Generic Drug Collusion

260.   The DOJ opened a criminal investigation into collusion in the generic pharmaceutical industry in 2014.[23] Subsequently, most of the Defendants here have come under DOJ scrutiny.

261.   As a result of their investigation, the DOJ charged Heritage executives Jeffrey Glazer and Jason Malek with criminal counts related to price collusion for generic doxycycline hyclate and glyburide.[24]   On January 9, 2017, the two pleaded guilty to violating Section 1 of the Sherman Act.[25] In late April, 2018, Bloomberg reported that at

---

[22] GAO Report at Appx. III.
[23] Joshua Sisco, DoJ believes collusion over generic drug prices widespread-source, POLICY AND REGULATORY REPORT (June 26, 2015), available at http://www.mergermarket.com/pdf/DoJ-Collusion-Generic- Drug-Prices-2015.pdf; David McLaughlin and Caroline Chen, U.S. Charges in Generic-Drug Probe to be Filed by Year-End, BLOOMBERG MARKETS (Nov. 3, 2016), available at https://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said- to-be-filed-by-year-end.
[24] United States v. Glazer, No.2:16-cr-00506-RBS (E.D. Pa. Dec. 12, 2016) (ECF No. 1); United States v. Malek, No.2:16-cr-00508-RBS (E. D. Pa. Dec. 13, 2016) (ECF No. 1)
[25] Tr. of Plea Hearing at 19:16-20:4, United States v. Glazer, No. 2:16-cr-00506-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24); see also id. at 22:4-11 (admitting facts).

least two additional companies were expected to be indicted, and that another company could plead guilty before then.[26]

262.    Since the DOJ opened its investigation Defendants Actavis, Aurobindo, Dr. Reddy's, Amneal, Lannett, Mylan, Par, Perrigo, Sun, Sandoz, Taro, and Teva admitted to receiving grand jury subpoenas from the DOJ. [27]

263.    In addition, at least two Defendants have been raided by federal authorities in connection with the investigation—Perrigo disclosed that its offices were raided in 2017 and Mylan's Pennsylvania headquarters were raided by the FBI in the fall of 2016.[28]

264.    The DOJ has also intervened in numerous civil antitrust actions that are now part of the consolidated and coordinated proceedings styled *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, No. 16-MD-2724 (E.D. Pa.), stating that these cases overlap with the DOJ's ongoing criminal investigation.[29]

265.    On May 31, 2019, the DOJ released a statement that Heritage admitted that it "conspired to fix prices, rig bids, and allocate customers for glyburide," and agreed to pay $7 million in criminal penalty and civil damages, and to cooperate fully with ongoing parallel investigations into the generics industry.[30]

---

[26] David McLaughlin & Drew Armstrong, Generic-Drug Companies to Face First Charges in U.S. Probe, BLOOMBERG (Apr. 24, 2018), available at https://www.bloomberg.com/news/articles/2018-04-24/generic-drug-companies-said-to-face- first-charges-in-u-s-probe.
[27] Novartis, 2016 ANNUAL REPORT at 217, available at
https://www.novartis.com/sites/www.novartis.com/files/novartis-20-f-2016.pdf; Par Pharmaceutical Companies, Inc., Annual Report (Form 10-K) at 37 (Mar. 12, 2015); Taro Pharmaceutical Industries Ltd., Report of Foreign Private Issuer (Form 6-K) (Sept. 9, 2016); Teva Pharmaceutical Industries Ltd., Report of Foreign Private Issuer (Form 6-K) at 33 (Nov. 15, 2016).
[28] Mylan Inc., Annual Report (Form 10-K) at 160 (Feb. 16, 2016); Mylan Inc., Quarterly Report (Form 10-Q) at 58 (Nov. 9, 2016).
[29] *See* Memorandum of Amicus Curiae United States of America Concerning Consolidation, In re: Generic Digoxin and Doxycycline Antitrust Litig., MDL No. 2724, ECF 284 (PETERS (TEVA)M.L. Mar. 10, 2017).
[30] *See* https://www.justice.gov/opa/pr/pharmaceutical-company-admits-price-fixing-violation-antitrust-law-resolves-related-false.

266.   Heritage is not alone in its admission of guilt. In December 2019, Rising admitted to conspiring to fix prices for Benazepril HCTZ and was ordered to pay a reduced $3 million in fines in exchange for agreeing to cooperate with the ongoing criminal investigation.[31]

267.   On February 4, 2020, the Eastern District of Pennsylvania returned an indictment against Ara Aprahamian ("Aprahamian"), a former top executive at Defendant Taro for his role in conspiracies to fix prices, rig bids and allocate customers for generic drugs.[32]

268.   On February 14, 2020, Hector Armando Kellum, a former senior executive at Defendant Sandoz, pleaded guilty to federal conspiracy charges for his role in a scheme to fix prices for a range of the drugmaker's products, including clobetasol and nystatin.[33]

269.   The DOJ investigation is currently ongoing.

iii.    State Attorneys General Launch Their Own Investigation

270.   In July 2014, the State of Connecticut initiated a non-public investigation into suspicious price increases for certain generic pharmaceuticals. Based on evidence procured through their own subpoena-power, the State AGs filed a civil action alleging a wide-ranging series of conspiracies implicating numerous generic drugs and manufacturers. The Connecticut Mirror reported that the State AGs "suspected fraud on a broader, nearly unimaginable scale" and that "new subpoenas are going out, and the

---

[31] Sam Wood, *N.J. Generic Drug Maker Rising Admits To Price Fixing, Will Pay $3 Million In Fines And Restitution*, The Philadelphia Inquirer, Dec. 3, 2019, available at: https://www.inquirer.com/business/drugs/generic-drug-maker-rising-pharmaceuticals-william-mcswain-us-attorney-antitrust-20191203.html

[32] *See* https://www.justice.gov/opa/pr/generic-drug-executive-indicted-antitrust-and-false-statement-charges.

[33] *See* https://www.fiercepharma.com/pharma/former-novartis-sandoz-exec-pleads-guilty-generics-price-fixing-investigation.

investigation is growing beyond the companies named in the suit."[34] Then-Connecticut

AG George Jepsen called the evidence obtained in that investigation "mind-boggling."[35]

271.    Mr. Jepsen confirmed the scope of the State AGs' action in a press release

in December 2016:

> My office has dedicated significant resources to this investigation for more
> than two years and has developed compelling evidence of collusion and
> anticompetitive conduct across many companies that manufacture and
> market generic drugs in the United States. . . While the principal architect
> of the conspiracies addressed in this lawsuit was Heritage Pharmaceuticals,
> we have evidence of widespread participation in illegal conspiracies across
> the generic drug industry. Ultimately, it was consumers - and, indeed, our
> healthcare system as a whole - who paid for these actions through artificially
> high prices for generic drugs.[36]

272.    In their consolidated amended complaint filed on June 18, 2018, the State

AGs broadened their case to include fifteen (15) drugs, many of which are At Issue Drugs

in this Complaint.[37] At the time, CTAG Jepsen stated that "[t]he issues we're investigating

go way beyond the two drugs and six companies. Way beyond . . . We're learning new

things every day."[38] According to a recent interview with Joseph Nielsen, the court-

---

[34] Mark Pazniokas, How a small-state AG's office plays in the big leagues, THE CONN. MIRROR (Jan. 27, 2017), available at https://ctmirror.org/2017/01/27/how-a-small-state-ags-office-plays-in-the-big-leagues/.
[35] Id.
[36] Press Release, Attorney General George Jepsen, Connecticut Leads 20 State Coalition Filing Federal Antitrust Lawsuit against Heritage Pharmaceuticals, other Generic Drug Companies (Dec. 15, 2016), available at https://portal.ct.gov/AG/Press-Releases/2016-Press-Releases/Connecticut- Leads-20-State-Coalition-Filing-Federal-Antitrust-Lawsuit-against-Heritage-Pharmaceutica.
[37] Plaintiff States' Consolidated Amended Complaint, Case No. 2:17-cv-03768-CMR, ECF No. 14 (E.D. Pa.).
[38] Kaiser Health News, How Martinis, Steaks, and a GolfRound Raised Your Prescription Drug Prices, THE DAILY BEAST, Dec. 21, 2016, http://www.thedailybeast.com/how-martinis-steaks-and-a-golf-round-raised-your-prescription-drug-prices?source=twitter&via=desktop.

appointed Liaison Counsel for the State AGs in these consolidated MDL proceedings, "[t[his is most likely the largest cartel in the history of the United States."[39]

273.   On May 10, 2019, the State AGs filed a new complaint focusing on a conspiratorial web Teva constructed with various other Defendants named herein, that led to either artificial stabilization or price increases on over one-hundred (100) generic drug products ("State AG Complaint No. 2").[40]

274.   The allegations in the State AG Complaint No. 2 were based on "(1) the review of many thousands of documents produced by dozens of companies throughout the generic pharmaceutical industry, (2) an industry-wide phone call database consisting of more than 11 million phone call records from hundreds of individuals at various levels of Defendant companies and other generic manufacturers, and (3) information provided by several as-of-yet unidentified cooperating witnesses who were directly involved in the conduct alleged..."[41] Many of the drugs identified in that complaint are the subject of this Complaint.

275.   In addition, Teva has, at all times relevant to the Complaint, maintained a live database that it refers to as Delphi where it has catalogued nearly every decision it

---

[39] Christopher Rowland, Investigation of Generic "Cartel" Expands to 300 Drugs, THE WASHINGTON POST, December 9, 2018, available at https://www.washingtonpost.com/business/economy/investigation-of-generic-cartel-expands-to- 300-drugs/2018/12/09/fb900e80-f708-11e8-863c- 9e2f864d47e7_story.html?utm_term=.a838a7f671cd.
[40] *Connecticut, et al v. Teva Pharmaceuticals USA, Inc.*, 2:19-cv-02407 (E.D. Pa.).
[41] State AG Complaint No. 2 at ¶4. The State AGs detail their extensive investigatory efforts in State AG Complaint No. 2. They have compiled over 7 million documents, issued more than 300 subpoenas to telephone carriers, issued over 30 subpoenas to generic drug manufacturers and examined the names and contact information of over 600 drug manufacturer employees, giving the State AGs a "unique perspective to know who in the industry was talking to who, and when" *Id.*
¶¶ 64-65. The State AGs have also corroborated these allegations through cooperating witnesses, including senior executives and employees of many Defendants named here.

has made regarding the products it sells, including those decisions that were made collusively – which Teva often referred to as "strategic" decisions.

276.    Although the State AGs do not have full access to Delphi, they have obtained static images of the database that were internally disseminated over time by Teva, and referred to as Market Intel Reports.

277.    Through their review and investigation of some of those reports, in combination with the phone records, the State AGs have, to date, identified over 300 instances of collusion where Teva spoke to competitors shortly before or at the time it made what the company referred to as a "strategic" market decision. A number of those instances are detailed throughout this Complaint.

## C.  Defendants' Overarching Conspiracy

278.    Each Defendant participated in an overarching conspiracy and shared in the common goal of achieving artificially inflated prices by disincentivizing competition across the entire generic drug industry.

279.    This section describes the overarching conspiracy and provides a few examples for illustrative purposes. The following section provides particular details of the market allocation and price fixing agreements for specific At Issue Drugs that make up the overarching conspiracy.

i.    <u>Defendants Are Competitors or Potential Competitors for All At Issue Drugs</u>

280.    One of the driving forces underpinning Defendants' overarching conspiracy is that all Defendants are either current or future competitors with each other across every generic drug market.

281.    Defendants gain access to generic pharmaceutical markets through at least three methods, all of which were employed by Defendants during the relevant time frame: (1) obtaining ANDA approval; (2) purchasing existing ANDAs from companies that have obtained approval; or (3) licensing the use of an ANDA held by someone else.

282.    Consequently, all Defendants market and sell multiple products and could have obtained approval or otherwise acquired marketing rights to sell any of the At Issue Drugs, had they chosen to do so.

283.    The competitive overlap of these Defendants is indisputable, as depicted by the graphic representation in Figure 5:

**Figure 5:**
**Overarching Conspiracy**
**Co-Conspirator Relationships: Common ANDAs**



284.   Figure 5 highlights how all Defendants are actual or potential competitors. Yet this graphic actually *understates* the competitive relationships between these Defendants in a number of ways.

285.   First, the relationship map shows a single line between Defendants regardless the number of drugs for which they have common ANDAs. For example, Par, Mylan and Sun have overlapping ANDAs for at least three (3) formulations of the At Issue Drugs (Doxycycline Hyclate, Doxycycline Monohydrate, and Zoledronic Acid) yet the graphic shows only a single line between each of them; Mylan and Heritage have overlapping ANDAs for at least seven (7) formulations of At Issue Drugs, yet the graphic shows only a single line between them.

286.   Second, the graphic above is limited to ANDAs for formulations of only a few of the At Issue Drugs. If it were expanded to include all of the At Issue Drugs—all drugs in Defendants' portfolios of generic pharmaceuticals—the web of competitive overlap would be significantly denser.

287.   Third, the graphic does not capture Defendants' ability to seek out and license ANDAs, which essentially provides every Defendant with the ability to access the market for every generic drug for sale in the United States.

288.   As discussed in detail below, Defendants use their diverse portfolios and competitive overlap as leverage to make broad market allocation and price fixing agreements with each other that span across multiple drug products.

ii.      Defendants' "Fair Share" Agreement

289.   Defendants' overarching conspiracy was built around a common "fair share" agreement that permeates the entire generic drug industry.

290.   This overarching conspiracy consisted of several aspects, including monitoring, tracking, and maintaining each other's "fair share," in addition to price-fixing agreements for certain drugs as set forth below. Defendants understood that to effectuate

a successful price-fixing and market allocation agreement on one drug, they would need to effectuate an agreement across each Defendant's portfolio of drugs.

291.    In furtherance of this, Defendants all had a common understanding of what "fair share" means in different circumstances. The terminology evolved through in-person meetings, telephonic communications and other interactions between several generic manufactures over several years, but ground rules have been in place since at least 2006.

292.    Referred to sometimes as the "rules of engagement" or "rules of the road," the "fair share" understanding among Defendants dictates that when two generic manufacturers enter the market at the same time, each competitor is entitled to approximately 50% of the market. When a third competitor enters, each competitor expects to obtain 33% share; when a fourth competitor enters, each expects 25%; and so on, as additional competitors enter the market.

293.    Even when a generic drug manufacturer enters the market on an exclusive basis, Defendants agree that such manufacturer is entitled to a little more than a proportional share of the market the period of exclusivity ends.. Then-Vice-President of Sales and Marketing for Defendant Dr. Reddy summarized this during a discussion with a competitor in January 2013 when it was about to enter the market for a drug, stating that "he views it this way. If they [Dr. Reddy's] are first and others come out after, he deserves 60%. If he launches with others on day [one], he considers fair share 2-50%, 3-33%, 4-25%, etc."

294.    Conversely, those generic manufacturers that enter later are typically deemed entitled to something less than their proportional share.

295.    One of the many examples of this occurred in March 2014, when – as discussed more fully below – Defendant Lupin entered the Niacin ER market after

Defendant Teva had previously been exclusive. Teva executive Nisha Patel ("Patel") and Dave Berthold ("Berthold") of Lupin spoke directly by phone a number of times during this period, including three (3) calls on March 24, 2014. That same day, another Teva executive sent an internal e-mail to Patel stating that Teva should concede "the 40% [of the market] we were okay with conceding." Teva's expectation to maintain a 60% share in a two-player market, after being the first in that market, was consistent with the "rules of the road" within the overarching conspiracy.

296.   The common objective of the "fair share" system is to attain a state of artificial equilibrium, where no competitors are incentivized to compete for additional market share by eroding price.

297.   This common goal was aptly stated by Aprahamian, an executive in the Taro Pricing Department, in training documents: "[g]iving up share to new entrant (as warranted) shows responsibility and will save us in the long run" and "[d]on't rock the boat – [g]reedy hogs go to slaughter."

298.   For each competitor to maintain its "fair share," Defendants frequently traded large customers among each other by exchanging information about bids and requests for proposals ("RFPs") and agreeing that a particular incumbent supplier would "walk away" from a large customer by knowingly submitting a higher bid than a competing supplier.

299.   The competing supplier looking to increase or maintain its "fair share" would then submit a bid slightly less than the supplier that "walked away," but still at a supra-competitive level. The competitors then continue to divide the market until they reach an artificial equilibrium, creating a "stable" market. Once achieved, the competitors agree not to compete on price and, at times, significantly raise prices.

300.   This pattern is frequently followed even in the absence of direct communication between the competitors, demonstrating the universal code of conduct agreed to by Defendants.

301.   This "fair share" understanding has been particularly effective when a new competitor enters the market – a time when, in a free-functioning, competitive market for generic drugs, prices would be expected to go down.

302.   These "fair share" rules apply equally to price increases. As long as everyone is playing fair, and the competitors believe that they have their "fair share," the larger understanding dictates that they will not seek to compete or take advantage of a competitor's price increase by bidding a lower price to take that business. Doing so is viewed as "punishing" a competitor for raising prices – which is against the "rules." Indeed, rather than competing for customers in the face of a price increase, competitors often use this as an opportunity to follow with comparable price increases of their own.

303.   For example, in May 2013 after a Glenmark price increase on a number of different drugs (discussed more fully below), Teva was approached by a large retail customer requesting a bid for several drugs. Teva executive Kevin Green ("Green") immediately sought to determine whether this request was due to a competitor price increase, in order to determine what Teva's strategy should be:

> On May 29, 2013, at 11:52 PM, "Kevin Green" <Kevin.Green@tevapharm.com> wrote:
>
> Do you think the Fluconazole Tabs below is due to a recent price increase. I don't have my list here at home. We are in a great inventory position, but not sure I want to steal it on an increase. [42]

66

304.   Teva declined to bid, after conversations with competitors confirming that the reason for the request was due to a competitor's price increase.

305.   Adherence to the rules regarding "fair share" is critical in order for Defendants to maintain their unlawfully high prices. Indeed, that is the primary purpose of the agreement. If even one competitor does not participate (and, thus behave in accordance with) the larger understanding, it can lead to unwanted competition and lower prices.

306.   In a July 2013 correspondence, Defendant Sandoz succinctly summarized the co-conspirators common objective of maintaining their "fair share" in order for all Defendants to profit off their anticompetitive scheme. During this correspondence, a senior marketing executive at Sandoz, sent an internal e-mail identifying forty-seven (47) products where Sandoz did not have "fair share" of the market. After some back-and-forth internal joking among Sandoz executives about the idea that Sandoz might actually attempt to compete for business in those markets by driving prices down, a Sandoz executive responded by emphasizing the truly industry-wide nature of the agreement:



| | |
|---|---|
| **From:** | Kellum, Armando |
| **Sent:** | Tuesday, July 02, 2013 12:31 AM |
| **To:** | ██████████████ |
| **Subject:** | Re: Product Sales and Market Share Performance_v17 (3).xls |

Fair Share for all!!!

iii.   Defendants' Agreement to "Play Nice in the Sandbox"

307.   Along with "fair share," another understood phrase in Defendants' conspiracy lexicon is "playing nice in the sandbox." When a generic manufacturer

67

participates in this scheme, and prices stay artificially high, this is viewed as "playing nice in the sandbox."

308.   For example – as discussed more fully below – in December 2014, Defendant Teva was approached by a large retail customer on behalf of Defendant Greenstone (subsidiary of Defendant Pfizer). The customer indicated that Greenstone was entering the market for the generic drug Cabergoline and was seeking to target specific customers. The customer specifically requested that Teva give up a large customer to the new entrant and indicated that "Greenstone has promised to play nice in the sandbox." After discussing the matter internally, a Teva representative responded to the customer: "[t]ell Greenstone we are playing nice in the sandbox and we will let them have [the targeted customer.]"

309.   Similarly, when a generic manufacturer is "playing nice in the sandbox," it is generally referred to as a "responsible" or "rational" competitor. For instance, in May 2013, a senior sales and marketing executive at Defendant Sandoz, sent an internal e-mail to another Sandoz senior executive, stating "My sense is that Sandoz is viewed by customers and competition as a respectful/responsible player in the market, which we should be proud of and has taken years to develop."

310.   Defendant Sandoz, in turn, uses that same terminology to refer to its competitors that are acting in accordance with "fair share" principles. For example, in internal company presentations throughout 2014, Sandoz consistently referred to Defendant Actavis as a "responsible competitor" and Defendant Taro as a "very responsible price competitor."

311.   Defendant Teva had its own term of art – referring to the competitors it had the most collusive relationships with as "high quality" competitors. As explored more fully

below, Teva had long-standing relationships with its competitors which affected nearly every overlapping drug it sold.

312.    As just one example, Patel of Teva exchanged seven (7) text messages and had two (2) long phone calls with then Aprahamian of Taro, on June 3 and 4, 2014. After a lengthy twenty-five (25) minute call with Aprahamian on the morning of June 4, Patel sent an internal e-mail to a Teva senior marketing executive, stating "[w]e should probably discuss how we want to handle all Taro increase items. Taro is a "high quality" competitor – I think we need to be responsible where we have adequate market share."

iv.      Defendants' Cartel Agreement Includes All Generic Products

313.    Defendants' "fair share" agreement is not limited to any one market; these principles constantly inform and guide the market actions that generic drug manufacturers decide to take (or not take) both within and across product markets.

314.    Defendants understood that to effectuate a successful price-fixing and market allocation agreement on one drug, they would need to effectuate an agreement across each Defendants' portfolio of drugs.  If the agreement were limited to one or two drugs, it could easily fall apart.

315.    "Fair share" decisions consider factors across multiple generic drug markets. Customers in one drug market might be traded for customers in another drug market so to create a global "fair share" outcome. Or competitors might avoid challenging a price increase on one generic drug based on a *quid pro quo* arrangement from other competitors on different drugs.

316.    For instance, in April 2013, Defendant Teva hired Nisha Patel as its Director of Strategic Customer Marketing. Patel's "strategy" primarily focused on a widespread effort to implement collusive price increases on numerous drugs manufactured by

69

numerous manufacturers. Before joining Teva, Patel worked at a large drug wholesaler, working her way up to Director of Global Generic Sourcing. During her time at the wholesaler, Patel developed and maintained relationships with many sales and marketing executives at Teva's competitors. Teva hired Patel for the express purpose of strengthening Teva's relationships with other manufacturers in order to maintain prices and to implement price increases.

317. On May 1, 2013, Patel began creating a spreadsheet with a list of "Price Increase Candidates." In a separate tab of the spreadsheet, she rated Teva's "Quality of Competition" by assigning companies into several categories, including "Strong Leader/Follower," "Lag Follower," "Borderline," and "Stallers."

318. As she was creating the list, Patel was talking to competitors to determine their willingness to increase prices and adjusted the ratings accordingly. For example, in one of her first conversations with another manufacturer after joining Teva, Patel learned that Sandoz would follow Teva's price increases and would not poach Teva's customers after Teva price increases. Sandoz was thus rated as one of Teva's highest "quality" competitors. Patel and Teva based many anticompetitive decisions on this understanding with Sandoz over the next several years.

319. By May 6, 2013, Patel created an initial rating of fifty-six (56) different manufacturers in the generic drug market by their "quality." Patel defined "quality" by her assessment of whether a manufacturer would agree to lead or follow price increases. The rating system was a scale from +3 for the "highest quality" manufacturer to a -3 ranking for the "lowest quality" manufacturer.

320. Patel used her rating system, in conjunction with other market factors, to identify drugs that were candidates for price increases. The best candidates (aside from a

drug where Teva was the sole supplier) were drugs where there was only one other "high quality" manufacturer in the market. Drug markets with several "low quality" competitors were less desirable candidates for price increases.

321.   Patel's systematic approach to collusive pricing was understood and authorized by her supervisors and executives at Teva, including Senior Vice President of Sales and Marketing Maureen Cavanaugh ("Cavanaugh") and Vice President of Sales David Rekenthaler ("Rekenthaler").

322.   Approximately one year after her initial set of "competitor" ratings, on May 9, 2014, Patel updated her ratings of the various manufacturers. The updates took into account Teva's work over the prior year to expand and solidify agreements with numerous manufacturers, including many Defendants here. Some manufacturers had a high-quality rating throughout the entire relevant time period, while other competitors' ratings increased after successfully colluding with Teva on one or more drugs.

323.   The breadth of Patel's list—fifty-six (56) manufacturers—and Teva's systematic effort to maintain and strengthen the "fair share" agreement across the numerous overlapping drug markets in which these companies "competed" underscores the overarching and multi-drug aspect of Defendants' conspiracy.

324.   Another example that Defendants' overarching conspiracy stretched across multiple specific drug markets occurred in 2014 when Defendant Heritage attempted to impose industry-wide price increases simultaneously on numerous drugs, including: Acetazolamide ER, Doxycycline Monohydrate, Leflunomide, Nystatin, Theophylline ER and Verapamil. This involved reaching out to competitors as to each of the drugs in an attempt to agree on price increases.

325.   In early 2014, Heritage executives held a pricing meeting to discuss analyzing the impact of numerous planned price increases.

326.   On April 15, 2014, Heritage's Jason Malek ("Malek") called Patel of Teva to discuss price increases on Acetazolamide, Leflunomide, Nystatin, Theophylline and others. During their 17-minute conversation, Patel (Teva) agreed that if Heritage increased the prices for those drugs, Teva would either follow or not challenge Heritage's price increases by underbidding.

327.   On April 22, 2014, Heritage held a "Price Increase Discussion" teleconference in which Malek identified eighteen (18) drugs that Heritage would target for increase. Prior to the call, Malek circulated to his sales team a spreadsheet ("the Heritage list") which listed each drug, the competitors, and their respective market share. The Heritage list included Acetazolamide, Doxycycline Monohydrate (which was slated for a "big price increase"), Leflunomide, Nystatin, Theophylline and Verapamil, among others. Malek instructed members of the team to immediately reach out to contacts at each competitor for the drugs on the list and attempt to reach agreement on price increases.

328.   The Heritage sales team promptly began to contact their competitors— reaching agreements with numerous competitors to implement simultaneous price increases, including Defendants Sun/Caraco (for Nystatin and Paromomycin), Actavis (for Verapamil and Glipizide Metformin), Lannett (for Doxycycline Monohydrate), Mylan (for Doxycycline Monohydrate, Verapamil and Glipizide-Metformin) and Ascend (for Nimodipine).

329.   On May 8, 2014, Heritage sales team circulated an internal email stating:

72

Two weeks back we had a teleconference regarding 13 [sic] products where the pricing dynamics may change. We each had takeaways, can everyone confirm or not who they have/not spoken with since our call?
Need to move forward with the plan asap.

330.   Heritage's Ann Sather ("Sather") responded: "Jason, I made contact with all my takeaways – with positive results. I can resend those notes or talk with you on any details." Sather had been tasked with communicating with Defendants Lannett on Doxycycline Mono, Actavis on Verapamil, and Sun on Nystatin, among others.

331.   On June 23, 2014, Heritage employees had another "Price Change Call" to discuss the specific percentage amounts by which they would seek to increase the pricing of certain drugs, including drugs for which they had already obtained agreement from all competitors (or potential future competitors), and the strategies for achieving this goal. The drugs discussed on the call included Acetazolamide (75% increase); Theophylline (150% increase); and Nystatin (95% increase).

332.   Two days later, on June 25, 2014, a Heritage executive spoke with Patel (Teva) and informed her that Heritage would shortly be increasing prices for a number of drugs for which Teva was a competitor.

333.   On July 1, 2014, Malek circled back with the Heritages sales team:

Team:

Looks like you are making good traction with our July 1 price increase.
Going forward, send a summary to [a Heritage executive] and me at each cob of who is not yet signed with a status and plan.
Please send each day until further notice or until all or [sic] accounted for.
Any questions please call me directly.

334.   In the following weeks Heritage employees continued to reach out to their competitors to obtain additional agreements to raise prices. Heritage was ultimately able

to increase prices on numerous drugs, including at least Acetazolamide, Leflunomide and Nystatin, as well as others.

335.    These discrete examples (of which there are many as detailed below) underscore the overarching nature of the conspiracy: Defendants' conspiracy stretched across numerous generic products in order to lessen competition in the markets for all At Issue Drugs.

### D. Defendants' Extensive Inter-Firm Communications

336.    Defendants' were able to organize and perpetuate their overarching conspiracy through extensive inter-firm communications.

337.    The Defendants developed the conspiracy and ensured that all conspirators were adhering to the collective scheme by communicating at (1) trade association meetings and conferences; (2) private meetings, dinners and outings among smaller groups of employees of various generic drug manufacturers; and (3) individual, private communications between and among Defendants' employees through use of the telephone, electronic messaging, and similar means.

i.      <u>Trade Association Meetings and Conferences</u>

338.    Defendants routinely coordinated their schemes through direct interaction with their competitors at trade associations and industry conferences.[43] For example, between February 20, 2013 and December 20, 2013, there were at least forty-four (44) different tradeshows or customer conferences where Defendants met in person and, as detailed below, engaged in discussions in furtherance of their conspiracy.

---

[43] Press Release, Attorney General George Jepsen, 40 State Attorneys General Now Plaintiffs in Federal Generic Drug Antitrust Lawsuit (Mar. 1, 2017), available at http://members.naag.org/assets/files/Antitrust/files/03-01-17%20CT%20Announces%2040%20AGs%20in%20Generic%20Drug%20case.pdf.

339.    Defendants also used their memberships in numerous trade organizations to facilitate conspiratorial communications and implement their anticompetitive scheme including, but not limited to the Generic Pharmaceutical Association ("GPhA"), Healthcare Distribution Management Association ("HDMA"), Efficient Collaborative Retail Marketing ("ECRM"), Minnesota Multistate Contracting Pharmacy Alliance ("MMCAP"), and the Healthcare Supply Chain Association ("HSCA").

340.    GPhA, HDMA, ECRM, MMCAP, and HSCA frequently held meetings and events between 2012 and the present, and high-level representatives and corporate officers from Defendants, including employees with price-setting authority, attended these meetings.  In addition, executives from many of the Defendants were members and held leadership positions within these organizations.

ii.    Industry Dinners and Private Meetings

341.    Many Defendants are headquartered in close proximity, providing them with easy and frequent access to one another. For example, at least forty-one (41) different generic drug manufacturers are concentrated between the New York City and Philadelphia metropolitan areas, including Defendants Actavis, Aurobindo, Rising, Dr. Reddy's, Glenmark, Heritage, Lannett, Par, Perrigo, Sandoz, Sun, Taro, Teva, Hikma and Zydus. This close proximity provided Defendants with additional opportunities to collude.

342.    High-level executives of many generic manufacturers get together periodically for "industry dinners." In January 2014, for example, as many generic prices were increasing, at least thirteen (13) high-ranking male executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, including

at least executives from Defendants Actavis, Dr. Reddy's, Lannett and Sun, among others, met at a steakhouse in Bridgewater, New Jersey to discuss their ongoing conspiracy.

343.    At the "industry dinners" one company will typically pay for all attendees. In a December 2013 group email, a high-ranking executive for Defendant Dr. Reddy's joked "[y]ou guys are still buying for Mark and I, right?" Another executive responded: "Well…I didn't think the topic would come up so quickly but…we go in alphabetical order by company and [a generic drug manufacturer] picked up the last bill….PS….no backing out now! Its [sic] amazing how many in the group like 18 year-old single malt scotch when they aren't buying."

344.    Generic drug manufacturer employees also regularly convened for "Girls' Night Out" or "Women in the Industry" meetings and dinners. At these events, generic drug companies' employees met with their competitors and discussed proprietary and competitive information. Upon information and belief, several of these events occurred in 2015, including at the ECRM conference in February (involving Defendants Dr. Reddy's, Heritage, Lannett, and Teva, among others), in Baltimore in May (involving Defendants Dr. Reddy's, Heritage, Teva, and Zydus, among others), and in August (involving Defendants Dr. Reddy's and Heritage, among others).

iii.    Private Communications

345.    As discussed in great detail below, Defendants routinely also conferred with one another privately through personal communications, often sharing information on bids and pricing strategy. This included forwarding customer bid packages to a competitor, either on the forwarding company's own initiative or at the competitor's request.

346.   Many of these communications were facilitated by the close relationships between executives at these competitor companies. These relationships resulted from the fact that many executives and other marketing and sales personnel employed by Defendants worked at multiple companies—including other Defendants—during their careers. These employees maintained contact with people at their prior employers, which facilitated the conspiratorial agreements.

347.   For example, Teva's Patel met Heritage's Malek when she worked at Amerisource Bergen, which was a Heritage customer whom Malek managed.

348.   Based on telephone records obtained during the State AGs' investigation, representatives of several of the Defendants with pricing responsibility had frequent telephone calls with representatives of their competitors, including Defendants. During the relevant time period, executives at Heritage, for example, had at least 513 contacts with executives from Defendants Actavis, Apotex, Dr. Reddy's, Glenmark, Lannett, Mayne, Par, Sandoz, Sun, Teva and Zydus. Executives at Teva had at least 1,501 contacts with executives from Defendants Actavis, Apotex, Dr. Reddy's, Glenmark, Heritage, Lannett, Mayne, Par, Sandoz, Sun, and Zydus.

349.   One example occurred when Patel moved from a large drug wholesaler, Amerisource Bergen Corp. ("ABC"), to Defendant Teva in April 2013. Following this move, she contacted her former customer Malek of Heritage to discuss which generic drugs both Teva and Heritage sold so that they could coordinate pricing. As detailed below, Malek and Patel (Teva) orchestrated a number of price increases between 2013-present—some led by Teva, others by Heritage.

350.   Tables 1 and 2, below, tally examples of these Defendant communications during a portion of the relevant period:

Table 1
Heritage Phone/Text Communications with Co-Conspirators (by Month) July 1, 2013-July 30, 2014

| | July 2013 | Aug 2013 | Sep 2013 | Oct 2013 | Nov 2013 | Dec 2013 | Jan 2014 | Feb 2014 | Mar 2014 | Apr 2014 | May 2014 | Jun 2014 | Jul 2014 | Year TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actavis | | | | | | | | | | 2 | | | | 2 |
| Apotex | | | | | | | | | | | 17 | 2 | 1 | 20 |
| Ascend | | | | | | | | | | 1 | | | | 1 |
| Aurobindo | | | | | 1 | 1 | | 1 | | 5 | 2 | 1 | 3 | 14 |
| Rising | | | | 6 | 1 | 12 | | 7 | 1 | | 2 | 29 | 52 | 110 |
| DRL | 1 | 6 | 3 | 2 | | | | | 1 | 5 | 3 | | | 21 |
| Glenmark | | | | | | | | | | 1 | | | 3 | 4 |
| Lannett | | 35 | | 27 | | | 21 | 8 | | 3 | 3 | 14 | 2 | 113 |
| Mayne | | | | | | 1 | | | 2 | 7 | 3 | | | 13 |
| Mylan | 3 | 1 | | | 1 | | | 1 | | 2 | 8 | | 2 | 18 |
| Par | | | | | | | | | | | 3 | 6 | | 9 |
| Sandoz | | | | | | | | | | | 4 | 3 | | 7 |
| Sun | 1 | 2 | | 1 | | | | 3 | | | 3 | 10 | 32 | 7 | 59 |
| Teva | 7 | 9 | | | | | | 5 | 5 | 3 | | | 1 | 5 | 35 |
| Zydus | | 61 | 19 | 6 | | | | | | | | | 1 | 87 |
| | | | | | | | | | | | | | | 513 |

Table 2
Teva  Phone/Text Communications with Co-Conspirators (by Month) July 1, 2013-July 30, 2014

| | July 2013 | Aug 2013 | Sep 2013 | Oct 2013 | Nov 2013 | Dec 2013 | Jan 2014 | Feb 2014 | Mar 2014 | Apr 2014 | May 2014 | Jun 2014 | Jul 2014 | Year TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actavis | | 11 | 16 | 37 | 11 | 35 | 25 | 14 | 36 | 30 | 63 | 13 | 43 | 334 |
| Apotex | 3 | 4 | | | | | | | | | | | | 7 |
| Ascend | | | 3 | | | | | | | | | | | 3 |
| Aurobindo | 17 | 5 | 3 | 15 | 8 | 10 | 7 | 7 | 6 | 6 | | | 5 | 89 |
| Rising | | | | 3 | 3 | 3 | | 1 | | 1 | | 1 | | 12 |
| DRL | 2 | | | | | | | | | 2 | 1 | 3 | 6 | 14 |
| Glenmark | 7 | 8 | 1 | 17 | 18 | 21 | 5 | 4 | 2 | | 3 | | 8 | 94 |
| Heritage | 7 | 10 | | | | | | 5 | 5 | 3 | | 1 | 5 | 36 |
| Lannett | | | | | | | | | 16 | 13 | | 1 | 13 | 43 |
| Mayne | 2 | | 2 | 1 | 1 | 2 | 4 | 5 | | | | 7 | | 24 |
| Mylan | 28 | 22 | 2 | 7 | | 12 | 6 | 1 | 1 | 1 | 7 | | | 88 |
| Par | | | 4 | 4 | 3 | 16 | 1 | 18 | 6 | 9 | 11 | 14 | 3 | 89 |
| Sandoz | 3 | 5 | 3 | | | | 7 | | 2 | 3 | | 1 | | 24 |
| Sun | | | | 2 | | 1 | | | | 1 | | | 2 | 6 |
| Zydus | 75 | 29 | 25 | 203 | 43 | 48 | 20 | 39 | 46 | 35 | 41 | 14 | 20 | 638 |
| | | | | | | | | | | | | | | 1501 |

78

351.    These numbers are only a representative sample of the total volume of contacts between these Defendants during this period because they include only phone and text message records from some of Defendants' executives and salespeople. It is clear, however, from even this sample, that there was a widespread pattern of communications occurring simultaneously between Defendants that marketed and sold the At Issue Drugs.

### E.  The Overarching Conspiracy In Operation: Market Allocation And Price Fixing Agreements

352.    From at least 2010, in furtherance of their overarching conspiracy, Defendants routinely and systematically sought out their competitors in an effort to reach agreements to allocate market share, maintain or raise prices and/or avoid competing on price.

353.    Examples of these agreements are set forth below. Each of these agreements between particular sets of Defendants detailed below contributed to the overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the entire generic pharmaceutical industry and caused Plaintiff Harris County to pay more than it would have paid in a free and fair market for all generic drugs.

354.    The following are only illustrative examples based upon the information from the State AGs' investigation that has been made public, other publicly available information and upon information and belief.  Further investigation from the State AGs and from Plaintiff Harris County will likely reveal significant additional information, including information on generic drugs that are not detailed below.

i.      Acetazolamide

355.   Acetazolamide ER ("Acetazolamide") is an extended release anhydrase inhibitor medicine to treat glaucoma, epilepsy, altitude sickness, periodic paralysis and heart failure.

356.   Acetazolamide is sold in two forms: tablets and capsules. Defendants Taro and Lannett dominate the market for Acetazolamide tablets. Defendants Heritage, Teva, and Zydus dominate the market for Acetazolamide capsules.

357.   During the relevant time period, Plaintiff Harris County purchased Acetazolamide manufactured and/or sold by Teva, Heritage, Lannett, Taro and Zydus.

358.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Acetazolamide as follows:

### a.      Acetazolamide Tablets

359.   Acetazolamide tablets are sold in two dosages: 125 mg and 250 mg. In the Spring of 2012, Taro was the only manufacturer of 125 mg tablets, but both Taro and Lannett manufactured the more popular 250 mg tablets. Taro and Lannett conspired to increase the price of both 125 mg and 250 mg tablets beginning in April and May of 2012.

360.   In April and May of 2012, Taro and Lannett imposed 40-50% price increases in unison, bringing their list prices for Acetazolamide 250 mg tablets to identical levels. Taro's 125 mg tablets increased in price simultaneously as well.

361.   In early 2013, Taro slightly increased prices on both Acetazolamide tablets and by the middle of 2013, Taro and Lannett's market share stabilized as a result of their market sharing agreement. Lannett held approximately 56% of the 250 mg tablet market and Taro held approximately 44%. As the only manufacturer at this time, Taro

maintained 100% of the market for 125 mg tablets. When market sales for both tablets are evaluated together, Taro and Lannett's dollar sales across both products remained virtually even. The combined market share (total dollar sales) for both 125 mg and 250 mg Acetazolamide tablets is depicted in Figure 6 below:

**Figure 6: Acetazolamide Tablets: Total Sales %**



362.   With their respective market shares allocated by agreement, Taro and Lannett were well-positioned to raise prices without losing customers.

363.   Between November of 2013 and February of 2014, Taro and Lannett both imposed over 200% price increases on their Acetazolamide tablets, bringing their 250 mg tablets to identical list prices. Taro's 125 mg tablets saw similar price increases and AWP prices for both products increased significantly.

364.   The price increases imposed by Taro and Lannett, initially in 2012, then more significantly in late 2013, can be seen in Figure 7 below:

**Figure 7: Acetazolamide WAC Price Increase**



365.     According   to   NADAC   data,   the   average   market   price   for   generic
Acetazolamide tablets saw the following price increases from November 2013 to February
2014:

Acetazolamide 125mg: increased by 241%.

Acetazolamide 250mg: increased by 265%.

366.    NADAC data shows that average market prices of Acetazolamide tablets
remained artificially high thereafter, as depicted in Figure 8 below:

**Figure 8: Acetazolamide NADAC Price Increase**



367.   Throughout this period, Lannett and Taro had ample opportunity to coordinate their market share agreements and price increases.  They both attended: (i) October 1-3, 2012 GPhA Fall Technical Conference in Las Vegas, Nevada; (ii) June 4-5, 2013 GPhA CMC Workshop in Bethesda, Maryland; and (iii) October 28-30, 2013 GPhA Technical Conference in North Bethesda, Maryland.

368.   The lockstep price increases with nearly perfect market share splits by Taro and Lannett contradicts expected pricing behaviors in a competitive market; it is, however, consistent with Defendants' "fair share" agreement.

369.   No shortages or other market features can explain Defendants' price increases for Acetazolamide during the relevant period.

### b. *Acetazolamide Capsules*

370.    At all relevant times, Defendants Heritage, Teva and Zydus dominated the market for Acetazolamide capsules. As of April 2014, Defendants Heritage and Teva controlled 78% of the market.

371.    Prior to this conspiracy, the prices for Acetazolamide capsules were stable.

372.    As part of the market-wide conspiracy to increase generic drug prices, Heritage began communicating with high level executives at Teva. On April 15, 2014, Malek (Heritage) spoke with Patel (Teva) for more than seventeen (17) minutes to discuss increasing the price of Acetazolamide capsules and other drugs. Patel (Teva) had already secured Heritage's agreement to support Teva's price increases for two other drugs, Nystatin and Theophylline. During the April 15th call, Patel (Teva) agreed that if Heritage raised prices for Acetazolamide capsules, Teva would follow suit or at minimum refrain from competing for Heritage's accounts. Malek (Heritage) and Patel's (Teva) conversations would continue through the spring and summer to coordinate and confirm their price increases.

373.    After speaking with Malek on April 15, Teva executives reached out to Zydus executives to coordinate the price increases. Between April 16 and 17, 2014, Patel (Teva) and Green, now the Senior Director of National Accounts at Zydus, formerly an executive at Teva, spoke twice regarding Acetazolamide prices, first for approximately twenty (20) minutes, then for twelve (12). They communicated frequently over the next several months, along with other Teva and Zydus executives.

374.    On April 22, 2014, Malek held a telephone conference call with the Heritage sales team to dictate a pricing strategy that targeted eighteen (18) drugs for price increases, including Acetazolamide.

84

375.   To coordinate with Zydus, Malek (Heritage) contacted a Zydus executive on April 24, 2014 through LinkedIn.

376.   Heritage came to agreements with both Teva and Zydus on price increases and market share. In an internal Heritage e-mail, Malek confirmed the Acetazolamide price-fixing agreements and reiterated that Heritage needed to refrain from bidding on contracts held by competitors.

377.   Malek previously asked Heritage executives to refrain from responding to a large customer that requested a price quote on Acetazolamide. In e-mails on May 6th and 7th, 2014, Malek told Sather (Heritage) that he formed agreements to raise the price of Acetazolamide and not to compete on customers. Malek said, "[w]e have buy in from all (competitors) to go up . . ." and Heritage agreed not to reduce its price in response to the request from the large customer. As Malek stated: "We are going to pass [on reducing the price] and most likely are taking an increase within the next week."

378.   Defendants Teva and Zydus also remained in close contact during this time as well.

379.   Defendants had many opportunities to speak in person about their agreements. On May 12-15, 2014, Heritage executives attended the MMCAP National Member Conference in Bloomington, Minnesota. Executives from Teva also attended. On June 1-4, 2014, Heritage's Sather, Malek and others attended the HDMA Business and Leadership Conference at the JW Marriott Desert Ridge in Phoenix, Arizona, along with Teva's Patel and Zydus' Green, among others. At this conference, Sather (Heritage) met in person for dinner and drinks with Par's Karen O'Connor ("O'Connor") and Lannett's Tracy Sullivan ("Sullivan"), as well as Christopher Bihari, Director of National Accounts

at Sandoz. Defendants used these meetings as an opportunity to confirm agreements on pricing and market share.

380.   During these months, Heritage avoided soliciting or bidding on Acetazolamide customers supplied by Zydus in order to maintain the artificial equilibrium their conspiracy created.

381.   On June 23, 2014, Heritage held a "Price Change Call" to discuss specific price increases on certain drugs and related strategies, including for Acetazolamide, which was targeted for a 75% increase. According to the discussion, the increases on the six (6) drugs discussed would amount to an additional $16 million in profit per year for Heritage and assumed no loss in market share.

382.   On June 25, 2014, Malek spoke with Patel (Teva) for approximately fourteen (14) minutes, confirming that Heritage would soon be increasing prices for a number of drugs sold by Teva.

383.   On June 26, 2014, Heritage began sending out price increase notices to customers for nine (9) different drugs, including Acetazolamide. Sather (Heritage) sent a text message to a large wholesaler customer:

> As of 7/1, [m]arket wide we are increasing prices on: Paromomycin, Nimodipine, Acetazolamide ER, Fosi/HCTZ, Glip/Met, Glyburide and Theophylline ER. You will see only the Paro and Nimo increases—you have those letters." She followed up with another text moments later, "Here are the approximate/average $ increases on the other items: Acetazolamide 75% increase, Fosi/HCTZ 200%, Glip/Met 100%, Glyburide 200%, Theo ER . . . 150%.

384.   By July 9, 2014, Heritage was able to raise Acetazolamide prices to at least seventeen (17) customers nationwide. Heritage, Teva and Zydus collectively implemented a successful 75% increase on prices for Acetazolamide.

ii.    Amiloride HCL/HCTZ, Clemastine Fumarate, Diclofenac, Diltiazem HCL, Tolmetin Sodium Capsules

385.    Amiloride is a potassium-sparing diuretic that prevents your body from absorbing too much salt and keeps your potassium levels from getting too low.

386.    During the relevant time period, Plaintiff Harris County purchased Amiloride manufactured and/or sold by Mylan, Par, Rising and Teva.

387.    Clemastine is an antihistamine used to relieve symptoms of allergy, hay fever and the common cold.

388.    During the relevant time period, Plaintiff Harris County purchased Clemastine manufactured and/or sold by Sandoz and Teva.

389.    Diclofenac is a nonsteroidal anti-inflammatory drug used to reduce substances in the body that cause pain and inflammation.

390.    During the relevant time period, Plaintiff Harris County purchased Diclofenac manufactured and/or sold by Actavis, Akorn, Amneal, Apotex, Glenmark, Lannett, Mylan, Par, Pfizer, Sandoz, Taro, Teligent and Teva.

391.    Diltiazem HCL is used to treat high blood pressure, angina and certain heart rhythm disorders.

392.    During the relevant time period, Plaintiff Harris County purchased Diltiazem manufactured and/or sold by Actavis, Apotex, Mylan, Par, Sandoz, Sun and Teva.

393.    Tolmetin is used to reduce pain, swelling, and joint stiffness from rheumatoid arthritis and osteoarthritis.

394.    During the relevant time period, Plaintiff Harris County purchased Tolmetin manufactured and/or sold by Mylan, Sun and Teva.

395.    As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Amiloride, Clemastine Fumarate Tablets, Diclofenac Tablets, Diltiazem HCL Tablets and Tolmetin Sodium Capsules as follows:

396.    On August 9, 2013, Teva raised prices on twelve (12) different drugs, including Amiloride, Clemastine Fumarate Tablets, Diclofenac Tablets, Diltiazem HCL Tablets and Tolmetin Sodium Capsules. These increases were coordinated with a number of Teva's competitors, including Defendants Mylan, Sandoz, Taro, Lupin, Glenmark, Zydus and Apotex.

397.    On July 11, 2013, Patel (Teva) sent a preliminary draft list of price increase candidates to a colleague which included all of these drugs and involved the following competitors: Actavis, Aurobindo, Glenmark, Heritage, Lupin, Mylan and Sandoz. In the days leading up to the price increase, Patel was communicating directly with executives at nearly all of these competitors, including the following:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:11:24 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:08:34 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Grauso, Jim (Aurobindo) | 0:08:34 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:08 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:21:08 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:00:05 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:00:07 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:16:16 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:04 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:04:26 |
| 7/10/2013 | Text | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:00:00 |
| 7/11/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:54 |
| 7/11/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:07:29 |

398.    Patel was also communicating indirectly with Mylan through Green (Teva). For example, on July 10, 2013 - the day before Patel sent the preliminary price increase list - Green and Mylan's Jim Nesta ("Nesta") spoke twice. The next day, on July 11, Nesta and Green exchanged several more calls. The timing of those calls is set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 7/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 15:29:50 | 0:15:38 |
| 7/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 15:46:55 | 0:02:18 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Teva) | 15:59:38 | 0:07:05 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 12:11:34 | 0:00:08 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:12:47 | 0:00:17 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:38:48 | 0:04:03 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:43:51 | 0:00:00 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:20:15 | 0:01:52 |

399.    By August 7, 2013, Patel had finalized the list of drugs for which Teva planned on increasing the prices and circulated it internally. The spreadsheet that Patel circulated included competitively sensitive information about certain competitors' plans regarding future price increases that Patel and/or Green could have only learned from directly colluding with those competitors.

400.    Teva and its competitors were coordinating consistently during this period, including the time leading up to the August 9, 2013 increases. During each step in the process, Teva kept its co-conspirators apprised of its decisions.

401.    The day before the price increase went into effect - August 8, 2013 - Patel was particularly busy, spending most of her morning reaching out and communicating with several key competitors:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 7:27:26 | 0:00:33 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:34:46 | 0:11:41 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:59:48 | 0:00:01 |
| 8/8/2013 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:01:07 | 0:00:00 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 8:04:04 | 0:12:15 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Nesta, Jim (Mylan) | 9:08:05 | 0:00:00 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Nesta, Jim (Mylan) | 9:08:28 | 0:00:07 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Nesta, Jim (Mylan) | 9:27:19 | 0:00:37 |

402.    Based on all of these communications between these competitors, Teva was able to successfully increase price on numerous drugs on August 9, 2013, including: Amiloride, Clemastine Fumarate Tablets, Diclofenac Tablets, Diltiazem HCL Tablets and Tolmetin Sodium Capsules. Teva's price increases were coordinated with similar price increases from its competitor co-conspirators that occurred during 2013 and then subsequently again in 2014.

403.    NADAC data shows that following Teva's price increases (and the coordinated price increases of other competitors) the average market-wide price of Amiloride, Clemastine Fumarate Tablets, Diclofenac Tablets, Diltiazem HCL Tablets and Tolmetin Sodium Capsules rose dramatically in late 2013 and early 2014 and continued to increase as these co-conspirators implemented subsequent coordinated price increases in the Fall of 2014, as depicted in Figures 9-13 below:

90

**Figure 9: Amiloride NADAC Price Increase**



**Figure 10: Clemastine NADAC Price Increase**



**Figure 11: Diclofenac NADAC Price Increase**

**Figure 12: Diltiazem NADAC Price Increase**



**Figure 13: Tolmetin NADAC Price Increase**



404.    No shortages or other market features can explain Defendants' price increases for Amiloride, Clemastine Fumarate Tablets, Diclofenac Tablets, Diltiazem HCL Tablets and Tolmetin Sodium Capsules.

iii.    Amitriptyline

405.    Amitriptyline is a tricyclic antidepressant used to treat symptoms of depression.

406.    During the relevant time period, Plaintiff Harris County purchased Amitriptyline manufactured and/or sold by Mylan, Par, Sandoz, Sun and Zydus.

407.    As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the price of Amitriptyline as follows:

408.   Beginning in May 2014, the average NADAC price for Amitriptyline rose dramatically.

409.   These price increases followed the (i) April 1, 2014 HDMA Annual CEO Roundtable Fundraiser in New York, New York, at which numerous Defendants who sold Amitriptyline attended, including: Mylan, Par, and Sandoz.

410.   According to NADAC data, the average market prices of Amitriptyline remained stable prior to May 2014, but rose dramatically and remained artificially inflated thereafter.  Figures 14-15 below shows average price increases for various dosages of Amitriptyline tablets:

**Figures 14-15: Amitriptyline NADAC Price Increase**





411.   WAC data confirms that the Defendants increased Amitriptyline prices largely in unison by the following amounts:

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage of Increase |
|---|---|---|---|---|---|---|
| 100ct | Sandoz | 00781148801 | $0.05 | $0.57 | 5/23/2014 | 1032% |
| 1,000ct | Sandoz | 00781148810 | $0.05 | $0.48 | 5/23/2014 | 945% |
| 100ct | Mylan | 00378265001 | $0.05 | $0.57 | 7/16/2014 | 1,032% |
| 1,000ct | Mylan | 00378265010 | $0.05 | $0.57 | 7/16/2014 | 1,157% |
| 100ct | Par | 0060322421 | | $0.57 | 9/26/2014 | |
| 1,000ct | Par | 0060322432 | | $0.48 | 9/26/2014 | |

412.   News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, market-wide price increases. For example, the Financial Times reported on May 12, 2015 that the $1.07 price for a 100 mg pill of Amitriptyline "jumped by 2,487 per cent in under two years" noting that "in July 2013, the same pill cost just 4 cents."[44] The Boston Globe similarly reported, in November of the same year, "The cost of the antidepressant drug Amitriptyline jumped 2,475 percent, from 4 cents for a 100-milligram pill in 2013 to $1.03 in 2015."[45]

413.   The GAO Report identified Amitriptyline as having experienced an "extraordinary price increase."[46] These price increases impacted multiple dosages of Amitriptyline.

414.   No shortages or other market features can explain Defendants' price increases for Amitriptyline.

   iv.   <u>Cimetidine Tablets, Desmopressin Acetate, Fluvastatin Sodium and Prazosin HCL</u>

415.   Cimetidine is a stomach acid reducer that is used to treat and prevent certain types of stomach ulcer.

416.   During the relevant time period, Plaintiff Harris County purchased Cimetidine manufactured and/or sold by Akorn, Mylan and Teva.

417.   Fluvastatin Sodium ("Fluvastatin") is used to help lower LDL and triglycerides cholesterol and fats and raise to HDL cholesterol in the blood.

---

[44] David Crow, *Teva bids for Mylan amid pressure on copycat drugmakers*, FIN. TIMES, May 12, 2015, available at https://www.ft.com/content/8ff2fc5a-f513-11e4-8a42-00144feab7de
[45] Priyanka Dayal McCluskey, *As competition wanes, prices for generics skyrocket*, BOS. GLOBE, Nov. 6, 2015, available at https://www.bostonglobe.com/business/2015/11/06/generic-drug-price-increases-alarm-insurers-providers-andconsumers/H3iA9CSxAUylnCdGjLNKVN/story.html.
[46] GAO Report at Appx. III.

418.    During the relevant time period, Plaintiff Harris County purchased Fluvastatin manufactured and/or sold by Mylan, Sandoz and Teva.

419.    Prazosin HCL ("Prazosin") is used to treat hypertension.

420.    During the relevant time period, Plaintiff Harris County purchased Prazosin manufactured and/or sold by Mylan, Pfizer and Teva.

421.    As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Cimetidine Tablets, Fluvastatin and Prazosin as follows:

422.    On August 28, 2014, Teva raised prices on a number of different drugs, including those set forth below:

| Product Description | Competitors | % WAC Increase |
|---|---|---|
| AMILORIDE HCL/HCTZ TABLETS | Mylan (88%) | 50% |
| AMOXICILLIN/CLAV CHEW TABLETS | Sandoz (34%) | 25% |
| CARBAMAZEPINE CHEWABLE TABLETS | Taro (5.9%); Torrent (24.9%) | 270% |
| CARBAMAZEPINE TABLETS | Taro (5.2%); Torrent (3.2%); Apotex (3%) | 1538% |
| CIMETIDINE TABLETS | Mylan (58%); Apotex (0.4%) | 25% |
| CLEMASTINE FUMARATE TABLETS | Sandoz (13%) | 45% |
| CLOTRIMAZOLE TOPICAL SOLUTION | Taro (5.4%) | 208% |
| DESMOPRESSIN ACETATE TABLETS | Actavis (43%) | 75% |
| DICLOFENAC POTASSIUM TABLETS | Mylan (37%); Sandoz (13.5%) | 50% |
| DISOPYRAMIDE PHOSPHATE CAPSULES | Actavis (47%) | 100% |
| ENALAPRIL MALEATE TABLETS | Mylan (30%); Wockhardt (22.5%) | 230% |
| EPITOL TABLETS | Taro (5.2%); Torrent (3.4%); Apotex (3%) | 1538% |
| FLURBIPROFEN TABLETS | Mylan (41%) | 75% |
| FLUTAMIDE CAPSULES | Par (33%); Actavis (26.8%) | 140% |
| FLUVASTATIN SODIUM CAPSULES | Mylan (82%) | 32% |
| HYDROXYUREA CAPSULES | Par (64%) | 37% |
| LOPERAMIDE HCL CAPSULES | Mylan (56%) | 25% |
| PENICILLIN VK TABLETS | Sandoz (26%); Northstar (5.3%); Dava (4%); Aurobindo (3.6%); Greenstone (2%) | 100% |
| PRAZOSIN HCL CAPSULES | Mylan (71%); Mylan Inst. (0.5%) | 21% |
| PROCHLORPERAZINE TABLETS | Mylan (35%); Cadista (30.3%); Sandoz (11%); Mylan Inst. (0.3%) | 0% |
| TOPIRAMATE SPRINKLE CAPSULES | Zydus (81%); Actavis (3.5%) | 0% |
| WARFARIN SODIUM TABLETS 10MG 100 | Taro (5.7%); Zydus (16.2%); Upsher-Smith (5%); Amneal (0.4%); | 5% |

423.   In the days and weeks leading up to the price increase, Patel (Teva) and other Teva executives, including Rekenthaler, were communicating with every "high quality" competitor on these drugs to coordinate the increases in advance. At least some of those communications are set forth in the graphic below:



424.   The day before the increase became effective – August 27, 2014 – Patel (Teva) communicated about the price increases with her contacts at Sandoz, Actavis, Taro, Zydus and Glenmark.

425.   In addition to these phone communications noted above, representatives from every Defendant met in Boston, Massachusetts shortly before the increase, from August 23-26, 2014, for the NACDS annual event, which was the largest pharmaceutical industry meeting of the year. Rekenthaler and Patel, along with many other Teva executives, as well as executives from every other corporate Defendant, attended.

426.   On August 28, 2014, after getting sign off from all of its competitors, Teva increased the price on numerous drugs, including Cimetidine Tablets, Fluvastatin and Prazosin.

427.   A large number of the drugs on Teva's August 28, 2014 price increase list were selected because Teva was following a "high quality" competitor's price increases.

428.   NADAC data shows that following these price increases the average market-wide price of Cimetidine Tablets, Fluvastatin and Prazosin began to rise after the Summer of 2014 and continued to rise as Defendants coordinated subsequent price increases for these drugs, as depicted in Figures 16-18 below:

**Figure 16: Cimetidine NADAC Price Increase**



**Figure 17: Fluvastatin NADAC Price Increase**



**Figure 18: Prazosin NADAC Price Increase**



429.   No shortages or other market features can explain Defendants' price increases for Cimetidine Tablets, Fluvastatin and Prazosin.

> v.   <u>Azithromycin Suspension, Bumetanide Tablets, Clarithromycin ER Tablets, Cyproheptadine HCL Tablets, Estazolam Tablets, Ethosuximide, Hydroxyzine, Medroxyprogesterone Tablets and Pentoxifylline Tablets</u>

430.   Azithromycin Suspension is a macrolide-type antibiotic used to treat certain bacterial infections (including sinusitis, pneumonia).

431.   During the relevant time period, Plaintiff Harris County purchased Azithromycin Suspension manufactured and/or sold by Apotex, Aurobindo, Lupin, Pfizer/Greenstone, Sandoz, Teva and Wockhardt.

432.   Bumetanide is a diuretic used to reduce extra fluid in the body (edema) caused by conditions such as congestive heart failure, liver disease, and kidney disease.

433.    During the relevant time period, Plaintiff Harris County purchased Bumetanide manufactured and/or sold by Amneal, Teva, Upsher-Smith and Zydus.

434.    Clarithromycin is a macrolide antibiotic used to treat many different types of bacterial infections affecting the skin and respiratory system.

435.    During the relevant time period, Plaintiff Harris County purchased Clarithromycin manufactured and/or sold by Actavis, Aurobindo, Hikma, Lannett, Mylan, Rising, Sandoz, Teva, Wockhardt and Zydus.

436.    Cyproheptadine is an antihistamine used to relieve allergy symptoms such as watery eyes, runny nose, itching eyes/nose, sneezing, hives, and itching.

437.    During the relevant time period, Plaintiff Harris County purchased Cyproheptadine manufactured and/or sold by Actavis, Amneal, Breckenridge, Rising and Teva.

438.    Estazolam is a benzodiazepine used to treat insomnia symptoms.

439.    During the relevant time period, Plaintiff Harris County purchased Estazolam manufactured and/or sold by Actavis and Teva.

440.    Ethosuximide is an anti-epileptic medication used to treat absence seizures.

441.    During the relevant time period, Plaintiff Harris County purchased Ethosuximide manufactured and/or sold by Akorn, Heritage, Pfizer/Greenstone, and Teva.

442.    Hydroxyzine is used to treat anxiety disorders and allergic conditions, especially those that involve the skin.

443.    During the relevant time period, Plaintiff Harris County purchased Hydroxyzine manufactured and/or sold by Actavis, Akorn, Amneal, Glenmark, Heritage, Lannett, Rising, Teva and Wockhardt.

444.    Medroxyprogesterone is a female hormone used to treat conditions such as absent or irregular menstrual periods, or abnormal uterine bleeding.

445.    During the relevant time period, Plaintiff Harris County purchased Medroxyprogesterone manufactured and/or sold by Pfizer/Greenstone and Teva.

446.    Pentoxifylline is used to improve the symptoms of a certain blood flow problem in the legs/arms (intermittent claudication due to occlusive artery disease).

447.    During the relevant time period, Plaintiff Harris County purchased Pentoxifylline manufactured and/or sold by Apotex and Teva.

448.    As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Azithromycin Suspension, Bumetanide Tablets, Clarithromycin ER Tablets, Cyproheptadine HCL Tablets, Estazolam Tablets, Ethosuximide, Hydroxyzine, Medroxyprogesterone Tablets and Pentoxifylline Tablets as follows:

449.    In November of 2013, Defendant Greenstone began planning to increase prices on several drugs, including some that overlapped with Teva, including: Azithromycin Suspension, Azithromycin Oral Suspension, and Medroxyprogesterone Tablets. Patel (Teva) and a national account executive at Greenstone were communicating frequently during that time, including exchanging six (6) text messages on November 16, 2013 and a phone call on November 23, 2013.

450.    During that same time Teva was also planning on increasing prices on over twenty (20) different generic drugs and, in addition to Greenstone, was coordinating with Defendants Sandoz, Taro, Actavis, Mylan, Lupin, Breckenridge and Heritage.

451.    Because many of these conspirators were "high quality" competitors, and because the companies had successfully conspired to raise prices previously, it was

understood that if Teva raised prices that the other companies would follow and would not seek to poach Teva's customers after the increase.

452.    Defendant Pfizer was also directly involved in the approval process for these price increases. On November 18, 2013 - only two days after Patel (Teva) and the executive at Greenstone exchanged text messages – another senior pricing executive at Greenstone sent an e-mail to Greenstone's General Manager, seeking approval to implement the price increases.

453.    Because Greenstone was a subsidiary of Pfizer, the General Manager could not make a decision on the price increase on his own; instead, he had to send a message to a senior Pfizer executive for sign off. To help convince the Pfizer executive to approve the increase, the Greenstone General Manager told the Pfizer executive that the price increases that Greenstone was seeking to take were consistent with Defendants' other price increases – in other words, he was assuring Pfizer that it was not risking losing customers in a commoditized industry by raising prices, which would be the result in a non-collusive market.

454.    Pfizer approved the price increases on November 22, 2013, the Friday before that year's Thanksgiving holiday. In the following week, Patel (Teva) communicated with her contact at Greenstone through two (2) phone calls and two (2) emails, discussing the increases.

455.    Thereafter, on Thursday, December 5, Patel continued her communications with Greenstone about the increases and how Teva would react to unsolicited customer requests for bids – trading two (2) voicemails. The same day, Teva declined to bid on Azithromycin at multiple customers.

456.    Over the next several months - during the period of time before Teva and its competitors coordinated price increases – Teva continued to refuse to bid (and reduce Greenstone's market share) when requested by customers for several At Issue Drugs involved in this price increase.

457.    On February 7, 2014, Patel created a formal list of price increase candidate drugs in a spreadsheet. In the days leading up to February 7, Patel was feverishly coordinating by phone with a number of different competitors to identify price increase candidates, including at least the following:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:23:21 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:00 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:10 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 0:15:53 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:22 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:04 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:00:00 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:00:29 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:00:11 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:04 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 0:00:04 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 0:30:28 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 1:02:06 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:05 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:00 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:03 |
| 2/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | S.C. (Breckenridge) | 0:01:20 |
| 2/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | S.C. (Breckenridge) | 0:04:53 |

458.    Those efforts were successful. By February 26, 2014, Patel had a more refined list of price increase candidates which she forwarded to another colleague for his review.

459.    That list included the following drugs and notes about each :

| Family | Market Notes | Pricing Notes |
|---|---|---|
| Clarithromycin ER | Zydus exiting | Raise non-Cardinal customers in accordance with new Cardinal price |
| OCs | Secondary at ABC | Raise to non-primary pricing/within 10% of primary market sell-refer to Anda intel |
| Cephalexin OS | | Follow Lupin - price points - WS net $14.70, 23.52, 16.75, 25.13 |
| Azith Susp | | Follow GS - price points - WS net $12.50 on all sku's |
| Medroxypro Tabs | | Follow GS - price points - WS net 8.50, 9.50, 10.50 on 100s |
| Nadolol (Econdisc only) | | Raise to originally planned increase price |
| Ethosuximide Liquid | Shared only with Versa; test quality of competitor | |
| Ethosuximide Caps | Shared only with Versa; test quality of competitor; UNPROFITABLE | |
| Cyproheptadine | Shared only with Breckenridge | Follow Breckenridge - price points - WS contract 55.10 |
| Mimvey | Shared only with Breckenridge | Follow Breckenridge - price points - WS contract 96.30 |
| BUDESONIDE | Exclusive | PER PRICING INFORMATION FROM DECEMBER |
| NIACIN ER | Exclusive but Lupin entering | PER PRICING INFORMATION FROM DECEMEBER |
| Bumetanide | Teva exiting  CHECK SALES FOR % INCREASE | Lead market with potential share loss in mind |
| Divalproex ER | UNPROFITABLE  several competitors | |
| Diflunisal | Shared only with Rising | |
| Ketoconazole Cream | Shared with Taro and Sandoz | |
| Ketoconazole Tab | Shared with Taro, Myl and Apo | |
| Mupirocin Ointment | Shared with Perrigo, GM, Taro, Sandoz | |
| Theophylline Tab | Shared with Heritage, Major and Inwood | |
| Nystatin Tab | Shared with Heritage and Mutual/Caraco | |
| Hydroxyzine Pamoate | Shared with Sandoz and Actavis | |
| Pentoxi ER | Shared with Apo and Mylan | |

460.   Patel continued to refine the list over the next several weeks, while remaining in continuous contact with Teva's conspirators:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 3/10/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | S.G. (Zydus) | 7:46:00 | 0:02:00 |
| 3/10/2014 | Voice | Rekenthaler, David (Teva) | Incoming | S.G. (Zydus) | 8:23:00 | 0:16:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:59:46 | 0:00:02 |
| 3/10/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:00:03 | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 10:46:30 | 0:05:08 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 17:48:05 | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 17:48:28 | 0:00:30 |
| 3/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 9:25:06 | 0:06:25 |
| 3/11/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 15:25:00 | 0:01:00 |
| 3/12/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 12:36:00 | 0:03:00 |
| 3/12/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 12:40:00 | 0:01:00 |
| 3/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 13:41:03 | 0:00:00 |
| 3/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 13:41:24 | 0:00:21 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:05:47 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 8:07:44 | 0:20:38 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:35:27 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:41:11 | 0:19:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rekenthaler, David (Teva) | 9:00:43 | 0:10:43 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 9:11:50 | 0:07:54 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 9:53:49 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 9:54:11 | 0:00:22 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 10:31:09 | 0:12:37 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 12:36:59 | 0:05:31 |
| 3/14/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 16:11:00 | 0:01:00 |
| 3/15/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 10:27:00 | 0:11:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:57:19 | 0:05:53 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 9:06:23 | 0:05:04 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 10:23:00 | 0:07:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 10:26:51 | 0:07:44 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 10:40:04 | 0:00:05 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | CW-2 (Rising) | 10:44:00 | 0:05:00 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | CW-2 (Rising) | 10:56:00 | 0:03:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 11:07:35 | 0:00:01 |
| 3/17/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 11:08:08 | 0:00:00 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Green, Kevin (Zydus) | 11:17:00 | 0:20:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 11:35:28 | 0:15:25 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 11:53:08 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 11:53:31 | 0:00:05 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 12:17:50 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 12:18:13 | 0:00:22 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 12:19:10 | 0:19:13 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 12:36:50 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 12:38:42 | 0:09:51 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 16:46:25 | 0:11:13 |

461.   Satisfied that Patel had confirmed agreement with all the appropriate competitors, on April 4, 2014, Teva increased pricing on various dosage strengths of the following drugs:

| Product Description | Lead/Follow | Competitors |
|---|---|---|
| AZITHROMYCIN ORAL SUSPENSION | Follow | Greenstone |
| AZITHROMYCIN SUSPENSION | Follow | Greenstone |
| BUMETANIDE TABLETS | Lead | Sandoz |
| CEPHALEXIN SUSPENSION | Follow | Lupin |
| CLARITHROMYCIN ER TABLETS | Follow | Actavis; Zydus |
| CYPROHEPTADINE HCL TABLETS 4MG 100 | Follow | Breckenridge |
| DICLOXACILLIN SODIUM CAPSULES | Lead | Sandoz |
| DIFLUNISAL TABLETS | Lead | Rising |
| ESTAZOLAM TABLETS | Follow | Actavis |
| ETHOSUXIMIDE CAPSULES | Lead | Versapharm |
| ETHOSUXIMIDE ORAL SOLUTION | Lead | Versapharm |
| HYDROXYZINE PAMOATE CAPSULES | Lead | Sandoz; Actavis |
| KETOCONAZOLE CREAM 2% | Lead | Taro; Sandoz |
| KETOCONAZOLE TABLETS | Lead | Taro; Mylan |
| MEDROXYPROGESTERONE TABLETS | Follow | Greenstone |
| MIMVEY (ESTRADIOL/NORETH) TAB | Follow | Breckenridge |
| NYSTATIN ORAL TABLETS | Lead | Heritage; Mutual |
| PENTOXIFYLLINE TABLETS | Lead | Apotex; Mylan |
| TAMOXIFEN CITRATE TABLETS | Follow | Actavis |
| THEOPHYLLINE ER TABLETS 100MG 100 | Lead | Heritage |

462.    These price increases were all coordinated and agreed-to between Teva and its competitors. Teva executives, Patel and/or Rekenthaler communicated directly with all of their key competitors in the days and weeks leading up to the increase. Many of those communications are set forth in the graphic below:



463.   NADAC data shows that following Teva's April 2014 price increases (and the coordinated and subsequent price increases of other competitors) the average market-wide price of Azithromycin Suspension, Bumetanide Tablets, Clarithromycin ER Tablets, Cyproheptadine HCL Tablets, Estazolam Tablets, Ethosuximide, Hydroxyzine and Medroxyprogesterone Tablets increased in the spring of 2014 and remained artificially high thereafter, as depicted in Figures 19-26 below:

**Figure 19: Azithromycin NADAC Price Increase**



**Figure 20: Bumetanide NADAC Price Increase**



**Figure 21: Clarithromycin NADAC Price Increase**



**Figure 22: Cyproheptadine NADAC Price Increase**



**Figure 23: Estazolam NADAC Price Increase**



**Figure 24: Ethosuximide NADAC Price Increase**



**Figure 25: Hydroxyzine NADAC Price Increase**



**Figure 26: Medroxyprogesterone NADAC Price Increase**



464.    No shortages or other market features can explain Defendants' price increases for Azithromycin Suspension, Bumetanide Tablets, Clarithromycin ER Tablets, Cyproheptadine HCL Tablets, Estazolam Tablets, Ethosuximide, Hydroxyzine, Medroxyprogesterone Tablets and Pentoxifylline Tablet.

   vi.  <u>Baclofen</u>

465.    Baclofen is used to treat muscle spasms caused by certain conditions (such as multiple sclerosis, spinal cord injury/disease).

466.    During the relevant time period, Plaintiff Harris County purchased Baclofen manufactured and/or sold by Lannett, Par, Teva and Upsher-Smith.

467.    As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Baclofen as follows:

468.    At all relevant times, Defendants Lannett, Par, Teva and Upsher-Smith have dominated, and continue to dominate, the market for Baclofen.

469.    According to NADAC data, the average market price for Baclofen remained steady prior to the spring of 2014. From November 2013 through March 2014, the average market price of Baclofen fluctuated by less than $0.003 per unit for 10mg tablets and by less than $0.0065 per unit for 20mg tablets.

470.    Beginning around in the Spring of 2014, however, the overall average market price rose by more than 550%.

471.    According to NADAC data, the average market price for Baclofen increased by the following percentages:

    Baclofen 10mg tablet: Between March 2014 and April 2014,
    prices increased 636%; and

Baclofen 20mg tablet: Between March 2014 and January 2015, prices increased 437%.

472.    WAC data confirms that Defendants Teva and Upsher-Smith both imposed dramatic price increases for Baclofen largely in unison, by the following amounts:

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage of Increase |
|---|---|---|---|---|---|---|
| 100ct | Upsher-Smith | 00832102500 | $0.10 | $0.49 | 2/21/2014 | 420% |
| 100ct | Teva | 00172409760 | $0.10 | $0.49 | 4/15/2014 | 420% |
| 1,000ct | Upsher-Smith | 00832102510 | $0.10 | $0.49 | 2/21/2014 | 420% |
| 1,000ct | Teva | 00172409780 | $0.09 | $0.49 | 4/15/2014 | 447% |

473.    Although WAC data is not available for Par and Lannett, upon information and belief, they implemented nearly simultaneous and identical price increases as Upsher-Smith and Teva.

474.    The GAO Report identified Baclofen as having "experienced an extraordinary price increase."[47]

475.    Defendants had numerous opportunities to coordinate their price increases. All Baclofen Defendants attended the (i) October 28-30, 2013 GPhA Technical Conference in North Bethesda, Maryland; and executives from at least Par, Teva, and Upsher-Smith attended the (ii) February 19-21, 2014 GPhA Annual Meeting in Orlando, Florida. Shortly thereafter, the average prices for generic Baclofen increased dramatically.

476.    No shortages or other market features can explain Defendants' price increases for Baclofen.

---

[47] GAO Report at 35.

477.    NADAC data shows that average market prices of Baclofen remained stable prior to March 2014, but rose dramatically and remained artificially high after March 2014, as depicted in Figure 27 below:

**Figure 27: Baclofen NADAC Price Increase**



478.    No shortages or other market features can explain Defendants' price increases for Baclofen during the relevant period.

vii.        <u>Benazepril HCTZ</u>

479.    Benazepril HCTZ ("Benazepril") ACE inhibitor that is used to treat high blood pressure (hypertension).

480.    During the relevant time period, Plaintiff Harris County purchased Benazepril manufactured and/or sold by Amneal, Apotex, Aurobindo, Mylan, Rising, Sun, Teva and Upsher-Smith.

481.    As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Benazepril as follows:

482.    At all relevant times, Defendants Mylan and Sandoz dominated the Benazepril market.

483.    Prior to August 2013, the effective prices for Benazepril were stable.

484.    Beginning in August 2013, the prices for Benazepril dramatically increased and in unison.

485.    As a result, prices across the market rose more than 300% for Benazepril, according to data compiled by the Healthcare Supply Chain Association and released by Senator Sanders and Representative Cummings, depicted in the chart below:

| Dosage | Package Size | October 2013 | July 2014 | Percentage Price Increase |
|---|---|---|---|---|
| 12.5-20mg | 100ct | $34 | $149 | 338% |
| 20-25mg | 100ct | $34 | $149 | 338% |
| 5-6.25mg | 100ct | $34 | $149 | 338% |

486.    NADAC data shows that average market prices of Benazepril remained stable prior to August 2013, but rose dramatically and remained artificially high after August 2013, as depicted in Figures 28-30 below.

117

**Figures 28-30: Benazepril-HCL NADAC Price Increase**





118



487. WAC data confirms that Defendants Mylan and Sandoz both imposed dramatic prices in Benazepril largely in unison, by the following amounts:

| Package Size (25mg) | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage of Increase |
|---|---|---|---|---|---|---|
| 20ct | Mylan | 00378477501 | $0.38 | $1.65 | 8/9/2013 | 334% |
| 20ct | Sandoz | 00185027701 | $0.32 | $1.62 | 8/20/2013 | 407% |

488. The GAO Report also noted an "extraordinary price increase" for Benazepril.[48]

489. This price increase occurred after the June 2-5, 2013 HDMA Business & Leadership Conference in Orlando, Florida, and the June 4-5, 2013 GPhA CMC Workshop in Bethesda, Maryland. Key executives from Defendants Mylan and Sandoz attended both and were afforded the opportunity to coordinate on these price increases in person.

---

[48] GAO Report at 35.

119

490.   No shortages or other market features can explain Defendants' price increases for Benazepril.

       viii.      <u>Bethanechol Chloride</u>

491.   Bethanechol Chloride is a cholinergic agent and stimulates the bladder to empty used to treat urinary retention.

492.   During the relevant time period, Plaintiff Harris County purchased Bethanechol Chloride manufactured and/or sold by Amneal, Lannett, Rising, Upsher-Smith and Wockhardt.

493.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Bethanechol Chloride as follows:

494.   Prior to raising the price for Bethanechol Chloride in tandem, Patel (Teva) had numerous communications with Amneal executives to coordinate these two companies price increases.

495.   Patel spoke with these Amneal executives beginning in the summer of 2014 and continued to communicate with them into at least 2015 – sometimes using alternative forms of communication. In addition to cell phones and emails, these executives also used Facebook Messenger to coordinate anticompetitive conduct.

496.   Following these communications, in January 2015, Defendants Teva and Amneal raised the prices for Bethanechol Chloride in tandem.

497.   NADAC data shows that following these coordinated price increases the average market-wide price of Bethanechol Chloride spiked in early 2015 and remained artificially high thereafter, as depicted in Figure 31 below:

**Figure 31: Bethanechol NADAC Price Increase**



498.   No shortages or other market features can explain the price increases for Bethanechol Chloride.

ix.   Budesonide DR Capsules

499.   Budesonide DR Capsules, also known by the brand name Entocort EC, is a steroid used to treat Crohn's disease and ulcerative colitis when taken orally.

500.   During the relevant time period, Plaintiff Harris County purchased Budesonide DR Capsules manufactured and/or sold by Actavis, Amneal, Mayne, Mylan, Par, Rising, Teva and Zydus.

501.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the price of Budesonide DR Capsules as follows:

502.   Teva was preparing to enter the market for Budesonide DR in or about March 2014. At that time, it was a 2-player market: Par had 70% market share and Mylan had the remaining 30%.

503.   Shortly before Teva received approval to market Budesonide DR, Par decided to increase the price of the drug. On April 1, 2014, a senior national account executive at Par called Rekenthaler (Teva). The two executives spoke for twenty-six (26) minutes. The next day, April 2, 2014 — which happened to be the same day that Teva received FDA approval to market Budesonide DR — Par increased its price for Budesonide DR by over 15%.

504.   That same day, Teva sales employees were advised in an email to find out which customers were doing business with Par and which were with Mylan, so that Teva would have a better sense of how to obtain its fair share: "it would be helpful to gather information regarding who is with mylan and who is with par...they are the two players in the mkt...as well as usage."

505.   Par and Mylan were also communicating at this time. On April 3, 2014 – the day after the Par price increase – a senior account executive at Par, spoke to a senior account manager at Mylan, for fifteen (15) minutes.

506.   On April 4, 2014, Rekenthaler (Teva) informed some members of Teva's sales force that, although the company had received approval to market and manufacture Budesonide DR, Teva was not prepared to launch the product and he did not yet know when it would do so. Nonetheless, Rekenthaler spoke to both the Vice President of Sales at Mylan and a similarly high-level executive at Par that same day.

507.   Although Teva did not launch Budesonide DR until approximately June 2016, company executives clearly attempted to coordinate pricing and market share with

its competitors in anticipation of its product launch date. When Teva entered the market in June 2016, it did so at prices slightly above its competitors.  Such pricing would not make sense in a competitive market, however it does make sense within Defendants' overarching conspiracy.

508.   The reported AWP prices for Budesonide DR during that time period demonstrates this conspiracy—as more competitors entered the market the prices did not decrease, as would be expected in a competitive market, but actually increased, as demonstrated by Figure 32:

**Figure 32: Budesonide AWP Price Increase**



x.     Budesonide Inhalation

509.   Budesonide Inhalation, also known by the brand name Pulmicort Respules, is an anti-inflammatory steroid, administered through inhalers or similar devices, used to prevent asthma attacks.

510.     During the relevant time period, Plaintiff Harris County purchased Budesonide Inhalation manufactured and/or sold by Actavis, Amneal, Apotex, Par and Sandoz and Teva.

511.     As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the price of Budesonide Inhalation as follows:

512.     Teva obtained approval to market Budesonide Inhalation in November 2008. Prior to February 2015, Teva controlled virtually the entire market for generic Budesonide Inhalation, with other competitors having less than 1% market share.

513.     On February 13, 2015, Rekenthaler (Teva) informed other Teva employees of Actavis's plans to enter the market, saying: "[i]t appears that Actavis is intending on shipping" Budesonide Inhalation. Rekenthaler and Actavis's Vice President of Marketing, Pricing and Contracts Marc Falkin ("Falkin") had spoken by phone three (3) days earlier on February 10, 2015.

514.     On February 16, 2015, Rekenthaler and Falkin had another lengthy telephone conversation lasting twenty-three (23) minutes. The following morning, a Teva executive confirmed to her colleagues that Teva had conceded the Budesonide Inhalation accounts of two major customers to Actavis. She explained that Actavis's sense of urgency to obtain the accounts was due to concerns about getting its product into market before it faced legal action from the brand manufacturer. Thus, she explained, she was working with the customers on an "exit strategy" to get Teva's product out of the supply channel, so as to streamline Actavis's entry into the market.

515.     This agreement between Teva and Actavis was for the purposes of and allowed each competitor to maintain its "fair share" in the Budesonide Inhalation market.

xi.      Buspirone HCL Tablets, Estradiol Tablets, Labetalol Tablets, Loperamide HCL Capsules, Mimvey Tablets, Nadolol Tablets, Nitrofurantoin MAC Capsules and Tamoxifen Citrate Tablets

516.    Buspirone HCL ("Buspirone") is used to treat symptoms of anxiety, such as fear, tension, irritability, dizziness, pounding heartbeat, and other physical symptoms.

517.    During the relevant time period, Plaintiff Harris County purchased Buspirone Hydrochloride manufactured and/or sold by Actavis, Amneal, Mylan, Par, Teva and Zydus.

518.    Estradiol is a female hormone (estrogen) used to treat certain symptoms of menopause such as dryness, burning, and itching of the vaginal area and urgency or irritation with urination.

519.    During the relevant time period, Plaintiff Harris County purchased Estradiol manufactured and/or sold by Actavis, Amneal, Breckenridge, Glenmark, Mayne, Mylan, Sandoz and Teva.

520.    Labetalol is used to treat high blood pressure (hypertension).

521.    During the relevant time period, Plaintiff Harris County purchased Labetalol manufactured and/or sold by Actavis, Par, Teva and Zydus.

522.    Loperamide HCL Capsules is used to treat sudden diarrhea.

523.    During the relevant time period, Plaintiff Harris County purchased Loperamide HCL Capsules manufactured and/or sold by Mylan and Teva.

524.    Mimvey is used for the treatment of moderate to severe vasomotor symptoms associated with menopause, and the prevention of postmenopausal osteoporosis.

525.    During the relevant time period, Plaintiff Harris County purchased Mimvey manufactured and/or sold by Teva.

526.   Nadolol is a "beta blocker" which is used to treat high blood pressure, reducing the risk of stroke and heart attack.

527.   During the relevant time period, Plaintiff Harris County purchased Nadolol manufactured and/or sold by Amneal, Mylan, Pfizer, Sandoz, Teva and Zydus.

528.   Nitrofurantoin is used for short-term treatment of urinary tract infections.

529.   During the relevant time period, Plaintiff Harris County purchased Nitrofurantoin manufactured and/or sold by Actavis, Amneal, Mylan, Sun and Teva.

530.   Tamoxifen Citrate ("Tamoxifen") is a nonsteroidal antiestrogen used to block the actions of estrogen to treat some types of breast cancer in men and women.

531.   During the relevant time period, Plaintiff Harris County purchased Tamoxifen manufactured and/or sold by Actavis, Mayne, Mylan, Teva and Zydus.

532.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the price of Buspirone Hydrochloride Tablets, Estradiol Tablets, Labetalol Tablets, Loperamide HCL Capsules, Mimvey Tablets, Nadolol Tablets, Nitrofurantoin MAC Capsules and Tamoxifen Citrate Tablets as follows:

533.   Effective July 31, 2012, Teva increased pricing on a number of different drugs, including the following:[49]

---

[49] Watson Pharmaceuticals, Inc. ("Watson"), acquired Actavis in or about October 2012. The two companies operated as a single entity, albeit under separate names, until January 2013, when Watson announced that it had adopted Actavis, Inc. as its new global name. *See* https://www.allergen.com/news/news/thomsonreuters/Watson-pharmaceuticals-inc-is-now-actavis-inc.

| Drug | Competitors |
|------|-------------|
| Buspirone Hydrochloride Tablets | Mylan (29.5%); Watson (23.5%) |
| Estradiol Tablets | Mylan (26.7%); Watson (16.4%) |
| Labetalol HCL Tablets | Sandoz (61.4%); Watson (10%) |
| Loperamide HCL Capsules | Mylan (67%) |
| Mimvey (Estradiol/Noreth) Tablets | Breckenridge (66.2%) |
| Nadolol Tablets | Mylan (49.8%); Sandoz (10.3%) |
| Nitrofurantoin MAC Capsules | Mylan (45.3%); Alvogen (7.9%) |
| Tamoxifen Citrate Tablets | Mylan (22.2%); Watson (10.3%) |

534.    Before raising prices on these drugs, Teva coordinated each of these price increases with its competitors. For every drug on the list above, Teva was communicating directly or indirectly with its competitors to coordinate in the days and weeks leading up to the price increase. For example:

- **Mylan**: Green (Teva) spoke to Nesta (Mylan) on July 23 (7 minutes), July 24 (2 calls: 4 and 8 minutes); July 25 (4 minutes); July 26 (4 minutes); July 30 (2 calls, including one 8 minutes); and July 31, 2012 (5 calls: 6, 2, 4, 7 and 2 minutes);

- **Actavis/Watson:** Rekenthaler (Teva) spoke to a senior Actavis/Watson sales executive on July 11, 2012 (2 calls: 1 and 9 minutes);

- **Sandoz:** Green (Teva) spoke to an executive at Sandoz on July 29, 2012 (2 calls: 2 and 4 minutes) and July 31, 2012 (6 minutes);

- **Breckenridge:** Rekenthaler (Teva) spoke to a senior sales executive at Breckenridge on July 17, 2012 (4 minutes).

535.     With regards to Nadolol, as early as 2012, Teva was speaking to competitors about this drug.

536.    In 2012 and 2013, Teva's only competitors for Nadolol were Mylan and Sandoz. All three (3) companies experienced supply problems of some sort during that time period, but they were in continuous communication to coordinate pricing and market allocation in order to maintain market stability. Nadolol was a high-volume drug

and one of the most profitable drugs where Teva, Mylan and Sandoz overlapped, so it was very important that they maintain their coordination.

537.   By 2012, an anticompetitive understanding among Teva, Mylan and Sandoz was firmly entrenched.

538.   Teva raised its price on Nadolol on July 31, 2012. In the days leading up to that increase—following a pattern that would become routine and systematic over the following years—Green (Teva) was in frequent communication with executives at both Sandoz and Mylan. Green spoke to an executive at Sandoz twice on July 29, 2012, and again on the day of the price increase, July 31, 2012. Similarly, Green was communicating with Nesta of Mylan often in the days leading up to the increase, including five (5) calls on the day of the price increase.

539.   Sandoz followed with its own increase on August 27, 2012. The increases were staggering – varying from 746% to 2,762% depending on the formulation. The day before the Sandoz increase, then the Senior Director of Pricing and Contracts at Sandoz called Green. They had also spoken once earlier in the month, shortly after the Teva increase. This Sandoz executive also called Green twice on August 21, 2012 – the same day that Sandoz requested approval from its Pricing Committee to raise the Nadolol price. The day after the Sandoz increase, Green—acting as the conduit of information between Sandoz and Mylan—called Nesta of Mylan twice.

540.   Mylan, which returned to the market after a brief supply disruption, followed and matched the Teva and Sandoz increases on January 4, 2013. The day before the Mylan increase Nesta spoke to Green four (4) times. The next day, Green conveyed the information he had learned from Nesta directly to his counterpart at Sandoz.

541.    On January 4, 2013 – the day of the Mylan increase Green called executives at Sandoz twice in the morning. Shortly after hanging up with Green, a Sandoz executive reported internally on what he had learned – but concealing the true source of the information – a convention that was frequently employed by many Sandoz executives to avoid documentation of their covert communications with competitors:

**From:** Kellum, Armando
**Sent:** Friday, January 04, 2013 11:28 AM
**To:** ███████████████████████████████████████████
███████████████████████
**Subject:** Levothryoxine and nadolol

Just heard from a customer that

- Teva and Mylan raised have now raised price on Nadolol to our levels

and

Mylan took a significant price increase on Levothryoxine

Let's please be cautious on both of these products.

Thanks

Being "cautious" on those products meant that Sandoz did not want to steal business away from its competitors by offering a lower price and taking their market share.

542.    At 11:50am the same morning, Green (Teva) called his contact at Sandoz and they spoke for fifteen (15) minutes.

543.    NADAC data shows that following these competitor Defendants' price increases the average market-wide price of Estradiol Tablets, Labetalol Tablets, Loperamide HCL Capsules, Mimvey Tablets, Nadolol Tablets, Nitrofurantoin MAC Capsules and Tamoxifen Citrate Tablets rose dramatically in late 2012 and remained artificially high thereafter despite new competitors (co-conspirators) re-entering the market, as depicted in Figures 33-39 below:

**Figure 33: Buspirone NADAC Price Increase**



**Figure 34: Estradiol NADAC Price Increase**



**Figure 35: Labetalol NADAC Price Increase**



**Figure 36: Loperamide NADAC Price Increase**



**Figure 37: Mimvey NADAC Price Increase**



**Figure 38: Nadolol NADAC Price Increase**



**Figure 39: Tamoxifen NADAC Price Increase**



544. With the limited exception of a short-term supply issue in 2012-13, no shortages or other market features can explain the lasting and coordinated price increases for Buspirone Hydrochloride Tablets, Estradiol Tablets, Labetalol Tablets, Loperamide HCL Capsules, Mimvey Tablets, Nadolol Tablets, Nitrofurantoin MAC Capsules and Tamoxifen Citrate Tablets.

xii.    Cabergoline

545. Cabergoline is used to treat high levels of prolactin hormone in your body.

546. During the relevant time period, Plaintiff Harris County purchased Cabergoline manufactured and/or sold by Apotex, Mylan, Par, Pfizer/Greenstone, and Teva.

547. Throughout the relevant period, Defendant Teva was the incumbent supplier of Cabergoline.

548.    As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the price of Cabergoline as follows:

549.    In December of 2014, Defendant Greenstone was preparing to enter the market for Cabergoline. Under the "rules of the road," Greenstone would therefore be entitled to its "fair share" of Teva customers. Accordingly, Greenstone wanted to communicate this to Teva and chose to do so through an intermediary—its customer's employee, a senior executive responsible for generic products at a large joint venture between a retail pharmacy and a large wholesaler.

550.    This intermediary told Teva that Greenstone was entering the market for Cabergoline and was seeking to target specific customers, specifically requesting that Teva give up a large wholesaler to the new entrant, telling Teva that "Greenstone has promised to play nice[ly] in the sandbox."

551.    After discussing the matter internally, a Teva representative responded – again, via the same intermediary – that Teva would give the business with the requested wholesaler to Teva's competitor: "[t]ell Greenstone we are playing nice in the sandbox and we will let them have [the wholesaler]."

552.    Pursuant to this agreement, Greenstone was able to acquire the wholesaler as a customer for Cabergoline without fear that Teva would compete to retain the business. In exchange, Greenstone agreed to "play nice in the sandbox" – *i.e.*, not to compete with Teva for other customers and drive prices down.

xiii.    Capecitabine

553.    Capecitabine, also known by the brand name Xeloda, is a chemotherapy agent used in treating breast and colon cancers.

554.    During the relevant time period, Plaintiff Harris County purchased Capecitabine manufactured and/or sold by Amneal, Hikma, Mylan, and Teva.

555.    As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Capecitabine as follows:

556.    As early as January 2014, Teva and Mylan were planning their eventual Capecitabine launch. As was standard practice in Defendants' cartel, part of this planning process included sharing the market and allocating Capecitabine customers between them.

557.    For example, in a January 31, 2014 e-mail, a national accounts executive at Teva, told Rekenthaler and others at Teva, that Mylan was courting a specific customer, Armada Health Care. Teva incorporated this information from Mylan into its launch plan for Capecitabine.

558.    On February 26, 2014, Mylan's Nesta called Rekenthaler at Teva and they spoke for approximately a quarter of an hour. Nesta told Rekenthaler that Mylan would not be able to launch Capecitabine on time, which Rekenthaler immediately passed on to his Teva colleagues; this meant that, as the sole generic supplier of Capecitabine, Teva would charge a higher price than it could if it faced generic competition.

559.    A week or two later, in early March 2014, Teva launched as the sole generic supplier of Capecitabine, and remained the exclusive generic Capecitabine manufacturer until August, when Mylan finally entered the market.

560.    On August 4, in preparation for Mylan entering the market, Nesta (Mylan) and Rekenthaler (Teva) spoke three (3) times by telephone, during which calls they

discussed how to divide up the market between them, including that Teva would concede its Capecitabine business at ABC, Econdisc and McKesson/Rite-Aid to Mylan.

561.   After their calls, Rekenthaler e-mailed Cavanaugh, his boss at Teva, regarding this issue, to which Cavanaugh replied that they should discuss in person when she was back in the office the next day.

562.   Less than an hour later, Rekenthaler sent another e-mail requesting Patel run a customer report and indicating that Mylan will "be looking at ABC, McKesson, and Econdisc as well as a couple small guys, probably aiming at 35% share."

563.   On August 7, 2014, Nesta (Mylan) and Rekenthaler (Teva) spoke by phone for nearly thirteen (13) minutes. On that call, Nesta and Rekenthaler reconfirmed their market allocation scheme.

564.   This market allocation scheme was highlighted in other e-mails as well. On August 10, 2014, a Teva sales representative sent an internal email about the plan, including to Rekenthaler and Patel. Rekenthaler knew Mylan was targeting Econdisc, even though Econdisc had not contacted Teva, because he and Nesta had previously discussed it.

565.   The next morning, at 8:30am on August 11, 2014, Rekenthaler alerted others at Teva that Mylan had received formal approval to market Capecitabine. Five (5) minutes later, Rekenthaler received a call from Nesta (Mylan). After exchanging voicemails, the two spoke at 8:52 am. The call lasted just under six (6) minutes. Shortly after hanging up the phone, at approximately 9:02 am, Rekenthaler e-mailed Patel and others at Teva to confirm Mylan's participation in the scheme.

566.   In accordance with their market allocation scheme and in furtherance of all Defendants' overarching conspiracy, Mylan targeted the Capecitabine accounts of ABC,

Econdisc, and McKesson/Rite-Aid; and in accordance with their market allocation scheme and in furtherance of all Defendants' overarching conspiracy allocation, Teva conceded all three of those accounts.

567.    In addition, and also pursuant to these agreements, Teva conceded some smaller customers, as well. For example, on August 14, 2014, Cigna (a smaller customer) told Teva that Cigna had received a bid for Capecitabine. On August 18, Rekenthaler called Nesta to discuss the market allocation scheme and Mylan's bid to Cigna. The pair talked for thirteen (13) minutes. The next day, Teva confirmed internally that it "will be conceding this business" at Cigna. Teva did not retain Cigna's Capecitabine business; instead, it went to Mylan.

568.    After these market allocation agreements, Teva and Mylan were each able to obtain their agreed upon "fair share" of the Capecitabine market.

xiv.    Celecoxib

569.    Celecoxib, also known by the brand name Celebrex, is a Non-Steroidal Anti-Inflammatory drug, and is used in the treatment of pain and inflammation associated with rheumatoid arthritis, juvenile rheumatoid arthritis and other disorders.

570.    During the relevant time period, Plaintiff Harris County purchased Celecoxib manufactured and/or sold by Actavis, Apotex, Aurobindo, Lupin, Mylan, Pfizer and Teva.

571.    As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, Defendants conspired to fix, raise, maintain and/or stabilize the price of Celecoxib as follows:

572.    Teva received approval to market generic Celecoxib in May of 2014.

573.    On November 20, 2014, as Teva was preparing to launch Celecoxib, a customer informed Teva that Actavis was bidding on some of that customer's Celecoxib business. The customer said that Actavis was preparing for a launch of its own Celecoxib product and had advocated for the sale by pointing out that Teva had already secured over 30% of the market.

574.    Rekenthaler (Teva) took a cooperative – rather than competitive – stance upon hearing that news and agreed with Actavis to divide the market in accordance with these competitors overarching "fair share" agreement.

575.    Eleven (11) days later, on December 1, 2014, the issue of which account for Teva to give to Actavis to obtain its "fair share" remained undecided. Another customer, a large retail pharmacy chain, became actively involved in trying to broker an agreement between Teva and Actavis, and – in accordance with the Defendants' overarching conspiracy – ultimately split its business between Teva and Actavis to accommodate the "rules of the road."

576.    In addition, in the days leading up to Teva's Celecoxib launch of December 10, 2014, Teva executives had numerous telephone conversations with their counterparts at Actavis to ensure they had agreement on their market allocation scheme. For example, Rekenthaler had a six-minute call with Falkin at Actavis on November 25; the two spoke twice more a week later, on December 3. Patel spoke to a senior sales and marketing executive at Actavis, for approximately eight minutes on December 5, and for over a quarter hour a few days later, on December 8. Rekenthaler and Falkin resumed their communications the day before the Teva launch December 9 with a one-minute phone call. On the day of the launch – December 10 – Rekenthaler and Falkin spoke three (3) times, the longest of which was for approximately nine (9) minutes.

577.   As Teva and Actavis entered the Celecoxib market, they continued to allocate the market in accordance with their "fair share" agreement.

xv.      Clobetasol

578.   Clobetasol is a corticosteroid used to treat skin conditions such as eczema, contact dermatitis, seborrheic dermatitis, and psoriasis.

579.   During the relevant time period, Plaintiff Harris County purchased Clobetasol manufactured and/or sold by Actavis, Akorn, Glenmark, Lupin, Mylan, Perrigo, Sandoz/Fougera, Taro, Teligent and Wockhardt.

580.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, Defendants conspired to fix, raise, maintain and/or stabilize the price of Clobetasol as follows:

581.   In 2009, there were approximately ten (10) Clobetasol manufacturers. In 2012, Novartis acquired Fougera and in 2013, Akorn acquired Hi-Tech, further consolidating the market. By 2014, many Clobetasol manufacturers exited the market, including Teva and Glenmark.

582.   Since May 2014, Defendants Actavis, Fougera, Perrigo, Sandoz, Taro and Wockhardt have dominated the market for Clobetasol.

583.   Prior to 2014, the effective prices for Clobetasol were stable.

584.   Beginning in May 2014, however, these Defendants all increased their prices abruptly and in unison.

585.   Collectively, these Defendants raised prices for Clobetasol by approximately 1,300% between July 2014 and September 2014.

586.   According to NADAC data, the average market price for Clobetasol saw the following price increases from July 2014 to September 2014:

Clobetasol .05% Ointment (15g): increased by 1,852%;

Clobetasol 0.05% Solution (50mL): increased by 1,176%; and

Clobetasol 0.05% Cream (30g): increased by 1,596%.

587.   NADAC data shows that average market prices of Clobetasol remained stable prior to July 2014, but rose dramatically and remained artificially high after June 2014, as depicted in Figures 40-43 below:

**Figures 40-43: Clobetasol NADAC Price Increase**



CLOBETASOL 0.05% CREAM







588.   WAC data depicted below confirms that Defendants Actavis, Sandoz and Taro all increased prices in their Clobetasol cream largely in unison by the following amounts:

| Clobetasol cream .05%: | Defendant: | Old WAC: | New WAC: | Date of Increase: | Percentage Increase: |
|---|---|---|---|---|---|
| 15gm | Taro | $0.38 | $6.84 | 3-Jun-14 | 1684% |
| 15gm | Sandoz | $0.73 | $6.84 | 18-Jul-14 | 833% |
| 15gm | Actavis | * | $6.84 | 10-Mar-15 | * |
| 30gm | Taro | $0.33 | $6.84 | 3-Jun-14 | 1993% |
| 30gm | Sandoz | $0.50 | $6.84 | 18-Jul-14 | 1268% |
| 30gm | Actavis | * | $6.84 | 10-Mar-15 | * |
| 45gm | Taro | $0.33 | $6.84 | 3-Jun-14 | 1971% |
| 45gm | Sandoz | $0.59 | $6.84 | 18-Jul-14 | 1057% |
| 45gm | Actavis | * | $6.84 | 10-Mar-15 | * |

| 60gm | Taro | $0.32 | $6.12 | 3-Jun-14 | 1832% |
| 60gm | Sandoz | $0.50 | $6.12 | 18-Jul-14 | 1124% |
| 60gm | Actavis | * | $6.12 | 10-Mar-15 | * |

589.    Although WAC data is not available for Fougera, Perrigo and Wockhardt, upon information and belief, they implemented simultaneous and identical price increases in their Clobetasol products.

590.    No shortages or other market features can explain the price increases for Clobetasol.

591.    News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, market-wide price increases.

592.    For example, by October 2014, pharmacists expressed outrage at the dramatic price increases. Kushal Patel, a pharmacy manager at Well Future Pharmacy said "Clobetasol, which used to cost $10 for the entire tube, now costs $300. The same exact medication we got one day. Next day, it's an increase of three thousand percent."[50]

593.    Ascension Health, a hospital system with facilities in 23 states, reported a price increase from $2.89 in 2013 to $198.64 (or 6,773%) in 2014 for a 45-gram tube of generic Clobetasol propionate cream.[51]

---

[50] Dorothy Tucker, Prices Soar For Some Generic Drugs – Why?, CBS CHICAGO, Oct. 31, 2014, http://chicago.cbslocal.com/2014/10/31/prices-soar-for-some-generic-drugs-why/.
[51] Samantha Liss, Hospitals and Pharmacies Grapple With Rising Drug Prices, St. Louis Post-Dispatch, Nov. 16, 2014, http://www.stltoday.com/business/local/hospitals-and-pharmacies-grapple-with-rising-drug- prices/article_c6616678-bf8f-5b0e-8df1-9238df0f6919.html.

594.    Express Scripts, a PBM company that compiles its own price index for generic drugs, included Clobetasol in the top four most significant price increases for 2014[52] and in the top ten for 2015.[53]

595.    An article in the Boston Globe described price changes from 2013 to 2015, when one form of Clobetasol's price spiked 1,496% from $0.23 per gram to $4.15 per gram.

596.    Defendants had numerous opportunities to coordinate their price increases. Key pricing executives from at least Actavis, Sandoz, Taro and Wockhardt attended the (i) June 1-4, 2014 HDMA Business and Leadership Conference in Phoenix, Arizona; and key executives from at least Actavis, Fougera, Perrigo, Sandoz and Taro attended the (ii) June 3- 4, 2014 GPhA Annual CMC Workshop in Bethesda, Maryland.

xvi.    Clomipramine

597.    Clomipramine, sold under the brand name Anafranil among others, is a tricyclic antidepressant used for the treatment of obsessive–compulsive disorder, panic disorder, major depressive disorder and chronic pain.

598.    During the relevant time period, Plaintiff Harris County purchased Clomipramine manufactured and/or sold by Mylan and Taro.

599.    As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the price of Clomipramine Capsules as follows:

---

[52] The Reality Behind Generic Drug Inflation, EXPRESS SCRIPTS, Dec. 30, 2014, http://lab.express-scripts.com/lab/insights/drug-options/the-reality-behind-generic-drug-inflation.
[53] 2015 Drug Trend Report, EXPRESS SCRIPTS, March 2016, available at http://lab.express-scripts.com/lab/drug-trend-report/previous-reports.

600. Defendants Mylan, Sandoz and Taro dominate the market for Clomipramine. Their sales represent approximately 98% of total generic Clomipramine sales.

601. Prior to 2013, the effective prices for Clomipramine were stable.

602. Upon information and belief, around May 2013 these Defendants suddenly and dramatically raised the price of Clomipramine largely in unison.

603. The Average Whole Price ("AWP") for Clomipramine 50 mg increased by the following amounts:

| Defendant | Old AWP price | New AWP price | Post-increase date | Percentage increase |
|---|---|---|---|---|
| Mylan | $1.172 | $11.242 | May 2013 | 859% |
| Sandoz | $1.065 | $11.242 | July 2013 | 956% |
| Taro | $1.103 | $11.242 | May 2013 | 919% |

604. NADAC price data demonstrates that the average market price per unit for generic Clomipramine (50 mg) increased from $0.31 in April 2013 to $9.03 in July 2013, representing a more than 2,800% increase.

605. WAC data confirms that Defendants Mylan, Sandoz and Taro all increased their Clomipramine prices largely in unison by the following amounts.

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 90ct | Taro | 51672401106 | $0.25 | $8.99 | 5/1/2013 | 3,441% |
| 90ct | Taro | 51672401105 | $0.25 | $8.99 | 5/1/2013 | 3,441% |
| 100ct | Mylan | 378302501 | $0.30 | $8.99 | 5/16/2013 | 2,853% |
| 100ct | Sandoz | 781202701 | $0.31 | $8.99 | 7/22/2013 | 2,778% |

606.    Prices for various dosages of Clomipramine increased by as much as 2,000% in one year, according to the GAO Report.[54] In 2015 alone, total sales revenue for Clomipramine spiked to $519 million, which is more than half the total sales revenue for the same products from 2011-2014 combined. This type of revenue growth in a mature market is evidence of Defendants' collusion.

607.    No shortages or other market features can explain the price increases for Clomipramine.

608.    NADAC data shows that average market prices of Clomipramine remained stable prior to May 2013, but rose dramatically and remained artificially high after May 2013, as depicted in Figure 44 below:

**Figure 44: Clomipramine NADAC Price Increase**



609.   No shortages or other market features can explain Defendants' price increases for Clomipramine during the relevant period.

xvii.      Clonidine TTS Patch and Doxazosin Mesylate

610.   The Clonidine TTS Patch ("Clonidine-TTS"), also known by the brand name Catapres-TTS, is a transdermal patch that administers such medicines to treat high blood pressure.

611.   During the relevant time period, Plaintiff Harris County purchased Clonidine manufactured and/or sold by Actavis, Mayne, Mylan and Teva.

612.   Doxazosin mesylate ("Doxazosin"), also known by the brand names Cardura and Carduran, is a quinazoline compound used to treat high blood pressure and urinary retention associated with benign prostatic hyperplasia.

613.   During the relevant time period, Plaintiff Harris County purchased Doxazosin mesylate manufactured and/or sold by Apotex, Mylan, Pfizer, Teva and Zydus.

614.   As part of Defendants' overarching conspiracy, they conspired to fix, raise, maintain and/or stabilize the prices of Doxazosin and the Clonidine TTS Patch as follows:

615.   As of September 2011, Mylan and Teva were at rough parity in the market for generic Clonidine-TTS, with Mylan having approximately 48.4% market share and Teva having approximately 44.4% market share. At the end of 2011 and beginning of 2012, however, that relationship was changing.

616.   In November of 2011, Walgreens solicited Teva to provide a bid for its Clonidine-TTS business. Teva was successful and took the Clonidine-TTS account at Walgreens from Mylan. Two months later, in January of 2012, Cardinal Health, Inc. solicited a bid from Teva for a one-time-buy to cover what Teva assumed was a short-term supply issue that Mylan was experiencing. A few days after Teva submitted its offer to

Cardinal for the one-time-buy, Cardinal asked Teva to become Cardinal's primary supplier for Clonidine TTS. Because Teva believed that Cardinal's request was prompted by Mylan having supply issues, Teva accepted and took over the primary position at Cardinal for Clonidine-TTS. This would not have been a breach of the "rules of the road" of Defendants' cartel because Teva's bid did not erode prices. Supplying a customer if their incumbent supplier was unable to do so was acceptable, so long as the cartel's prices were maintained.

617.    With the Walgreens and Cardinal business, Teva now had 65-70% of the Clonidine-TTS market. On February 10, 2012, a senior sales and marketing executive at Teva told his colleagues to find out the extent of Mylan's supply issues. Following this request, that same day, Rekenthaler (Teva), called a senior national accounts executive at Mylan to find out about Mylan's supposed supply issues.

618.    Later that day, Rekenthaler reported back to his Teva colleagues that Teva's assumptions were incorrect and cautioned that Teva should reconsider its current more than "fair share" market position.

619.    Shortly thereafter, Teva conceded its Clonidine-TTS business at a large distributor, McKesson Corp. to Mylan. But this was not enough to bring Teva back into compliance with the "fair share" aspect of Defendants' overarching conspiracy, so in April, Teva also conceded its Clonidine-TTS business at CVS to Mylan.

620.    As shown throughout this Complaint, Defendants' overarching conspiracy was not limited to any single drug; rather, it spanned Defendants' entire portfolio of generic products. As a result, misconduct from Defendants' cartel in one product line often affected another market.

621.    On May 4, 2012, just a few days after ceding CVS's Clonidine-TTS account to Mylan, Cardinal approached Teva about a different drug, Doxazosin. At the time, Mylan was the primary supplier for Doxazosin at Cardinal. Cardinal representatives told Teva that Mylan was on backorder for one of the four (4) Doxazosin dosage strengths until the end of June, but Cardinal wanted to move the entire Doxazosin line to Teva.

622.    Further illustrating this aspect of Defendants' overarching conspiracy, a Teva executive cautioned his colleagues that doing so would be a bad idea. Rather than underbidding Mylan and taking this business, and thus eroding Doxazosin pricing towards the competitive level, Teva left Cardinal's Doxazosin business with Mylan.

623.    On the morning of September 28, 2012, an executive for Mylan and Green (Teva) spoke by phone at least twice, once for four (4) minutes and once for approximately a quarter of an hour. On those calls, Nesta informed Green of Mylan's impending temporary exit from the Clonidine-TTS market.

624.    As expected, later in the day, Teva began getting solicitations from Mylan customers, such as Wal-Mart and CVS, seeking a bid from Teva for Clonidine-TTS because Mylan had just issued a temporary discontinuation notice. Ultimately, Teva took both these accounts from Mylan while Mylan was dealing with supply issues.

625.    Mylan's temporary hiatus from the Clonidine-TTS market gave Teva the opportunity to raise prices and collusively reallocate the market at these inflated prices when Mylan re-entered the market.

626.    In October of 2012 when Teva took the CVS business back, Teva charged CVS a direct invoice price that was significantly higher than not only the competitive price, but above the original cartel pricing that Teva was charging at the start of the year.

627.    In the days leading up to Teva's CVS and Wal-Mart bids, Teva and Mylan spoke repeatedly to ensure there were no misunderstandings that could lead to competition and price cuts, including a five-minute call between Nesta and Green, both on Oct. 1, and then on October 4, the day Teva submitted its CVS bid, Nesta and Green spoke again, this time for 11 minutes.

628.    When Mylan relaunched Clonidine-TTS early the following year and began seeking its former market share, Teva steered clear – of underbidding, but not of communicating with Mylan. Instead, Teva remained in constant contact with its co-conspirator. In February and March of 2013 alone, Teva and Mylan representatives called each other at least thirty-three (33) different times and spoke for a total of nearly 2 hours and 45 minutes.

629.    For example, in early March of 2013, Mylan sought to secure the Clonidine-TTS business at Econdisc. Rather than competitively bid for the business, Teva chose to cede the Econdisc account to Mylan. By April, Teva had also retroceded McKesson back to Mylan, as well – at Teva's increased pricing, of course.

630.    The conspiracy did not stop there: on April 8, 2013, a marketing manager at Teva, reported internally to his Teva colleagues, including Rekenthaler, that Mylan had agreed to raise prices. In addition, Green and Nesta spoke twice that day, for one (1) minute and for nine (9) minutes, and the next day, they spoke again for eleven (11) minutes, reconfirming Teva's and Mylan's agreement to implement increased prices – which they did shortly thereafter.

631.    Teva and Mylan were not the only members of Defendants' cartel who were involved with this Clonidine-TTS aspect of the conspiracy. Aptly illustrating Defendants'

frequent entry and exit from various product markets, early the following year, on May 6, 2014, Actavis was granted FDA approval to market Clonidine-TTS.

632.   That day, as was standard practice among members of Defendants' cartel, Teva and Actavis immediately discussed price and market share. Rekenthaler spoke by phone three (3) times (for fifteen (15) minutes, one (1) minute, and three (3) minutes) with Falkin (Actavis). Falkin would eventually become a Teva employee when Actavis was acquired by Teva in August 2016.

633.   During his employment at Actavis, Falkin was a prolific communicator and had established relationships with executives at many of the Defendants. For example, between August, 2013 and July, 2016, Falkin exchanged at least 2,562 phone calls or text messages with his contacts at Defendants Zydus, Teva, Glenmark, Lannett, Aurobindo, Mylan, Lupin, Par, Greenstone, Apotex, Taro, Amneal, Sandoz, and Wockhardt, including over 430 calls or text messages with Rekenthaler during that time period, at least 410 calls or text messages with Cavanaugh at Teva; 270 calls or text messages with representatives at Glenmark; 78 calls or text messages with Nesta at Mylan; 52 calls or text messages with Berthold at Lupin; 41 calls or text messages with representatives at Greenstone; and at least 21 calls or text messages with Aprahamian at Taro.

634.   On May 7, 2014, the day after speaking to Falkin about Clonidine-TTS, Rekenthaler announced to his colleagues that Actavis was entering the market. A Teva representative responded by requesting that Patel (Teva) come up with a recommendation as to which customers Teva should concede to Actavis.

635.   Teva personnel (successfully) worked to convince Actavis to increase its pricing for Clonidine-TTS in the cartel's usual way, by coordinating the incumbent

supplier's (Teva) withdrawal from enough customers to give the newcomer its so-called "fair share" of the market.

636.   The next day, May 8, Rekenthaler (Teva) spoke to Falkin (Actavis) three (3) more times and Patel spoke with Actavis's Executive Director of Pricing and Business Analytics. Shortly after her last call with Actavis, Patel instructed her Teva colleagues to "Please concede Ahold and HEB," two of Teva's then-current customers, and the following day, May 9, 2014, Patel called Actavis three (3) additional times.

637.   Unsurprisingly, the agreement and inducements of Defendants' overarching conspiracy held, and Actavis raised its Clonidine-TTS pricing while Teva quietly surrendered market share: shortly after those phone calls, Patel conveyed to her boss, that "I just found out that Actavis rescinded their offer." Shortly after that, Patel also learned that Actavis had "resent all of their offer letters at pricing that is higher than our [i.e., Teva's] current [prices]." In addition, Patel informed her colleagues that Actavis wanted 25% of the market and expected that 10-15% of that share to come from Teva.

638.   Rekenthaler was concerned that Actavis might thereafter defect from Defendants' cartel agreement by competing for market share, a senior sales executive at Teva, rebuked him, writing in an e-mail: "now, now Mr. Rekenthaler play nice in the sand box . . . If history repeats itself[,] activist [sic] is going to be responsible in the market..." – "be responsible in the market" being a euphemism that meant Actavis would stand by the cartel's arrangement and, in return for the Clonidine-TTS market share that it was given, Actavis would not cut its pricing below the cartel level.

639.   On May 14, 2014, Patel told colleagues that Teva must be "responsible" and concede a particular wholesaler's account to Actavis, which Teva did a few days later. On

May 20, Patel again declined to bid at another customer due to the new entrant, Actavis, stating that "We are trying to be responsible with share and price."

640.   Mylan's brief supply issues described above cannot explain Defendants' price increases for Clonidine-TTS during the relevant period, in whole or in part, and no other shortages or other market features can explain Defendants' elevated pricing and price increases for Doxazosin and Clonidine-TTS during the relevant period.

  xviii.    Desogestrel/Ethinyl Estradiol Tablets

641.   Desogestrel/Ethinyl Estradiol ("Kariva") is a combination pill containing two hormones: progestin and estrogen. This medication is an oral contraceptive.

642.   During the relevant time period, Plaintiff Harris County purchased Desogestrel/Ethinyl Estradiol manufactured and/or sold by Mylan and Teva.

643.   Defendant Glenmark markets this drug under the name Viorele, while Defendant Teva markets the drug under the name Kariva. These drugs are also known by the brand name, Mircette. Glenmark entered the market for Kariva/Viorele on April 4, 2012.

644.   As part of Defendants' overarching conspiracy, they conspired to fix, raise, maintain and/or stabilize the prices of Kariva/Viorele as follows:

645.   During the morning of May 19, 2014, Patel (Teva) learned that Glenmark bid a low price for its own version of Kariva – Viorele – at Publix, a retail pharmacy purchaser.  An analyst at Teva e-mailed Patel a list of suggested re-bid prices to send to Publix for various drugs, including Kariva.  The chart included suggested a re-bid price for Kariva of $76.14 – which was $52.64 higher than the $23.50 that Glenmark had offered Publix.

646.    This sparked a flurry of communications that same day between Patel and three (3) different Glenmark representatives.

647.    After this flurry of communications between the two competitors, Teva agreed to allocate the Kariva/Viorele market by conceding this share of the market to Glenmark.  Teva ultimately decided to offer Publix a re-bid price with a nominal 10% reduction off the originally proposed re-bid price of $76.14 – virtually guaranteeing that the business would be awarded to Glenmark.

648.    This agreement between Teva and Glenmark was for the purposes of and allowed each competitor to maintain its "fair share" in accordance with Defendants' overarching conspiracy.

xix.    Desonide

649.    Desonide is used to help relieve redness, itching, swelling, or other discomfort caused by skin conditions (e.g., atopic dermatitis).

650.    During the relevant time period, Plaintiff Harris County purchased Desonide manufactured and/or sold by Actavis, Glenmark, Perrigo, Sandoz and Taro.

651.    As part of Defendants' overarching conspiracy, they conspired to fix, raise, maintain and/or stabilize the prices of Desonide as follows:

652.    Consolidation in the Desonide market occurred in the years leading up to Defendants' price increases. For instance, in July 2012, Sandoz completed its acquisition of Fougera Pharmaceuticals, making Fougera the world's top manufacturer of generic dermatology medications.

653.    At all relevant times, Defendants Actavis, Fougera, Perrigo, Sandoz and Taro have dominated, and continue to dominate, the market for Desonide.

654.    Prior to May 2013, the effective prices for Desonide remained stable.

655.   However, beginning in May 2013 the average NADAC price for Desonide rose dramatically.

656.   Defendants had numerous opportunities to coordinate their price increases. Shortly before increasing prices, key pricing executives from at least Actavis, Perrigo, Sandoz and Taro attended the February 20 -22, 2013 GPhA Annual Meeting in Orlando, Florida and the June 4-5, 2013 GPhA CMC Workshop.

657.   According to NADAC data, the average market price for generic Desonide saw the following price increases:

Desonide 0.05% cream: between July 11 and July 18, 2013, the average price increased by 442%

Desonide 0.05% ointment: between July 11 and July 18, 2013, the average price increased by 390%

658.   NADAC data shows that the average market price of Desonide remained stable prior to May 2013, but rose dramatically and remained artificially high after July 2013, as depicted in Figures 45-46 below:

**Figures 45-46: Desonide NADAC Price Increase**





659.    WAC data confirms that Defendants Perrigo, Taro and Sandoz all increased their prices in Desonide in lockstep fashion in the following amounts:

| Product Package | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 15gm | Taro | 51672128101 | $0.84 | $3.21 | 5/01/2013 | 282% |
| 60gm | Taro | 51672128103 | $0.53 | $3.21 | 5/01/2013 | 501% |
| 15gm | Perrigo | 45802042335 | $1.30 | $3.21 | 5/21/2013 | 146% |
| 60gm | Perrigo | 45802042337 | $0.31 | $3.21 | 5/21/2013 | 932% |
| 15gm | Sandoz | 00168030915 | | $3.21 | 1/17/2014 | |
| 60gm | Sandoz | 00168030960 | | $3.21 | 1/17/2014 | |

660.    Although WAC data is not available for Actavis or Fougera, upon information and belief, they implemented similar price increases, largely in unison for their Desonide products.

661.    Actavis entered the Desonide market in August 2013 and set its prices at supra-competitive levels instead of entering at a lower cost and competing for customers. Actavis contacted the other Defendants in the Desonide market well before August 2013 and explained its intention of market entry. Defendants then colluded to allocate market share and set supra-competitive prices. This agreement prevented Actavis' entry from eroding the artificial equilibrium the Defendants conspiratorially created.

662.    News reports and testimonials from physicians corroborate these dramatic, immediate, market-wide price increases. For example, dermatologist Alan Rockoff reported in Dermatology News in February 2015:

> Then this week it happened again. I prescribed hydrocortisone valerate 0.2% for a groin rash. The patient left a message asking me for an over-the-counter suggestion, since the prescription was going to cost him $52.70 out of pocket.

> I asked my secretary to call the pharmacy to get a price for other generic steroid creams. Triamcinolone would cost $14.70. Alclometasone would cost $35.20. And desonide – generic desonide – would cost $111.70. For a

157

15-g tube. $111.70 for 15 g of a generic cream that's been on the market forever! Does that make any sense?

663.    This agreement between these Defendants contributed to an overarching conspiracy maintained by all Defendants to unreasonably restrain trade in the generic pharmaceutical market.

664.    No shortages or other market features can explain the price increases for Desonide.

### xx.    Dexmethylphenidate HCL Extended Release

665.    Dexmethylphenidate HCL Extended Release ("Dexmeth ER"), also known by the brand name Focalin, is used to treat attention deficit hyperactivity disorder (ADHD).

666.    During the relevant time period, Plaintiff Harris County purchased Dexmeth ER manufactured and/or sold by Actavis, Amneal, Mylan, Par, Sandoz and Teva.

667.    As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, Defendants conspired to fix, raise, maintain and/or stabilize the prices of Dexmeth ER as follows:

668.    When Sandoz decided it was going to start marketing the 40mg dose of Dexmeth ER, it followed what was by then standard procedure: reaching out to fellow cartel members to coordinate entry without decreasing price. In early 2014, executives at Sandoz began speaking regularly with Patel (Teva) about Dexmeth ER.

669.    For example, on February 10, 2014, executives at Sandoz had several telephone conservations with Patel to discuss Dexmeth ER.

670.   Two days later, Sandoz submitted a bid to ABC for Dexmeth ER. The same day, a Sandoz executive and Patel spoke by telephone and Teva agreed to concede the ABC account to Sandoz, in order to avoid price competition between the two suppliers. Patel then e-mailed her colleagues at Teva to summarize the details of the deal she had worked out with Sandoz.

671.   Two days after that, on Friday, February 14, 2014, Anda (a large customer) – in light of Sandoz's entry into the market – approached Teva and asked for a price reduction on Dexmeth ER. Rather than lower their price to retain the account, Teva refused – handing that business to its nominal competitor (and co-conspirator), Sandoz.

672.   The following week, on February 18, Patel (Teva) left a voicemail for a Sandoz executive; and that same day, Teva ceded the Rite Aid account to Sandoz. The two confirmed their arrangement again two days later, again via telephone.

673.   Two days after that, on February 20, 2014, another large retail customer approached Teva indicating that because a new competitor had launched for Dexmeth ER, the customer was entitled to certain price protection terms (*i.e.*, a lower purchase price for the drug). The same day, Patel spoke to her contact at Sandoz for almost twenty-one (21) minutes.

674.   The next day, February 22, Patel responded internally about the customer's request, with additional inside information from Sandoz. Patel and the Sandoz executive spoke again a few days later, on February 27, to further coordinate about Dexmeth ER.

675.   Teva and Sandoz were not alone in allocating customers for Dexmeth ER. The agreement was also carried out by other manufacturers, allowing Sandoz to take share from them. In February of 2014, for example, as Sandoz was seeking share on the 15mg dosage strength of Dexmeth ER, Par assisted them.

676.    Simultaneously with Patel's coordination with Sandoz, Teva's Rekenthaler was speaking to a senior national account executive at Par, including two (2) calls on February 10, two (2) calls on February 19 and calls on February 24 and 25, in order to effectuate the scheme.

677.    Throughout this time period, Sandoz, Par and Teva all abided by the fair share principles as part of Defendants' ongoing conspiracy, ceding customer accounts to Sandoz in order to abide by the "rules of the road" to accommodate the new market entrant without lowering prices. In accordance with the terms of Defendants' cartel, Sandoz's target market share for varying strengths of Dexmeth ER varied by how many manufacturers were in the market. Further, the scheme was not limited to any particular dose of Dexmeth ER.

678.    On May 6, 2015, for example, Teva declined to submit a bid to Walgreens for the 5mg dose of Dexmeth ER. Similarly, on June 30, 2015, Sandoz declined to put in a bid to Managed Health Care Associates, a large customer, on Dexmeth ER 20mg, on the basis that Sandoz already had 57% market share – greater than its sole competitor on this dosage strength, Teva.

679.    These agreements between Defendants to allocate the market for Dexmeth ER were in furtherance of Defendants' overall "fair share" overarching conspiracy.

xxi.    Amphetamine/Dextroamphetamine

680.    Amphetamine/Dextroamphetamine Immediate Release, also known by the brand name Adderall IR, is a medication used in the treatment of attention deficit hyperactivity disorder (ADHD). The drug is an immediate release formulation comprised of a combination of dextroamphetamine salts and levoamphetamine salts and is sometimes referred to as "Mixed Amphetamine Salts" or "MAS-IR."

681.    During the relevant time period, Plaintiff Harris County purchased Amphetamine/Dextroamphetamine Immediate Release manufactured and/or sold by Actavis, Amneal, Mylan, Sandoz, Sun and Teva.

682.    As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, Defendants conspired to fix, raise, maintain and/or stabilize the prices of Amphetamine/Dextroamphetamine as follows:

683.    In March 2014, Aurobindo was making plans to enter the market with its MAS-IR product. On March 18, 2014, a Teva executive shared with her colleagues that Aurobindo's market share target for the impending launch was 10%. Teva's senior marketing operations executive indicated that Teva was aware that both Aurobindo and Actavis were launching.

684.    A flurry of telephone communications between Teva and these two competitors took place on the days surrounding the foregoing e-mail. The day before, on March 17, 2014, Patel (Teva) had spoken to Actavis's Director of Pricing three (3) times. Rekenthaler (Teva) and Falkin (Actavis) also spoke once on that day. On March 18, 2014, the day of the e-mail, Rekenthaler and a senior executive at Aurobindo had a thirty (30) minute telephone conversation. Rekenthaler and Falkin spoke again seven (7) times on March 20, 2014.

685.    On April 16, 2014, Teva received word from a customer that a new competitor in the market had made an offer for that Teva customer's business for MAS-IR. Patel (Teva) informed another Teva executive that the challenge was coming from Actavis and recommended that Teva concede that customer's account. At 1:43 p.m., she communicated to another colleague that the decision had been made to concede.

Apparently closing the loop, she called Richard Rogerson ("Rogerson") at Actavis at 1:55 p.m. They spoke for just over four (4) minutes.

686.   NADAC data shows that the average market price of Adderall IR has risen steadily since 2013 despite the entry of additional competitors (co-conspirators), as depicted in Figure 47 below:

**Figure 47: Adderall NADAC Price Increase**



687.   Teva's agreement with Actavis to concede a portion of its market share for MAS-IR was in furtherance of Defendants' overall "fair share" overarching conspiracy.

xxii.        Dextroamphetamine Sulfate Extended Release

688.   Dextroamphetamine Sulfate Extended Release, also known by the brand name Dexedrine and sometimes referred to as "Dex Sulfate XR," is a medication used to stimulate the central nervous system in the treatment of hyperactivity and impulse control.

689.   During the relevant time period, Plaintiff Harris County purchased Dextroamphetamine Sulfate Extended Release manufactured and/or sold by Actavis, Mayne and Teva.

690.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, Defendants conspired to fix, raise, maintain and/or stabilize the prices of Dex Sulfate XR as follows:

691.   On June 19, 2014, as Actavis was entering the market for Dex Sulfate XR, Patel (Teva) reviewed a profitability analysis for that drug and asked Rekenthaler (Teva) what share of the market Actavis was targeting. Rekenthaler responded: "20-25%." Rekenthaler knew Actavis's market share goals because he and Falkin (Actavis) had spoken twice by phone that morning – once for more than eleven (11) minutes and again for more than nine (9) minutes.

692.   Five days later on June 24, 2014, another Teva employee confirmed to her colleagues in an e-mail that Actavis had entered the market for Dex Sulfate XR. She remarked that Teva had a 72.2% share of this "multi-player market" and thus recommended giving up a large customer to Actavis and reducing Teva's market share to 58.3% – in accordance with the overarching conspiracy to allocate the market, and Teva's ongoing agreement with Actavis.

693.   Later internal e-mails confirmed Teva's decision to concede that customer to Actavis because "Actavis is entering the market and seeking share."

694.   Teva's agreement with Actavis to concede a portion of its market share for Dex Sulfate XR was in furtherance of Defendants' overall "fair share" overarching conspiracy.

xxiii.      Diflunisal

695.    Diflunisal is a salicylic acid derived nonsteroidal anti-inflammatory drug with analgesic properties and is used to relieve mild to moderate pain, swelling and joint stiffness caused by arthritis.

696.    During the relevant time period, Plaintiff Harris County purchased Diflunisal manufactured and/or sold by Rising and Teva.

697.    As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Diflunisal as follows:

698.    By February 26, 2014, Patel (Teva) had created a list of "P[rice] I[ncrease] Candidates," which she forwarded to another colleague for his review. In addition to other drugs described elsewhere in this Complaint, such as Niacin ER and Azithromycin suspension, the list included Diflunisal and correctly noted in the "Market Notes" column that the drug was "Shared only with Rising."

699.    In a practice that was routine at Teva, Patel and Rekenthaler both communicated multiple times with the relevant members of Defendants' cartel – in this case Taro, Lupin, Actavis, Greenstone, Zydus, Heritage and Rising – to coordinate the price increases on numerous drugs, including Diflunisal, through calls and text messages.

700.    On March 17, 2014, having confirmed the cooperation of these Defendants with the planned price increases, Patel sent a near final version of the "PI Candidates" spreadsheet to her supervisor for approval.

701.    At that time, Rising had a 21% market share for Diflunisal and Teva dominated the market with the remaining 79%.

164

702.    That same day, Rekenthaler spoke with an executive at Sandoz twice. During those calls, the Sandoz representative told Rekenthaler that Rising was having supply problems for Diflunisal, might be temporarily exiting the market at some point in the future and confirmed that it would be a good opportunity for Teva to take a price increase.

703.    Rekenthaler and his contact at Sandoz spoke again on March 31, 2014, shortly before Teva's Diflunisal price increase. On April 4, 2014, Teva increased its WAC pricing on Diflunisal by as much as 30%, and its contract pricing by as much as 182%.

704.    Rising exited the Diflunisal market for a short period of time a few months later, in mid-July of that year. When Rising decided to exit the market, his Sandoz contact called Rekenthaler to let him know. Four months later – when Rising's supply problems were cured – Rising re-entered the market for Diflunisal.

705.    Consistent with the fair share principles of Defendants' cartel, representatives at Sandoz and Teva spoke by phone on several occasions in advance of Rising's re-entry to identify specific customers whom Rising would obtain and, most importantly, to retain the high pricing that Teva had established through its price increase on April 4.

706.    On December 3, 2014, Rising re-entered the market for Diflunisal Tablets. Its new pricing exactly matched Teva's WAC price increase from that April.

    xxiv.    Digoxin

707.    Digoxin is used to treat congestive heart failure and to slow the heart rate in patients with atrial fibrillation.

708.    During the relevant time period, Plaintiff Harris County purchased Digoxin manufactured and/or sold by Amneal, Hikma, Lannett, Par and Sun.

709.    As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Digoxin as follows:

710.    In late 2012, Amneal and Lannett were the only active domestic manufacturers of Digoxin. Par and Hikma re-entered the market in 2014 and Mylan re-entered in 2015. Defendants Lannett, Mylan, Par, Sun and Hikma dominate the market for Digoxin.

711.    Prior to November 2013, effective prices for Digoxin were stable.

712.    Beginning in November 2013, Amneal and Lannett increased their prices abruptly and in unison. During this period, prices for generic Digoxin rose more than 630%.

713.    Defendants had ample opportunity to coordinate their pricing agreements. Shortly before the price increase, key executives from at least Lannett, Mylan, Par and Sun attended the October 28-30, 2013 GPhA Fall Technical Conference.

714.    As a result, prices across the market rose more than 884% for Digoxin, according to data compiled by the Healthcare Supply Chain Association and released by Senator Sanders and Representative Cummings, depicted in the chart below:

| Drug | Avg. Market Price Oct. 2012 | Avg. Market Price June 2014 | Percentage Increase: |
|---|---|---|---|
| Digoxin (single tablet 250mcg) | $0.11 | $1.10 | 884% |

715.    According to NADAC data, the average market price for generic Digoxin saw the following price increases from November 2013 to February 2014:

Digoxin 125 mcg tablets: 881%

Digoxin 250 mcg tablets: 825%

716.     These dramatic price increases, initially instituted by Lannett and Amneal, were maintained even after Par's entry into the market in early 2014, Hikma's entry soon thereafter, and Mylan's entry in early 2015. In fact, these Defendants continued to increase prices for Digoxin during the first six months of 2014, including these new entrants. This is especially telling evidence of collusion, as entry of three additional competitors would typically lead to substantial price decreases.

717.   NADAC data shows that average market prices for Digoxin rose dramatically and remained artificially high after November 2013, as depicted in Figure 48 below:

**Figure 48: Digoxin NADAC Price Increase**



718.   WAC and AWP data for 0.25mg Digoxin tablets also shows that prices for Digoxin remained relatively stable prior to the November 2013 price increase and then rose dramatically.

**Figure 49: Digoxin WAC and AWP Price Increase**



719. Specific WAC pricing depicted below confirms that Defendants Amneal, Lannett, Mylan and Par all increased their Digoxin prices substantially and largely in unison.

| Package size (0.125 mg) | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100ct | Lannett | 00527132401 | $0.14 | $1.19 | 10/16/2013 | 734% |
| 1,000ct | Lannett | 00527132410 | $0.12 | $0.99 | 10/16/2013 | 738% |
| 100ct | Amneal | 00115981101 | $0.14 | $1.19 | 10/22/2013 | 734% |
| 1,000ct | Amneal | 00115981103 | $0.12 | $0.99 | 10/22/2013 | 738% |
| 100ct | Par | 49884051401 | | $1.19 | 1/17/2014 | |
| 1,000 | Par | 49884051410 | | $0.99 | 1/17/2014 | |

| 100ct | Hikma | 00143124001 | $0.16 | $1.19 | 4/14/2014 | 638% |
| 1,000ct | Hikma | 00143124010 | $0.13 | $0.99 | 4/14/2014 | 687% |
| 100ct | Mylan | 00378615501 | | $1.19 | 11/17/2014 | |
| 1,000ct | Mylan | 00378615510 | | $0.99 | 11/17/2014 | |

720.  Although WAC data is not available for Sun, upon information and belief, Sun implemented simultaneous and identical price increases in its generic Digoxin products.

721.  No shortages or other competitive market features can explain Defendants' price increases for Digoxin.

xxv.  Divalproex

722.  Divalproex is used to treat seizure disorders, certain psychiatric conditions (manic phase of bipolar disorder), and to prevent migraine headaches.

723.  During the relevant time period, Plaintiff Harris County purchased Divalproex manufactured and/or sold by Amneal, Aurobindo, Dr. Reddy's, Lupin, Mylan, Par, Rising, Sun, Teva, Upsher-Smith, Wockhardt and Zydus.

724.  As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Divalproex as follows:

725.  At all relevant times, there has been more than one manufacturer of Divalproex in the market.

726.  At all relevant times, Defendants Dr. Reddy's, Mylan, Par and Zydus dominated the market for Divalproex.

727.  Prior to September 2013, effective prices for Divalproex were stable.

728.  In September 2013 Dr. Reddy's, Mylan and Par and Zydus increased their prices for Divalproex dramatically and largely in unison.

729.    As a result, Divalproex prices rose across the market by more than 700%, according to data compiled by the Healthcare Supply Chain Association and released by Senator Sanders and Representative Cummings, depicted in the chart below:

| Drug | Avg. Market Price Oct. 2012 | Avg. Market Price June 2014 | Percentage Increase |
|---|---|---|---|
| Divalproex Sodium ER (bottle of 80, 500 mg tablets ER 24H) | $31 | $234 | 736% |

730.    Defendants had numerous opportunities to coordinate their price increases and market share agreements. Shortly before the price increase, key pricing executives from Dr. Reddy's, Mylan, Par, and Zydus all attended the June 2-5, 2013 GPhA CMC Workshop in Bethesda, Maryland.

731.    NADAC data shows that average market prices of Divalproex remained stable prior to June 2013, but rose dramatically and remained artificially high after September 2013, as depicted in a sample dosage below. For example, the average market price for generic Divalproex increased 920%, from $0.31 per tablet to $3.18 per tablet between September 12th, 2013 and September 19th, 2013.

**Figure 50: Divalproex NADAC Price Increase**



732.    These dramatic price increases, initially instituted by Mylan and Par, were maintained even after Dr. Reddy's and Zydus' entry into the market in August 2013. WAC pricing, depicted below, confirms that Defendants Dr. Reddy's, Mylan, Par, and Zydus each increased their prices uniformly and largely in unison:

| Package Size (500mg ER) | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100ct | Mylan | 00378047301 | $0.74 | $3.26 | 6/14/2013 | 338% |
| 500ct | Mylan | 00378047305 | $0.71 | $3.26 | 6/14/2013 | 361% |
| 100ct | Par | 10370051110 | $0.74 | $3.26 | 6/26/2013 | 338% |
| 500ct | Par | 10370051150 | $0.71 | $3.26 | 6/26/2013 | 361% |
| 100ct | Zydus | 68382031501 | | $3.26 | 8/14/2013 | |
| 500ct | Zydus | 68382031505 | | $3.26 | 8/14/2013 | |
| 100ct | Dr. Reddy's | 55111053401 | | $3.26 | 8/14/2013 | |
| 500ct | Dr. Reddy's | 55111053405 | | $3.26 | 8/14/2013 | |

171

733.   Industry experts and audit reports corroborate these dramatic, immediate, market-wide price increases. The GAO Report noted an "extraordinary price increase" for Divalproex.[55] In January 2014, a Morgan Stanley analyst report found that "companies have been raising prices on divalproex . . . aggressively."[56]

734.   No shortages or other competitive market features can explain Defendants' price increases for Divalproex.

    xxvi.      <u>Doxycycline</u>

735.   Doxycycline is a tetracycline used to treat many different bacterial infections, such as acne, urinary tract infections, intestinal infections, respiratory infections, eye infections, gonorrhea, chlamydia, syphilis, periodontitis (gum disease), and others.

736.   During the relevant time period, Plaintiff Harris County purchased Doxycycline manufactured and/or sold by, Actavis, Amneal, Heritage, Hikma, Lannett, Lupin, Mayne, Mylan, Par, Pfizer, Rising, Sun, Teva and Zydus.

737.   Doxycycline is sold primarily in three forms: Doxycycline Hyclate ("Doxy Hyclate"), Doxycycline Hyclate Delayed Release ("Doxy DR") and Doxycycline Monohydrate ("Doxy Mono").

738.   At all relevant times, Defendants Actavis, Par, Sun, Teva and Hikma dominated the market for Doxy Hyclate; Defendants Heritage, Mayne, and Mylan dominated the market for Doxy DR; and Defendants Heritage, Lannett, Mylan and Par dominated the market for Doxy Mono.

---

[55] GAO Report at 38

[56] Morgan Stanley, *Specialty Pharmaceuticals Rx Trends in Pictures* (Jan. 27, 2014).

### a.   Doxycycline Hyclate

739.   Prior to October 2012, effective prices for Doxy Hyclate were stable.

740.   Beginning in October 2012, Defendants Actavis, Par, Sun and Hikma increased their prices abruptly and largely in unison. Collectively, the Doxy Hyclate Defendants raised prices for generic Doxy Hyclate by at least 2,000% (for certain dosages, as much as 8,200%) between November 2012 and March 2013.

741.   As a result, prices rose dramatically and largely in unison. According to a report produced by PRIME Institute and presented by Dr. Stephen Schondelmeyer at a Senate hearing in November 2014, Doxy prices rose approximately 2,000% between December 2012 and December 2013. Dr. Schondelmeyer report chronicled the retail prices for Hikma's (West-Ward) Doxy Hyclate prices, depicted in the chart below:

| Drug | Dosage | Mfr | NDC | Usual Dose/ Day | Retail price/day (Median) Dec. 2012 | Retail price/day (Median) Dec. 2013 | Percentage Increase |
|---|---|---|---|---|---|---|---|
| Doxycycline Hyclate | 100mg tablet | Hikma | 00143211205 | 2.00 | $0.36154 | $7.21887 | 1,896% |
| Doxycycline Hyclate | 100mg capsule | Hikma | 00143314205 | 2.00 | $0.34746 | $7.46247 | 2,047% |

742.   NADAC data shows that the average market price for Doxycycline Hyclate rose dramatically in late 2012 and early 2013 and remained artificially high thereafter, as depicted in Figure 51 below:

**Figure 51: Doxycycline HCL NADAC Price Increase**



743.    WAC and AWP data for Hikma's 100mg Doxy Hyclate capsules show that prices for Doxy Hyclate remained relatively stable prior to the late 2012 price increase. Figure 50 was also submitted by Dr. Stephen Schondelmeyer, as part of his testimony at the Senate Hearing on drug price inflation.

**Figure 52: Doxycycline Price Per Day Increase**



744.    Specific WAC data depicted below confirms that Defendants Actavis, Sun and Hikma (West-Ward) all increased their prices in generic Doxy Hyclate by the following amounts:

| Product | Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|---|
| 100mg capsule | 50ct | Hikma | 00143314250 | $0.10 | $4.43 | 1/21/2013 | 4,326% |
| 100mg capsule | 500ct | Hikma | 00143314205 | $0.10 | $4.43 | 1/21/2013 | 4,370% |
| 100mg capsule | 50ct | Actavis | 00591544050 | $0.10 | $2.74 | 2/1/2013 | 2,515% |
| 100mg capsule | 500ct | Actavis | 00591544005 | $0.10 | $2.74 | 2/1/2013 | 2,663% |
| 100mg capsule | 50ct | Sun | 53489011902 | $0.10 | $4.92 | 2/5/2013 | 4,847% |

| 100mg capsule | 500ct | Sun | 53489011905 | $0.06 | $4.92 | 2/5/2013 | 7,844% |
| 100mg tablet | 50ct | Actavis | 00591555350 | $0.10 | $2.74 | 2/1/2013 | 2,515% |
| 100mg tablet | 500ct | Actavis | 00591555305 | $0.10 | $2.74 | 2/1/2013 | 2,663% |
| 100mg tablet | 50ct | Sun | 53489012002 | $0.09 | $4.92 | 2/5/2013 | 5,631% |
| 100mg tablet | 500ct | Sun | 53489012005 | $0.08 | $4.92 | 2/5/2013 | 6,268% |

745.    Although WAC data is not available for Par, upon information and belief, Par implemented simultaneous and identical price increases in Doxy products.

746.    Defendants had ample opportunity to conspire and coordinate their price increases and market share agreements. Shortly before or while implementing the price increase, key pricing executives from at least Actavis, Par, Sun and Teva attended the October 1-3, 2012 GPhA Technical Conference in Bethesda, Maryland.

747.    In May of 2013, after the price increase was implemented, Teva discontinued production of Doxy Hyclate – a product it had manufactured for three decades. This act contradicts Teva's self-interest, but furthered Defendants' conspiracy to coordinate pricing and allocate market share across the entire generic pharmaceutical industry.

748.    Manufacturing or supply costs do not explain this sudden and dramatic price increase.

### b.    *Doxy DR*

749.    Mylan served as the exclusive generic in the market for Doxy DR until July 2013 when Heritage entered the market. Mylan and Heritage then dominated the market for Doxy DR until Mayne entered the market in 2014.

176

750.    While Mylan held exclusivity over the Doxy DR generic market they were able to raise prices (significantly in November 2012) and keep prices high, as would be expected without competition. By 2013, Heritage considered entering the Doxy DR market. In accordance with the overarching conspiracy, Heritage contacted Mylan before entering the market for Doxy DR to coordinate pricing and market share in alignment with their "fair share" agreement to prevent price erosion when Heritage entered.

751.    In April 2013, Glazer (Heritage) and Malek (Heritage) traveled to India to meet with executives of Heritage's parent company, Emcure. The purpose of their trip was to discuss Heritage's plans to enter the Doxy DR market and to coordinate how Heritage and Mylan could minimize competition. These discussions resulted in a decision to work out an agreement between Heritage and Mylan relating (at least) to Doxy DR. Satish Mehta ("Mehta"), the CEO of Emcure, would reach out to Rajiv Malik ("Malik"), President and Executive Director at Mylan, in order to facilitate subsequent communications between Glazer and Malek and their counterparts at Mylan.

752.    In early May, upon return to the United States, Heritage employees at many levels began to reach out to their counterparts at Mylan to discuss Doxy DR pricing and market allocation.

753.    For instance, on May 3, 2013, Malek asked Neal O'Mara ("O'Mara") at Heritage to set up a call between Malek and a contact at Mylan. O'Mara provided Malek with contact information for Nesta (Mylan). Malek immediately connected with Nesta through LinkedIn. Malek and Nesta (Mylan) communicated on multiple occasions about various drugs, including Doxy DR.

754.    Additionally, in May 2013, Glazer reached out to another contact to reach an agreement to refrain from competing in the Doxy DR market. Glazer told his Mylan

contact that Heritage intended to pursue two of Mylan's large Doxy DR customers (wholesaler McKesson and retail pharmacy CVS), who collectively comprised 30% of the market. Glazer confirmed they would not price aggressively (lower than Mylan) and the Mylan executive responded that Mylan would "play fair," agreeing to give up the two accounts to Heritage.

755.     In the months that followed, in accordance with their agreement, Mylan surrendered the McKesson and CVS accounts to Heritage.

756.     McKesson and CVS account for more than 80% of Heritage's Doxy DR business.

757.     In a competitive market, Heritage's entry into the Doxy DR market should have spurred price competition across all customers and lowered market prices. Instead, by allocating the McKesson and CVS accounts, Mylan and Heritage were able to stabilize Doxy DR prices across the market at supra-competitive levels.

758.     Once Heritage entered the market and Mylan allowed Heritage to obtain the business of these two large customers, Heritage maintained its agreement by ensuring the new market share equilibrium remained intact. Heritage walked away or refrained from competing on Mylan customers so as not to upset the balance.

759.     Throughout this period, these Defendants had opportunities to conspire and coordinate their pricing agreements in person. Key pricing executives from at least Heritage, Mayne and Mylan all attended the October 28-30, 2013 GPhA Fall Technical Conference in Bethesda, Maryland.

760.     In February 2014, a new competitor, Mayne entered the Doxy DR market. Even before launching their product, Mayne approached Heritage to discuss its plan, recognizing that it would need to establish an agreement to coordinate a re-balancing of

market share for each company. On January 7, 2014, Gloria Peluso-Schmidt ("Paluso-Schmidt"), a Director of National Accounts for Mayne, called Sather (Heritage) for 12 minutes and Mayne agreed not to compete with Heritage in the Doxy DR market.

761.    For example, in November 2014, Mayne placed bids with Heritage controlled entities—McKesson and Econdisc. On November 20, 2014, a senior national account manager at Heritage, emailed Malek and others at Heritage, conveying that "Midlothian [Mayne] has taken another shot at our business on the Doxy 150mg at Econdisc and we have to respond to this in a timely manner."

762.    The next morning, Sather (Heritage) sent a text message to her contact at Mayne and spoke over the phone discussing what her goals were for Doxy DR.  Her Mayne contact responded that Mayne was looking for market share and needed a "big customer like Econdisc." She explained Mayne submitted an offer to McKesson ten (10) days earlier and Sather (Heritage) suggested that Heritage might be willing to walk from Econdisc if Mayne agreed to withdraw its offer from McKesson and not to price Doxy DR aggressively.

763.    On November 24, 2014, Sather (Heritage) spoke again with her contact at Mayne and then sent Malek an email update, "Just spoke with her ... can you call me anytime?" After speaking with Malek, Sather (Heritage) formally offered Mayne an agreement via text message with Sather's contact: "If you retract McK[esson] - we will give up Econ[disc]. I can talk anytime."

764.    In the weeks following, Glazer confirmed through internal e-mail communications that Heritage was "walking away from one [customer] so pricing would stabilize" and that Heritage "wanted to give Midlothian [Mayne] market share so they stop eroding" the price for Doxy DR.

765.   Communications between Sather (Heritage) and her contact at Mayne continued throughout December, including text messages and an in-person meeting at the American Society of Health-System Pharmacists ("ASHP") conference on December 9, 2014.

766.   The agreements between Heritage, Mayne and Mylan on Doxy DR business and pricing continued and all three companies held the understanding that they would refrain from competing on market share and eroding price.

767.   In September 2015, a large nationwide pharmacy chain approached Heritage requesting a bid on Doxy DR. Sather (Heritage) confirmed internally that Heritage had the capacity to bid, but Malek cautioned that "[w]e need to know why this is out to bid and find out who the incumbent is" before providing a response.

768.   Upon learning that Mayne served as the incumbent supplier, Sather (Heritage) reached out to her contact at Mayne. Her contact conveyed that Mayne had no supply issues and that the pharmacy chain was simply shopping for a better price. Keeping with their agreement, Heritage refused to provide a bid. Sather (Heritage) sent a follow-up text message to her Mayne contact reiterating Heritage's intent to keep their agreement, "Confirming we are not bidding." Her Mayne contact replied, "Thank you."

769.   NADAC data confirms that average market prices for Doxy DR increased dramatically in November 2012 and remained artificially high thereafter despite the entry of additional competitor (co-conspirators) into the market, as depicted in Figure 53 below:

**Figure 53: Doxycycline DR NADAC Increase**



770.    No shortages or other market features can explain Defendants' price increases for Doxy DR during the relevant period.

### c.    *Doxycycline Monohydrate ("Doxy Mono")*

771.    In February 2013, Heritage wanted to raise the prices of Doxy Mono. Heritage reached out to its competitors in the Doxy Mono market – Lannett, Mylan and Par – to discuss and form agreements on price increases and prevent loss of market share.

772.    During the second week of March 2013, Sather (Heritage) communicated to Sullivan (Lannett) twice over the phone and once over email discussing Heritage's intent to increase Doxy Mono prices.

773.    On March 25, 2013, Malek (Heritage) e-mailed his sales team, indicating that Heritage would be "taking a price increase in the market this week" for Doxy Mono. Heritage continued to contact its Doxy Mono competitors throughout 2013. Sather

(Heritage) spoke, texted and met in person with several different Lannett employees during this time.

774.    On March 25, 2013, Sullivan (Lannett) e-mailed her boss relaying news of the price increase Heritage intended to institute. Sullivan (Lannett) and Sather (Heritage) continued to communicate through numerous phone calls, text messages, and in-person meetings over the next several months.

775.    These Defendants agreed to implement their price increases for Doxy Mono during the summer of 2013 and communicated frequently throughout this period, including the days surrounding Lannett's June 12th Doxy Mono price increase:

> On June 11, 2013, O'Mara (Heritage) spoke to Aigner (Mylan) for nearly ten minutes.
>
> O'Connor (Par) communicated frequently with Aigner (Mylan) in June and July of 2013, including several phone calls on June 7, 2013 and June 13, 2013.
>
> O'Connor (Par) also communicated frequently with a Lannett representative, including through nine text messages exchanged on June 11th and 12th, 2013.

776.    Lannett increased its price for Doxy Mono on June 12, 2013.

777.    Heritage maintained communications with Lannett and other competitors. Due to concerns about supply issues, Heritage was slower to raise its prices. In a competitive environment, other Doxy Mono competitors would have viewed Heritage's supply problems as opportunities to gain market share. However, Defendants' "fair share" agreement mitigated any customer losses for Heritage.

778.    A flurry of communications between the four competitors followed throughout August 2013. As Heritage planned its Doxy Mono price increase, Malek asked Sather (Heritage) to obtain specifics regarding Lannett's price increases. Accordingly,

Sather (Heritage) and Sullivan (Lannett), while both attending the NACDS 2013 Total Store Expo August 10-13th, discussed the Doxy Mono increases. Notably, Aigner (Mylan) and O'Connor (Par) also attended this conference.

779.   On August 13th, the Senior Vice President of Generic Sales at Par sent an e-mail to Par's Vice President of Marketing and Business Analytics, reading: "I hear that Lannett is taking a price increase on doxy mono and Heritage will follow." The email was forwarded internally at Par with the instruction: "FYI . . . we will follow. . .  No new opps until we see where pricing ends up."

780.   On August 20, 2013, Sather (Heritage) e-mailed Malek (Heritage), confirming that Lannett "tripled WACs and did/will do similar to contract prices."

781.   Mylan and Par announced their price increases for Doxy Mono in the Summer of 2013.

782.   By the Spring of 2014, Heritage also increased their prices.

783.   On May 8, Malek emailed the entire Heritage sales team, asking for confirmation that everyone had been speaking with their competitor counterparts about price increases. Sather (Heritage), responsible for communicating with Lannett responded: "Jason: I made contact with all my take aways -- with positive results. I can resend those notes or talk with you on any details."

784.   Sather (Heritage) then attended the MMCAP Conference in Bloomington, Minnesota May 12-15, 2014, where she met in person with numerous competitors to discuss price increases, including with Sullivan (Lannett) regarding Doxy Mono. Sather (Heritage) reported back to Malek (Heritage) via e-mail on her success reaching pricing agreements, including with Lannett: "Hi Jason: At the MMCAP meeting yesterday, spoke with some other industry reps and found similar like minding on the pricing strategies we

discussed. Overall, spoke with ... Lannett ([Sullivan])..." Par and Mylan executives also attended this conference, including O'Connor (Par).

785.    These competitors' continued communications during the price hike implementations.

786.    By way of example, Heritage's price for 50mg Doxy Mono tablets more than tripled between February and July 2013. Lannett's price for 75mg tablets steadily increased between February and July 2013, more than doubling during that period. Mylan also increased prices for 75mg tablets in the summer of 2013, as its prices nearly doubled from a low in June to a high in November. Lannett's price for 100mg Doxy Mono tablets approximately doubled between January and August of 2013. Heritage, Mylan and Par's prices for 150mg Doxy Mono tablets all increased significantly between the spring and fall of 2013.

787.    In addition to the communications detailed above, these competitors had ample opportunity to coordinate their price increases and market share agreements in person. Key pricing executives from at least Heritage, Mylan and Par attended the February 20-22, 2013 GPhA Annual Meeting in Orlando, Florida. Key pricing executives from at least Heritage, Lannett, Mylan and Par attended the June 2-5, 2013 HDMA Business & Leadership Conference in Orlando, Florida; the June 4-5, 2013 GPhA CMC Workshop in Bethesda, Maryland; the October 28-30, 2013 GPhA Fall Technical Conference in Bethesda, Maryland; the February 23-26, 2014 ECRM Retail Pharmacy EPPS in Amelia Island, Florida; the May 12-15, 2014 MMCAP National Member Conference in Bloomington, Minnesota; the June 1-4, 2014 HDMA Business & Leadership Conference in Phoenix, Arizona; and the June 3-4, 2014 GPhA CMC Workshop in Bethesda, Maryland.

xxvii.    Drospirenone/EE

788.    Ethinyl Estradiol in conjunction with Drospirenone ("Drospirenone/EE"), also known by brand names such as Yaz, Yasmin and Ocella, provides hormonal birth-control.

789.    During the relevant time period, Plaintiff Harris County purchased Drospirenone/EE manufactured and/or sold by Apotex, Glenmark, Lupin, Mylan and Sandoz.

790.    As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, Defendants conspired to fix, raise, maintain and/or stabilize the prices of generic Drospirenone/EE as follows:

791.    Barr    Pharmaceuticals    received    approval    to    market    generic Drospirenone/EE in 2008 and Teva continued to market the drug after the acquisition of Barr in 2011 under the name Gianvi.

792.    In late 2012, Lupin received approval to market a generic Drospirenone/EE product. By April 2013, Lupin was making plans for a summer 2013 entry into the market, so, in accordance with the established practices of Defendants' cartel, Lupin contacted Teva to initiate discussions on how the competitors would allocate fair share among themselves. On April 24, 2013, Teva's Green received a call from Berthold (Lupin).

793.    This was far from Berthold's only communication advancing the conspiracy; as Lupin's Vice President of Sales, Berthold has relationships with individuals at many of the Defendants and is one of the most prolific communicators of all the conspirators identified herein.

794.    For example, between March of 2011 and October of 2018, Berthold exchanged at least 4,185 phone calls or text messages with his contacts at Defendants

Aurobindo, Glenmark, Greenstone, Actavis, Wockhardt, Zydus, Teva, Breckenridge, Mylan, Sandoz, Dr. Reddy's, Amneal and Lannett, including over 1,900 calls or texts representatives at Aurobindo and Glenmark, at least 791 calls or texts with connections at Greenstone, over 300 calls or texts with connections at Actavis, over 75 calls or texts with Patel at Teva, and over 240 calls or texts with Green during his tenure at Teva and, later, Zydus – including the three minute call just mentioned, which was followed by two additional calls the following day, April 25.

795.    Discussions intensified among Teva, Lupin, and a third supplier, Actavis the week following Green and Berthold's initial communications about Drospirenone/EE. In preparation, on April 29, 2013, Green (Teva) asked a colleague for current market share figures along with a list of Teva's Drospirenone customers. The colleague responded with a customer list, estimating Teva's current market share at 70-75%.

796.    The next day, April 30, a senior sales and marketing executive at Actavis spoke twice with Teva's Rekenthaler and once with Teva's Patel. The competitors' communications continued into early May.

797.    On May 8, Teva learned that Actavis had bid for one of Teva's customer's Drospirenone business – which, of course, as a new entrant, Actavis was entitled to do under the terms of Defendants' cartel, so long as each supplier ended up with its appropriate "fair share."

798.    The day after that, on May 10, Rekenthaler (Teva) received an analysis for how much it would cost to concede two of its major accounts, which he passed on to Patel (Teva). With that information in hand, Patel then spoke to Berthold (Lupin) and Rogerson (Actavis).

799.    A few days later, on May 14, 2013, a Teva executive recommended conceding those accounts; Rekenthaler agreed.

800.    On July 10, 2013, Green (Teva) spoke to Berthold twice; after the first of those calls, Green requested "the normal profitability analysis on all customers with pricing and market share[;] Lupin is entering the market" from a colleague to help him continue to negotiate with Lupin.

801.    Later that day, Green called and spoke to Patel, conveying what he had learned from Berthold. During that call, the two decided that Patel would call Berthold back and confirm the agreement between Teva and Lupin. Patel called Berthold shortly after. They spoke again first thing the next morning.

802.    The next day, Patel e-mailed Green, saying: "BTW, Ocella. Check!" Green, confused by the e-mail, responded: "Huh... you are calling....correct?" Patel confirmed that she had indeed called her counterpart at Lupin: "Yes. I was saying it's all done."

803.    The lines of communication between competitors Teva and Lupin remained open and active over the next few months as they worked on the details of which company would take which Drospirenone accounts. On September 5, 2013, for example, Rekenthaler conveyed to a colleague the importance of retaining a particular customer's account, along with his understanding of Green's discussions with Berthold about Lupin's desired market share. Green spoke to Berthold by phone twice the following day to re-confirm the understanding between the two companies.

804.    On September 9, 2013, a Teva executive sent an internal e-mail to his colleagues, conveying his thoughts about Lupin's bid for a portion of another customer's Drospirenone business. He informed them that because Teva had secured two other

significant customers, "we will likely need to give up some of our formulary position to this new market entrant."

805.   In mid-October of 2013, as Teva and Lupin finalized allocating customer accounts between them, a Teva executive reminded one of his colleagues to be careful before conceding large customers on a "bucket basis," rather than drug-by-drug, in order to "make sure we are not giving up volume on products where we do not have our fair share."

806.   Defendants' agreement to allocate the market for Drospirenone/EE was in furtherance of Defendants' overall "fair share" overarching conspiracy.

xxviii.      Econazole

807.   Econazole is used to treat a variety of fungal skin infections such as athlete's foot, jock itch and ringworm.

808.   During the relevant time period, Plaintiff Harris County purchased Econazole manufactured and/or sold by Perrigo, Sandoz, Taro and Teligent.

809.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Econazole as follows:

810.   At all relevant times, Defendants Fougera, Perrigo, Sandoz, Taro and Teligent dominated the market for Econazole, controlling approximately 99% of the market.

811.   NADAC data shows that the average market prices for Econazole remained stable prior to June 2014, but rose dramatically in July, and then remained artificially high after October 2014, as depicted in certain forms and dosages below:

**Figure 54: Econazole Nitrate NADAC Increase**



812.    Between January 2011 and September 2013, Econazole cost approximately 12 cents for one month's worth of treatment.

813.    Starting at least as early as July 2014 Defendants Fougera, Perrigo, Sandoz, Taro and Teligent increased their prices for generic Econazole abruptly and in unison. During this period, prices for generic Econazole rose more than 1,657%.

814.    According to NADAC data, the average market price for generic Econazole saw the following price increases from July 2014 to March 2015:

Econazole 1% Cream (15g): increased by 853%

Econazole 1% Cream (30g): increased by 1,024%

Econazole 1% Cream (85g): increased by 929%

815.    WAC data depicted below confirms that Defendants Perrigo, Teligent and Taro all increased their prices in Econazole cream between July and November 2014 by the following amounts:

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage of Increase |
|---|---|---|---|---|---|---|
| 15gm | Perrigo | 45802046635 | $0.79 | $5.80 | 7/24/2014 | 637% |
| 30gm | Perrigo | 45802046611 | $0.69 | $5.80 | 7/24/2014 | 736% |
| 85gm | Perrigo | 45802046653 | $0.50 | $4.09 | 7/24/2014 | 719% |
| 15gm | Teligent | 52565002215 | $0.82 | $5.80 | 9/1/2014 | 610% |
| 30gm | Teligent | 52565002230 | $0.72 | $5.80 | 9/1/2014 | 704% |
| 85gm | Teligent | 52565002285 | $0.52 | $4.09 | 9/1/2014 | 688% |
| 15gm | Taro | 51672130301 | $0.66 | $5.80 | 11/18/2014 | 779% |
| 30gm | Taro | 51672130302 | $0.59 | $5.80 | 11/18/2014 | 890% |
| 85gm | Taro | 51672130308 | $0.42 | $4.09 | 11/14/2014 | 871% |

816.    Although WAC data is not available for Fougera, upon information and belief, Fougera implemented simultaneous and identical price increases in their generic Econazole products.

817.    No supply shortages or other market events can explain the Econazole price increases. The only significant change was Teligent's market entry in February 2013, which should have, but did not, drive prices down.

818.    On February 1, 2013, Teligent obtained an ANDA for Econazole from Prasco LLC. Shortly thereafter, Teligent's CEO attended the 2013 GPhA Annual Meeting on February 20-22, 2013 in Orlando, Florida and the 2013 ECRM EPPS Retail Pharmacy Generics conference on February 24-27, 2013 in Dallas, Texas, along with Perrigo and Taro. Particularly, the CEOs of Perrigo and Taro joined Teligent's CEO at the 2013 GPhA Annual Meeting.

819.    When Teligent launched Econazole under its own ANDA, it irrationally increased effective prices immediately, rather than compete for market share on price.

Here, rather than compete, when a Defendant raised its price, the market remained stable, indicating a conspiracy.

820.   The significant price increases shortly followed or occurred at about the time of the following trade conferences: June 1-4, 2014 HDMA 2014 Business and Leadership Conference in Phoenix, Arizona; June 3-4, 2014 GPhA CMC Workshop in North Bethesda, Maryland; October 27-29, 2014 GPhA Fall Technical Conference in Bethesda, MD; February 9-11, 2015 GPhA Annual Meeting in Miami Beach, FL; and February 22- 25, 2015 ECRM 2015 Retail Pharmacy Generic Pharmaceuticals EPPS in Destin, FL. Key executives from Defendants Fougera, Perrigo, Sandoz, Taro, and Teligent all attended.

> xxix.      Enalapril Maleate

821.   Enalapril Maleate ("Enalapril"), also known by the brand name Vasotec, is a drug used in the treatment of high blood pressure and congestive heart failure.

822.   During the relevant time period, Plaintiff Harris County purchased Enalapril manufactured and/or sold by Apotex, Mylan, Taro, Teva and Wockhardt.

823.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Enalapril Maleate as follows:

824.   In 2009, Taro discontinued its sales of Enalapril under its own label and effectively exited the market. It continued supplying Enalapril thereafter only to certain government purchasers under the "TPLI" label.

825.   By mid-2013, the Enalapril market was shared by three players: Mylan with 60.3%, Wockhardt with 27.5%, and Teva with 10.7%. Those three companies coordinated a significant anticompetitive price increase for Enalapril in July 2013.

826.    Shortly before the Teva and Wockhardt price increases, on or about July 12, 2013, Aprahamian (Taro) was considering whether to renew or adjust Taro's price on Enalapril for its national contract (for government purchasers), which was slated to expire in September 2013.

827.    In the midst of that coordinated price increase, however, Aprahamian was communicating with both Patel (Teva) as well as a senior sales and marketing executive at Wockhardt about Enalapril. As a result of those conversations, Taro's plans changed.

828.    On the morning of July 19, Aprahamian sent an internal e-mail to Taro colleagues signaling a change in plans, stating:

> Currently if I'm not mistaken we only supply the government with Enalapril in TPLI label (looks like we exited our label in 2009). There has been some significant changes in the market landscape with this product and I'd like to get product back in Taro label (and fast).

Aprahamian followed up with another e-mail shortly after, adding that Taro "[w]ould only look or 10-15% MS [market share] but with recent market changes and units on this product, it would be incremental."

829.    In the coming months, both Teva and Taro engaged in intensive analyses of how the market should look after Taro's re-launch so that each competitor would have its desired, or "fair," share of the market.

830.    On July 31, 2013, for example, Patel (Teva) provided her analysis of the drugs Teva should bid on in response to a request for bids from a major customer, which was largely based on whether Teva had reached its "fair share" targets. Enalapril was one of the drugs where, according to Patel, Teva was "seeking share," so she authorized the submission of a bid. Prior to sending that e-mail, Patel had spoken to Aprahamian (Taro) on July 30 and July 31, 2013.

831.   Based on the agreement between the two companies, and in accordance with the industry's "fair share" code of conduct, Taro understood that it would not take significant share from Teva upon its launch because Teva had a relatively low market share compared to others in the market.

832.   Meanwhile, as he worked on pricing for Taro's upcoming re-launch, Aprahamian emphasized to his colleagues that Taro's final prices would be set largely based on "continued market intelligence to secure share . . ."

833.   In early December 2013, Taro was fully ready to re-enter the Enalapril market. On December 3, 2013, Aprahamian consulted twice by phone with Mylan's senior account executive.

834.   Taro's fact sheet for the Enalapril re-launch generated on the day of Aprahamian's call with Teva showed a "[t]arget market share goal" of 15%, with pricing identical to Teva's and nearly identical to Wockhardt's and Mylan's.

835.   Taro began submitting offers on Enalapril the following day, December 6, 2013. But even with the bidding process underway, Aprahamian made certain to communicate with a Mylan executive during a brief phone conversation that afternoon. This particular communication was important since Mylan was the market share leader and Taro was targeting more of Mylan's customers than those of other competitors.

836.   Over the next ten days, the discussions between Taro and Mylan continued over how to allocate the Enalapril market. Aprahamian and his contact at Mylan talked on December 11 and December 12.

837.   Thereafter, and with the likely consent of Mylan, Aprahamian reported on an internal sales and marketing call on December 16, 2013, that Taro's prior target Enalapril market share goal of 15% had been raised to 20%.

838.   Taro continued to gain share from both Mylan and Wockhardt, and to coordinate with both. For example, in late December, Taro submitted a competitive offer to Morris & Dickson, a Wockhardt customer. This caused a Wockhardt executive to call Aprahamian on December 31, 2013, to discuss the situation. During the call, the Wockhardt executive agreed that so long as Wockhardt was able to retain McKesson as a customer, it would concede Morris & Dickson to Taro.

839.   By May 2014 the market was stable, and market share for Enalapril was reasonably distributed among the companies. As Teva was considering whether to bid on specific drugs for an RFP sent out by a large wholesaler customer, Patel provided the following caution with regard to Enalapril: "no bid due to potential market/customer disruption, aka strategic reasons." The same day she sent that e-mail – May 14, 2014 – Patel (Teva) spoke to Aprahamian (Taro) and exchanged eight (8) text messages with him.

840.   By June 2014, Taro had obtained 25% market share for Enalapril in a 4-player market. Mylan and Teva each had approximately 28% market share in accordance with Defendants' overarching "fair share" agreement.

841.   NADAC data shows that average market prices of Enalapril rose following Defendants' coordinated price increases in July 2013 and continued to increase thereafter as Defendants coordinated additional subsequent price increases, as depicted in Figure 55 below:

**Figure 55: Enalapril Maleate NADAC Increase**



842.   No shortages or other market features can explain Defendants' price increases for Enalapril during the relevant period.

> xxx.   <u>Entecavir</u>

843.   Entecavir, also known by the brand name Baraclude, is a medication used to treat chronic Hepatitis B.

844.   During the relevant time period, Plaintiff Harris County purchased Entecavir manufactured and/or sold by Aurobindo, Camber, Par, Teva and Zydus.

845.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Entecavir as follows:

846.   As Teva was preparing to enter the market for Entecavir in August 2014, a senior sales and business relations executive at Teva sent an email to a colleague stating

that Teva was planning on launching Entecavir "shortly" and noting that: "We may or may not be alone on the market at launch. Sandoz has a settlement and we do not know their terms. Apotex has recently filed a PIV [Paragraph IV certification] but we invalidated the patent. We are hearing PAR has the [authorized generic] and is stating they will launch after we launch, but there is still a good chance we may be alone in the market for a short time."

847.   On August 28, 2014, Rekenthaler (Teva) informed Teva sales employees that Teva had received approval on Entecavir and would circulate offers later that day or the next day. Rekenthaler noted: "[w]e are looking for at least a 60 share. Known competition is Par with an [authorized generic]." Rekenthaler also noted that Teva would be pricing as if they were "exclusive" in the market and expressed concern that customers might react negatively to the launch of this drug "because of our recent price increase [on other drugs]."

848.   On August 29, a Teva sales employee reported that a customer had informed her that Par was launching Entecavir at a lower price point than Teva. The employee inquired whether Teva might consider reducing its price as well. Rekenthaler, after speaking with his contact Par several times on August 28 and 29, replied that Teva would remain firm on the price and noted that he was "doubtful PAR will be much lower." Despite Teva's refusal to lower its price, that customer signed an agreement with Teva to purchase Entecavir.

849.   Teva and Par both launched their respective Entecavir products on September 4, 2014. Within days of its launch, Teva had captured 80% of the market for new generic prescriptions and 90.9% of the total generic market (new prescriptions and refills).

850.    Within a few weeks, however, Teva's share of the market was much more in line with "fair share" principles – 52.6% for new generic prescriptions, and 47% of the total generic market (new prescriptions and refills).

851.    On October 9, 2014, another customer, who had already received a discount on Entecavir, asked for an additional discount to "help close the gap with current market prices." Teva declined to do so, citing that the "pricing is competitive and in line with the market." Rekenthaler had spoken to his contact at Par twice on October 2, 2014.

852.    The two-player market for Entecavir remained stable over time. By January 2, 2015, Teva's share of the market for new generic prescriptions was 52.2%, and its share of the total generic market (new prescriptions and refills) was 46.7% in accordance with Defendants' overarching "fair share" agreement.

xxxi.    Etodolac ER

853.    Etodolac Extended Release ("Etodolac ER") is a nonsteroidal anti-inflammatory drug that is used to treat symptoms of juvenile arthritis, rheumatoid arthritis, and osteoarthritis.

854.    During the relevant time period, Plaintiff Harris County purchased Etodolac ER manufactured and/or sold by Taro, Teva and Zydus.

855.    As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Etodolac ER as follows:

856.    Prior to Zydus' entry into the Etodolac ER market, Defendants Teva and Taro were the only generic suppliers of the product. Teva and Taro – through Patel (Teva) and Aprahamian (Taro) – colluded to significantly raise the price of Etodolac ER in August 2013.

857.   On May 12, 2014, Defendant Zydus entered the Etodolac ER market at WAC pricing that matched Teva and Taro's artificially high pricing. Not surprisingly, in the days leading up to the Zydus launch, Patel was relaying communications back and forth between Green (Teva) and Aprahamian (Taro). During these calls, the competitors discussed the allocation of market share to the new entrant, Zydus.

858.   On May 14, 2014, Anda—a wholesaler customer of Teva—notified Teva that Zydus had submitted a bid for its Etodolac ER business. That same day, Patel exchanged eight (8) text messages and had a phone call with Aprahamian.

859.   On May 20, 2014, a senior sales executive at Zydus exchanged six (6) text messages and had a call with an executive Teva.

860.   The next day, on May 22, 2014, the Teva executive circulated an internal email, stating: "I have proposed we concede Anda as they are a small percent of market share and we will have to give up some share with a new market entrant. Anda is looking for a response today." Patel responded: "agree with concede."

861.   Similarly, on June 27, 2014, Econdisc, a Teva customer, notified Teva that it had received a competitive offer for its Etodolac ER business. Later that day, Patel spoke with Aprahamian (Taro) for fourteen (14) minutes.

862.   On July 2, 2014, Patel called Green and left a voicemail. The next day, on July 3, 2014, Patel sent an internal e-mail advising that "We will concede." Later that day, Teva told Econdisc that it was unable to lower its pricing to retain the business.

863.   When Patel's supervisor, learned that Teva had lost the Econdisc business, he sent an internal e-mail asking "Did we choose not to match this?" Patel responded, "Yes. New market entrant – Zydus." The supervisor replied, "Okay good. Thank you."

198

864.  NADAC data shows that the average market prices for Etodolac ER rose dramatically in August 2013 following Defendants coordinated price increases and then remained artificially high after despite the entry of additional competitors (co-conspirators), as depicted in Figure 56 below:

**Figure 56: Etodolac NADAC Increase**



865.  No shortages or other market features can explain Defendants' price increases for Etodolac ER during the relevant period.

xxxii.  Fenofibrate

866.  Fenofibrate, also known by brand names such as Tricor, is a medication used to treat cholesterol conditions by lowering blood levels of "bad" cholesterol and fats (such as LDL and triglycerides) and raising blood levels of high- density, "good" cholesterol (HDL).

867.   During the relevant time period, Plaintiff Harris County purchased Fenofibrate manufactured and/or sold by Amneal, Apotex, Aurobindo, Camber, Dr. Reddy's, Glenmark, Lupin, Mylan, Perrigo, Sun, Teva and Zydus.

868.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, Defendants conspired to fix, raise, maintain and/or stabilize the prices of Fenofibrate as follows:

869.   As of the end of 2012, Teva and Lupin were the only major suppliers of generic Fenofibrate 48mg and 145mg tablets, with Teva having approximately 65% market share and Lupin having approximately 35% market share.

870.   On February 27, 2013, a senior marketing executive at Teva e-mailed multiple Teva colleagues, asking them to provide information on Mylan's potential entry to the market, including details of the timing of Mylan's planned launch – sensitive competitive information that, in the absence of Defendants' overarching conspiracy, would have been unavailable to Teva. In advance of this launch, Teva, Lupin and Mylan conspired to allocate the market for Fenofibrate.

871.   In order to get this information, Green (Teva) called Mylan's Nesta. Over the course of that day, Green and Nesta spoke at least four (4) different times. That same day, Green reported back to his Teva colleagues what he had learned: that Mylan planned to launch Fenofibrate 48mg and 145mg in November 2013.

872.   A few months later, however, Teva discovered that Mylan was moving its launch date for Fenofibrate from a few months away to May 17, 2013 – just days away.

873.   In a competitive market, this information would have been closely held by Mylan, who would have wanted to surprise their competitors – but instead, the co-conspirators disseminated this information and acted on it.

874.   In general, because they were aware their conduct was flagrantly illegal, Defendants tried to keep their communications regarding this conspiracy oral, so there would be no record of who said what to whom: on May 6, 2013, Berthold (Lupin) called Patel (Teva) regarding this price increase, and they spoke for approximately twenty (22) minutes.

875.   On May 7-8, Nesta (Mylan), Green (Teva) and Berthold (Lupin) communicated several times.

876.   Despite the co-conspirators' best efforts to avoid leaving electronic evidence of their words by communicating orally (including in person), the speed of business sometimes required the convenience of written electronic communications.  On that same day, May 8, 2013, Green e-mailed his colleagues at Teva regarding this impending launch for Teva's profitability and sales data on Fenofibrate.  This request that was repeated the following day by Green's boss at Teva, who also mentioned the fact that Mylan's launch date for Fenofibrate was imminent.

877.   On May 10, 2013, Teva decided to cede Teva's Econdisc business to Mylan, even though Econdisc was a significant source of revenue and profit on Fenofibrate.

878.   That same day, May 10, 2013, Green (Teva) reached out to Nesta (Mylan), and told him that Teva was on board with the scheme and Mylan would get the Econdisc account. They spoke for a little over ten (10) minutes, whereupon Nesta reached out to Patel (Teva), who in turn left a message for Berthold (Lupin), who then called Patel back to discuss the conspiracy, in particular, pricing and allocating the Fenofibrate market. Berthold and Patel spoke twice that day.

879.   Teva made good on its agreement to concede Econdisc to Mylan. On May 15, 2013, Econdisc informed Teva that a new market entrant – which, because of the

conspiracy, Teva already knew about, including the identity of the new bidder – had submitted a competitive offer for Fenofibrate 48 mg and 145 mg tablets and asked Teva for a counteroffer to retain Econdisc's business.

880.   In furtherance of the conspiracy and to the detriment of consumers, including Plaintiff Harris County, Teva refused to counteroffer.

881.   Following Teva's internal confirmation of the market allocation scheme, Teva executives spoke with executives at Mylan and Lupin numerous times over the next two days – when Mylan actually launched, and the news that Mylan was selling Fenofibrate was finally made public.

882.   In a competitive market, the sales force of a company launching a product is speaking to its customers and shippers, not to its competitors; but the importance to Defendants' conspiracy of coordination and of reassuring each other of their intent to abide by the agreement meant the Fenofibrate launch was not a normal launch.

883.   Teva, Mylan and Lupin were not the only Defendants involved in the Fenofibrate part of Defendants' overarching conspiracy: in February of 2014, Zydus was preparing to launch into the Fenofibrate market on March 7, 2014.

884.   By this time, Green was now at Zydus as the Associate Vice President of National Accounts, and maintained his collusion with his former Teva colleagues, Patel and Rekenthaler, then Vice President of Sales for US Generics at Defendant Teva until April 2015.

885.   At that time, in another example of the cozy relationships among ostensible competitors in the market for generic pharmaceuticals, Rekenthaler then transitioned from Defendant Teva to Defendant Apotex, where – as VP of Sales – he maintained and cultivated the cross-manufacturer relationships he had begun developing while at Teva,

including at least 1,044 phone calls and text messages with his contacts at Defendants Actavis, Mylan, Par, Aurobindo, Apotex, Zydus, Sandoz, Rising, Amneal, Breckenridge, Lupin, Dr. Reddy's, Glenmark, Greenstone, Taro, Lannett and Wockhardt.

886.   In addition to doing so with Patel and Rekenthaler, Green maintained his active collusion with Nesta (Mylan) and Berthold (Lupin), sharing pricing information and allocating market share with all four for the benefit of his new employer.

887.   In the absence of joint participation in a conspiracy, competitors would not telephone each other right before launching competing products. Yet, between February 19 and February 24, 2014, Patel and Green spoke by phone at least seventeen (17) times – including two (2) calls on February 20, lasting a combined total of over a half hour, and another call the next day, lasting almost a half hour, discussing Zydus's planned entry into the Fenofibrate market.

888.   In the days leading up to Zydus's Fenofibrate launch, Defendants from all four (4) competitors were in regular contact with each other to discuss pricing and allocating market share to Zydus, exchanging at least twenty-six (26) calls or voice mails with each other between March 3 and March 7, 2014.

889.   In a competitive market for fungible products, such as generic pharmaceuticals, new entrants come in at a price below the incumbent suppliers in order to obtain customers, who otherwise have no incentive to switch from the incumbents. That that is not what happened here.   Instead, because of Defendants' overarching anticompetitive agreement, Defendant Zydus entered the Fenofibrate market with WAC pricing that matched Defendants Teva, Mylan and Lupin.

890.   In the months that followed, Teva ceded several customers to Zydus in accordance with Defendants' "fair share" agreement.

xxxiii.        Fluocinonide

891.   Fluocinonide is medication is used to treat a variety of skin conditions (e.g., eczema, dermatitis, allergies, rash).

892.   During the relevant time period, Plaintiff Harris County purchased Fluocinonide manufactured and/or sold by Actavis, Glenmark, Mayne, Perrigo, Sandoz, Taro and Teva.

893.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, Defendants conspired to fix, raise, maintain and/or stabilize the prices of Fluocinonide as follows:

894.   At all relevant times, Defendants Actavis, Fougera, Sandoz, Taro and Teva dominated the market for Fluocinonide.

895.   Prior to June 2014, the effective prices for Fluocinonide were stable.

896.   Beginning in June 2014, Defendants increased their prices dramatically and largely in unison.

897.   In June 2014, Actavis planned to enter the Fluocinonide cream market. Actavis discussed its planned entry with at least Defendants Taro and Teva in advance of its entry. The conspirators coordinated price increases so that Actavis' new market entry would not erode the conspiratorial prices.

898.   During the last week of July 2014, Taro, Actavis, and Teva each tripled their respective prices for Fluocinonide cream, gel, and ointment in the United States.

899.   WAC data illustrates Taro and Teva's identical WAC price changes on June 3, 2014 and July 1, 2014, respectively, reflecting increases of more than 200%:

| Product Cream .05% | Defendant | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|
| 15gm | Taro | $.79 | $2.43 | June 3, 2014 | 206% |
| 30gm | Taro | $.56 | $2.43 | June 3, 2014 | 337% |
| 60gm | Taro | $.39 | $2.43 | June 3, 2014 | 524% |
| 15gm | Teva | $.79 | $2.43 | July 1, 2014 | 206% |
| 30gm | Teva | $.56 | $2.43 | July 1, 2014 | 337% |
| 60gm | Teva | $.39 | $2.43 | July 1, 2014 | 524% |

900.   Although WAC data is not available for Actavis or Fougera, upon information and belief, they implemented simultaneous and identical price increases in their generic Fluocinonide.

901.   These price increases followed the June 1-4, 2014 HDMA Business & Leadership Conference in Phoenix, Arizona and the June 3-4, 2014 GPhA CMC Workshop in Bethesda, MD. Key executives from the Fluocinonide Defendants all attended.

902.   The average market price for Fluocinonide remained artificially high after July 2014, according to the following NADAC data, as depicted in Figures 57 and 58:

**Figures 57-58: Fluocinonide NADAC Increase**





903.   The Fluocinonide Defendants' agreement, furthered through in-person discussions conducted at dinners and meetings, as well as email and text communications, was part of Defendants' overarching conspiracy to unreasonably restrain trade in the generic pharmaceutical market.

904.   No shortages or other market features can explain Defendants' price increases for Fluocinonide during the relevant period.

xxxiv.     Fosinopril-HCTZ

905.   Fosinopril-Hydrochlorothiazide ("Fosinopril-HCTZ"), also known by the brand name Monopril HCT, is a medicine used to treat hypertension.

906.   During the relevant time period, Plaintiff Harris County purchased Fosinopril-HCTZ manufactured and/or sold by Actavis, Akorn, Amneal, Aurobindo, Breckenridge, Camber, Glenmark, Pfizer, Sun, Teva and Zydus.

907.   The primary sellers of Fosinopril-HCTZ were Aurobindo, Citron, Glenmark, Heritage and Sandoz.

908.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Fosinopril-HCTZ as follows:

909.   In early 2012, the incumbent manufacturers of Fosinopril-HCTZ were Aurobindo, Glenmark and Sandoz. In the spring of 2012, Heritage entered the market. Rising did not enter the market until 2014.

910.   Instead of entering with a lower-priced product in order to gain market share, Heritage announced a list price identical to Sandoz, slightly higher than Aurobindo, and slightly lower than Glenmark.

911.    Even though it was not offering better pricing, Heritage quickly captured market share for Fosinopril-HCTZ, consistent with the "fair share" agreement between Defendants.

912.    In this timeframe, all the Fosinopril-HCTZ manufacturers at the time—Aurobindo, Glenmark, Heritage and Sandoz—met on numerous occasions at trade events.

913.    Prices remained stable in the Fosinopril-HCTZ market from 2012 into 2014, at which time Heritage included Fosinopril-HCTZ on its target list for price increases.

914.    During the week of April 14, 2014, Heritage's Malek asked two employees to analyze the impact of price increases for numerous generic drugs, including Fosinopril-HCTZ, and during a Heritage conference call on April 22, 2014, Malek informed the sales team that Fosinopril-HCTZ was targeted for a price increase.

915.    As with Heritage's other targeted price increases, Malek aimed to "socialize" the idea of price increases with the other Fosinopril-HCTZ manufacturers by direct outreach and communication about Heritage's intentions. Both Malek and Glazer pushed Heritage employees to communicate with their competitors and to obtain agreement to raise prices.

916.    Between the time of the sales team call in April and Heritage's price increase in July, Heritage communicated by phone call or text with every other manufacturer of Fosinopril-HCTZ, totaling at least one hundred (100) contacts.

917.    In addition, during this time period representatives from all of these Defendants met in person, including on April 26, 2014 at the NACDS 2014 Annual Meeting in Scottsdale, AZ, on May 14, 2014 at the MMCAP National Member Conference in Bloomington, Minnesota, on June 2014 HDMA Business and Leadership Conference.

918.   On June 27, Heritage began sending out price increase notices for Fosinopril-HCTZ and at the same time made numerous contacts to discuss the increases, including Aurobindo, Glenmark and Rising.

919.   At this time, Heritage doubled its WAC prices for Fosinopril-HCTZ. Fosinopril-HCTZ prices remained elevated – and well above the competitive price – thereafter.

920.   The "fair share" agreement among Defendants enabled Heritage to maintain and even increase its market share for Fosinopril-HCTZ, even though it had raised prices above a competitive level.

xxxv.   Gabapentin

921.   Gabapentin, also known by the brand name Neurontin, is part of a class of drugs called anticonvulsants and is used to treat the symptoms of epilepsy and neuropathic pain.

922.   During the relevant time period, Plaintiff Harris County purchased Gabapentin manufactured and/or sold by Akorn, Perrigo and Sandoz.

923.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Gabapentin as follows:

924.   On October 13 and 14, 2014, Patel (Teva) attended the Annual Meeting of the Pharmaceutical Care Management Association ("PCMA") in Rancho Palos Verdes, California, along with a number of Teva's competitors, including Glenmark.  At this conference these competitors discussed increasing the price of Gabapentin tablets.

925.   The Glenmark increase had not yet been made public and would not be effective until November 13, 2014. Nonetheless, shortly after returning from the PMCA

meeting, on October 15, Patel knew about this in advance and informed her colleagues at Teva that there would be a WAC price increase by Glenmark effective November 13, and that she had already been able to obtain certain contract price points that Glenmark would be charging to distributors.

926.   Around the time she sent the e-mail, Patel exchanged two text messages with an executive of Glenmark. Having relatively little market share for Gabapentin, Teva discussed whether it should use the Glenmark price increase as an opportunity to pick up some market share, and over the next several weeks, Teva did pick up market share to be more in line with "fair share" principles.

xxxvi.     <u>Glipizide-Metformin</u>

927.   Glipizide-Metformin HCL, also known by the brand name Metaglip, is used to treat high blood sugar levels that are caused by Type 2 Diabetes Mellitus.

928.   During the relevant time period, Plaintiff Harris County purchased Glipizide-Metformin manufactured and/or sold by Actavis, Heritage, Mylan, Teva and Zydus.

929.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Glipizide-Metformin as follows:

930.   By April of 2014, Defendants Heritage, Teva and Mylan controlled nearly the entire Glipizide-Metformin market.

931.   On April 15, 2014, Heritage's Malek called Teva's Patel and the two spoke for approximately seventeen (17) minutes and discussed seven (7) different At Issue Drugs for which Teva was a competitor of Heritage, including Glipizide-Metformin. During their

conversation, Patel agreed that if Heritage increased prices for the seven drugs they discussed, including Glipizide-Metformin, Teva would support the price increases.

932.   Heritage's Malek and Teva's Patel spoke several more times over the next several months to confirm and finalize their agreements regarding numerous drugs, including Glipizide-Metformin.

933.   On April 22, 2014, Heritage sales team held a teleconference discussing numerous drugs that were slated for a price increase, including Glipizide-Metformin. Concurrent with these discussions, and as outlined throughout, Heritage sales staff were also speaking with Defendants to formalize pricing agreements. For Heritage, O'Mara was responsible for communicating with Mylan about a number of drugs, including Glipizide-Metformin.

934.   On April 23, the day after Malek directed Heritage's sales team to contact Defendants about price increases, Mylan and Heritage agreed to raise prices on at least three (3) different drugs, including Glipizide-Metformin (as well as Doxy Mono and Verapamil). O'Mara conveyed this agreement with Mylan to Malek via e-mail the same day.

935.   Teva and Mylan were also in frequent communication with each other about pricing throughout this time period.

936.   Heritage had a call on June 25 and discussed an analysis of the proposed price increases and reviewed inter-competitor communications. The next day, Heritage began notifying customers of price increases for nine (9) drugs, including Glipizide-Metformin. Glipizide-Metformin was slated to double in price, effective July 1, 2014. Price increase notices were also mailed on June 26.

937.   By July 9, 2014, Heritage had increased prices of Glipizide-Metformin nationwide for at least twenty-seven (27) different customers. On August 20, 2014, an unidentified individual – likely a Heritage employee – updated a Sun employee via text messages on the agreements Heritage had reached with Actavis to increase the prices of Glyburide-Metformin and Verapamil. These text messages occurred just days before the start of the 2014 NACDS Total Store Expo, which was attended by employees of Heritage, Teva, Mylan and Sun.

938.   Because of their anticompetitive agreement, neither Teva nor Mylan challenged Heritage on its price increases. By November of 2014, Teva had increased its bid prices of Glipizide-Metformin to potential customers.

939.   Throughout the rest of the relevant period, the WAC prices announced for Glipizide-Metformin by Heritage, Mylan, Teva, Actavis, Sandoz and Zydus were virtually identical and unchanged, regardless of the number of sellers in the market and despite multiple entrances and exits from the market. This is because price competition was absent from this market and is further evidence of Defendants' "fair share" agreement. Rather than compete in the market, Defendants announced identical list prices, then, as described above, colluded with each other to elevate the prices paid by their customers.

xxxvii.     <u>Glyburide</u>

940.   Glyburide is a commonly prescribed oral anti-diabetic medication used to treat high blood sugar levels caused by Type 2 Diabetes. Introduced in the mid-1980's under the brand names Micronase and DiaBeta, generic Glyburide has been available since the mid-1990's.

941.    During the relevant time period, Plaintiff Harris County purchased Glyburide manufactured and/or sold by Aurobindo, Heritage, Hikma, Mylan, Pfizer, Rising and Teva.

942.    As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Glyburide as follows:

943.    As of April of 2014, Defendants Aurobindo, Heritage and Teva were the dominant sellers of Glyburide. A few months later, Defendant Rising entered the Glyburide market, in July of 2014.

944.    On April 15, 2014, Heritage's Malek called Teva's Patel and they discussed seven (7) different At Issue Drugs, including Glyburide. During their conversation, Heritage and Teva agreed not to compete in the Glyburide market. Malek (Heritage) and Patel (Teva) spoke several more times over the next several months to confirm and finalize their agreements regarding Glyburide and numerous other drugs.

945.    As discussed above, on April 22, 2014, the Heritage sales team held a teleconference during which Malek identified a large number of drugs that Heritage targeted for price increases, including Glyburide. At the time of this call, Aurobindo and Teva were Heritage's only competitors in the Glyburide market.

946.    Malek was responsible for communicating with Teva (among other Defendants) and Kathryn Lukasiewicz ("Lukasiewicz") of Heritage was assigned to communicate with Aurobindo. Malek and Glazer directed Heritage employees to communicate with their other competitors in the Glyburide market in order to reach agreements to raise prices.

947.   During the spring of 2014, these competitors continued having frequent communications about raising the price of a number of drugs, including Glyburide.

948.   On May 9, 2014, Heritage's sales team had another teleconference to share the results of their conversations with competitors and further discuss planned price increases for at least nine generic drugs, including Glyburide, Verapamil, Theophylline, Paromomycin, Nystatin, Nimodipine, Leflunomide, Glyburide-Metformin and Fosinopril-HCTZ were also all slotted for price increases.

949.   The following week, on May 14, Heritage's Sather met in person and discussed price increase strategies with several competitors at MMCAP in Bloomington, Minn. During that meeting, representatives of Aurobindo and Heritage agreed to raise the prices of Glyburide. Sather (Heritage) confirmed this agreement in a May 15 e-mail to Malek. Sather also indicated that she would try to meet with Teva representatives at MMCAP.

950.   On June 23, 2014, Heritage employees met and discussed the specific percentage amounts they would seek to increase Glyburide and the strategies for doing so. They reached a consensus that Glyburide prices would be increased by 200%.

951.   Over the next several weeks, Heritage employees continued reaching out to numerous generic drug competitors and potential competitor in the Glyburide market— in order to secure agreements to raise prices for Glyburide.

952.   On June 25, 2014, one Heritage employee texted his counterpart at Defendant Rising, to discuss whether Rising would be selling Glyburide in the near future. Once it was determined that Rising would be entering the Glyburide market, representatives at Rising and Heritage had extensive phone, text message and in-person conversations concerning Rising's pricing and bidding strategies for Glyburide.

953.    As Rising entered the Glyburide market in July 2014, it frequently contacted Heritage about Glyburide pricing and bidding strategies. Rising set an initial target of obtaining less than 10% of the Glyburide market. Rising was careful, however, to coordinate with Heritage so that it could acquire additional market share without eroding the price increases.

954.    Rising and Heritage's discussions did not occur in isolation. Concurrent with these pricing discussions, Heritage's Malek and his sales team continued to communicate with other Defendants about pricing for Glyburide.

955.    By July 9, 2014, Heritage had announced Glyburide price increases for at least seventeen (17) customers. Teva also had increased pricing on Glyburide. Rising, after confirming internally that Heritage had increased its list prices for Glyburide, also increased its Glyburide pricing in line with the price increases on July 15, 2014.

956.    Because of Defendants' conspiracy and the principles of "playing fair," throughout the summer, Teva, Aurobindo, Rising and Heritage were in contact with each other to ensure they were complying with their agreements on pricing for Glyburide.

957.    For example, because of Heritage's price increases, on July 9, 2014, a large national retail chain asked Teva to bid on both Glyburide and Nystatin. But instead of quoting a price that would win the business, Teva—following Defendants' agreement— raised its own prices for Glyburide to a similar level as Heritage's.

958.    Similarly, in response to Heritage's price increase on Glyburide and other At Issue Drugs, a large wholesaler separately e-mailed Teva and Aurobindo on July 25, 2014, and asked for bids. Aurobindo and Teva immediately contacted Heritage to coordinate their responses and ensure that they were complying with their pricing agreements.

959.   Teva's Patel and Heritage's Malek spoke for a quarter of an hour on the day the wholesaler's request was received. After this conversation, Teva declined to provide a bid to the wholesaler.

960.   While Teva, Aurobindo and Heritage were trying to maintain their price increases for Glyburide, Rising was also communicating directly with Aurobindo to coordinate its entry into the Glyburide market.

xxxviii.   <u>Glyburide-Metformin</u>

961.   Glyburide-Metformin, also known by the brand name Glucovance, is an oral medication used to treat Type 2 diabetes.

962.   During the relevant time period, Plaintiff Harris County purchased Glyburide manufactured and/or sold by Actavis, Aurobindo, Heritage, Pfizer, Rising, Teva and Zydus.

963.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Glyburide-Metformin, as follows:

964.   Glyburide-Metformin has been marketed and sold by a number of Defendants since 2009, including Actavis, Aurobindo, Rising (which entered the market in August 2014), Dr. Reddy's (which sold only de minimis amounts during the Relevant Period), Heritage (which entered the market in January, 2013), Par (selling only de minimis amounts by 2010), Sandoz (which sold only de minimis amounts by 2013), Teva, and Zydus (which entered the market in September of 2016).

965.   As of April 2014, the dominant sellers in the market for Glyburide-Metformin were Teva, Aurobindo and Actavis. Heritage had approximately a 5% market share, but nonetheless wanted to raise prices.

966.   As discussed above, on April 15, 2014, Heritage's Malek called Teva's Patel and the two discussed a number of At Issue Drugs, including Glyburide-Metformin. Patel and Malek agreed not to compete on these drugs. Over the next several months, Malek and Patel spoke several more times reconfirming and finalizing their agreements.

967.   On April 22, 2014, Heritage held a teleconference during which Malek identified a large number of drugs that Heritage targeted for price increases, including Glyburide-Metformin. After the call, Malek assigned Lukasiewicz to contact Aurobindo on behalf of Heritage about Glyburide-Metformin.

968.   Heritage's Sather was assigned to speak with Defendants Actavis, Sun and Lannett and, through her discussions, reached pricing agreements on at least five drugs: Nystatin, Paromomycin, Glyburide-Metformin, Verapamil, and Doxy Mono. Right after the Heritage sales call and in response to Malek's direction, Sather communicated with three (3) different competitors about multiple drugs—including with Actavis about Glyburide-Metformin. Sather spoke with an Actavis representative for nine (9) minutes the day of the April 22 pricing call and reached an agreement with Actavis to raise the price of Glyburide-Metformin. Sather updated Malek on her communications with Actavis on May 8, 2014.

969.   Within Actavis, news of its agreement with Heritage spread quickly. On April 28, 2014, an e-mail to the Actavis sales and pricing team discussed the agreement and potential price increases for a number of different drugs.

970.   A week later, in response to that April 28 e-mail, on May 6, an Actavis employee called an employee at Mylan, and they spoke for five (5) minutes. They spoke three (3) more times on May 6, with one call lasting a quarter of an hour. They continued

to communicate over the next several months and continued to discuss pricing for Glyburide-Metformin.

971.   On April 28, 2014, Heritage CEO Glazer sent an e-mail to Lukasiewicz (Heritage) directing her to contact Aurobindo about potential price increases on a number of drugs, including Glyburide-Metformin. Tellingly, Glazer told Lukasiewicz not to put any of his communications with Aurobindo on pricing in writing. Lukasiewicz exchanged several voicemails with her contact at Aurobindo on April 28 and 29. Glazer requested status updates from Lukasiewicz several times at the end of April.

972.   Heritage's Lukasiewicz and her Aurobindo contact spoke for approximately a quarter hour on May 8, 2014. During this phone call, they reached an agreement to raise the prices of at least Glyburide, Glyburide-Metformin and Fosinopril-HCTZ.

973.   And, as noted above, on May 15, 2014, while attending the MMCAP National Member Conference, Sather confirmed pricing agreements for five (5) different drugs with three (3) different Defendants, including with Aurobindo on pricing for Glyburide-Metformin and two other drugs.

974.   Concurrent with these discussions, on May 12, an employee of Actavis spoke with Bob Cunard, the CEO of Aurobindo, twice about its Glyburide-Metformin pricing. Between May 19 and May 22, 2014, that same Actavis employee also exchanged thirty (30) text messages with a Teva employee about drug pricing.

975.   In July 2014, both Heritage and Teva increased their WAC prices for Glyburide-Metformin.

976.   Rising took note of these actions. On July 9, 2014, in an internal memo, Rising noted that both Heritage and Teva had increased their prices on three different

drugs, including Glyburide-Metformin. In the same memo, a Rising employee then reiterated Rising's intent to abide by the agreement with Heritage and Teva.

977.    On August 20, 2014, a person – likely a Heritage employee – exchanged text messages with a Sun employee. The text exchange described the agreements reached with Actavis to increase the price of Glyburide-Metformin and Verapamil. This, again, highlights the overarching nature of the conspiracy and the fact that all Defendants were competitors in all drugs; Sun was kept apprised of agreements (in this case, between Actavis and Heritage) relating to At Issue Drugs that it did not market or sell because it could have chosen to enter those other markets.

978.    By September of 2014, Rising was ready to enter the Glyburide-Metformin market, but instead of undercutting the prices of Actavis, Aurobindo, Heritage and Teva in an effort to gain market share as would be expected in a competitive market, Rising announced list (WAC) prices higher than all of the incumbent suppliers. Rising was able to do so because it knew that the other Defendants in the market would not undercut its price because of the overarching conspiracy.

xxxix.      Griseofulvin

979.    Griseofulvin, also known by the brand name Grifulvin V, is an oral antifungal medication primarily used to treat ringworm infections that do not respond to topical medications, such as ointments or creams.

980.    During the relevant time period, Plaintiff Harris County purchased Griseofulvin manufactured and/or sold by Actavis, Amneal, Par, Perrigo, Rising, Sandoz and Teva.

981.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Griseofulvin, as follows:

982.   In September of 2014, Actavis wanted to implement a price increase on its Griseofulvin products – so, naturally (in light of Defendants' conspiracy), Actavis's first step with Griseofulvin was to make sure that its fellow seller of Griseofulvin, co-conspirator, and nominal competitor Teva would follow such an increase.

983.   Thus, Actavis employees reached out to their counterparts Patel and Rekenthaler at Teva – but not by phone. Instead, their first contact on this particular sub-agreement was likely at the NACDS 2014 Total Store Expo, held in Boston's Convention Center over the weekend of August 23-26 through that Tuesday, and attended by representatives of every Defendant.

984.   In the first week of September 2014, representatives of Actavis and Teva were in constant communication.  Following this, on September 9, 2014, Actavis notified its customers it raised the price of Griseofulvin Microsize Oral Suspension, effective October 6, 2014.

985.   Likewise, Teva immediately added Griseofulvin to its own price increase list. True to its word, on January 28, 2015, Teva raised the WAC price on its Griseofulvin Microsize Oral Suspension to exactly match that of Actavis.

xl.      Irbesartan

986.   Irbesartan is a drug used in the treatment of hypertension. It prevents narrowing of blood vessels, thus lowering a patient's blood pressure. Irbesartan is also known by the brand name Avapro.

987.    During the relevant time period, Plaintiff Harris County purchased Irbesartan manufactured and/or sold by Apotex, Aurobindo, Camber, Hikma, Lupin, Mylan, Par and Teva.

988.    As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, Defendants conspired to fix, raise, maintain and/or stabilize the prices of Irbesartan as follows:

989.    Teva received approval to manufacture generic Irbesartan in March of 2012.

990.    On March 6, 2012, Green's boss at Teva polled the sales team seeking information about competitors in the Irbesartan market. Later that morning, in response, Green called Berthold at Lupin and they spoke for over a quarter-hour. Within hours of Green's boss's request for sensitive commercial information from ostensible competitors, Green sent an answer to the team, including Rekenthaler and Cavanaugh that "Lupin is looking for a 15% share. They already have ABC [Amerisource Bergen Corp]. Confirmed Zydus is out, but was unable to get information on other players in the market." A senior commercial operations executive at Teva responded via e-mail that afternoon, "Then work harder...." (ellipsis in original).

991.    Because Defendants' cartel's standard procedure was to pass information indirectly from one ostensible competitor to another via intermediaries, who were sometimes cartel members and sometimes customers who were friendly to the cartel (as well as directly, from time to time), Green (Teva) called Berthold (Lupin) back at next morning, March 7, to get the requested information. The two spoke for just over seven minutes, around 10:54 a.m., but that was all the time that was needed for Berthold to pass on the requested sensitive competitive information, which Berthold did.

992.     A little over an hour later, Green's boss at Teva shared with the sales team the competitively sensitive information he had obtained, including the details Berthold gave Green regarding who was and who was not launching the drug, and which customers had received offers. Green's boss stated that Teva was in a position to take up to a 40% market share when it launched Irbesartan a few weeks later, on March 30 – a comment that would make little sense in a competitive market, where a supplier would want to try to take as much of the market as it could supply, but a comment that was entirely sensible in the context of Defendants' overarching scheme to provide market share to each market participant, in order to prevent price competition.

993.     The unlawful agreement between Teva and Lupin regarding Irbesartan was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise, maintain and/or stabilize the prices of the At Issue Drugs.

      xli.     <u>Ketoprofen, Ketorolac and Methotrexate</u>

994.     Ketoprofen is a nonsteroidal anti-inflammatory drug used to treat chronic condition such as arthritis.

995.     During the relevant time period, Plaintiff Harris County purchased Ketoprofen manufactured and/or sold by Mylan and Teva.

996.     Ketorolac is a nonsteroidal anti-inflammatory drug used for the short-term treatment of moderate to severe pain in adults.

997.     During the relevant time period, Plaintiff Harris County purchased Ketorolac manufactured and/or sold by Akorn, Apotex, Mylan, Sandoz, Sun and Teva

998.     Methotrexate belongs to a class of drugs known as antimetabolites and is used to treat certain types of cancer or to control severe psoriasis or rheumatoid arthritis that has not responded to other treatments.

999.   During the relevant time period, Plaintiff Harris County purchased Methotrexate manufactured and/or sold by Hikma, Mylan, Sun, Teva and Zydus.

1000.  As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices on Ketoprofen, Ketorolac and Methotrexate as follows:

1001.  In the spring and summer of 2013, executives at Teva began to investigate Mylan drugs as a potential source for coordinated price increases by communicating with Mylan executives extensively throughout May 2013.  For example, in June 2013, shortly before both companies significantly increased their prices of numerous drugs, Teva and Mylan executives spoke ten (10) times over the course of four days:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 6/24/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:25:29 | 0:00:06 |
| 6/24/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 13:32:25 | 0:10:13 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:43:27 | 0:00:06 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:02:58 | 0:00:32 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:51:43 | 0:00:03 |
| 6/26/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 9:55:29 | 1:00:25 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 10:47:23 | 0:00:06 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:04:04 | 0:01:03 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 15:42:07 | 0:04:20 |
| 6/28/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 10:59:56 | 0:03:53 |

1002. On June 26, 2013, in the midst of this flurry of communications between Teva and Mylan, one of Patel's colleagues sent her a suggestion with the following list of potential drugs to add to the price increase list:

| Product | Competitors (Mkt Share) |
|---------|-------------------------|
| Disopyramide Phosphate Capsules | Actavis (61%) |
| Ketorolac Tablets | Mylan (32%) |
| Ketoprofen Capsules | Mylan (63%) |
| Hydroxyzine Pamoate Capsules | Sandoz (39%); Actavis (9%) |
| Nystatin Tablets | Heritage (35%); Mutual (32%) |

1003.  A few days after this communication, Mylan raised its price for both Ketorolac and Ketoprofen on July 2, 2013. Teva then quickly followed with its own price increase for both drugs (and others) on August 9, 2013.

1004.  Similarly, on July 2, 2013, the day before Teva increased the price for the drug Methotrexate, a colleague asked Patel how Teva's competitors' pricing compared with regard to Methotrexate. Patel responded that Mylan's pricing was a little low on that drug, "but we are hearing rumors of them taking another increase," so Teva felt comfortable increasing the price of that drug on July 3, 2013.

1005.  These "rumors" – which were based on the direct communications between Teva and Mylan – again turned out to be accurate: Mylan increased its price of Methotrexate, pursuant to its agreement with Teva, in the Fall of 2013.

1006.  Following these price increases the average market prices for Ketoprofen, Ketorolac and Methotrexate remained artificially high after the Fall of 2013, according to NADAC data, as depicted in Figures 59-61 below:

**Figure 59: Ketoprofen NADAC Increase**



**Figure 60: Ketorolac NADAC Increase**



1007.  No shortages or other market features can explain Defendants' price increases for Ketoprofen, Ketorolac and Methotrexate during the relevant period.

xlii.        Ketoconazole

1008.  Ketoconazole is an imidazole antifungal drug and is primarily used to treat fungal infections. Ketoconazole is sold commercially as a tablet for oral administration and as a cream for topical administration.

1009.  During the relevant time period, Plaintiff Harris County purchased Ketoconazole manufactured and/or sold by Mylan, Perrigo, Sandoz, Taro and Teva.

1010.  As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Ketoconazole as follows:

1011.  On January 14, 2014, Patel identified Ketoconazole Cream and Ketoconazole Tablets as price increase candidates sometime in January-February of 2014 and included them on the list of price increase targets that she sent to a Teva colleague on February 26, 2014.

1012.  Taro was a common competitor on both drugs, but there were different sets of competitors for each formulation. For Ketoconazole Cream, Teva's nominal "competitors" (and co-conspirators) were Taro and Sandoz; for the Ketoconazole Tablets, Teva's nominal "competitors" (and co-conspirators) were Taro, Mylan and Apotex.

1013.  Teva led the price increases for both drugs but made sure to coordinate with all of its competitors as it was doing so. Meanwhile, co-conspirators Taro and Sandoz were also communicating directly with each other. For example, on April 4, 2014 – the day of Teva's price increase on Ketoconazole – Patel spoke separately with both Aprahamian of

Taro and a representative of Sandoz and told each co-conspirator about Teva's immediate price increasing on Ketoconazole.

1014.  That same day, Friday, April 4, 2014, Aprahamian then spoke to a senior sales executive at Sandoz to discuss the Teva increase and coordinate their response. They agreed that at least Taro would follow the increase and raise its prices. The Sandoz representative sent internal e-mail, informing his Sandoz colleagues about Teva's immediate price increase and Taro's commitment to follow the price increase and directing them not to bid on any new opportunities for Ketoconazole; Aprahamian sent a similar message to his colleagues at Taro.

1015.  The following Monday, April 7, 2014, Taro received a request for a bid from the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP"), a group purchasing organization. MMCAP asked for a bid on its Ketoconazole Tablets account due to Teva's price increase from the previous week. Taro refused to bid on the account in furtherance of their agreement with their competitors.

1016.  The next day, Tuesday, April 8, Aprahamian (Taro) called Patel (Teva) and the two spoke for more than a quarter of an hour. Later that same day, Aprahamian initiated a price increase for all of Taro's customers on both Ketoconazole Cream and Tablets. Aprahamian directed that the notice letters be sent to customers on April 16, 2014, with an effective date of April 17, 2014.

1017.  Although Sandoz already knew that it would follow the increased prices, it was not able to implement them until October. The delay was due to the fact that Sandoz had contracts with certain customers that contained price protection terms which would pose substantial penalties on Sandoz if it increased its prices at that time. Those penalties

outweighed the profits to be made from the increased prices, so Sandoz delayed following the price increases until that October.

1018.   This put Sandoz in a bind: its prices were lower than its competitors, which would normally lead to an increase in business; but increased market share would mean Sandoz was getting more than its overarching "fair share" agreed upon amount.

1019.   To avoid violating Defendants' overarching agreement, Sandoz did not seek out additional business, even though it was now the lowest-priced market participant. Likewise, Teva not only chose not to seek out new business, but also refused to accept new business that fell into its lap.

1020.   For example, a month after the price increase, Cardinal approached Teva to ask for a bid on its Ketoconazole business. The request was forwarded to Patel, who communicated several times via text and telephone with Aprahamian at Taro, and then directed that Teva decline to bid for Ketoconazole at Cardinal. The same day, May 14, 2014, Patel also directed that Teva decline to bid for Ketoconazole at ABC, thus protecting Taro from price competition.

1021.   The Teva increases on Ketoconazole were significant. For the cream, Teva, Taro and Sandoz all more than doubled their WAC prices. For the tablets, Teva's WAC increases were more than triple, but its customer price increases were even larger, averaging more than five (5) times the original price.

1022.   No product shortages or other market features can explain Defendants' abrupt, simultaneous (or, in Sandoz's case, delayed by six months), and substantially identical price increases during the Relevant Period.

1023.   Following these price increases the average market price for Ketoconazole remained artificially high after April 2014, according to the following NADAC data:

**Figure 61: Ketoconazole NADAC Increase**



xliii.        <u>Leflunomide</u>

1024.  Leflunomide is a pyrimidine synthesis inhibitor belonging to the disease-modifying anti-rheumatic class of drugs used to treat symptoms of rheumatoid arthritis.

1025.  During the relevant time period, Plaintiff Harris County purchased Leflunomide manufactured and/or sold by Apotex, Heritage and Teva

1026.  As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Leflunomide as follows:

1027.  At all relevant times, Defendants Apotex, Heritage and Teva have had domination shares of the Leflunomide market. Heritage held a 61% share by April 2014.

1028.  Prior to April 2014, the effective prices for Leflunomide were stable.

1029. Beginning in April 2014, these Defendants all increased their prices dramatically and largely in unison.

1030. During Heritage's April 2014 "Price Increase Discussion" teleconference, Malek identified Leflunomide as one of the eighteen (18) drugs targeted for a price increase. Malek was responsible for communicating with Teva about the Heritage's price increase (among others).

1031. On April 15, 2014, Malek (Heritage) called Patel (Teva) about the drugs on his list and Patel (Teva) agreed that if Heritage increased its prices, Teva would follow or, at a minimum, would not compete with Heritage by underbidding them. In the following months, Malek and Patel (Teva) spoke frequently and Malek kept her informed on the strategy for price increases.

1032. Heritage's Edelson was tasked with communicating with Defendant Apotex regarding the Leflunomide price increase. On May 2, 2014, Edelson (Heritage) called a Sales Manager at Apotex, regarding Leflunomide prices and they spoke for more than thirteen (13) minutes.

1033. Also, in May 2014, Heritage learned Teva might be leaving the Leflunomide market. On May 6, 2014, Sather (Heritage) emailed Malek that "the Teva discontinuation of Leflunomide has everyone in a fuss! Wow – can we take more share???" Malek responded "we may give some to apotex and follow our strategy we discussed. Will have clarity by tomorrow."

1034. That same day, Edelson (Heritage) had two more phone calls with Viera (Apotex). Edelson (Heritage) then reported to Malek that Apotex "has taken another shot at our Leflunomide . . . I am waiting for a callback from the VP of Apotex before we do anything." Malek replied, "Let's walk from leflunomide," confirming the strategy he

mentioned to Sather (Heritage). Following this, Beth Hamilton, Vice President of Sales at Apotex, called Edelson (Heritage). Heritage and Apotex representatives thereafter held four (4) additional phone calls within two days. During these communications, Heritage and Apotex agreed to avoid competition and increase prices on Leflunomide.

1035.   In response to Malek's May 8th e-mail to the Heritage sales team requesting confirmation on agreements reached with competitors, Edelson (Heritage) responded that he spoke "with everyone" and was only waiting for feedback regarding the drug Meprobamate.

1036.  On Heritage's May 9th call on "Price Increases," Leflunomide remained on the list of target drugs.

1037. On May 27th, 2014, Heritage learned that Apotex increased prices on Leflunomide and Malek confirmed with Edelson (Heritage), "we are going to increase." By July 9, 2014, Heritage successfully increased prices on Leflunomide for at least fifteen (15) different customers.

1038.  On June 25, 2014, Malek told Patel (Teva) Heritage would be increasing prices for several drugs sold by Teva.

1039.  In conformity with its agreement, Teva never challenged Heritage's price increases. This decision countered Teva's self-interest, as it could have benefitted by undercutting the higher prices charged by Apotex and Heritage and thereby gaining market share.

1040. NADAC data shows the following average market price increases for Leflunomide between June 2015 and December 2015:

Leflunomide (10mg): increased by 730%; and

Leflunomide (20mg) increased by 617%

1041.  Based on NADAC data, the average market price for Leflunomide rose dramatically and remained artificially high after June 2015:

**Figure 62: Leflunomide NADAC Increase**



1042.  Following the initial price spikes, Leflunomide prices continued to increase to approximately 675% higher than their pre-conspiracy levels and remain at artificially high levels.

1043.  These price increase occurred following the June 1-4, 2014 HDMA Business Leadership Conference in Phoenix, Arizona and the June 3-4 GPhA CMC Workshop in Bethesda, Maryland.

1044. No shortages or other market features can explain Defendants' price increases for Leflunomide during the relevant period.

xliv.        Levothyroxine

1045.  Levothyroxine is a thyroid medicine that replaces a hormone normally produced by your thyroid gland to regulate the body's energy and metabolism.

1046.  During the relevant time period, Plaintiff Harris County purchased Levothyroxine manufactured and/or sold by Amneal, Lannett, Mylan and Sandoz.

1047.  As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Levothyroxine as follows:

1048.  At all relevant times, there have been at least three (3) manufacturers of Levothyroxine in the market.

1049.  Since approximately December 2010, Defendants Lannett, Mylan and Sandoz have dominated the market for Levothyroxine with a nearly 100% share.

1050.  Prior to 2013, the effective prices of Levothyroxine were stable.

1051.  Beginning in August 2013, these Defendants all increased their prices for Levothyroxine dramatically and largely in unison.

1052.  The average prices for Levothyroxine experienced a rapid surge. Mylan's prices rose by approximately 225% between May and October of 2013, with an overall price hike of approximately 400% by May 2014. Defendants Lannett and Sandoz also raised their prices for Levothyroxine by similar amounts between May 2013 and October 2014, as set forth below.

1053.  NADAC data is publicly available only for the time period between November 2013 and the present (after the initial price hike), but even this limited data shows that average market price for various dosages of Levothyroxine nearly doubled in price and then remained artificially high thereafter. For instance:

Levothyroxine 100 mcg Tablets: increased by 70% between November 2013 and September 2014; and

Levothyroxine 175 mcg Tablets: increased by 78% between November 2013 and September 2014

1054.  WAC data for Levothyroxine's 0.05mg tablet demonstrates that Lannett, Mylan and Sandoz all implemented significant price increases in virtual lockstep, first in August and September of 2013, then again in April and May of 2014:

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000ct | Mylan | 00378180310 | $0.18 | $0.27 | 8/9/2013 | 45% |
| 100ct | Lannett | 00527134201 | $0.18 | $0.27 | 8/14/2013 | 46% |
| 1,000ct | Lannett | 00527134210 | $0.18 | $0.27 | 8/14/2013 | 120% |
| 90ct | Sandoz | 00781518192 | $0.12 | $0.27 | 9/13/2013 | 120% |
| 1,000ct | Sandoz | 00781518110 | $0.12 | $0.27 | 9/13/2013 | 54% |
| 1,000ct | Mylan | 00378180310 | $0.12 | $0.41 | 4/25/2014 | 55% |
| 1,000ct | Lannett | 00527134201 | $0.27 | $0.41 | 4/28/2014 | 54% |
| 100ct | Lannett | 00527134210 | $0.27 | $0.41 | 4/28/2014 | 54% |
| 90ct | Sandoz | 00781518192 | $0.27 | $0.41 | 5/23/2014 | 54% |
| 1,000ct | Sandoz | 00781518110 | $0.27 | $0.41 | 5/23/2014 | 54% |

1055.  News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, market-wide price increases. In a November 2014 hearing in the United States Senate HELP Subcommittee, pharmacist Stephen W. Schondelmeyer testified that in the prior year, Levothyroxine experienced a 35-50% price hike. Mr. Schondelmeyer added that Mylan increased its prices for nine different strengths of Levothyroxine by between 44-63%. Pharmacist Robert Frankil also testified that in 2013, Levothyroxine experienced a dramatic price increase.[57]

---

[57] Why Are Some Generic Drugs Skyrocketing in Price?: Hearing Before the Subcomm. On Primary Health and Aging of the S. Comm. on Health, Educ., Labor, and Pensions, 113th Cong. 10 (2014) (statement of Stephen W. Schondelmeyer, Director, Prime Institute and statement of Robert Frankil, President, Sellersville Pharmacy, Inc.), available at https://www.gpo.gov/fdsys/pkg/CHRG-113shrg24459/pdf/CHRG-113shrg24459.pdf.

1056. These price increases followed the October 28-30, 2013 GPhA Fall Technical Conference in North Bethesda, Maryland, at which key pricing executives from Lannett, Mylan, and Sandoz attended.

1057. NADAC data shows that average market prices of Levothyroxine remained stable prior to September 2013, but rose dramatically and remained artificially high thereafter, as depicted in Figures 64-67 below:

**Figures 63-66: Levothyroxine NADAC Increase**









1058. No shortages or other market features can explain Defendants' price increases for Levothyroxine during the relevant period

xlv.     Lidocaine

1059.  Lidocaine also known as lignocaine, is a medication used to numb tissue in a specific area (local anesthetic). It is also used to treat ventricular tachycardia and to perform nerve blocks.

1060. During the relevant time period, Plaintiff Harris County purchased Lidocaine manufactured and/or sold by Actavis, Akorn, Amneal, Glenmark, Hikma, Mylan, Par, Sandoz, Taro, Teligent and Wockhardt.

1061.  As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Lidocaine as follows:

1062. At all relevant times, there has been more than one manufacturer of Lidocaine in the market.

1063. Defendants Akorn, Amneal, and Sandoz dominate the market for one popular formulation of Lidocaine, Lidocaine-Prilocaine.

1064. Prior to March 2014, the effective prices for Lidocaine-Prilocaine were stable.

1065. Beginning in Summer of 2014, Defendants increased their prices abruptly and largely in unison for Lidocaine-Prilocaine.

1066. Prices for other forms of Lidocaine also experienced price increases. The GAO Report noted "extraordinary price increases" for Lidocaine 5% and for Lidocaine-Hydrochloride 3% cream.[58]

1067. NADAC data shows that average market prices for Lidocaine-Prilocaine increased beginning in Summer 2014 and remained artificially high thereafter:

---

[58] GAO Report at 41.

**Figure 67: Lidocaine-Prilocaine NADAC Increase**



1068. No shortages or other market features can explain Defendants' price increases for Lidocaine-Prilocaine during the relevant period.

xlvi.     <u>Moexipril Hydrochloride Tablets</u>

1069. Moexipril Hydrochloride ("Moexipril"), also known by the brand name Univasc, is part of a class of drugs called angiotensin-converting enzyme (ACE) inhibitors. It is used to treat high blood pressure by reducing the tightening of blood vessels, allowing blood to flow more readily and the heart to pump more efficiently. Glenmark entered the market for the 7.5mg and 15mg tablets of Moexipril on December 31, 2010.

1070. During the relevant time period, Plaintiff Harris County purchased Moexipril manufactured and/or sold by Glenmark and Teva.

239

1071.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Moexipril as follows:

1072.   Glenmark and Teva coordinated with each other to raise pricing on two different formulations of Moexipril between May and July 2013. When Patel (Teva) colluded with a senior executive at Glenmark to raise prices on Moexipril, one of the fundamental tenets of that agreement was that they would not try to poach each other's customers after the increase and the competitors would each maintain their "fair share."

1073.   On August 5, 2013, Teva learned that it had been underbid by Glenmark at one of its largest wholesaler customers, ABC. Upon hearing this news, Rekenthaler (Teva) forwarded an e-mail discussing the Glenmark challenge to Patel, expressing his confusion over why Glenmark would be challenging Teva's business.

1074.  Five (5) minutes after receiving the e-mail from Rekenthaler, Patel responded, "I know . . . made the call already." That call that Patel had made earlier that day was to a senior executive at Glenmark to find out why Glenmark sought to underbid Teva at ABC.

1075.  The following day – August 6, 2013 –the Vice President of Sales at Glenmark and Patel spoke twice regarding their prior agreement not to poach each other's customers after a price increase.

1076.  As a result of these communications, Glenmark decided to withdraw its offer to ABC and honor the agreement it had reached with Teva not to compete on Moexipril. Later that same day – August 6, 2013 – a representative of Teva informed colleagues that "[t]oday is a new day and today . . . ABC has now informed me that they will NOT be moving the Moexipril business to Glenmark."

1077.  NADAC data shows that average market prices for Moexipril increased beginning in May 2013 and remained artificially high thereafter, as depicted below:

**Figure 68: Moexipril NADAC Increase**



1078. No shortages or other market features can explain Defendants' price increases for Moexipril during the relevant period.

xlvii.  <u>Nabumetone, Ranitidine, Cefdinir, Cefprozil, Cephalexin, Oxybutynin and Adapalene Gel</u>

1079.  Nabumetone, also known by brand names such as Relafen, Relifex and Gambaran, is a non-selective non-steroidal anti-inflammatory drug used in the treatment of pain and inflammation.

1080. During the relevant time period, Plaintiff Harris County purchased Nabumetone manufactured and/or sold by Actavis, Amneal, Glenmark, Lupin, Mylan and Teva.

1081.   Ranitidine, also known by the brand name Zantac, among others, decreases stomach acid production, and is commonly used in treatment of peptic ulcer disease, gastroesophageal reflux disease, and Zollinger–Ellison syndrome.

1082.   During the relevant time period, Plaintiff Harris County purchased Ranitidine manufactured and/or sold by Akorn, Amneal, Apotex, Aurobindo, Dr. Reddy's, Glenmark, Heritage, Lannett, Par, Sandoz, Sun, Teva and Wockhardt.

1083.   Adapalene Gel, also known by brand names such as Pimpal, Gallet, and Adelene, is a topical retinoid used primarily in treating mild-to-moderate acne.

1084.   During the relevant time period, Plaintiff Harris County purchased Adapalene Gel manufactured and/or sold by Actavis, Glenmark, Perrigo, Sandoz, Taro and Zydus.

1085.   Cefprozil belongs to the class of medicines known as cephalosporin antibiotics and is used to treat bacterial infections.

1086.   During the relevant time period, Plaintiff Harris County purchased Cefprozil manufactured and/or sold by Aurobindo, Lupin, Pfizer, Rising, Sandoz and Teva.

1087.   Cephalexin is used to treat infections caused by bacteria, including upper respiratory infections, ear infections, skin infections, urinary tract infections and bone infections.

1088.   During the relevant time period, Plaintiff Harris County purchased Cephalexin manufactured and/or sold by Aurobindo, Hikma, Lupin, Sun and Teva.

1089.   Oxybutynin is used to reduce muscle spasms of the bladder and urinary tract and to treat symptoms of overactive bladder, such as frequent or urgent urination, incontinence (urine leakage), and increased night-time urination.

1090. During the relevant time period, Plaintiff Harris County purchased Oxybutynin manufactured and/or sold by Amneal, Lannett, Mylan, Par, Rising, Teva, Upsher-Smith, Wockhardt and Zydus.

1091.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to raise the prices of Nabumetone, Ranitidine, Cefdinir, Cefprozil, Cephalexin, Oxybutynin and Adapalene Gel as follows:

1092. In April of 2013, shortly after joining Teva, Patel began having conversations with a senior sales executive at Sandoz. Patel told this senior executive that Patel had been hired by Teva to identify drugs where Teva could increase its prices. Patel asked how Sandoz handled price increases and was told that Sandoz would follow Teva's price increases and, importantly, would not poach Teva's customers after any price increase by Teva. Not surprisingly, Sandoz was one of Teva's highest "high quality" competitors.

1093.   From this point on, for the remainder of the relevant period, Patel and Teva based many price increase (and market allocation) decisions on this understanding with Sandoz – one example of which involved Nabumetone, Ranitidine, Cefdinir, Cefprozil, Cephalexin, Oxybutynin and Adapalene Gel.

1094.   Patel had multiple means of communicating with competitors, including telephone, text, message functions on Facebook and LinkedIn, encrypted communication services like Snapchat, and, of course, in person.

1095.   Through her communications with other Defendants, Patel learned about Teva's competitor's planned price increases, which Teva agreed to follow with increases of its own, rather than gaining increased market share at Defendants' expense.

1096.  For example, on May 2, 2013, Patel had phone calls with a senior sales executive at Glenmark, a sales representative at Sandoz and an executive at Actavis.

1097.  After one of her calls on that day, Patel sent an e-mail to one her subordinates, directing him to add six (6) different Glenmark drugs to Teva's price increase list: Nabumetone, Pravastatin, Ranitidine, Moexipril, Moexipril HCTZ and Adapalene Gel.

1098.  Two weeks later, on May 16, 2013, Glenmark raised its prices on these drugs and Teva followed with its own price increases shortly thereafter.

1099.  A week after Glenmark's price increases, May 24, 2013, Patel circulated the following spreadsheet to her supervisor which included twelve (12) different drugs where Patel recommended that Teva follow a "high quality" competitor's—including Glenmark's—price increases as soon as possible. The spreadsheet also revealed competitively sensitive information about future pricing and bidding practices of several of Teva's "high quality" competitors – information that Patel could have only learned through her discussions with those competitors. The relevant columns are set forth below:

| Product Category | Competitors | Reason for Increase |
|---|---|---|
| NABUMETONE  TABLETS Total | Watson 26, Glenmark 25, Sandoz 5 | Follow 10% below Glenmark. Sandoz also bidding high. |
| RANITIDINE  HCL TABLETS Total | Glenmark 1, Amneal 35, Wockhardt 10? | Follow Glenmark and Amneal increase. 3% below Glenmark. |
| MOEXIPRIL  HCL TABLETS Total | Glenmark 18, Paddock 16 | Follow Glenmark increase.  5% lower |
| MOEXIPRIL  HCL/HCTZ TABLETS Total | Glenmark 78, Paddock 2 | Follow Glenmark increase.  5% lower |
| ADAPALENE  GEL Total | Glenmark 13, Taro 45 | Follow Glenmark increase. 5% lower. Rumors of Taro increase |
| CEFDINIR ORAL SUSPENSION Total | Lupin 35, Northstar 5, Sandoz 3 | Follow Lupin. 8-10% lower |
| CEFPROZIL  TABLETS Total | Lupin 42, Northstar 10, Sandoz 18 | Follow Lupin. 8-10% lower |
| CEFDINIR CAPSULES  Total | Lupin 49, Sandoz 16, Northstar 7 | Follow Lupin. 8-10% lower |
| FLUOCINONIDE OINTMENT Total | Taro 44, Sandoz 1 | Raise to follow Taro |
| FLUOCINONIDE CREAM E Total | Taro 62, Sandoz 10 | Raise to follow Taro |
| FLUOCINONIDE GEL Total | Taro 63, Sandoz 9 | Raise to follow Taro |
| FLUOCINONIDE CREAM Total | Taro 68, Sandoz 1 | Raise to follow Taro |
| CEFACLOR ER TABLETS Total | Teva Exclusive | Teva Exclusive |
| CEPHALEXIN  TABLETS Total | Teva Exclusive | Teva Exclusive |
| CEFADROXIL  TABLETS Total | Westward 41 | EXCLUDE; ERROR IN SOURCE DATA |

1100.   The following graph summarizes some of the calls made by Patel or another executive at Teva leading up to May 24, 2013, where Teva and its competitors agreed to fix prices and avoid competing with each other in the markets for the identified drugs:



1101.   On May 28, 2013, Patel's May 24 price increases were approved.

1102.   Teva implemented its first formal set of price increases on these drugs on July 3, 2013:

| | Price Increase -- Agenda |
|---|---|
| Date and Location | Tuesday, July 02, 2013 11:00 AM - 11:30 AM, Call In Number Below/Dave's Office |
| Attendees | Nisha Patel02; Kevin Green; Dave Rekenthaler; ▮ |
| Message | We are currently preparing to announce a price increase effective Wednesday, 7/3/13. The list includes several items. I wanted to take some time to do a quick review of the item list and answer any questions you may have.<br><br>Dial In: 866-225-0660<br>Access Code: 4075453 |

1) Price increase effective Wednesday, 7/3/2013

2) List of items affected:

| Product Family | Customers Affected | SWP Change | WAC Change | % ASP Increase (not actual inc) |
|---|---|---|---|---|
| ADAPALENE GEL Total | All | yes | | 95% |
| CEFACLOR ER TABLETS Total | All | yes | | 25% |
| CEFADROXIL TABLETS Total | All | | | 25% |
| CEFDINIR CAPSULES Total | All | | | 122% |
| CEFDINIR ORAL SUSPENSION Tot | All | | | 520-620% |
| CEFPROZIL TABLETS Total | All | | | 55-95% |
| CEPHALEXIN TABLETS Total | All | yes | yes | 95% |
| CIMETIDINE TABLETS Total | All | yes | yes | 200-800% |
| FLUCONAZOLE TABLETS Total | All | | yes | 875-1570% |
| FLUOCINONIDE CREAM E Total | All | | yes | 10% |
| FLUOCINONIDE CREAM Total | All | | yes | 15% |
| FLUOCINONIDE GEL Total | All | | yes | 15% |
| FLUOCINONIDE OINTMENT Total | All | | yes | 17% |
| METHOTREXATE TABLETS Total | All | | yes | 500-1800% |
| MOEXIPRIL HCL TABLETS Total | All | | yes | 300-560% |
| MOEXIPRIL HCL/HCTZ TABLETS | All | | yes | 70-175% |
| NABUMETONE TABLETS Total | All | | yes | 140-160% |
| NADOLOL TABLETS Total | All less Econdisc | yes | yes | 1200-1400% |
| OXYBUTYNIN CHLORIDE TABLETS | All | | yes | 1100-1500% |
| PRAZOSIN HCL CAPSULES Total | All | | yes | 30% |
| RANITIDINE HCL TABLETS Total | All | yes | yes | 330-900% |

1103.   The following graphic details some of the calls between Defendants in the days and weeks leading up to Teva's July 3 price increases:



1104.   Defendants' coordinated price increases and agreements not to compete in the markets of Nabumetone, Ranitidine, Cefdinir, Cefprozil, Cephalexin, Oxybutynin and Adapalene Gel was in furtherance of their overarching conspiracy.

    xlviii.      <u>Niacin ER</u>

1105.   Niacin Extended Release ("Niacin ER"), also known by the brand name Niaspan ER, is used to treat high cholesterol.

1106.   During the relevant time period, Plaintiff Harris County purchased Niacin ER manufactured and/or sold by Amneal, Aurobindo, Lannett, Lupin, Sun, Teva and Zydus.

1107.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Niacin ER as follows:

1108.   Teva entered the Niacin ER market on September 20, 2013, and as a result of patent litigation under the Hatch-Waxman Act, Teva had been awarded 180 days of exclusivity from that date. As a result, Teva's exclusivity was set to expire six months later, on March 20, 2014.

1109.   Teva knew that Lupin planned to enter on March 20, 2014, and that Lupin would have 100 days of semi-exclusivity (until June 28, 2014) before a third generic manufacturer (Zydus) could enter the Gabapentin market, on June 28, 2014.

1110.   Knowing that Lupin was a "high quality" competitor, *i.e.*, one that would stick to Defendants' overarching agreement and not compete with Teva on price, Teva increased price on Niacin ER by 10% on March 7, 2014, in advance of its competitors' entry. Teva did this because it knew Lupin would not erode Teva's price to gain market share beyond the so-called "fair share" that the "rules of the road" allowed.

1111.   In the days leading up to the price increase, all three (3) competitors exchanged several calls during which they discussed, among other things, the price increase on Niacin ER and the allocation of customers to the new entrants, Zydus and Lupin. The communications between Green (now of Zydus), Patel and Rekenthaler of Teva and Berthold of Lupin included, on March 3, two approximately 20-minute calls, one from Green to Rekenthaler and one from Rekenthaler to Patel, and then the following day, on March 4, an approximately 13-minute call between Green and Berthold.

1112.   These calls were in preparation for a March 6 meeting between Patel & Rekenthaler regarding which customers they would give to their competitors.

1113.   The same day, Patel called Green to discuss the same issue: which Niacin ER customers would Teva cede to Zydus. They agreed that Teva would cede 40% of the market to Zydus.

1114.   In a competitive market, a second generic entrant typically charges about 50% less than the incumbent.  Here, Zydus charged only 10% less than Teva's already-increased price thereby avoiding the price erosion that would have occurred in the presence of competition.

1115.   Additional calls among the three followed on May 7-9. Ultimately, the competitors agreed that Teva would retain its Niacin ER account with ABC but concede its account with McKesson and Cardinal, both large wholesalers, to Zydus and Lupin, respectively.

1116.   On June 5, 2014, a Director of National Accounts at Teva sent an internal e-mail regarding competition in the Niacin ER market, noted the loss of the McKesson Niacin ER account in Teva's internal database (Delphi) and noted that the reason for the concession was that it was a strategic decision, which was the conspirator's code for allowing "fair share" of the relevant market to their co-conspirator competitors.

1117.   On June 28, 2014, Zydus launched Niacin ER and published WAC pricing that matched the per-unit cost for both Teva and Lupin.

1118.   The agreement between Zydus, Teva and Lupin caused prices for Niacin ER to be higher than they would have been in a competitive market and prevented price erosion that would have occurred in such a market.

1119.   No shortages or other market features can explain Defendants' elevated prices for Niacin ER during the Relevant Period.

     xlix.      <u>Nimodipine</u>

1120.   Nimodipine, also known by the brand name Nymalize, is a calcium channel-blocker that reduces problems caused by bleeding blood vessels in the brain.

1121.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Nimodipine as follows:

1122.   Teva marketed and sold Nimodipine during the relevant period at least in part through its subsidiary, Barr.

1123.   Sun marketed and sold Nimodipine during the relevant period at least in part through its subsidiary, Caraco.

1124.   In June of 2012, Teva was preparing to exit the market for Nimodipine. This exit would leave Heritage and Sun as the only manufacturers of Nimodipine. Heritage wanted to use Teva's exit as a cover to raise Nimodipine prices.

1125.   Pricing discussions with competitors were part of Defendants' "toolkit" for achieving and maintaining elevated prices on At Issue Drugs, and Defendants understood that to maintain market share and increase prices, they needed to "play fair." With this in mind, Heritage devised a plan to approach Sun.

1126.   Heritage's Malek wanted to "socialize" increased Nimodipine prices with competitors, by which he meant direct outreach to other Defendants to coordinate and implement a market-wide price increase. To do so, Malek instructed Sather (Heritage) to reach out to Sun to discuss raising prices.

1127.   At Malek's direction, Sather contacted a representative of Sun. Heritage's Sather exchanged numerous text messages and had multiple phone calls with her contact at Sun throughout June 2012. These conversations between Heritage and Sun were successful. The ostensible competitors reached an agreement not to compete; their goal was to raise prices.

1128.   Ultimately, Teva never completely exited the market for Nimodipine, yet it did reduce sales to a very small share, ceding the market to Sun and Heritage.

1129.   Sather kept Malek apprised of her negotiations with Sun, including through a June 28, 2012, e-mail discussing the status of the agreement on Nimodipine between Heritage and Sun.

1130.   That same day, Sather sent an analysis of a Cardinal RFP to Malek, Glazer and other Heritage employees. Sather noted that Heritage would submit a bid at an artificially high price, which would allow Sun to retain Cardinal's business. Heritage informed Sun about the pricing before submitting to Cardinal. This information allowed Sun to retain Cardinal's business at a price that was significantly higher than it would have been in a competitive market.

1131.   On July 20, 2012, another employee at Heritage circulated proposed pricing in response to the Cardinal RFP, which, quoted pricing at a level lower than Sun. Malek responded the same day and exchanged emails with a Heritage employee about Heritage's pricing on Nimodipine and Heritage's agreement on pricing with Sun. Around the same time, Sather and her contact at Sun were also discussing Nimodipine.

1132.   Heritage's Sather and her contact at Sun communicated further by text and phone over the next few weeks. They also met in person at an industry event. Through these communications, at the end of July, Heritage and Sun reaffirmed their agreement to raise prices and allocate the market for Nimodipine. As part of this understanding, as it had in June, Heritage again agreed to provide a cover bid to Cardinal.

1133.   As a result of Heritage's cover bid, Sun retained its business with Cardinal, and both Heritage and Sun were able to maintain Nimodipine prices above the competitive level.

1134.   In September 2012, after Cardinal awarded Sun its Nimodipine business, Sun began to experience supply issues with its Nimodipine.

1135.   In October of 2012, Cardinal approached Heritage, asking for a new bid because it was concerned about Sun's supply chain. Although Sun never fully exited the market, its sales of Nimodipine declined to a small share.

1136.   Sather immediately e-mailed Malek and others at Heritage to apprise them of Cardinal's request. Given the circumstances, Sather felt responding to Cardinal's request for an RFP did not violate Heritage's agreement with Sun because Cardinal was coming directly to Heritage, because of Sun's supply issues – and most importantly, because Heritage was not going to underbid Sun on price.

1137.   Consistent with a price increase Heritage had recently imposed on a different wholesaler, Sather proposed that Heritage respond to Cardinal's request. Sather believed that Heritage could offer a higher price and still win the business from Cardinal because she had received Sun's Cardinal pricing from her contact at Sun. Sather also shared information she had learned at the earlier trade conference, which, consistent with Defendants' cartel agreement and industry practice, likely involved competitive market information.

1138.   When she spoke with her contact at Sun for thirty-eight (38) minutes the next day, Sather confirmed her understanding that Heritage could submit a bid to Cardinal without violating its agreement with Sun.

1139.   Heritage continued to communicate with Sun to monitor when Sun would re-enter the Nimodipine market. Malek e-mailed Sather on December 17, 2012, about Sun's supply issues. In response to Malek's e-mail, Sather reached out to her contact at Sun and kept Malek informed about her conversations.

1140.   On April 16, 2013, Sather reported to Malek that Sun was not pursuing Nimodipine customers because it did not know when its product would be available. Heritage's Malek responded to this information by expressing his willingness to continue Heritage's pricing and market allocation agreement with Sun when Sun re-entered the Nimodipine market.

1141.   Heritage's Sather continued speaking with her contact at Sun to assess when Sun might re-enter the Nimodipine market. When they spoke on May 23, 2013, Sather learned that Sun might be returning to the Nimodipine market in June or July. Sather immediately reported this development to Malek, and the two exchanged e-mails about pricing for Nimodipine.

1142.   Ultimately, Sun decided not to re-enter the Nimodipine market. In the spring of 2013, Heritage more than doubled the price of Nimodipine capsules and maintained this inflated price for the duration of the relevant period.

1143.   On June 26, Heritage began telling customers that it was increasing prices for nine (9) different drugs, including Nimodipine. Price increase notices were issued on the same date.

1144.   Sun's supply issues cannot explain Defendants' price increases for Nimodipine during the relevant period, in whole or in part, and no other shortages or other market features can explain Defendants' elevated pricing and price increases for Nimodipine during the Relevant Period.

1145.   NADAC data shows that average market prices of Nimodipine remained stable prior to the Spring of 2013, but rose dramatically in the Spring of 2013 and remained artificially high thereafter, as depicted below:

**Figure 69: Nimodipine NADAC Increase**



1146. No shortages or other market features can explain Defendants' price increases for Nimodipine during the relevant period.

l. Norethindrone/EE

1147. Norethindrone/ethinyl estradiol ("Norethindrone/EE"), also known by the brand name Ovcon 35, is a combination of medications used as an oral contraceptive.

1148. During the relevant time period, Plaintiff Harris County purchased Norethindrone/EE manufactured and/or sold by Actavis, Amneal, Glenmark, Lupin, Mylan and Teva.

1149. As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Norethindrone/EE as follows:

1150.   On January 23, 2014, a customer informed Teva that a new market entrant was seeking a share of its business. Teva employees surmised that the entrant was Lupin, as it had recently obtained approval to begin marketing its own generic of Ovcon 35.

1151.   Teva employees discussed internally how to make room for this new player in the market, with one expressing concern that "[w]e would lose our current market lead if we were to concede this business." Per Defendants' overarching conspiracy agreement, however, discussions about how to share the market with the recent entrant were not limited to internal communications. Indeed, the next day, Patel (Teva) spoke to Berthold at Lupin twice by phone.

1152.   A few days later, on January 29, Patel informed Rekenthaler (Teva) of her recommendation, based on her communications with Berthold (Lupin), saying: "we should concede part of the business to be responsible in the market." By being "responsible," Patel meant voluntarily conceding market share to the new entrant so Lupin could achieve its "fair share" of the Norethindrone/EE the market without any unpleasant competition with its co-conspirators.

1153.   On February 4, Patel received a profitability analysis to determine how much of the customer's business to hand over to Lupin. That same day, she spoke to Berthold two more times to further coordinate Lupin's seamless entry into the market.

1154.   Teva and Lupin's agreement was in furtherance of Defendants' overarching "fair share" conspiracy.

### li.   Nortriptyline Hydrochloride

1155.   Nortriptyline Hydrochloride ("Nortriptyline"), also known by the brand name Pamelor, is a drug used to treat depression.

1156.   During the relevant time period, Plaintiff Harris County purchased Nortriptyline manufactured and/or sold by Actavis, Mayne, Taro and Teva.

1157.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Nortriptyline as follows:

1158.   While Taro was approved in May 2000 to market Nortriptyline, it subsequently withdrew from the market. As of early 2013, the market was shared by only two players—Teva with a 55% share, and Actavis with the remaining 45%.

1159.   By February 2013, Taro personnel had come to believe that they should reclaim a portion of this market, one opining that ". . . Nortriptyline capsules should be seriously considered for re-launch as soon as possible."

1160.   In early November, Taro was formulating re-launch plans, including a "Target Market share goal" for Nortriptyline of 25% that would leave Teva with 42.45% and Actavis with 31.02%.

1161.   On November 6, 2013, Aprahamian (Taro) pressed his team to ". . . get some offers on Nortrip[tyline] out . . .." He emphasized the need to find out who currently supplied two particular large customers so that Taro could "determine our course (Cardinal or MCK)".

1162.   Two days later, on November 8, Aprahamian (Taro) received confirmation that McKesson was a Teva customer.

1163.   Several days of conversations ensued among the affected competitors in an effort to sort out how Teva and Actavis would make room for Taro in this market. For example, Rekenthaler (Teva) and Falkin (Actavis) spoke twice by phone on November 10, 2013.

1164.   Then, on November 12, 2013, Taro's Aprahamian called Patel at Teva. Their conversation lasted almost eleven (11) minutes. That same day, Aprahamian announced to his colleagues that Taro would not be pursuing Teva's business with McKesson, saying simply: "Will pass on MCK on Nortrip." Accordingly, he instructed a subordinate to put together an offer for Cardinal instead.

1165.   The discussions of how to accommodate Taro into the Nortriptyline market were far from over, however. Falkin of Actavis and Rekenthaler of Teva spoke on November 14, 15 and 18. Falkin also exchanged two (2) text messages with Cavanaugh of Teva on November 17, and one on November 18, 2014.

1166.   Immediately following this series of discussions, Aprahamian began delivering a new message to his team: Taro had enough offers out on Teva customers – it needed to take the rest of its share from Actavis. On November 19, 2013 when a colleague presented an opportunity to gain business from Teva customer HD Smith, Aprahamian flatly rejected the idea, saying: "Looking for Actavis.. [sic] We have outstanding Teva offers out .. [sic]".

1167.   The next day, November 20, 2013, another Taro employee succeeded in finding an Actavis customer that Taro might pursue. Armed with this new information, Aprahamian wasted no time in seeking Actavis's permission, placing a call to a senior national account executive at Actavis, less than four hours later. They ultimately spoke on November 22, 2013 for more than eleven (11) minutes.

1168.   Meanwhile, Teva employees finalized plans to cede Cardinal to Taro as discussed in the negotiations with Actavis and Taro. On November 21, 2013, Teva informed its customer that "[w]e are going to concede the business with Cardinal."

1169.   The competitors continued consulting with each other over the coming months on Nortriptyline. On December 6, 2013, for example, Aprahamian called a representative at Actavis and the two spoke for over thirteen (13) minutes. On December 10, 2013, a Taro colleague informed Aprahamian that a large customer, HEB, was with Actavis for all but one of the Nortriptyline SKUs, and that HEB was interested in moving the business to Taro.

1170.   Having already cleared the move with Actavis during his December 6 call, Aprahamian put the wheels in motion the next day for Taro to make an offer to HEB.

1171.   Aprahamian also continued to coordinate with Teva. He called Patel on January 28, 2014, but she did not pick up. The dialogue continued on February 4, 2014 when Patel called Aprahamian back. The two talked for nearly twenty-four (24) minutes.

1172.   Two days later, on February 6, a potential customer solicited Taro to bid on its business. When a colleague informed Aprahamian of that fact and asked if he wanted to pursue the opportunity, Aprahamian responded firmly that Teva had already done enough to help Taro with its re-launch and thus only Actavis accounts should be pursued, responding "No, need Actavis . . . Teva gave up Cardinal and Opti, enough with thenm (sic)."

1173.   Over the first ten (10) days of March, executives at Teva, Taro and Actavis called and texted each other frequently in their continuing efforts to work out the details of Taro's re-entry.

1174.   At the end of this flurry of communications, Teva documented its internal game plan for Nortriptyline. Prior to this time – particularly in early 2014 – Nortriptyline had been listed by Teva as a potential candidate for a price increase.  On March 10, 2014, however, as Patel was revising that list of price increase candidates (and the same day she

spoke with Aprahamian (Taro) for more than five (5) minutes), she removed Nortriptyline from contention in order to accommodate Taro's entry.  The spreadsheet that she sent to a colleague on that date expressly took into account the negotiations over Taro's entry that had occurred over the past few weeks. With respect to a possible Nortriptyline price increase, it stated: "Delay – Taro (new) seeking share."

1175.   Teva subsequently raised the price of Nortriptyline on January 28, 2015 – in coordination with both Taro and Actavis.

lii.   <u>Nystatin</u>

1176.   Nystatin is an antifungal medication that fights infections caused by fungus.

1177.   During the relevant time period, Plaintiff Harris County purchased Nystatin manufactured and/or sold by Actavis, Akorn, Glenmark, Heritage, Mayne, Par, Perrigo, Sandoz, Sun, Taro, Teva and Wockhardt.

1178.   During the relevant time frame, Defendants Actavis, Perrigo, Par, Sandoz and Taro dominated the market for Nystatin cream; Defendants Actavis, Perrigo and Sandoz dominated the market for Nystatin ointment; and Defendants Teva, Heritage, and Sun dominated the market for Nystatin tablets.

1179.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Nystatin as follows:

### a.   *Nystatin Cream*

1180. Defendants Actavis, Par, Perrigo, Sandoz and Taro all experienced fluctuations in their respective market shares for Nystatin Cream until suddenly stabilizing in 2013. As detailed below, prices *increased* for all these Defendants, even as

those with smaller market shares captured more of the market. This runs counter to economic theory, which dictates that competitors must lower prices to gain market share.

1181.   As late as 2009, Sandoz enjoyed approximately a 50% market share for Nystatin cream, Taro had 40%, Perrigo had approximately 7% and Par and Actavis controlled the remainder. Through 2009 and into 2010, Sandoz's market share began to decline. By the summer of 2010, Sandoz was effectively out of the market. By this time, Actavis and Par also were effectively out of the market. Although Sandoz, Actavis and Par appear to have continued making *de minimis* sales, they each had a market share of less than 1% by the spring of 2011. By May 2011, Taro had captured as much as 96% of the Nystatin cream market, leaving Perrigo approximately a 4% share.

1182.   Beginning in June of 2011, Defendants increased their prices for Nystatin Cream dramatically and largely in unison.

1183.   In June of 2011, Taro initiated a large price increase of more than 600%. Rather than compete on price to gain market share, Perrigo almost immediately followed Taro's increase and raised its own prices to nearly identical levels. Perrigo ramped up production and managed slowly to gain some market share over the next two years, but— as contemplated by the overarching "fair share" agreement—market prices remained elevated and stable.

1184.   In August, although it had only approximately 1% of the market, Par followed the Taro and Perrigo price increase in lockstep, also choosing to eschew price-competition. Par managed to grow its market share over the next couple of years, but it did so without eroding the elevated prices imposed by Taro and Perrigo, just as the "fair share" agreement intended.

1185.   In November 2011, Actavis ramped up production of Nystatin cream and re-joined the market. It, too, immediately elevated its prices to match that of Taro, Perrigo and Par, also choosing to forego price competition and the prospect of winning a larger share of the market. Even a fourth entrant into the Nystatin cream market did not cause prices to erode. Defendants' agreement was working.

1186.   Sandoz's share of the Nystatin cream market was close to 0% until the fall of 2013, at which point it ramped up production for re-entry into the market. Like Perrigo, Par and Actavis before it, rather than compete on price to regain lost market share, Sandoz priced its Nystatin cream at the same inflated level as its co-conspirators. Prices remained stable and elevated even with a fifth seller in the market.

1187.   WAC prices for each Defendant demonstrate that Nystatin Cream prices remained relatively stable prior to May 2011 until they increased dramatically and largely in unison around June of 2011, remaining artificially inflated thereafter.

**Figure 70: Nystatin Cream WAC Price Increase**



1188.  These price increases followed the March 6-10, 2011 ECRM EPPS Retail Pharmacy Conference, February 2012 ECRM EPPS Retail Pharmacy Conference; October 2012 GPhA Fall Technical Conference in Bethesda, Maryland; and June 4-5, 2013 GPhA CMC Workshop in Bethesda, Maryland, among others, at which representatives from the Nystatin Cream Defendants attended.

1189.  No shortages or other market features can explain Defendants' price increases for Nystatin Cream during the relevant period.

### b.    *Nystatin Ointment*

1190.  Nystatin external ointment prices followed a similar pattern to those of Nystatin external cream. Defendants Actavis, Perrigo and Sandoz increased their prices

for Nystatin Ointment, often while gaining market share, contrary to economic theory. In 2009, Sandoz had captured approximately 75% of the market, while Perrigo had 20% and Actavis 5%. From that point through the summer of 2011, Actavis and Sandoz drastically reduced production until they were effectively out of the market. By the summer of 2010 Actavis had approximately a 0% market share, though *de minimis* sales appear to have continued. By the summer of 2011, Sandoz had approximately a 5% market share.

1191.   Beginning in June of 2011, Defendants increased their prices for Nystatin Ointment dramatically and largely in unison.

1192.   In June 2011, after Sandoz and Actavis had all but ceded the Nystatin ointment market, Perrigo implemented a large price increase—more than 300%.

1193.   Five months later, Actavis ramped up production of Nystatin ointment. Rather than undercut Perrigo's elevated price to gain market share, Actavis hiked its list prices to nearly identical levels as Perrigo. As intended by the overarching "fair share" agreement among Defendants, the AWP price for Nystatin ointment remained virtually unchanged, even with the addition of a new seller in the marketplace.

1194.   In the summer of 2012, the pattern repeated itself. Sandoz ramped up its production of Nystatin ointment in June. Rather than compete on price to regain its lost market share, Sandoz raised its list prices to nearly identical levels as Perrigo and Actavis. Even with a third market participant prices remained unchanged, just as devised by Defendants' agreement.

1195.   WAC prices for each Defendant demonstrate that Nystatin Cream prices remained relatively stable prior to May 2011 until they increased dramatically and largely in unison around June of 2011 and again in 2012, remaining artificially inflated thereafter.

**Figure 71: Nystatin Ointment WAC Price Increase**



1196. Again, Defendants had the opportunity to discuss pricing of Nystatin Ointment at numerous industry events during the relevant period. For example, all Nystatin Ointment Defendants attended the March 2011 ECRM EPPS Retail Pharmacy Conference, and February 2012 ECRM EPPS Retail Pharmacy Conference, among others.

1197. No shortages or other market features can explain Defendants' price increases for Nystatin Ointment during the relevant period.

### c.    *Nystatin Tablets*

1198. Defendants Heritage, Sun, and Teva dominate the market for Nystatin tablets. In 2010 and 2011, the Nystatin oral tablet market was split between Teva and Sun (sold at least in part through its subsidiary, Mutual). During that time, Teva held

approximately 60% of the market, Sun held 40%, and they had nearly identical list prices for Nystatin tablets. In the Summer of 2012, Heritage entered the market. Rather than undercut Teva and Sun's prices to gain market share, Heritage identically matched Teva and Sun's prices, consistent with the "fair share" agreement they maintained throughout the generics market.

1199.  Sun, through its division Mutual, increased Nystatin prices on April 15, 2013.

1200.  Patel was hired by Teva in April 2013 to "run the pricing team." On July 9th, Patel (Teva) called Malek (Heritage) and they spoke for 21 minutes. The two spoke again on July 23rd (for ten minutes), and twice on July 30th, 2013 (once for more than 12 minutes).  During these discussions, Patel and Malek discussed, among other drugs, Nystatin tablets.

1201.  Between July 23rd and July 30th, 2013, Sather (Heritage) spoke with her contact at Sun for eleven minutes. Heritage remained in close contact with Sun before and after Sun (through Mutual) took its price increase in April 2013. On April 16th, 2013 – the day after Mutual increased Nystatin prices–Sather (Heritage) spoke for nearly 40 minutes with her contact at Sun. The two continued to communicate throughout the summer of 2013.

1202.  By late July 2013, Teva's "Price Increase Candidates" list, created by Patel, included Nystatin, with the note "Heritage involved; follow Mutual."

1203.  On August 1, 2013, Malek e-mailed Sather and others at Heritage, saying "Team: Pricing dynamics may be changing for us for Nystatin. Please advise when Mutual/URL/ (now Caraco) took their Nystatin price increase and if they kept it." On August 20th, 2013, Malek (Heritage) sent an internal email with the subject "PRICE

265

INCREASES," saying "We need [to] analyze the following product price increases and understand how much to increase and which customers to extend." Malek provided a list of four drugs, including Nystatin.

1204. Patel (Teva) was on maternity leave from August 2013 through December 2013 and decisions regarding Teva's and Heritage's Nystatin price increases were put on hold.

1205. On February 7, 2014 Patel (Teva) created a spreadsheet titled "P[rice] I[increase]Candidates," which included Nystatin. The Nystatin notes read "Shared with Heritage and Mutual/Caraco" and "WAC increase likely." Patel (Teva) called Malek (Heritage) on February 14, 2014 and the two connected the next day.

1206. Malek and Patel continued to talk throughout March and April of 2014. On a 17-minute phone call on April 15, 2014, Malek and Patel came to an agreement on all of the identified drugs involving Teva (at least seven drugs, including Nystatin). They agreed Teva would take the lead on the Nystatin (and Theophylline) price increase, which Heritage would follow and match.

1207. On April 4, 2014, Teva announced an increase of more than 100% on Nystatin, doubling WAC price from $47.06 to $100.30.

1208. During the April 2014 Heritage "Price Increase Discussion" teleconference, Malek (Heritage) identified Nystatin as one of the eighteen (18) drugs targeted for a price increase. Sather (Heritage) was tasked with reaching out to Sun regarding Nystatin (and other drugs). Immediately after the April call, Sather (Heritage) reached out to her contact at Sun. They spoke for 45 minutes and agreed to increase prices for Nystatin (and Paromomycin). Afterward, Sather (Heritage) reported to Malek (Heritage) and Glazer (Heritage) "[Sun] notified and on board." Glazer quickly responded, "No emails please."

1209.  On the June 23rd Heritage "Price Increase Call," Nystatin was designated for a 95% price increase. Heritage's Associate Director of International Sales noted that Heritage had to increase its WAC pricing for Nystatin because Teva "increased WAC already."

1210.  On June 25, 2014, Heritage held another internal call regarding "Product Price Changes" and Nystatin again appeared on the list of drugs slated for a price increase. During the call, Sather (Heritage) texted her contact at Sun to update Sun on the details regarding Heritage's anticipated Nystatin price increase.

1211.  On June 25, 2014, Malek (Heritage) spoke to Patel (Teva) again for nearly 14 minutes, explaining Heritage would soon be increasing prices for a number of Teva's drugs.

1212.  In June 2014, Heritage announced a price increase of nearly 100% on Nystatin. By July 9, 2014, Heritage successfully raised the price for at least fourteen customers nationwide.

1213.  Sun implemented a similar price increase by August 2014.

1214.  In conformity with their agreement, Teva refused to bid or challenge Heritage's price increases when requested by incumbent Heritage customers. On July 8th, a large retail customer e- mailed Teva requesting a quote for Nystatin tablets because of a recent large price increase instituted by the incumbent supplier. A Teva representative forwarded that e-mail to Patel (Teva), asking "Are you aware of the below? Should we engage?" Patel (Teva) responded that she was aware, and that Heritage would be "following Teva on the Nystatin." She confirmed "we will not be bidding. Thanks." Teva either declined to provide a bid or provided a "cover bid" so as not to undercut Heritage's price and maintain the equilibrium in their "fair share" agreement.

liii.      Omega-3-Acid Ethyl Esters

1215.   Omega-3-Acid Ethyl Esters, also known by the brand name Lovaza, is a lipid regulating agent used to lower levels of triglycerides.

1216.   During the relevant time period, Plaintiff Harris County purchased Omega-3-Acid Ethyl Esters manufactured and/or sold by Amneal, Apotex, Par and Teva.

1217.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Omega-3-Acid Ethyl Esters as follows:

1218.   Teva launched Omega-3-Acid Ethyl Esters on April 8, 2014. During this time period, manufacturers of the drug were all experiencing various supply problems, affecting how much market share each would be able to take on.

1219.   On the morning of June 26, 2014, Patel e-mailed a senior operations executive at Teva stating that Par had recently received FDA approval for Omega-3-Acid Ethyl Esters and that while Patel did not yet know if Par had started shipping that product she promised to "snoop around."

1220.   Patel had indeed already started "snooping around." At 9:46am, she had sent a message to a senior executive at Par through the website LinkedIn.

1221.   The senior executive did not respond through LinkedIn, but texted Patel on her cell phone later that day, initiating a flurry of ten (10) text messages between them in the late afternoon and early evening of June 26. That night, Patel followed up internally at Teva, stating that she knew at that point that Par was limited on supply, but that she was "working on getting more . . ."

1222.   The next morning, the senior executive at Par called Patel and they spoke for nearly thirty (30) minutes. That same morning, Patel sent another internal email

stating that she now had "some more color" on Par's launch of Omega-3-Acid Ethyl Esters. Patel also communicated this information to Rekenthaler (Teva). At 11:27am that same morning, Rekenthaler sent an e-mail to a Teva sales executive, with a veiled – but clear – understanding about Par's bidding and pricing plans:

> You're aware PAR receive [sic] an approval. I would imagine that CVS is going to receive a one time buy offer from PAR. I'm also assuming the price would be above ours so there should not be a price request (which we would not review anyway). My point in the email is to ensure that you are aware of all of this . . . .

1223.  Par launched Omega-3-Acid Ethyl Esters Capsules the following Monday, June 30, 2014.

1224.  After the discussions between Patel and an executive at Par, Teva proceeded to concede business to Par to ensure Par's smooth entry into the market. As of July 11, 2014, Teva's share of the market for new generic prescriptions had dropped 15.9 points to 84.1% and its share of the total generic market (new prescriptions and refills) had dropped 16.3 points to 83.7%.

1225.  As new competitors entered the market, Teva coordinated with them to avoid competition and keep prices high. For example, in an internal e-mail on October 2, 2014, a representative at Teva stated that "[w]e heard that Apotex may be launching with limited supply and at a high price." Rekenthaler had obtained this information through phone calls with a senior sales executive at Apotex, on September 25 and 27, 2014 – and then conveyed the information internally at Teva.

1226.  Because of supply limitations, Par was not able to meaningfully enter the market until late November 2014. On November 10, 2014, Patel and her contact at Par exchanged five (5) text messages. On December 1, 2014, Teva was notified by a customer that it had received a price challenge on Omega-3-Acid Ethyl Esters. A Teva sales

representative speculated that the challenge was from Apotex, but Rekenthaler knew better, stating "I'm confident it's Par." Rekenthaler informed Par that Teva would not reduce its price to retain the business – thus conceding the business to Par.

1227.   By mid-February 2015, Teva had conceded several large customers to Par to smooth Par's entry into the market and maintain high pricing. During this time, Rekenthaler was speaking frequently with a senior national account executive at Par to coordinate.

1228.   By April 2015, Apotex had officially entered the market for Omega-3-Acid Ethyl Esters, and consistent with the "fair share" understanding, Teva's market share continued to drop. By April 25, Teva's share of the market for new generic prescriptions for Omega-3-Acid Ethyl Esters had dropped to 68.3% and its share of the total generic market (new prescriptions and refills) had dropped to 66.8%. Rekenthaler was speaking frequently with a representative at Apotex to coordinate during the time period of Apotex's entry in the market.

       liv.    <u>Oxaprozin</u>

1229.   Oxaprozin, also known by the brand name Daypro, is a non-steroidal anti-inflammatory drug indicated for the treatment of signs and symptoms of osteoarthritis and rheumatoid arthritis.

1230.   During the relevant time period, Plaintiff Harris County purchased Oxaprozin manufactured and/or sold by Amneal, Dr. Reddy's, Pfizer, Sun and Teva.

1231.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Oxaprozin as follows:

1232.  In early 2013, Dr. Reddy's began having internal discussions about re-launching Oxaprozin in June of that year. In March 2013 – when Teva was still the sole generic in the market – the plan was to target one large chain and one large wholesaler in order to obtain at least 30% market share. Two months later, in May 2013, Dr. Reddy's adjusted its market share expectations down to 20% after Greenstone and Sandoz both re-launched Oxaprozin.

1233.  On June 13, 2013, members of the Dr. Reddy's sales force met for an "Oxaprozin Launch Targets Discussion" to "discuss launch targets based on the market intelligence gained by the sales team."

1234.  Dr. Reddy's re-launched Oxaprozin on June 27, 2013 with the same WAC price as Teva. At the time, Teva had 60% market share. Dr. Reddy's almost immediately got the Oxaprozin business of two customers, Keysource and Premier.

1235.  Eager to obtain a large customer, Dr. Reddy's turned its sights to Walgreens. At a July 1, 2013 sales and marketing meeting, there was an internal discussion among Dr. Reddy's employees about "asking to see if Teva would walk away from the business" at Walgreens. Following this Dr. Reddy's entered into discussions with Teva regarding conceding Walgreens.

1236.  On July 23, 2013, an executive at Dr. Reddy's called Green (Teva). Two days later, Green noted that "[i]f we give D[r. Reddy's] this business, they may be satisfied. I will see if I can find this out."

1237.  While deciding whether to concede Walgreens to Dr. Reddy's, Teva engaged in internal discussions about strategy. On July 29, 2013, a representative at Teva suggested the possibility of keeping the Walgreens business, but conceding Teva's next largest customer for Oxaprozin – Econdisc – to Dr. Reddy's.

1238.  Rekenthaler (Teva) followed up with Patel (Teva) to "look at our business on Oxaprozin in order to accommodate Dr. Reddy's entry." Rekenthaler's goal was to identify customers other than Walgreens that Teva could concede to Dr. Reddy's in order to satisfy its market share goals.

1239.  At 12:33pm that day, Patel (Teva) asked a colleague to "run the customer volume and profitability analysis for Oxaprozin." It was typical at Teva to run this type of report before negotiating market share with a competitor. At 2:20pm, that colleague provided the information to Patel, copying Rekenthaler. With this information in hand, less than an hour later Rekenthaler placed a call to a Senior Director of National Accounts at Dr. Reddy's.

1240.  After having this conversation, Teva decided to maintain the Walgreens business, but concede the Econdisc business to Dr. Reddy's. Teva conceded the Econdisc business on August 7, 2013. Green listed "Strategic Market Conditions" in Teva's Delphi database as the reason for conceding the business to Dr. Reddy's.

1241.  By September 10, 2013, Dr. Reddy's had achieved its goal of obtaining 20% share of the Oxaprozin market.

      lv.    <u>Paricalcitol</u>

1242.  Paricalcitol, also known by the brand name Zemplar, is used to treat and prevent high levels of parathyroid hormone in patients with long-term kidney disease.

1243.  During the relevant time period, Plaintiff Harris County purchased Paricalcitol manufactured and/or sold by Aurobindo, Teva, and Zydus.

1244.  As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Paricalcitol as follows:

1245.   Defendant Teva entered the market on Paricalcitol on September 30, 2013. As the first generic to enter the market, it was entitled to 180 days of exclusivity.

1246.   In March 2014, with the end of the exclusivity period approaching, Teva began planning which customers it would need to concede. Teva had advance knowledge that Defendant Zydus planned to enter the market on day 181, which was March 29, 2014.

1247.   In the month leading up to the Zydus launch, Patel (Teva) and Rekenthaler (Teva) spoke with Green (now at Zydus) and discussed, among other things, which Paricalcitol customers Teva would retain and which customers it would allocate to the new market entrant, Zydus.

1248. On March 12, 2014, a Teva sales representative e-mailed Patel and Rekenthaler stating that Zydus had bid on Paricalcitol at ABC. That same day, Patel sent an internal e-mail asking for a loss of exclusivity report for Paricalcitol, listing out Teva's customers and the percentage of Teva's business they represented. This was typically done by Teva employees before calling a competitor to discuss how to divvy up customers in a market.

1249.   During the morning of March 17, 2014, Patel and Green had two (2) more phone calls. During those calls they were discussing how to divvy up the market for several products where Zydus was entering the market. A half an hour after the second call, Patel e-mailed her supervisor, identifying "LOE Targets to Keep" for several products on which Teva overlapped with Zydus – including Paricalcitol. With respect to Paricalcitol, Patel recommended that Teva "Keep Walgreens, ABC, One Stop, WalMart, Rite Aid, Omnicare."

1250.   Over the next several weeks, Teva would "strategically" concede several customers to the new entrant Zydus.

273

1251.   For example, on March 28, 2014, OptiSource, one of Teva's GPO customers, notified a Director of National Accounts at Teva, that it had received a competing offer from Zydus for its Paricalcitol business. The Director forwarded the OptiSource e-mail to Patel. Within minutes, Patel responded "[w]e should concede."

1252.   That same day, Teva was notified by another customer, Publix, that Zydus had submitted a proposal for its Paricalcitol business. On April 1, 2014, Teva conceded the customer to Zydus and noted in Delphi that the reason for the concession was "Strategic New Market Entrant."

1253.   Also on April 1, 2014, Zydus bid for the Paricalcitol business at NC Mutual, another Teva customer. Over the next two days Patel and Green were in frequent communication. On April 2 an Associate Manager of Customer Marketing at Teva, sent an internal e-mail to the Teva Director of National Accounts assigned to NC Mutual, copying Patel, asking: "May we please have an extension for this request until tomorrow?" Patel responded, "I apologize for the delay! We should concede."

1254.   On April 15, 2014, Walmart received a competitive bid for its Paricalcitol business and provided Teva with the opportunity to retain. Two days later, on April 17, 2014, a Teva representative responded that he thought it might be Zydus. Patel replied, "We have conceded a reasonable amount of business (as planned) to Zydus. I would be surprised if they were going after a customer this big after they've picked up business recently." On April 22, 2014, Patel sent an internal e-mail regarding Walmart directing, "Need to retain. Please send an offer. Thanks."

1255.   The agreement between Zydus and Teva was in furtherance of the overarching "fair share" agreement.

lvi.      Paromomycin

1256.   Paromomycin, also known by the brand names Humatin, Catenulin and others, is a broad-spectrum antibiotic used to treat amoeba infection in the intestines and complications of liver disease.

1257.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Paromomycin as follows:

1258.   Sun, Taro and Heritage were the sellers of Paromomycin during the relevant period. Heritage was a dominants seller, with approximately 65% market share.

1259.   Starting in at least June of 2012, Heritage and Sun began discussing price increases and market allocation for at least Paromomycin.

1260.   At Malek's (Heritage) direction, Sather (Heritage) reached out to her contact at Sun. Throughout the summer of 2012, Heritage's Sather exchanged numerous text messages and had multiple phone calls with her Sun contact.

1261.   Heritage and Sun, as well as other Defendants, had the opportunity to discuss pricing and market share and otherwise further their conspiratorial discussions at trade meetings throughout this period, including at the October GPhA Fall Technical Conference.

1262.   As part of Defendants' overarching conspiracy, by the end of October 2012, Sun had increased its list WAC prices for Paromomycin to be identical with Heritage's pricing. Despite their different initial prices, Heritage and Sun kept their list prices at the same level thereafter.

1263.  After the Heritage teleconference with the sales team of April 22, 2014, in which Paromomycin was targeted for a price increase, Malek (Heritage) assigned Sather (Heritage) to communicate with Sun again.

1264.  Right after that Heritage sales call, Sather communicated with three (3) different competitors—Sun, Actavis, and Lannett—and reached a number of pricing agreements with these Defendants covering at least five different drugs, including Paromomycin.

1265.  Sather spoke with her counterpart at Sun for more than 3/4 of an hour. During this conversation, Sather and her counterpart discussed pricing and agreed to increase the prices of numerous drugs, including Paromomycin. Sather thereafter immediately reported her agreement with Sun to Malek.

1266.  In response to a May 8 status request from Malek, Sather e-mailed him to report the agreement she had reached with a number of competitors, including with Sun for Paromomycin. Sather also reported agreements she reached with Actavis for Glyburide-Metformin and Verapamil, with Lannett for Doxy Mono, and with Sun for Nystatin; during an internal Heritage call the next day, Paromomycin remained on the list of drugs slated for a price increase.

1267.  Representatives of Heritage and Sun spoke again for more than twelve (12) minutes on May 20. During the call, Heritage learned that Sun would be making changes to the production of Paromomycin. Malek was immediately informed of this development.

1268.  On June 23, Heritage employees discussed the specific percentage increases they would seek for a variety of drugs. Paromomycin was slated for a 100% increase.

1269.  Heritage had a final call confirming that Paromomycin would have a price increase on June 25, 2014, and the next day Heritage began sending out price increase notices.

1270.  By July 9, 2014, Heritage announced price increases for Paromomycin to at least thirteen (13) different customers nationwide. Over the ensuing months, pursuant to their agreement, Heritage and Sun continued to increase their prices for Paromomycin.

lvii.    Piroxicam

1271.  Piroxicam, also known by the brand name Feldene, is used in the treatment of pain and inflammation associated with rheumatoid arthritis, juvenile rheumatoid arthritis, and other disorders.

1272.  During the relevant time period, Plaintiff Harris County purchased Piroxicam manufactured and/or sold by Mylan, Pfizer/Greenstone and Teva.

1273.  As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Piroxicam as follows:

1274.  On March 3, 2014, Greenstone received FDA approval to market Piroxicam capsules in 10mg and 20mg doses. Greenstone entered the market with the exact same WAC pricing as the incumbent generic manufacturer, Teva, and immediately sought out customers.

1275.  At 10:07 am on March 5, 2014, Teva's Patel received an e-mail about Greenstone's Piroxicam approval and the fact that Greenstone was trying to take business from Teva.

1276.  Under Defendant's overarching conspiracy, this was acceptable conduct because, like Teva, Greenstone was entitled to its "fair share." Nevertheless, to ensure the

Greenstone would abide by what Defendants referred to as the "rules of the road," Patel reached out to her contacts at Greenstone that same day, less than an hour after receiving the e-mail with the news that Greenstone was entering the Piroxicam market.

1277.  The following day – March 6, 2014, the day after Greenstone's Piroxicam launch – rather than focusing on her customers, Patel had multiple conversations with her ostensible competitors at Greenstone. Internally, Patel requested a sales and profitability analysis of Teva's Piroxicam customers so she could figure out which accounts to cede to Greenstone.

1278.  The following day, Patel sent an internal e-mail to a marketing manager, identifying specific customers to concede to Greenstone because under the "rules of the road" for being a "high quality" competitor as part of the overarching conspiracy, and further based on Patel's several conversations with Greenstone, Greenstone had to take additional Teva customers to reach its "fair share" of the market.

1279.  Teva and Greenstone continued to coordinate their allocation over the coming days and weeks. On March 17, 2014, Patel spoke with a representative from Greenstone at 11:35 pm that night and they spoke for fifteen (15) minutes. The fact that competitors Teva and Greenstone were speaking in literally the middle of the night illustrates the strength of the overarching agreement and Defendants' attempts to hide it from Plaintiff and the public.

1280.  Ultimately, Teva retained the CVS account but conceded other customers (representing less market share) to Greenstone through March and April.

1281.  For example, on March 25, 2014, Teva learned of a challenge from Greenstone at Anda, a wholesaler distributor. Following an analysis of its market share, Teva determined that it still had more than its fair share of the market. Pursuant to the

understanding among generic manufacturers alleged herein, Teva conceded the Anda business to Greenstone for Piroxicam on April 1, 2014.

      lviii.      <u>Pravastatin</u>

1282.   Pravastatin belongs to a group of drugs known as "statins" and is used along with a proper diet to help lower cholesterol.

1283.   During the relevant time period, Plaintiff Harris County purchased Pravastatin manufactured and/or sold by Actavis, Apotex, Dr Reddy's, Glenmark, Lupin, Mylan, Rising, Sandoz, Teva and Zydus.

1284.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Pravastatin as follows:

1285.   Defendants Actavis, Apotex, Dr. Reddy's, Glenmark, Lupin, Mylan, Teva, and Zydus dominate the market for Pravastatin.

1286.   Prior to 2013, effective prices for Pravastatin were stable.

1287.   Beginning around July of 2013 Defendants increased their prices of Pravastatin abruptly and largely in unison.

1288.   As a result, prices across the market rose more than 500% for Pravastatin, according to data compiled by the Healthcare Supply Chain Association and released by Senator Sanders and Representative Cummings. The GAO Report also noted an "extraordinary price increase" for Pravastatin between in 2013-2014.[59]

---

[59] GAO Report at 43.

1289. NADAC data demonstrates that average market prices for Pravastatin remained stable prior to July 2013, then increased dramatically and remained artificially high thereafter, as depicted below:

**Figures 72-74: Pravastatin Sodium NADAC Price Increase**



PRAVASTATIN SODIUM 20 MG TABLETS





1290.  WAC pricing, depicted below confirms that Defendants Apotex, Lupin, Teva and Zydus all increased their Pravastatin prices substantially and largely in unison.

| Package Size (10mg) | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 90ct | Apotex | 60505016809 | $0.26 | $0.56 | 5/28/2013 | 119% |
| 500ct | Apotex | 60505016805 | $0.26 | $0.56 | 5/28/2013 | 119% |
| 90ct | Zydus | 68382007016 | $0.17 | $0.48 | 6/14/2013 | 189% |
| 500ct | Zydus | 68382007005 | $0.15 | $0.48 | 6/14/2013 | 222% |
| 90ct | Teva | 00093077198 | $0.17 | $0.48 | 8/9/2013 | 189% |
| 1,000ct | Teva | 00093077110 | $0.15 | $0.48 | 8/9/2013 | 221% |
| 90ct | Lupin | 68180048509 | $0.17 | $0.48 | 8/28/2013 | 190% |
| 500ct | Lupin | 68180048502 | $0.15 | $0.48 | 8/28/2013 | 222% |

1291.  Although WAC data is not available for Actavis, Dr. Reddy's, Glenmark, or Mylan, upon information and belief, they implemented virtually identical price increases at virtually the same time for their Pravastatin products.

1292.  Prices continued to increase after August of 2013. In the October 2014 letters Senator Sanders and Representative Cummings sent to generic manufacturers as part of their investigation, they outlined the price increase Pravastatin saw between October 2013 and April 2014. The sent letters to Defendants Mylan, Dr. Reddy's, Apotex, Teva, and Zydus, and depicted the following price increases during that six-month period:

| Drug | Package Size | Avg. Market Price Oct. 2013 | Avg. Market Price April 2014 | Percentage increase: |
|---|---|---|---|---|
| Pravastatin Sodium | 20mg, 1,000ct | $77 | $368 | 377% |
| Pravastatin Sodium | 40mg, 1,000ct | $114 | $540 | 373% |
| Pravastatin Sodium | 10mg, 500ct | $27 | $196 | 625% |
| Pravastatin Sodium | 80mg, 500ct | $59 | $299 | 365% |
| Pravastatin Sodium | 10mg, 90ct | $6 | $34 | 406% |

| Pravastatin Sodium | 20mg, 90ct | $7 | $35 | 400% |
|---|---|---|---|---|
| Pravastatin Sodium | 40mg, 90ct | $9 | $51 | 466% |
| Pravastatin Sodium | 80mg, 90ct | $14 | $52 | 271% |

1293.  These price increases cannot be explained by supply shortages or costs. According to a November 2014 report by the New York Times, a three-month supply of Pravastatin cost $230 in the United States, but $31.50 for the branded version, Pravachol, in Canada.[60]

1294.  These Defendants had numerous opportunities to coordinate their price increases and market share agreements for Pravastatin. Key pricing representatives from all these Defendants attended the October 1-3, 2012 GPhA Fall Technical Conference in Bethesda, Maryland, February 20-22, 2013 GPhA Annual Meeting in Orlando, Florida, and the June 4-5, 2013 GPhA CMC Workshop in Bethesda, Maryland.

lix.     Propranolol

1295.  Propranolol is a beta-blocker used to treat tremors, angina (chest pain), hypertension (high blood pressure), heart rhythm disorders, and other heart or circulatory conditions.

1296.  During the relevant time period, Plaintiff Harris County purchased Propranolol manufactured and/or sold by Actavis, Amneal, Breckenridge, Heritage, Hikma, Mylan, Par, Teva and Upsher-Smith.

---

[60] http://www.nytimes.com/2014/11/25/us/lawmakers-look-for-wa.vs-to-provide-relief-for-rising-cost-of-genericdrugs.html?_r=0.

1297.  As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Propranolol as follows:

1298.  At all relevant times, there have been at least three (3) manufacturers of Propranolol in both capsule and tablet forms in the market. Defendants Actavis, Breckenridge and Upsher-Smith dominate the market for Propranolol capsules and Defendants Actavis, Endo, Heritage, Mylan, Par and Teva dominate the market for Propranolol tablets. This dominance was achieved, in part, by consolidation among the manufacturers: Teva Pharmaceutical Industries, Ltd., the parent of Teva, acquired Actavis in March 2015. Endo acquired Par in September 2015.

1299. Beginning in November 2013 Defendants increased their prices for Propranolol abruptly and largely in unison.

1300.  The Propranolol price-fixing conspiracy was executed by two overlapping groups of Defendants in two phases. First, on or around December 2013, Defendants Actavis, Breckenridge and Upsher-Smith colluded to increase the prices of multiple dosage levels of Propranolol capsules. Next, on or around February 2015, Defendants Actavis, Endo, Heritage, Mylan, Par and Teva colluded to increase the prices of multiple dosage levels of Propranolol tablets.

1301.  Actavis, Breckenridge and Upsher-Smith increased prices on Propranolol capsules between December 2013 and October 2014.

1302.  According to NADAC data, various dosage levels of Propranolol capsules saw the following average price increases:

Propranolol ER 120mg capsules: increased by 181% between December 2013 and July 2014; and

Propranolol ER 180mg capsules: increased by 174% between December 2013 and October 2014.

1303.   These price increases followed the October 28-30, 2013 GPhA Technical Conference in North Bethesda, Maryland, which representatives from Actavis, Breckenridge and Upsher-Smith attended.

1304.   Defendants Actavis, Endo, Heritage, Mylan, Par and Teva all increased prices on Propranolol tablets between February 2015 and February 2016.

1305.   According to NADAC data, various dosage levels of Propranolol tablets saw the following price increases:

Propranolol 10mg tablets: Between February 18, 2015 and September 23, 2015, the average price increased by 819%;

Propranolol 20mg tablets: Between February 18, 2015 and November 18, 2015, the average price increased by 892%;

1306.   Propranolol 40mg tablets: Between February 18, 2015 and February 17, 2016, the average price increased by 1008%; and

1307.   Propranolol 80mg tablets: Between February 18, 2015 and November 18, 2015, the average price increased by 958%.

1308.   These price increases followed the February 9-11, 2015 GPhA Annual Meeting in Miami Beach Florida, which Propranolol Tablet Defendants attended; the February 16-18, 2015 HCSCA National Pharmacy Forum at the Marriott Waterside Hotel and Marina in Tampa, Florida, which Defendants Actavis, Mylan and Teva attended; and the February 22-25, 2015, ECRM Retail Pharmacy Efficient Program Planning Session at the Hilton Beach Golf Resort and Spa in Destin, Florida, which Defendants Actavis, Heritage, Par and Teva all attended.

1309. Where a group of manufacturers dominate the market, as they do here, and contemporaneously, or in quick succession, increase prices, the new higher price influences the rest of the market.

1310. NADAC data shows that the average price per unit of Propranolol capsules rose dramatically and remained artificially high after November 2013 and continued to increase as Defendants coordinated subsequent price increases, as depicted below:

**Figure 75: Propranolol Capsules NADAC Price Increase**



1311. NADAC data also shows that the average price per unit of Propranolol tablets rose dramatically and remained artificially high after February 2015.

**Figure 76: Propranolol Tablets NADAC Price Increase**



1312. Medicaid reimbursement data also confirms that Defendants all increased their prices abruptly and largely in unison. The following charts depict Medicaid reimbursement rates for exemplary dosage levels of Propranolol capsules.

**Figures 77-78: Propranolol Capsules Medicaid Price Increase**





1313.   The following charts depict Medicaid reimbursement rates for exemplary dosage levels of Defendants' Propranolol tablets.

**Figures 79-80: Propranolol Tablets Medicaid Price Increase**





1314.   No shortages or other market features can explain Defendants' price increases for Propranolol during the Relevant Period.

lx.      Temozolomide

1315.   Temozolomide, also known by the brand name Temodar, is used to treat brain cancer, including glioblastoma multiforme and refractory anaplastic astrocytoma.

1316.   During the relevant time period, Plaintiff Harris County purchased Temozolomide manufactured and/or sold by Amneal, Mayne, Mylan, Sandoz, Sun and Teva.

1317.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, Defendants conspired to fix, raise, maintain and/or stabilize the prices of Temozolomide as follows:

1318.   The patent on Temozolomide was set to expire in early 2014, but both Teva and Sandoz had independently obtained the right to launch in August 2013 – six (6) months prior to the patent's expiration. Leading up to the launch of the generic, Teva coordinated with Sandoz to divide up the market.

1319.   On July 18, 2013, a large retail pharmacy customer submitted an RFP to Sandoz for Temozolomide. Playing by the rules of the road, Sandoz waited to see what Teva was going to do before submitting their own bid. That same day, a Sandoz representative received a telephone call from Patel (Teva). Patel sought information on Sandoz's current customers and discussed options to allocate customers for Temozolomide.

1320.   On July 22, 2013, a senior Sandoz executive instructed his team to find out Teva's plans with regard to this customer. As directed, the next morning, a national

account executive at Sandoz, spoke with the pharmacy and asked about Teva's plans for this customer's Temozolomide business.

1321.   At the same time, Sandoz was reaching out to Teva directly to get more information. A Sandoz representative called Patel at approximately 1:45pm on July 23, 2013. After exchanging voicemails, they spoke for a quarter of an hour. On that same afternoon, the pharmacy replied to Sandoz and delivered Teva's message regarding its plans for the Temozolomide business, telling Sandoz the timing of Teva's Temozolomide launch, that Teva had sufficient Temozolomide stock for the 50% market share that the "rules of the road provided," but would not seek more than that, and wanted to reconfirm Sandoz's intentions. Although the message was coded, Sandoz received and understood it.

1322.   Just under a week later, on July 29, Patel called her contact at Sandoz and they spoke for nine minutes, discussing how to carve up the market for Temozolomide, on which they were exclusive manufacturers.

1323.   Teva and Sandoz were also coordinating through other channels. On July 29, after receiving the RFP from the pharmacy, several representatives from Sandoz communicated with representatives from Teva regarding the pharmacy and its Temozolomide business.

1324.   The next day, on July 30, a different retail pharmacy, CVS, contacted Teva to ask for a Temozolomide bid. A senior sales executive at Teva discussed the matter with Rekenthaler (Teva). Rekenthaler responded by alluding to the arrangement they had with Sandoz.

1325.   The day after that, July 31, arrangements were finalized: after several communications with Teva representatives, a Sandoz representative suggested internally

that Sandoz submit a cover bid and cede the pharmacy's Temozolomide business to Teva, which Sandoz ultimately did.

lxi.     Tolterodine ER

1326.   Tolterodine Extended Release ("Tolterodine ER"), also known by the brand name Detrol LA, is used for treating an overactive bladder.

1327.   During the relevant time period, Plaintiff Harris County purchased Tolterodine ER manufactured and/or sold by Mylan, Pfizer and Teva.

1328.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, Defendants conspired to fix, raise, maintain and/or stabilize the prices of Tolterodine ER as follows:

1329.   Pfizer is the branded drug manufacturer for Detrol LA. To resolve patent claims related to Detrol LA, Teva and Pfizer entered into a settlement agreement under which Teva would distribute an authorized generic of Tolterodine ER. To resolve similar claims, Mylan entered into its own settlement agreement with Pfizer, which allowed Mylan to launch its own generic version of Tolterodine ER.

1330.   On October 31, 2013, Mylan's ANDA for Tolterodine ER was approved. Under their respective settlement agreements with Pfizer, this triggering event allowed Teva and Mylan to launch their respective generics on January 2, 2014.

1331.   Teva planned to launch on January 2, 2014. During the first half of December 2013, Teva was understood (based on conversations with potential customers) that Mylan would not be in a position to launch until thirty (30) to sixty (60) days after Teva launched. Nonetheless, Teva was considering how to allocate the market with Mylan when it did eventually launch.

1332.  On December 3, 2013, a marketing executive at Teva, sent an e-mail to Rekenthaler and several other Teva colleagues stating "we prepared for 50-60 share . . . I am looking into the numbers as far as what this means." To prepare offers and figure out the allocation of customers that would bring Teva its desired 50% to 60% market share, Teva executives were instructed to gather usage from potential customers.

1333.  Through the first half of December 2013, as Teva was soliciting usage amounts from potential customers, customers were asking Teva to send in pricing offers before the launch. Teva resisted sending out those offers and instead did not plan to do so until the launch date of January 2, 2014.

1334.  Teva's delay in putting together pricing for potential customers was part of a plan to drive up the amount it could charge for Tolterodine ER. Teva expected that on January 1, 2014, its last day before generic competition entered the market, Pfizer would raise the price of branded Detrol LA. This would allow Teva to peg its price to the now inflated price of the branded drug and thereby command a higher price for Tolterodine ER on the January 2, 2014 generic launch date.

1335.  At the end of the day on Friday December 20, 2013, Teva learned from representatives at Cardinal that: (1) Mylan intended to launch its Tolterodine ER on January 2; (2) the price which Mylan would use for the launch; and (3) that Mylan is "looking for a 40% market share."

1336.  Teva used this information to set the initial pricing for all of Teva's potential customers and then shared it internally. In a telling admission that Teva had no intention to bid competitively for all accounts, a Teva representative noted that the next step was "to pick who should receive" bids. The goal in "pick[ing] who should receive" bids was to ensure that both Mylan and Teva received their previously stated market share goals:

Teva wanted "50-60 [%] share" while, in accordance with what Defendants' overarching conspiracy would sometimes euphemistically refer to as the "rules of the road," Mylan was only "looking for a 40% market share."

1337.   On Monday, December 23, 2013, Rekenthaler (Teva), Patel (Teva) and several others at Teva had a telephone conference scheduled from 8:00am to 9:00am to discuss the Tolterodine ER launch strategy.

1338.   Just minutes before the meeting was to start, Rekenthaler tried calling Nesta at Mylan. Nesta returned Rekenthaler's call at 8:15 am, during the Teva Tolterodine ER phone conference. Rekenthaler nonetheless answered Nesta's call on his cell phone and the pair spoke for a minute and a half. Immediately after the Tolterodine ER phone conference, Rekenthaler tried calling Nesta two (2) more times.

1339.   Later that same morning, at 10:22 am, Nesta returned Rekenthaler's calls and they spoke for an additional twelve (12) minutes, exchanging details about their offers to various customers, including the specific contractual language used in their offers.

1340.   During these calls between Nesta and Rekenthaler, Teva and Mylan reached an agreement to allocate the Tolterodine ER market on launch day so that Teva and Mylan could reach their target share without eroding pricing.

1341.   In addition, at 10:33 am – while Rekenthaler was still on the phone with Nesta – a Teva representative circulated an internal email, asking about the appropriate contractual language to use in offers about the potential for price increases. Minutes later, at 10:41 am, Rekenthaler replied with the exact language, in quotes, that Mylan was using, in an e-mail titled "Subject: RE: Proposed Price Increase Language": "Mylans [sic] language is vague. 'Pricing subject to change at Mylan's sole discretion.'"

1342.  An hour and a half later, at 12:12 pm (still on December 23, 2013), a revised version of Teva's pricing plan for the Tolterodine ER launch was circulated internally. This new version incorporated Teva and Mylan's plan to allocate the market, including the submission of cover bids and abstention from bidding. Notably, the revised pricing plan included a chart identifying the major customers (and their associated market share percentage) that Teva would receive to get close to its desired 60% market share: Teva would retain CVS (with 18% of the market), EconDisc (15%), Cardinal (8%), McKesson (6%), Wal-Mart (5%), Rite Aid (4%), Anda (2%), and Omnicare (1%). Meanwhile, Mylan would get its 40% share from the remainder of the market, including Walgreens, Cigna, Humana, Optum Rx, Prime Therapeutics and Kaiser.

1343.  In order to facilitate this market division, Teva had to arrange to lose the accounts. This was easily accomplished, however; Teva simply jacked up its prices on the major accounts (which Teva sometimes wanted to retain for other products) and refused to submit bids to the other customers that Mylan targeted.

1344.  Specifically, after Rekenthaler (Teva) and Nesta (Mylan) spoke, Teva's direct invoice price for 30 capsules of the 2mg and 4mg dose for Walgreens was raised by 30%: by $24.90, from $83.03 to $107.93 for 30 capsules; by $74.72, from $249.08 to $323.80, for 90 capsules; and Teva raised the price by $415.13, from $1,383.78 to $1,798.91, for 500 capsules.

1345.  For Cigna, Humana, Optum and Prime, after Rekenthaler and Nesta spoke, Teva's somewhat higher (than for Walgreens) direct invoice price was raised by 23%: by $19.95, from $88.05 to essentially the same higher price as Walgreens, $108.00 for 30 capsules; by $59.85, from $264.15 to $324.00, for 90 capsules; and by $332.50, from $1,467.50 to 1,800.00, for 500 capsules.

1346.   Finally, for Kaiser (which initially had the worst pricing), after Rekenthaler and Nesta spoke, Teva's direct invoice price for 30 capsules of the 2mg and 4mg dose was raised by only 4.5%: by $4.15, from $91.85 to $ 96.00 for 30 capsules; by $12.45, from $275.15 to $288.00, for 90 capsules; and by $69.17, from $1,530.83 to 1,600.00, for 500 capsules.

1347.   The fact that Teva did not intend to actually win with these bids is further illustrated in the discrepancy between how Walgreens, Cigna, Humana, Optum, Prime and Kaiser were priced before the Nesta-Rekenthaler conversations versus how they were priced after: before, there were significant differences in the direct-invoice pricing. Walgreens had the best price, $83.03 for 30 capsules; Cigna, Humana, Optum, and prime all had the same middle price of $88.05, and Kaiser got the worst price, $91.85. After Nesta and Rekenthaler spoke, however, Kaiser now had the best price ($96.00), while Walgreens now shared the worst pricing with Cigna and the others ($108); there was simply no need to bother with proportionate final prices because Teva knew (and intended) these bids would not be successful, anyway.

1348.   In addition to submitting inflated bids for Walgreens, Cigna, Humana, Optum, Prime and Kaiser, Teva agreed to refrain from bidding for certain customers, such as Publix, Ahold, Hannaford and PVA Health.

1349.   The following day, on December 24, 2013, Rekenthaler and Nesta had two (2) more calls to confirm and refine Teva and Mylan's market allocation agreement. Those calls lasted for nine (9) minutes and eight (8) minutes, respectively.

lxii.     Tolterodine Tartrate

1350.   Like Tolterodine ER, Tolterodine Tartrate ("Tolterodine"), also known by the brand name Detrol, is used for treating an overactive bladder.

1351.   During the relevant time period, Plaintiff Harris County purchased Tolterodine Tartrate manufactured and/or sold by Apotex, Mylan, Pfizer/Greenstone and Teva.

1352.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, Defendants conspired to fix, raise, maintain and/or stabilize the prices of Tolterodine as follows:

1353.   As with the many other examples cited herein, the integrated nature of Defendants' cartel is illustrated by the combined examples of Tolterodine and Tolterodine ER: while Tolterodine ER is more convenient, allowing once-daily dosing, at some price point, the inflated price in the market for the ER formulation would drive patients to the market for the regular-release formulation – but whichever way consumers turned, they ran into Defendants' overarching conspiracy, because just as it covered Tolterodine ER, it also covered Tolterodine's regular-release formulation.

1354.   Teva was already a manufacturer of Tolterodine tablets when Defendant Greenstone decided to enter the market, planning its entry for late January of 2014.

1355.   So, in accordance with the established practices of Defendants' cartel, in the days leading up to Greenstone's entry, Greenstone's Senior Director of Sales and National Accounts reached out to her counterparts at Teva, Patel and Rekenthaler, to coordinate Greenstone's entry into the market. In particular, these Defendants wanted to ensure that their pricing was consistent and to allocate customer accounts to the new entrant, Greenstone, which Teva ultimately did, including one of its largest accounts, CVS, which held more than 20% of Teva's Tolterodine business.

297

1356. On January 21-22, 2014, representatives of Teva and Greenstone communicated numerous times, resulting in the agreement that Teva would concede significant business to Greenstone in order to avoid price erosion.

1357. The very next day, on January 23, 2014, Greenstone entered the market for Tolterodine Tartrate 1mg and 2mg Tablets with the exact same WAC prices as Teva for all formulations.

1358. The day after Greenstone's entry – January 24, 2014 – in an internal message about how important it was for Teva to determine and document which competitor was challenging Teva for business in a particular situation (because it would help Teva determine whether to concede or not), Patel stated that "[a]s we've heard, Greenstone is entering the market for Tolterodine. I'm sure we will have to concede somewhere."

1359. A few days later, on Tuesday, January 28, Teva was informed by CVS that it had received a competitive price challenge on Tolterodine. A Teva representative immediately asked: "do we know who this could be?" Rekenthaler responded that it was Greenstone, but did not want to put the details into writing: in a reply e-mail from 4:02 p.m., copied to Patel, on the subject "RE: price challenge delphi 10707 cvs tolterodine," Rekenthaler wrote "It's Greenstone, new to market. We can discuss."

1360. A few days later, on Monday, February 3, 2014, Patel instructed a colleague at Teva to concede the business at CVS by providing a small price reduction that she knew would not be sufficient to retain the business.

1361. The next day, February 4, 2014, Patel spoke to representatives at Greenstone for approximately a quarter of an hour.

298

1362.  Shortly thereafter, Teva conceded the CVS account to Greenstone. CVS represented more than 20% of Teva's Tolterodine business.

     lxiii.      <u>Tizanidine</u>

1363.  Tizanidine is used to treat muscle spasms caused by certain conditions such as multiple sclerosis, spinal cord injury.

1364.  During the relevant time period, Plaintiff Harris County purchased Tizanidine manufactured and/or sold by Actavis, Apotex, Dr. Reddy's, Mylan, Par, Sun and Zydus.

1365.  As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, Defendants conspired to fix, raise, maintain and/or stabilize the prices of Tizanidine as follows:

1366.  In the spring of 2013, Dr. Reddy's was working with Defendants Sandoz and Mylan to coordinate their efforts related to the drug Tizanidine.

1367.  As of May, 2013, Defendants Sandoz, Mylan, and Dr. Reddy's were sellers in the Tizanidine market. At that time, Dr. Reddy's was dominant in the market with 59% market share – because it had the lowest prices and in a commodity market, such as generic pharmaceuticals generally and Tizanidine in particular, market share follows pricing – while Mylan had 24% and Sandoz had 17%.

1368.  Dr. Reddy's led the increase on this product on Monday, May 13, 2013, increasing its Tizanidine WAC price and contract pricing by a factor of ten.

1369.  Sandoz was thrilled when it learned that Dr. Reddy's was going to increase its price on Tizanidine by such a large multiple. On May 10, the Friday before the price increase, a national account executive at Sandoz sent an internal e-mail noting this achievement by their nominal competitor.

1370. On the day Dr. Reddy's published its new WAC pricing for Tizanidine (Monday, May 13, 2013), Nesta of Mylan called a representative at Sandoz and they spoke for 4 minutes.

1371. In the following days, Mylan's Nesta and his contact at Sandoz continued their communications regarding Tizanidine price increases, eventually including a national account executive at Dr. Reddy's into the loop on the discussions.

1372. On Thursday, May 23, while Sandoz's price increase was imminent, numerous representatives from Mylan and Sandoz were in constant communications.

1373. The next day, Friday, May 24 – less than two weeks after Dr. Reddy's astronomical price increase – Sandoz matched Dr. Reddy's increased Tizanidine pricing, and in one formulation, actually exceeded it.

1374. Notably, however, while the resulting pricing was the same as Dr. Reddy's, because Sandoz's pre-increase pricing was higher than Dr. Reddy's, Sandoz's increases had to be by lower amount, and lower percentages, as Dr. Reddy's, to get to the same final price.

1375. As a result, Sandoz's increases were "merely" between 248% and 344% – still outrageous and significant, but noticeably less than Dr. Reddy's 900% increase.

1376. Mylan followed with similar pricing a month later, on July 2.

1377. No shortages or other market features can explain Defendants' price increases for Tizanidine during the Relevant Period.

1378. NADAC data shows that average market prices of Tizanidine remained stable prior to the Spring of 2013, but thereafter rose dramatically and remained artificially high, as depicted below:

**Figure 81: Tizanidine Tablets NADAC Price Increase**



1379.  No shortages or other market features can explain Defendants' price increases for Tizanidine during the relevant period.

lxiv.      Theophylline

1380.  Theophylline belongs to a class of drugs known as xanthines and is used to treat lung diseases such as asthma and chronic obstructive pulmonary disease.

1381.  During the relevant time period, Plaintiff Harris County purchased Theophylline manufactured and/or sold by Glenmark, Heritage and Teva.

1382.  As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, Defendants conspired to fix, raise, maintain and/or stabilize the prices of Theophylline as follows:

1383.   At all relevant times, Defendants Heritage and Teva dominated the market for Theophylline. Prior to Heritage's entry into the market for 300mg and 450mg Theophylline tablets in late 2011, Teva held nearly 100% of market share.

1384.   When Heritage entered the market, rather than price its product below Teva's to gain market share, it listed its products identical to or even slightly above Teva's prices. As a result, Theophylline prices remained relatively stable despite the entry of a new competitor.

1385.   Beginning in February 2014, Defendants increased their prices dramatically of Theophylline and in unison.

1386.   In early 2014, Teva began to consider raising the price of Theophylline ER. On February 4, 2014, Patel (Teva) called Malek (Heritage) upon her return from maternity leave and the two spoke for over an hour the next day. On February 7th, Patel (Teva) created a spreadsheet titled "PI [Price Increase] Candidates," targeting Theophylline for a price increase.

1387.   Patel and Malek spoke numerous times in February and March 2014. They came to an agreement that Teva would lead the Theophylline price increase and Heritage would follow, matching Teva's pricing.

1388.   Effective April 4, 2014, Teva began implementing across-the-board price increases for Theophylline. By late April 2014, Teva fully implemented a price increase for Theophylline by approximately 150% and Heritage planned to follow.

1389.  On April 24, 2014, shortly after implementing the price increases, Teva received the following email with the subject line "PLIVA.com [Info] Price Gouging":[61]

> I have been a consultant to virtually every major pharma company including Teva and Pliva (before it was acquired and located in E. Hanover). Since retiring I have been asked to participate with a US Senate Special Committee on the issue of pharmaceutical price gouging in the U.S.A. Today, I acquired my usual Rx of Theophylline ER from Costco for which I usually pay $19.01 and was charged $53.28 an increase of almost 200%. Costco Pharmacy confirmed that this increase is correct and was instituted sometime earlier this year (2014). Before having this listed in our national report as another example of Pharmaceutical Price Gouging, [w]e respectfully request a confirmation response from you, the manufacturer, relative to the accuracy of our data. Please respond to me at the above email address. If you prefer you can respond to Senator Schumer a New York State representative.

1390.  A member of Teva's Government Affairs Department received the internally forwarded e-mail and responded: "Can I get some details on the specifics of this product and the price increase. I'm hoping someone increased the price and we had to follow it up. Or, API or something I can give the senate." Patel (Teva) ultimately received the correspondence and replied, "I don't have a great story. I'll take a closer look." But Patel (Teva) did know and had a great story: Teva colluded with Heritage to violate the law and set prices on generic drugs.

1391.  At the April 22, 2014 Heritage "Price Increase Discussion," Malek instructed his team that Heritage would follow Teva's pricing on Theophylline. On May 9, Heritage again slated Theophylline for a price increase. On June 23, during a Heritage "Price Change Call," Heritage targeted Theophylline for a 150% price increase.

---

[61] Teva marketed and/or sold its generic Theophylline, at least in part through Pliva, Inc. ("PLIVA"), a wholly-owned subsidiary of Teva USA. Teva USA acquired PLIVA's assets as part of its acquisition of Barr Pharmaceuticals, LLC.

1392. On June 25, 2014, Heritage held one last call regarding "Product Price Changes" before the price increases were to be implemented. On the same day, Malek and Patel (Teva) spoke for fourteen (14) minutes. Malek reported that Heritage would be sending out its price increases in the coming weeks.

1393. Heritage began sending price increase notices to customers the next day. On June 26, 2014, Sather (Heritage) texted a large wholesaler customer that "As of 7/1, [m]arket wide we are increasing prices on: . . . Theophylline ER . . ." She followed with another text message, "Here are the approximate/average $ increases on the other items: ...Theo ER . . . 150%."

1394. On June 30, 2014, Patel (Teva) emailed her team that "[i]t appears that Heritage took an increase to follow Teva. The new pricing looks like it will be effective tomorrow and matches Teva's WACs." She continued that this "will likely trigger some bid requests/activity," but Teva "should not be considering decreases."

1395. By July 9, 2014, Heritage successfully increased prices to at least twenty (20) customers nationwide, following in lockstep with Teva.

1396. The GAO Report noted that Theophylline had an extraordinary price increase.

1397. According to NADAC data, the average market price for generic Theophylline saw the following price increases between April 2014 and January 2015:

Theophylline ER 100mg: increases from $0.12 per unit to $0.37 per unit, a 250% increase

Theophylline ER 200mg: increases from $0.16 per unit to $0.40 per unit, a 150% increase

Theophylline ER 300mg: increases from $0.20 per unit to $0.35 per unit, a 75% increase

1398.  NADAC data shows that the average market prices for Theophylline were stable prior to the summer of 2014, then rose dramatically and remained artificially high thereafter.

**Figure 82: Theophylline NADAC Price Increase**



1399.  No shortages or other market features can explain Defendants' price increases for Theophylline during the relevant period.

  lxv.  <u>Tobramycin</u>

1400.  Tobramycin, also known by the brand name Tobi, is an eye drop used to treat bacterial infections.

1401.  During the relevant time period, Plaintiff Harris County purchased Tobramycin manufactured and/or sold by Akorn, Amneal, Lupin, Sandoz and Teva.

1402.  As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, Defendants conspired to fix, raise, maintain and/or stabilize the prices of Tobramycin as follows:

1403.  Beginning in October of 2013, prior to the first generic launch of Tobramycin (for which Teva would have 180-day generic exclusivity), Sandoz began making plans for its entry after Teva's statutory exclusivity period expired. These plans included trying to get a so-called "fair share" for Sandoz, but depended on the incumbent generic manufacturer, Teva, being cooperative – or as Defendants like to refer to their co-conspirators, it required Teva to act as a "high quality" competitor.

1404.  As a partner in the conspiracy, Teva was, in fact, cooperative when it came time to give up share to Sandoz. Nearing Teva's loss of exclusivity and Sandoz's entry, on July 1, 2014, Teva and Sandoz began sharing information and coordinating to divide up the market for Tobramycin. Patel exchanged seven (7) calls with a Sandoz pricing executive on July 1, during which they discussed Sandoz's launch plans and how to divide up the market for Tobramycin. Patel conveyed some of this competitor's information in an internal Teva e-mail the same day.

1405.  On July 7, 2014, Patel and the Sandoz pricing executive spoke five (5) more times, including one call lasting approximately eleven (11) minutes. On these calls, Patel and the Sandoz pricing executive discussed how to divide up the market for Tobramycin, including specific accounts that each would maintain or concede to the other.

1406.  Patel then memorialized the agreement in an e-mail two days later. The agreement: Teva would take Walgreens, McKesson, Econdisc, ABC, and Omnicare; while Sandoz would take CVS, Cigna, Prime Therapeutics, Kinney Drugs, and OptumRx. Teva also planned to concede the Cardinal business to Sandoz.

1407.   Patel told the Sandoz pricing executive specifically that Teva would not even submit a bid to CVS. This was significant because Tobramycin was a very expensive product, and Sandoz was able to acquire the CVS business by offering only a nominal reduction to the extremely high price that Teva was able to set when it was the only generic manufacturer, and was very close to the branded price that was charged during the patented and 180-day exclusivity periods.

1408.   As planned, Teva conceded the CVS business to Sandoz after CVS contacted Teva and requested that Teva submit a lower price to retain the business; Teva also went through with its plan to concede Cardinal to Sandoz.

1409.   The Sandoz pricing executive, in turn, told Patel that Sandoz would not pursue business from ABC and Walgreens. The Sandoz pricing executive spoke internally about his conversations with Patel and the agreement to stay away from Walgreens and ABC, and his colleagues agreed with the plan. Pursuant to that agreement, Sandoz made no effort to contact those two large customers when it entered the market for Tobramycin.

1410.   The Sandoz pricing executive and Patel also discussed Sandoz's target market share. The pricing executive informed Patel that Sandoz was seeking a 50% share.

1411.   Following these market allocation agreements, these Defendants achieved the desired equilibrium in the Tobramycin market in furtherance of the overarching "fair share" conspiracy.

lxvi.      Ursodiol

1412.   Ursodiol is a bile acid used to dissolve certain types of gallstones that decreases the amount of cholesterol produced by the liver and absorbed by the intestines.

1413.   During the relevant time period, Plaintiff Harris County purchased Ursodiol manufactured and/or sold by Actavis, Amneal, Glenmark, Lannett, Mylan, Par and Teva.

1414.  As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, Defendants conspired to fix, raise, maintain and/or stabilize the prices of Ursodiol as follows:

1415.  At all relevant times, Defendants Actavis and Lannett dominated the market for Ursodiol.

1416.  Beginning in May 2014 Defendants increased their prices abruptly for Ursodiol and largely in unison.

1417.  NADAC data shows that average market price for Ursodiol rose dramatically and remained artificially high after May 2014, as depicted below:

**Figure 83: Ursodiol NADAC Price Increase**



1418.  No shortages or other market features can explain Defendants' price increases for Ursodiol during the relevant period.

308

1419.   Specific WAC pricing depicted below confirms that Defendants Actavis and Lannett all increased their Ursodiol prices substantially and largely in unison.

| Dosage | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|--------|-----------|-----|---------|---------|------------------|---------------------|
| 300mg | Lannett | 00527132601 |  | $5.11 | 5/1/2014 |  |
| 300mg | Actavis | 00591315901 | $0.77 | $5.11 | 6/24/2014 | 562% |

lxvii.   <u>Valsartan</u>

1420.   Valsartan HCTZ ("Valsartan"), also known under the brand name Diovan, is used to treat high blood pressure. Diovan was a so-called "blockbuster" drug that had sales in the United States of approximately $1.6 billion for the 12 months ending June 30, 2012.

1421.   During the relevant time period, Plaintiff Harris County purchased Valsartan manufactured and/or sold by Actavis, Amneal, Apotex, Aurobindo, Camber, Lupin, Mylan, Par, Sandoz and Teva.

1422.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, Defendants conspired to fix, raise, maintain and/or stabilize the prices of Valsartan as follows:

1423.   Mylan was the first to file an abbreviated new drug application (ANDA) to market the generic version – Valsartan HCTZ – which, if approved, would give Mylan 180 days of generic exclusivity. Sandoz manufactured the authorized generic.

1424.   This meant that Sandoz and Mylan would be the only two manufacturers of the generic version of the drug for six months once Mylan entered the market.

1425.   Mylan and Sandoz launched Valsartan HCTZ on the same day – September 21, 2012. Over the preceding three weeks, leading up to the launch, employees of

Defendants Mylan and Sandoz spoke multiple times by phone during which they discussed, inter alia, allocating market share for this product.

1426. On September 6, the Thursday immediately following the Labor Day holiday that year, Nesta (Mylan) called a senior sales executive at Sandoz to discuss Valsartan HCTZ and market allocation. They spoke for twenty (20) minutes initially and several additional times on that day.

1427. From September 7-14, 2012, representatives of Sandoz and Mylan spoke an additional eleven (11) times.

1428. The next week was the week of both companies' Valsartan launch, and via these phone calls, Sandoz and Mylan agreed to divide up the market for at least Valsartan without cutting prices, so that each "competitor" obtained a roughly 50% market share.

1429. In November 2012, Sandoz employees were e-mailing regarding the possibility of seeking additional business. Following the "rules of the road" for Defendants' overarching conspiracy, Sandoz representatives circulated an internal email, stating, "I'm concerned we are going to disrupt the market. I understand the need for additional sales but we need to be thoughtful here . . . Do not approach new customers, with[out] [higher management's] consent." The purpose of this email was to ensure that Mylan retained its so-called fair share without competition for market share between Sandoz and Mylan eroding prices.

    lxviii.     <u>Verapamil</u>

1430. Verapamil belongs to a class of drugs known as calcium channel blockers and is used to treat high blood pressure and to control your heart rate if you have a fast/irregular heartbeat.

1431.   During the relevant time period, Plaintiff Harris County purchased Verapamil manufactured and/or sold by Actavis, Apotex, Glenmark, Heritage, Lannett, Mylan, Sun and Teva.

1432.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, Defendants conspired to fix, raise, maintain and/or stabilize the prices of Verapamil as follows:

1433.   Defendants Actavis, Heritage and Mylan dominate the market for Verapamil.

1434.   From 2009 until 2013, Actavis and Mylan dominated the market for Verapamil. Combined, the two companies enjoyed nearly 100% market share until Heritage began to gain tablet share in 2013.

1435.   Heritage entered the Verapamil tablet market in the second half of 2011, but its share remained around 5% until 2013. When Heritage entered, it announced WAC prices identical to Mylan and slightly higher than Actavis for 80mg tablets. Heritage announced prices slightly higher than both Mylan and Actavis for 120mg tablets. Heritage did not begin to sell 40mg Verapamil tablets until the second half of 2015, at which point it set list prices identical to Actavis, the only seller of 40mg tablets at that time.

1436.   In conformity with the market-wide "fair share" agreement between Defendants, when Heritage entered the market for Verapamil, it set prices at or above competitors Actavis and Mylan. In October 2012, Mylan then increased its tablet prices by approximately 50%, allowing Heritage to gain more than 25% market share. Shortly thereafter, market share between Actavis, Heritage and Mylan quickly stabilized thereafter.

1437.  On Heritage's April 2014 "Price Increase Discussion," Verapamil was targeted for a price increase. O'Mara (Heritage) was primarily responsible for communicating with Mylan about Verapamil, among other drugs, and reached out to Mylan representatives. On an April 23rd, 2014 phone call, O'Mara (Heritage) and her contact at Mylan reached an agreement to raise prices for Verapamil (and two other drugs). O'Mara (Heritage) immediately sent an e-mail to Malek, titled "Mylan," saying "Just let me know a day before we price adjust on the three Mylan products and they will put the word out to the reps to leave us alone. They are looking at price increases as well on a number of products."

1438.  Sather (Heritage) was responsible for communicating with Actavis about Verapamil. Within hours of the April 22nd call, she called the Director of National Accounts at Actavis and they spoke for nine minutes, reaching an agreement to raise the price of Verapamil (and Glyburide-Metformin).

1439.  An executive at Actavis immediately thereafter called two Senior Pricing Managers at Actavis, to update them on the pricing strategy, requesting that they "keep[] an eye out for an increase on … Verapamil IR."

1440.  On May 6th, 2014, Falkin (Actavis) called Nesta (Mylan). The two spoke regularly over the next several months, including a three-minute call on May 7th and a seven-minute call on May 19th.

1441.   In response to Malek's May 8th e-mail to the Heritage sales team trying to finalize price increase agreements, Sather (Heritage) responded, "Jason: I made contact with all my take aways -- with positive results. I can resend those notes or talk with you on any details." This would have included her conversation with Actavis on Verapamil.

1442.   When Heritage held another call about the "Price Increases" on May 9, 2014, Verapamil remained on the list of drugs targeted for increase.

1443.   Heritage did not initially increase prices market-wide for Verapamil, but it did raise prices to at least one customer as part of its price increase initiative in July 2014.

1444.   Heritage announced its price increase in June 2014, and Actavis and Mylan soon followed with similar price increases.

1445.   Beginning in July 2014, these Defendants increased their prices abruptly for certain dosages of Verapamil and largely in unison. The following April 2015, these Defendants again dramatically increased the price of Verapamil in unison.

1446.   Throughout this period, upon information and belief, Actavis, Mylan and Teva coordinated price increases on Verapamil. All of these competitors engaged in steady and unexplained price increases over the same time period, suggesting coordination.

1447.   NADAC data shows that average market prices of Verapamil remained stable prior to the summer of 2014, but began to rise thereafter, including a dramatic rise in April 2015, and remained artificially high following these increases, as depicted below:

**Figure 84: Verapamil NADAC Price Increase**



1448. No shortages or other market features can explain Defendants' price increases for Verapamil during the Relevant Period.

  lxix.  <u>Warfarin, Carbamazepine and Clotrimazole</u>

1449. Warfarin, also known by the brand name Coumadin, *inter alia*, is an anticoagulant for blood and is commonly used to help prevent strokes and other cardiac events and to treat blood clots, such as deep vein thrombosis.

1450. During the relevant time period, Plaintiff Harris County purchased Warfarin manufactured and/or sold by Amneal, Camber, Rising, Taro, Teva and Zydus.

1451. Carbamazepine, also known by the brand name Tegretol, inter alia, is an anticonvulsant medication used primarily in the treatment of epilepsy and neuropathic pain and is used in schizophrenia along with other medications and as a second-line agent in bipolar disorder.

1452. During the relevant time period, Plaintiff Harris County purchased Carbamazepine manufactured and/or sold by Apotex, Mylan, Sandoz, Taro, Teva and Wockhardt.

1453. Clotrimazole, also known by the brand name Canesten, inter alia, is an antifungal medication. It is used to treat vaginal yeast infections, oral thrush, and certain types of ringworm, including those that cause athlete's foot and jock itch.

1454. During the relevant time period, Plaintiff Harris County purchased Clotrimazole manufactured and/or sold by Actavis, Glenmark, Hikma, Sandoz and Taro.

1455. As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, Defendants conspired to fix, raise, maintain and/or stabilize the prices of Warfarin, Carbamazepine, and Clotrimazole, as follows:

1456. As of May 2014, there were three suppliers in the market for Warfarin: Taro, Teva and Zydus.

1457. On May 14, 2014, Patel (Teva) and Aprahamian (Taro) exchanged eight (8) text messages and had one phone conversation lasting just under five (5) minutes. Thereafter, Patel directed a colleague at Teva to create a list of future price increase candidates, based on a set of instructions and data she provided related to Taro.

1458. On May 28, 2014, Patel received the requested list of "2014 Future Price Increase Candidate Analysis." The list included several drugs sold by Taro, including Carbamazepine, Clotrimazole, and the four formulations of Fluocinonide, all with "Follow/Urgent" listed as the reason for the increase, even though Taro had not yet increased its price on those drugs or notified its customers that it would be doing so.

1459. A few days later, on June 3, 2014, Taro increased prices on, *inter alia*, Warfarin, Carbamazepine, Clotrimazole, Fluocinonide – and Patel (Teva) and

Aprahamian (Taro) exchanged five text messages. After exchanging those text messages, Patel confirmed to her boss and another Teva colleague that Taro had raised its pricing on these drugs. Patel added: "I'll be looking at shares and intel tomorrow and will provide commentary." She also noted that "Taro is a high-quality competitor. It's just a matter of who the others are."

1460.   At 5:08 p.m. that evening (June 3), Patel called Aprahamian and the two spoke for nearly seven (7) minutes. The next morning, Patel and Aprahamian exchanged text messages. Then, at 9:56 a.m., the two spoke again for a little less than a half hour. Shortly after hanging up the phone with Aprahamian, Patel sent an e-mail to another Teva colleague, making it clear that she had obtained additional "intel" regarding the Taro price increases – and that she did not want to put them into writing: "I have additional intel (I can discuss with you) that will be useful."

1461.   The following week, on June 11, Aprahamian (Taro), Patel (Teva) Rekenthaler (Teva) and Green (Zydus) again played telephone tag: under the cover of darkness, at 4:30 a.m., Green called Rekenthaler and they spoke for eight (8) minutes; then, that afternoon, Patel called Green, and a few minutes later, Green returned the call, and they spoke for a quarter of an hour. The following day, June 12, Patel called Aprahamian just before 8:00 a.m. and they spoke for just under ten (10) minutes.

1462.   The very next day, June 13, 2014, Green (Zydus) called Patel (Teva), just after 8:15 am, and they spoke until nearly 8:30 a.m. – and Zydus raised its price on Warfarin tablets.

1463.   Later that same day, a customer gave Teva an offer for a one-time buy on Warfarin; Patel responded, "We will review, but note that we intend to follow [the] Taro and Zydus increase price." Later that same day, Patel sent an internal e-mail alerting her

group about a list of drugs on which Teva planned to raise prices. A number of them –
including Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clotrimazole
Topical Solution, Warfarin Tablets, and Fluocinonide Cream, Emollient Cream, Gel and
Ointment – included the notation "Follow/Urgent – Taro" as the reason for the increase.

1464. For that list of drugs, Patel directed that "we should not provide any
decreases on these products." This meant Teva would not seek to compete for market
share against Taro or Zydus when approached by customers due to those cartel members'
price increases.

1465. On August 28, 2014, Teva followed the Taro price increases on
Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clotrimazole Topical
Solution, and Warfarin Sodium Tablets. As demonstrated above, Teva coordinated those
increases with Taro and Zydus through direct communications with those competitors in
the days leading up to the increase.

1466. No shortages or other market features can explain Defendants' price
increases for Warfarin, Carbamazepine, or Clotrimazole during the Relevant Period.

1467. Following these price increases the average market prices for Warfarin,
Carbamazepine, or Clotrimazole remained artificially high after the Summer of 2014,
according to NADAC data, as depicted below:

**Figure 85-87: Warfarin NADAC Price Increase**







**Figures 88-89: Carbamazepine NADAC Price Increase**





**Figure 90: Clotrimazole NADAC Price Increase**



lxx.      Zoledronic Acid

1468.   Zoledronic Acid belongs to a class of drugs known as bisphosphonates. It is used to treat high blood calcium levels (hypercalcemia) that may occur with cancer.

1469.   During the relevant time period, Plaintiff Harris County purchased Zoledronic Acid manufactured and/or sold by Dr. Reddy's and Heritage.

1470.   As part of Defendants' overarching conspiracy with respect to the At Issue Drugs, they conspired to fix, raise, maintain and/or stabilize the prices of Zoledronic Acid as follows:

1471.   In early 2013, Heritage began preparing to launch a generic version of the 5mg injection. It planned to be the first generic entrant in the Zoledronic Acid market.

1472.   Dr. Reddy's was positioned to enter the Zoledronic Acid market shortly after Heritage.

1473.   Par, which did not have an ANDA for Zoledronic Acid, eventually was able to obtain the rights to market and sell Zoledronic Acid using an ANDA obtained by Defendant Breckenridge. Par entered the market approximately 8 months after Heritage and Dr. Reddy's.

1474.   Being the first generic to the market was atypical for Heritage, and Heritage wanted to work with its competitors so that it could enter the market at a price that would not be challenged by subsequent market entrants. For that reason, on January 21, 2013, Heritage's Malek instructed O'Mara (Heritage) to reach out to her contact at Dr. Reddy's to discuss market strategy and to "socialize" the idea of keeping prices elevated above a competitive level.

1475.   A Dr. Reddy's representative called Heritage's O'Mara on January 22, 2013, and they spoke for ten minutes.

1476.   After the call, O'Mara reported to Malek (Heritage) the substance of the call: O'Mara had learned that Dr. Reddy's would launch a 4mg product on the first day it could produce a generic, but it was not certain if it would launch on the 5mg formulation. Dr. Reddy's ultimately did launch the 5mg formulation. O'Mara also reported that Dr. Reddy's wanted its "fair share" of the market.

1477.   If Dr. Reddy's entered the Zoledronic Acid market first—consistent with fair share agreements that drove Defendants' overarching conspiracy—it expected a 60% share of the market. If Heritage entered the market at the same time as Dr. Reddy's, the expectation was that the market share would be split evenly.

1478.   Less than an hour after they first spoke on January 22, 2013, Heritage's O'Mara and her counterpart at Dr. Reddy's spoke again for approximately ten (10) minutes and discussed a plan to keep the pricing of Zoledronic Acid elevated above competitive levels. They spoke again on January 24 for approximately twenty-four (24) minutes.

1479.   Heritage knew that Dr. Reddy's was going to enter the market, but Heritage's Malek did not want to take any chance of other competitors disrupting Heritage's cozy relationship with Dr. Reddy's, and in March of 2013, Malek set out to confirm that there would be no other entrants to the market.

1480.   Malek instructed another Heritage employee (likely Sather) to reach out to competitors and large customers in an effort to confirm that no other manufacturers were planning on entering the generic Zoledronic Acid market. In his instructions to this employee, Malek provided the same list of questions he had provided to O'Mara for contacting Dr. Reddy's.

1481.   Prior to the launch, Heritage continued communicating with Dr. Reddy's to refine their agreement on market share and pricing. For example, Heritage's O'Mara called her counterpart at Dr. Reddy's on March 3, 2013.

1482.   Consistent with their agreement, in April of 2013, both Heritage and Dr. Reddy's entered the Zoledronic Acid market at a higher price than they otherwise would have absent their collusive pricing agreement. Heritage and Dr. Reddy's announced list prices that were within a few percentage points of each other. They maintained these list prices through at least early 2016. These list prices remained stable at this elevated, anticompetitive level even when a third manufacturer entered the market.

1483.   After Zoledronic Acid launched, Heritage and Dr. Reddy's remained in contact about the allocation of customers.

1484.   Heritage's ability to contact Dr. Reddy's and obtain an agreement on the allocation of the market and the price of Zoledronic Acid would not have been possible absent the existing "fair share" agreement among Defendants. The discussions between Dr. Reddy's and Heritage make clear that they were not starting from zero in working out the details of their agreement on Zoledronic Acid, but were building on an existing understanding about "fair share" and the avoidance of competition across numerous drugs.

1485.   Defendants were aware that their conversations were anticompetitive and illegal. For example, on April 19, 2013, Malek sent a text message to his entire sales team reminding them not to put their pricing discussions with competitors in writing.

1486.   In addition, shortly before Dr. Reddy's and Heritage's conversations in March of 2013, both Defendants attended two trade association meetings where they also had the opportunity to exchange information: the GPhA Annual Meeting, held from Feb.

20-22, 2013, in Orlando, FL; and the ECRM Retail Pharmacy Generic Pharmaceuticals Conference, held from Feb. 24-27, 2013, in Dallas, TX. Both of those trade shows were attended by most Defendants.

1487.  Similarly, shortly before Par entered the market for Zoledronic Acid, its sales employees attended the NACDS Total Store Expo in Las Vegas, which also was attended by numerous Defendants, including representatives of: Apotex, Aurobindo, Rising, Dr. Reddy's, Glenmark, Heritage, Lannett, Mylan, Sandoz, Sun, Taro, Teva, Hikma (West-Ward) and Zydus.

1488.  When Par finally entered the market in late 2013, it announced list prices even higher than those of Heritage and Dr. Reddy's. List prices for Dr. Reddy's, Heritage and Par remained elevated thereafter. Although it was the third generic manufacturer into the market, Par did not undercut the prices of Heritage and Dr. Reddy's in an effort to gain market share, as normally happens in a competitive market for a generic pharmaceutical product and would have happened here, but for Defendants' anticompetitive agreement.

1489.  Instead, Par complied with the terms of Defendants' overarching conspiracy and imposed higher prices than a competitive market would have allowed and attempted prevented price erosion in the market for Zoledronic Acid.

## VI.    PLAINTIFF HARRIS COUNTY'S ANTITRUST INJURY

1490.  During the period relevant to this Complaint, Defendants engaged in a continuing agreement, understanding and conspiracy to restrain trade, the purpose and effect of which were to allocate customers, rig bids and artificially fix, raise, maintain and/or stabilize the price of the At Issue Drugs sold throughout the United States, Texas, including within Harris County, and in Arizona, California, Connecticut, District of

Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin. These activities included the following:

      i.     Defendants participated in meetings and/or conversations regarding the price of the At Issue Drugs;

      ii.    Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of the At Issue Drugs sold throughout the United States,Texas, including within Harris County, and in Arizona, California, Connecticut, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin and subsequently followed through on their agreements and did increase prices on the At Issue Drugs; and

      iii.   Defendants agreed during those meetings and conversations to allocate customers, rig bids, and fix the price of the At Issue Drugs and subsequently followed through on their agreements and did allocate customers, rig bids and fix prices of At Issue Drugs.

1491.   Defendants engaged in the activities described above for the purpose of effectuating the unlawful agreements described herein.

1492.   During and throughout the relevant time period, Plaintiff Harris County purchased the At Issue Drugs at inflated, supra-competitive prices.

1493.  Defendants' cartel, contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1,) and the laws of the State of Texas, Arizona, California, Connecticut, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin, as enumerated below.

1494. As a result of Defendants' unlawful conduct, Plaintiffs have suffered financial damages in that they have paid more for the At Issue Drugs than they would have paid in a competitive market.

1495.  General economic principles recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below.  Moreover, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to end payers such as Plaintiff.  Wholesalers and retailers passed on the inflated prices to Plaintiff.  The impairment of generic competition injured Plaintiff Harris County by denying it the opportunity to purchase less expensive generic versions of the drugs.

1496. Defendants' unlawful contract, combination and conspiracy has had the following effects, among others:

> i.  Price competition in the individual markets for the At Issue Drugs, as well as in the entire market for all generic drugs has been artificially restrained;

> ii.  Prices for the At Issue Drugs have been raised, fixed, maintained or stabilized at artificially high and non-competitive levels; and

iii.     Purchasers of the At Issue Drugs, including Plaintiff, have been

deprived of the benefit of free and open competition in the individual

markets for the At Issue Drugs, as well as in the entire market for all generic

drugs.

## VII.   TOLLING AND FRAUDULENT CONCEALMENT

1497.   Plaintiff Harris County, as a county government, is a political subdivision of the State of Texas. Pursuant to the common law and TEX. CIV. PRAC. & REM CODE 16.061, Harris County is not subject to any applicable statute of limitations.

1498.   Even assuming, *arguendo*, that Harris County were subject to applicable statutes of limitations, in the alternative Harris County asserts that it diligently pursued and investigated the claims asserted in this Complaint. Through no fault of its own, Harris County did not receive inquiry notice nor learn of the factual basis for its claims in this Complaint and the injuries suffered therefrom until recently.

### A.  Plaintiff Did Not and Could Not Discover Defendants' Unlawful Conspiracy

1499.   Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiff Harris County. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiff Harris County into accepting the price hikes as a normal result of competitive and economic market trends rather than the consequences of Defendants' collusive acts.

1500.   Plaintiff had no knowledge of Defendants' conspiracy alleged herein or of facts sufficient to place it on inquiry notice of the claims set forth against Defendants, until (at the earliest) the filing of the State AGs' May 10, 2019 Complaint.

1501.  No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the Defendants were involved in a conspiracy to fix prices for generic drugs.

1502.  For example, Defendants repeatedly and expressly stated throughout the relevant time period, including on their public websites, that they maintained antitrust/fair competition policies, which prohibited the type of collusion alleged in this Complaint. Representative examples include:

     i.    Allergan's (predecessor to Actavis) Code of Conduct states: "We support a free and open market, which is why we comply with competition laws everywhere we do business and strive to always compete fairly."

     ii.    Apotex's Code of Conduct directs employees: "Do not communicate with competitors about competitive business matters such as prices, costs discounts, customer suppliers, marketing plans, production capacities or any terms of conditions of sale that could create the appearance of improper agreements or understandings. Do not make agreements or reach understandings with competitors regarding allocation of customers, territories or market share. Do not conspire with other bidders when competing for contracts."

     iii.    Dr. Reddy's Code of Conduct provides: "We believe in free and open competition and never engage in improper practices that may hamper fair competition. We never look to gain competitive advantages through unethical or unlawful business practices …. [W]e must never enter into agreements with competitors to engage in any anti-competitive behavior, including colluding or cartelization, fixing prices, dividing up customers, suppliers or markets."

     iv.    Glenmark's Code of Conduct states: "We must engage in fair competition and must ensure that our business dealings comply with all applicable local antitrust and competition laws, such as monopoly, unfair trade, or price discrimination laws. We must not make agreements or engage in concerted actions with a competitor with the intent of improperly dividing markets by allocating territories, customers, goods, or services, or price fixing or collusion."

v.      Hikma's (West-Ward) Code of Conduct provides: "Hikma will engage in free and fair competition and not seek competitive advantage through unlawful means. Hikma will not collude with competitors on prices, bids or market allocations, nor exchange information with third parties in a way that could improperly influence business outcomes."

vi.      Mayne's Business Code of Conduct provides: "Do not agree, even informally, with competitors on price (or any elements of price including discounts or rebates), production, customers or markets without a lawful reason."

vii.      Mylan's Code of Conduct and Business Ethics states: "Mylan is committed to complying with applicable antitrust and fair competition laws."

viii.      Novartis' (Parent of Sandoz) Code of Conduct states: "We are committed to fair competition and will not breach competition laws and regulations."

ix.      Par's Code of Conduct provides: "It is Company policy to comply with the antitrust and competition laws of each country in which the Company does business."

x.      Perrigo's Code of Conduct provides: "We will succeed based on the quality and value of our products and not by illegal or otherwise improper business practices. Competition laws, also known as "antitrust" laws, generally prohibit agreements with competitors, suppliers or customers that could unfairly limit free and open competition."

xi.      Sun Pharmaceutical Industries, Ltd. (parent of Sun and Taro) has a Global Code of Conduct that provides: "We seek to outperform our competition fairly and honestly. We seek competitive advantages through superior performance, never through unethical or illegal business practices." It goes on to state: "Sun Pharma shall compete only in an ethical and legitimate manner and prohibits all actions that are anti-competitive or otherwise contrary to applicable competition or anti-trust laws."

xii.　　Taro's Code of Conduct provides: "[W]e do not discuss any of the following topics with our competitors: prices or price-fixing, customer or market allocation, bids or bid-rigging, any topic that seems to be about restricting competition. If a competitor attempts to engage you in a discussion on any of these topics, make it clear that you do not wish to participate. Leave the conversation immediately, and report the matter to Corporate Compliance."

xiii.　　Teva's Code of Conduct provides: "We believe that customers and society as a whole benefit from fair, free and open markets. Therefore, we compete on the merits of our products and services and conduct business with integrity. We recognize that the potential harm to Teva's reputation and the penalties for breaching competition laws are severe, and can subject Teva, members of the Board of Directors and employees to severe civil fines and criminal penalties."

1503.  It was reasonable for Plaintiff to believe that Defendants were complying with their own antitrust policies.

1504.  Thus, the discovery rule tolls all applicable limitations periods.

## B. Fraudulent Concealment

1505.  The doctrine of fraudulent concealment also tolled the statute of limitations on the claims asserted by Plaintiff. Defendants actively concealed, suppressed and omitted to disclose material facts to Plaintiff concerning Defendants' unlawful activities.

1506.  Through their misleading, deceptive, false and fraudulent statements, including the Codes of Conduct cited above, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiff. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiff into accepting the price hikes as a normal result of competitive and economic market trends rather than the consequences of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiff into paying unjustifiably higher prices for generic drugs.

1507.  Defendants took affirmative steps to conceal and destroy evidence of their wrongdoing.  For example, Defendants' executives failed to maintain document retention policies, instructed each other and their co-conspirators not to put communications relating to the conspiracy in writing, intentionally withheld documents subject to subpoenas and deleted text messages from their telephones.

1508.  Specific examples include: (a) on June 26, 2014, Heritage's CEO reminded Heritage's President via email not to put any evidence of illegal conduct in writing, (b) Heritage instructed a competitor not to communicate through email but to instead communicate by telephone, (c) Heritage's President sent a text message about how to avoid detection by regulators—a text message that was not produced by Heritage in response to a subpoena by the Connecticut AG; (d) Heritage executives and employees deleted emails and text messages regarding illegal communications with competitors, and (e) one of Mayne's key executives who participated in the conspiracy deleted several of the most incriminating text messages from her cellular phone before the data on that telephone was imaged and produced to the Connecticut AG's office.[62]

1509.  As Attorney General Jespen said in the press release referenced above that was issued at the time that the original AG Complaint was filed: "the states further allege that the drug companies knew that their conduct was illegal and made efforts to avoid communicating with each other in writing or, in some instances, to delete written communications after becoming aware of the investigation."[63]

---

[62] State AG Complaint ¶¶ 457-461.
[63] Connecticut AG, Press Release (Dec. 15, 2016), http://portal.ct.gov/AG/Press-Release/2016-Press-Releases.

1510. All Defendants also forwent written and/or recorded forms of communication while planning and effectuating their conspiracy and rather engaged in unusual patterns of communication such as playing telephone tag and calling each other multiple times back and forth in the same day.

1511.  As a result, virtually all of Defendants' communications were via telephone conversations. As detailed above, rather than leave an e-mail or voicemail with a permanent record of the substance of their communications (which could be found in, for example, a document production of Defendants' e-mail servers), Defendants' employees would repeatedly telephone each other, often on the same day, until they connected by phone. They did this because it meant the substance of their communications would not be retained, and the only way to trace the fact that they communicated at all was via obtaining records from telephone companies, which is significantly more challenging, including requiring matching telephone number(s) to the corresponding participant in the scheme. The purpose of these tactics was to hide their conspiracy.

1512.  In addition, to further hide Defendants' overarching conspiracy (and because they knew what they were doing was illegal), even when Defendants' employees e-mailed each other within the same company, they were circumspect about what was occurring and transmitted much information orally or using obscure or vague language; e-mail was used simply to alert the recipient that there was news to communicate.

1513.  Furthermore, Defendants spoke and met in secret to conceal the conspiracies, often under the pretext of legitimate industry activities as set forth above and took steps to ensure that communications relating to the conspiracies were not recorded in writing.

1514.  Defendants also engaged in deceptive tactics such as staggering price increases in some cases to conceal the coordination and straw bidding activity, which was intended to, and did, give a false impression of competition among Defendants.

1515.  Plaintiff Harris County acted with due diligence at all relevant times by, among other things, monitoring available prices for the At Issue Drugs and seeking to obtain the most competitive prices possible, efforts that were hindered by Defendants' concealment.  As a result, Plaintiff Harris County did not know or reasonably suspect the existence of the claims alleged in this Complaint until recently, nor was Plaintiff Harris County aware of any facts until recently that would have put it on reasonable notice of its claims.

1516.  Consequently, Plaintiff Harris County's claims against Defendants are tolled by all applicable tolling doctrines, including the discovery rule and fraudulent concealment doctrines.

### C. Continuing Violations

1517.  This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and Defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations.

1518. Thus, all applicable statutes of limitations are also tolled because Defendants' fraudulent activities have not ceased and still continue to this day and thus any causes of action are not complete and do not accrue until the tortious and anticompetitive acts have ceased. As a result, Plaintiff can recover for damages that it suffered during any applicable limitations period.

## VIII.  CAUSES OF ACTION

1519.   As to the overarching conspiracy in which all Defendants participated, and as to each drug(s)-specific conspiracy in which certain Defendants participated as alleged above, Plaintiff Harris County seeks relief under the laws specified in Causes of Action 1 through 7 below.

## FIRST CAUSE OF ACTION

### Violations of § 1 of the Sherman Act, 15 U.S.C. § 1, et. seq.
### (Against All Defendants)

1520.   Plaintiff Harris County re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

1521.   This cause of action is brought against all Defendants for their participation in an overarching conspiracy to fix, raise and/or stabilize the prices of all At Issue Drugs.

1522.  This cause of action is also brought against the groups of Defendant-participants in each of the drug-specific conspiracies alleged above.  A chart detailing which Defendant participated in each of the drug-specific conspiracies is attached hereto as **Appendix B**.

1523.  Defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

1524.   As detailed above, during the relevant time period Defendants entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for the At Issue Drug(s) in the United States, thereby creating anticompetitive effects.

334

1525.  The conspiratorial acts and combinations have caused unreasonable restraints in the market for the At Issue Drug(s).[64]

1526.  Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing the prices for generic drugs throughout the United States and Texas, including in Harris County.

1527.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff Harris County has been harmed by being forced to pay inflated, supra-competitive prices for the At Issue Drug(s). The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1528.  Defendants' conspiracy had the following effects, among others:

i.  Price competition in the market for the At Issue Drug(s) has been restrained, suppressed, and/or eliminated throughout the United States and Texas, including in Harris County;

ii.  Prices for the At Issue Drug(s) provided by Defendants have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States and Texas, including in Harris County; and

iii.  Plaintiff Harris County purchased and reimbursed purchases of the At Issue Drug(s) at supra-competitive prices because of Defendants' conspiracy and thus has been deprived of the benefits of free and open competition.

---

[64] The overarching conspiracy encompasses the market for all At Issue Drugs collectively.  Each drug specific conspiracy encompasses the market for that particular drug or group of drugs.

1529.   Plaintiff Harris County has been injured and will continue to be injured by paying more for the At Issue Drug(s) than it would have paid and will pay in the absence of the conspiracy.

1530.   Defendants' conspiracy constitutes a restraint of trade that is unlawful under all three applicable standards of review: (1) the *per se* standard, which governs price-fixing and the allocation of markets; (2) the "quick-look" standard, which governs apparently anticompetitive schemes with which the courts lack familiarity; and (3) the rule of reason standard (the "Rule of Reason"), which governs all other challenged restraints of trade.

1531.   Plaintiff Harris County respectfully submits that the Court should apply well-recognized *per se* rules to condemn the challenged price fixing and market allocation conspiracy, but in an abundance of caution pleads the quick look and Rule of Reason standards in the alternative so that this claim is raised under all applicable standards.

1532.   There is no legitimate, non-pretextual, pro-competitive business justification for Defendants' conspiracy that outweighs its harmful effects.

1533.   Plaintiff Harris County seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct and other relief to which it may be entitled to assure that similar anticompetitive conduct does not recur.

1534.   Plaintiff Harris County also seeks recovery of its attorneys' fees and costs pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, as a remedy for the costs they have incurred as a result of Defendants' conduct.

## SECOND CAUSE OF ACTION

## Violations of the Texas Free Enterprise and Antitrust Act ("TFEAA") (Against All Defendants)

1535.   Plaintiff Harris County re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

1536.   This cause of action is brought against all Defendants for their participation in an overarching conspiracy to fix, raise and/or stabilize the prices of all At Issue Drugs.

1537.   This cause of action is also brought against the groups of Defendant-participants in each of the drug-specific conspiracies alleged above.   A chart detailing which Defendant participated in each of the drug-specific conspiracies is attached hereto as **Appendix B.**

1538.   Defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of the Texas Free Enterprise and Antitrust Act.

1539.   As detailed above, during the relevant time period Defendants entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for the At Issue Drug(s) in Texas, thereby creating anticompetitive effects.

1540.   The conspiratorial acts and combinations have caused unreasonable restraints in the market for the At Issue Drug(s).[65]

---

[65] The overarching conspiracy encompasses the market for all At Issue Drugs collectively.   Each drug specific conspiracy encompasses the market for that particular drug or group of drugs.

1541.   As a result of Defendants' unlawful conduct, Plaintiff Harris County has been harmed by being forced to pay inflated, supra-competitive prices for the At Issue Drug(s).

1542.   Defendants' conspiracy had the following effects, among others:

  i.   Price competition in the market for the At Issue Drug(s) has been restrained, suppressed, and/or eliminated throughout Texas, including in Harris County;

  ii.   Prices for the At Issue Drug(s) provided by Defendants have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout Texas, including in Harris County; and

  iii.   Plaintiff Harris County purchased and reimbursed purchases of the At Issue Drug(s) at supra-competitive prices because of Defendants' conspiracy and thus has been deprived of the benefits of free and open competition.

1543.   Plaintiff Harris County has been injured and will continue to be injured by paying more for the At Issue Drug(s) than it would have paid and will pay in the absence of the conspiracy.

1544.   Defendants' conspiracy constitutes a restraint of trade that is unlawful under all three applicable standards of review: (1) the *per se* standard, which governs price-fixing and the allocation of markets; (2) the "quick-look" standard, which governs apparently anticompetitive schemes with which the courts lack familiarity; and (3) the rule of reason standard (the "Rule of Reason"), which governs all other challenged restraints of trade.

1545.   Plaintiff Harris County respectfully submits that the Court should apply well-recognized *per se* rules to condemn the challenged price fixing and market allocation conspiracy, but in an abundance of caution pleads the quick look and Rule of Reason standards in the alternative so that this claim is raised under all applicable standards.

1546.   Plaintiff Harris County seeks equitable and injunctive relief pursuant to Section 15.21(b) of the Texas Free Enterprise and Antitrust Act to correct for the anticompetitive market effects caused by Defendants' unlawful conduct and other relief to assure that similar anticompetitive conduct does not recur.

1547.   Plaintiff Harris County also seeks recovery of its attorneys' fees and costs under Section 15.21 of the Texas Free Enterprise and Antitrust Act as a remedy for the costs they have incurred as a result of Defendants' conduct.

### THIRD CAUSE OF ACTION

### Violations of State Antitrust Statutes[66]
### (Against All Defendants)

1548.   Plaintiff Harris County re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

1549.   This cause of action is brought against all Defendants for their participation in fixing, raising and/or stabilizing the prices of all At Issue Drugs.

1550.   This cause of action is also brought against the groups of Defendant-participants in each of the drug-specific conspiracies alleged above.   A chart detailing

---

[66] Statutory antitrust violations are alleged herein for the following jurisdictions: Arizona, California, Connecticut, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

which Defendant participated in each of the drug-specific conspiracies is attached hereto as **Appendix B**.

1551.   During the relevant time period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of the At Issue Drugs in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

1552.   The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain the prices of the At Issue Drugs and to allocate customers for At Issue Drugs in the United States and in the specific states alleged below.

1553.   In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating m meetings and conversations among themselves in the United States and elsewhere during which they agreed to price the At Issue Drugs at certain levels, and otherwise to fix,  increase, inflate, maintain, or stabilize prices paid by Plaintiff with respect to the At Issue Drugs provided in the United States and in the specific states alleged below; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

1554.   Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for the At Issue Drugs.

1555.   Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes:

**Arizona**

1556.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, § 44-1401, *et seq*. Defendants' combination and conspiracy had the following effects: (1) price competition for the At Issue Drugs was restrained, suppressed and eliminated throughout Arizona; (2) the At Issue Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supracompetitive, artificially inflated prices for the At Issue Drugs. During the relevant time period, Defendants' illegal conduct substantially affected Arizona commerce. Defendants' violations of Arizona law were flagrant. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in its business and property and is threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, *et seq*. Accordingly, Plaintiff seeks all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq*.

**California**

1557.   Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700 *et seq*. During the relevant time period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code § 16720. Defendants, and each of them, have acted in violation of § 16720 to fix, raise, stabilize and maintain prices of the At Issue Drugs at supracompetitive levels. The aforesaid violations of § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among

Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of the At Issue Drugs. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above and creating a price floor, fixing, raising and stabilizing the price of the At Issue Drugs. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for the At Issue Drugs has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for the At Issue Drugs provided by Defendants and their co-conspirators have been fixed, raised, stabilized and pegged at artificially high, non-competitive levels in the State of California; and (3) those who purchased the At Issue Drugs indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in its business and property in that it paid more for the At Issue Drugs than they otherwise would have paid in the absence of Defendants' unlawful conduct. During the relevant time period, Defendants' illegal conduct substantially affected California commerce. As a result of Defendants' violation of § 16720, Plaintiff seeks treble damages and its cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

### Connecticut

1558.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Connecticut Antitrust Act, Conn. Gen. Stat § 35-35, *et seq*. Defendants' combination and conspiracy had the following effects: (1) price competition for the At Issue Drugs was restrained suppressed, and eliminated throughout Connecticut; (2) the

At Issue Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout Connecticut; (3) Plaintiff was deprived of free and open competition, including in Connecticut; and (4) Plaintiff paid supracompetitive, artificially inflated prices for the At Issue Drugs, including in Connecticut. During the relevant time period, Defendants' illegal conduct substantially affected Connecticut commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in its business and property and is threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation Connecticut Antitrust Act, Conn. Gen. Stat § 35-35, *et seq*. Accordingly, Plaintiff seeks all forms of relief available under Connecticut Antitrust Act, Conn. Gen. Stat § 35-35, *et seq*.

### District of Columbia

1559.   Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated § 28-4501, *et seq*. Defendants' combination and conspiracy had the following effects: (1) price competition for the At Issue Drugs was restrained, suppressed and eliminated throughout the District of Columbia; (2) the At Issue Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff was deprived of free and open competition, including in the District of Columbia; and (4) Plaintiff paid supracompetitive, artificially inflated prices for the At Issue Drugs, including in the District of Columbia. During the relevant time period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in its business and property and is threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of District of Columbia Code Ann. §

28-4501, *et seq*. Accordingly, Plaintiff seeks all forms of relief available under District of Columbia Code Ann. § 28-4501, *et seq*.

**Hawaii**

1560.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for the At Issue Drugs was restrained, suppressed and eliminated throughout Hawaii; (2) the At Issue Drugs' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supracompetitive, artificially inflated prices for the At Issue Drugs. During the relevant time period, Defendants' illegal conduct substantially affected Hawaii commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in its business and property and is threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-4, *et seq*. Accordingly, Plaintiff seeks all forms of relief available under Hawaii Revised Statutes Annotated § 480-4, *et seq*.

**Illinois**

1561.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq*.). Defendants' combination or conspiracy had the following effects: (1) price competition for the At Issue Drugs was restrained, suppressed, and eliminated throughout Illinois; (2) the At Issue Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout Illinois; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supracompetitive, artificially inflated prices for the At Issue Drugs. During

the relevant time period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in its business and property and is threatened with further injury. Accordingly, Plaintiff seeks all forms of relief available under the Illinois Antitrust Act.

**Iowa**

1562.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) price competition for the At Issue Drugs was restrained, suppressed, and eliminated throughout Iowa; (2) the At Issue Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supracompetitive, artificially inflated prices for the At Issue Drugs. During the relevant time period, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in their business and property and is threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Accordingly, Plaintiff seeks all forms of relief available under Iowa Code § 553, *et seq*.

**Kansas**

1563.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, § 50-101, *et seq*. Defendants' combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of the At Issue Drugs, increasing the prices of the At Issue Drugs, preventing competition in the sale of the At Issue Drugs, or binding themselves not to sell the At Issue Drugs, in a manner that established the price of the At Issue Drugs and precluded free and unrestricted

competition among themselves in the sale of the At Issue Drugs, in violation of Kan. Stat. Ann. § 50-101, *et seq*. Defendants' combination or conspiracy had the following effects: (1) price competition for the At Issue Drugs was restrained, suppressed and eliminated throughout Kansas; (2) the At Issue Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supracompetitive, artificially inflated prices for the At Issue Drugs. During the relevant time period, Defendants' illegal conduct substantially affected Kansas commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in its business and property and is threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Kansas Stat. Ann. § 50-101, *et seq*. Accordingly, Plaintiff seeks all forms of relief available under Kansas Stat. Ann. § 50-101, *et seq*.

**Maine**

1564.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101, *et seq*.) Defendants' combination or conspiracy had the following effects: (1) price competition for the At Issue Drugs was restrained, suppressed, and eliminated throughout Maine; (2) the At Issue Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supracompetitive, artificially inflated prices for the At Issue Drugs. During the relevant time period, Defendants' illegal conduct substantially affected Maine commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in its business and property and is threatened with further injury. By reason

346

of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101, *et seq*. Accordingly, Plaintiff seeks all relief available under Maine Rev. Stat. Ann. 10, § 1101, *et seq*.

**Maryland**

1565.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maryland Antitrust Act, Maryland Code, Com. Law § 11-204, *et seq*. Defendants' combination or conspiracy had the following effects: (1) price competition for the At Issue Drugs was restrained, suppressed, and eliminated throughout Maryland; (2) the At Issue Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maryland; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supracompetitive, artificially inflated prices for the At Issue Drugs. During the relevant time period, Defendants' illegal conduct substantially affected Maryland commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in its business and property and is threatened with further injury. By reason of the foregoing, Defendant has entered into an agreement in restraint of trade in violation of the Maryland Antitrust Act. Accordingly, Plaintiff seeks all relief available under Maryland law.

**Michigan**

1566.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated§ 445.771, *et seq*. Defendants' combination or conspiracy had the following effects: (1) price competition for the At Issue Drugs was restrained, suppressed and eliminated throughout Michigan; (2) the At Issue Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiff was deprived of free and open competition; and (4)

Plaintiff paid supracompetitive, artificially inflated prices for the At Issue Drugs. During the relevant time period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in its business and property and is threatened with further injury. By reason of the foregoing, Defendant has entered into an agreement in restraint of trade in violation of Michigan Comp. Laws Ann. § 445.771, *et seq*. Accordingly, Plaintiff seeks all relief available under Michigan Comp. Laws Ann. § 445.771, *et seq.*

**Minnesota**

1567.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes § 325D.49, *et seq*. Defendants' combination or conspiracy had the following effects: (1) price competition for the At Issue Drugs was restrained, suppressed, and eliminated throughout Minnesota; (2) the At Issue Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supracompetitive, artificially inflated prices for the At Issue Drugs. During the relevant time period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in its business and property and is threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Minnesota Stat. § 325D.49, *et seq*. Accordingly, Plaintiff seeks all relief available under Minnesota Stat. § 325D.49, *et seq.*

**Mississippi**

1568.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated § 75-21-1, *et seq*. Trusts are combinations,

contracts, understandings or agreements, express or implied when inimical to the public welfare and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production and sale of a commodity. Miss. Code Ann. § 75-21-1. Defendants' combination or conspiracy was in a manner inimical to public welfare and had the following effects: (1) price competition for the At Issue Drugs was restrained, suppressed, and eliminated throughout Mississippi; (2) the At Issue Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supracompetitive, artificially inflated prices for the At Issue Drugs. During the relevant time period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in its business and property and is threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq*. Accordingly, Plaintiff seeks all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

**Nebraska**

1569.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq*. Defendants' combination or conspiracy had the following effects: (1) price competition for the At Issue Drugs was restrained, suppressed, and eliminated throughout Nebraska; (2) the At Issue Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supracompetitive, artificially inflated prices for the At Issue Drugs. During the relevant time period, Defendants' illegal conduct substantially affected Nebraska commerce. As a

direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in its business and property and is threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq*. Accordingly, Plaintiff seeks all relief available under Nebraska Revised Statutes § 59- 801, *et seq*.

**Nevada**

1570.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated§ 598A.010, *et seq*. Defendants' combination or conspiracy had the following effects: (1) price competition for the At Issue Drugs was restrained, suppressed, and eliminated throughout Nevada; (2) the At Issue Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supracompetitive, artificially inflated prices for the At Issue Drugs. During the relevant time period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in its business and property and is threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A.010, *et seq*. Accordingly, Plaintiff seeks all relief available under Nevada Rev. Stat. Ann. § 598A.010, *et seq*.

**New Hampshire**

1571.   Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) price competition for the At Issue Drugs was restrained, suppressed, and eliminated throughout New Hampshire; (2) the At Issue

350

Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supracompetitive, artificially inflated prices for the At Issue Drugs. During the relevant time period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in its business and property and is threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq*. Accordingly, Plaintiff seeks all relief available under New Hampshire Revised Statutes § 356: 1, *et seq*.

### New Mexico

1572.   Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) price competition for the At Issue Drugs was restrained, suppressed, and eliminated throughout New Mexico; (2) the At Issue Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supracompetitive, artificially inflated prices for the At Issue Drugs. During the relevant time period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in its business and property and is threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. § 57-1-1, *et seq*. Accordingly, Plaintiff seeks all relief available under New Mexico Stat. Ann. § 57-1-1, *et seq*.

**New York**

1573.   Defendants have entered into an unlawful agreement in restraint of trade in violation of New York's Donnelly Act, New York General Business Law § 340, *et seq*. Defendants' combination or conspiracy had the following effects: (1) price competition for the At Issue Drugs was restrained, suppressed, and eliminated throughout New York; (2) the At Issue Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supracompetitive artificially inflated prices for the At Issue Drugs that were higher than they would have been absent Defendants' illegal acts. During the relevant time period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in its business and property and is threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of the New York's Donnelly Act, New York General Business Law § 340, *et seq*. The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiff seeks all relief available under New York Gen. Bus. Law § 340, *et seq*.

**North Carolina**

1574.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes § 75-1, *et seq*. Defendants; combination or conspiracy had the following effects: (1) price competition for the At Issue Drugs was restrained, suppressed and eliminated throughout North Carolina; (2) the At Issue Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supracompetitive, artificially inflated prices for the At Issue Drugs. During the

relevant time period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in its business and property and is threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. § 75-1, *et seq*. Accordingly, Plaintiff seeks all relief available under North Carolina Gen. Stat. § 75-1, *et. seq*.

**North Dakota**

1575.   Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code § 51-08.1-01, *et seq*. Defendants' combination or conspiracy had the following effects: (1) price competition for the At Issue Drugs was restrained, suppressed and eliminated throughout North Dakota; (2) the At Issue Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supracompetitive, artificially inflated prices for the At Issue Drugs. During the relevant time period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in its business and property and is threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Dakota Cent. Code§ 51-08.1-01, et seq. Accordingly, Plaintiff seek all relief available under North Dakota Cent. Code § 51-08.1-01, *et seq*.

**Oregon**

1576.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq*. Defendants' combination or conspiracy had the following effects: (1) price competition for the At Issue Drugs was

restrained, suppressed, and eliminated throughout Oregon; (2) the At Issue Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supracompetitive, artificially inflated prices for the At Issue Drugs. During the relevant time period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in its business and property and is threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq*. Accordingly, Plaintiff seeks all relief available under Oregon Revised Statutes § 646.705, *et seq*.

### Rhode Island

1577.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) price competition for the At Issue Drugs was restrained, suppressed, and eliminated throughout Rhode Island; (2) the At Issue Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supracompetitive, artificially inflated prices for the At Issue Drugs. During the relevant time period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in its business and property and is threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-

1, *et seq.* Accordingly, Plaintiff seeks all relief available under Rhode Island General Laws § 6-36-1, *et seq.*

**South Dakota**

1578.   Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) price competition for the At Issue Drugs was restrained, suppressed and eliminated throughout South Dakota; (2) the At Issue Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supracompetitive, artificially inflated prices for the At Issue Drugs. During the relevant time period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in their business and property and is threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of South Dakota Codified Laws Ann. § 37-1-3.1, *et seq.* Accordingly, Plaintiff seeks all relief available under South Dakota Codified Laws Ann. § 37-1-3.1, *et seq.*

**Tennessee**

1579.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated § 47-25-101, *et seq.* Defendants' combination or conspiracy had the following effects: (1) price competition for the At Issue Drugs was restrained, suppressed, and eliminated throughout Tennessee; (2) the At Issue Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supracompetitive, artificially inflated prices for the At Issue Drugs. During the relevant

time period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in its business and property and is threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Tennessee Code Ann. § 47-25-101, *et seq*. Accordingly, Plaintiff seeks all relief available under Tennessee Code Ann. § 47-25-101, *et seq*.

**Utah**

1580.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated§ 76-10-3101, *et seq*. Defendants' combination or conspiracy had the following effects: (1) price competition for the At Issue Drugs was restrained, suppressed and eliminated throughout Utah; (2) the At Issue Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supracompetitive, artificially inflated prices for the At Issue Drugs. During the relevant time period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in its business and property and is threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq*. Accordingly, Plaintiff seeks all relief available under Utah Code Annotated § 76-10-3101, *et seq*.

**Vermont**

1581.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq*. Defendants' combination or conspiracy had the following effects: (1) price competition for the At Issue Drugs was restrained,

suppressed, and eliminated throughout Vermont; (2) the At Issue Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supracompetitive, artificially inflated prices for the At Issue Drugs. During the relevant time, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in its business and property and is threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq.* Accordingly, Plaintiff seek all relief available under Vermont Stat. Ann. 9 § 2453, *et seq.*

### West Virginia

1582.  Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq.* Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of West Virginia Antitrust Act. Defendants' combination or conspiracy had the following effects: (1) price competition for the At Issue Drugs was restrained, suppressed, and eliminated throughout West Virginia; (2) the At Issue Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supracompetitive, artificially inflated prices for the At Issue Drugs. During the relevant time period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in its business and property and is threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of West

Virginia Code § 47-18-1, *et seq*. Accordingly, Plaintiff seeks all relief available under West Virginia Code§ 47-18-1 , *et seq*.

**Wisconsin**

1583.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes § 133.01, *et seq*. Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiff in the United States and in Wisconsin. Specifically, Defendants' combination or conspiracy had the following effects: (1) price competition for the At Issue Drugs was restrained, suppressed, and eliminated throughout Wisconsin; (2) the At Issue Drugs' prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supracompetitive, artificially inflated prices for the At Issue Drugs. During the relevant time period, Defendants' illegal conduct had a substantial effect on the people of Wisconsin and Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in its business and property and is threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Wisconsin Stat. § 133.01, *et seq*. Accordingly, Plaintiff seeks all relief available under Wisconsin Stat. § 133.01, *et seq*.

**As to All Jurisdictions Above**

1584.   Plaintiff has purchased At Issue Drugs in each of the above jurisdictions and has been injured in its business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiff has paid more for the At Issue Drugs than it otherwise would have paid in the absence of Defendants' unlawful conduct.

This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

1585.   In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiff.

1586.   Accordingly, in each of the above jurisdictions, Plaintiff seeks damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

### FOURTH CAUSE OF ACTION

### Texas Deceptive Trades Practices Act
### (Against All Defendants)

1587.   Plaintiff Harris County re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

1588.   This cause of action is brought against all Defendants for their participation in fixing, raising and/or stabilizing the prices of all At Issue Drugs and for the substantial and repeated misrepresentations and failure to provide relevant information to Plaintiff.

1589.   This cause of action is also brought against the groups of Defendant-participants in each of the drug-specific conspiracies alleged above.  A chart detailing which Defendant participated in each of the drug-specific conspiracies is attached hereto as **Appendix B**.

1590.   Plaintiff Harris County brings claims under the Texas Deceptive Trade Practices Act.  TEX. BUS. & COMM. CODE §§ 17.41–.63 (the "DTPA").  Plaintiff Harris County is a consumer under the DTPA because it is "a subdivision . . . of this state who

seeks or acquires by purchase or lease, any goods or services," including the Issue Drug(s). TEX. BUS. & COMM. CODE § 17.45(4).

1591. At all times, Defendants and their agents have engaged in conduct constituting "trade" and "commerce," as defined in § 17.45(6) of the DTPA.

1592. Defendants committed false, misleading, or deceptive acts or practices that Plaintiff Harris County relied on, including:

>   i.    "[F]ailing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed."  TEX. BUS. & COM. CODE § 17.46(b)(24); see also TEX. BUS. & COMM. CODE § 17.50(a)(1)(a).

>   ii.   "[F]ailing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed."  TEX. BUS. & COM. CODE § 17.46(b)(24); see also TEX. BUS. & COMM. CODE § 17.50(a)(1)(a).

1593. Defendants also committed unconscionable actions.  TEX. BUS. & COMM. CODE § 17.50(a)(3).

1594. Defendants' violations of the DTPA were a producing cause of Plaintiff Harris County's damages.  TEX. BUS. & COM. CODE § 17.50(a).

1595. Defendants engaged in a conspiracy to violate the DTPA.  *See Four Bros. Boat Works, Inc. v. Tesoro Petroleum Companies, Inc.*, 217 S.W.3d 653, 667 (Tex. App.—

Houston [14th Dist.] 2006, pet. denied) ("Two or more persons can be held liable for a conspiracy to violate the DTPA.").

1596.   Defendants' actions were committed intentionally or knowingly, so Plaintiff Harris County is entitled to recover up to three times the amount of its economic damages. TEX. BUS. & COM. CODE § 17.50(b)(1).

1597.   Plaintiff Harris County seeks injunctive relief under Texas Business and Commerce Code § 17.50(b)(2).

1598.   Plaintiff Harris County seeks costs and attorneys' fees under the DTPA. TEX. BUS. & COM. CODE § 17.50(d) ("Each consumer who prevails shall be awarded court costs and reasonable and necessary attorneys' fees.").

## FIFTH CAUSE OF ACTION

### Money Had and Received
### (Against All Defendants)

1599.   Plaintiff re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

1600.   This cause of action is brought against all Defendants for their participation in an overarching conspiracy to fix, raise and/or stabilize the prices of all At Issue Drugs.

1601.   This cause of action is also brought against the groups of Defendant-participants in each of the drug-specific conspiracies alleged above.  A chart detailing which Defendant participated in each of the drug-specific conspiracies is attached hereto as **Appendix B**.

1602.   Defendants have benefitted and hold money from selling and setting artificially inflated prices for the At Issue Drug(s) they marketed and sold.

1603.  Defendants have received and retained money and unjust benefits from Plaintiff Harris County in the form of excess payments paid by Plaintiff Harris County for the At Issue Drug(s).

1604.  As a result of Defendants' conspiracy inequity has resulted and it would be unconscionable for Defendants to retain these monies and benefits.

1605.  Because Defendants concealed their conspiracy, Plaintiff Harris County was not aware of the true facts concerning the conspiracy described herein and did not benefit from Defendants' misconduct.

1606. Defendants knowingly accepted the money and unjust benefits of its conspiratorial conduct.

1607. As a result of Defendants' misconduct, an amount of money and Defendants' unjust enrichment should be disgorged and returned to Plaintiff Harris County in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### Unjust Enrichment
### (Against All Defendants)

1608. Plaintiff re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

1609.  This cause of action is brought against all Defendants for their participation in an overarching conspiracy to fix, raise and/or stabilize the prices of all At Issue Drugs.

1610.  This cause of action is also brought against the groups of Defendant-participants in each of the drug-specific conspiracies alleged above.  A chart detailing which Defendant participated in each of the drug-specific conspiracies is attached hereto as **Appendix B**.

1611.   Defendants have unlawfully benefited from the sales of their At Issue Drugs because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully over-charged Plaintiff Harris County who made purchases of or reimbursements for the At Issue Drug(s) at prices that were more than they would have been but for Defendants' unlawful actions.

1612.   Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs.

1613.   Plaintiff Harris County has conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiff.

1614.   Defendants have been enriched by revenue resulting from unlawful overcharges for the At Issue Drug(s) while Plaintiff Harris County has been significantly damaged. Defendants' enrichment and Plaintiff's financial damage are connected.

1615.   There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused significant ongoing financial harm to Plaintiff Harris County because Plaintiff paid supracompetitive prices that inured to Defendants' benefit.  It would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

1616.   Plaintiff Harris County did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

1617.   The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of the At Issue Drug(s).

1618.   The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of the At Issue Drug(s) are ascertainable by review of sales records.

1619.   The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for the At Issue Drug(s) is a direct and proximate result of Defendants' unlawful practices.

1620.   The financial benefits derived by Defendants rightfully belong to Plaintiff Harris County because Plaintiff paid supracompetitive prices, inuring to the benefit of Defendants.

1621.   It would be inequitable under unjust enrichment principles for Defendants to be permitted to retain any of the overcharges for the At Issue Drug(s) derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1622.   Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiff Harris County. Defendants consciously accepted the benefits and continue to do so as of the date of this filing.

1623.   Defendants should be compelled to disgorge to Plaintiff Harris County all unlawful or inequitable proceeds they received from their sales of the Issue Drug(s).

1624.   Plaintiff Harris County has no adequate remedy at law.

1625.   By engaging in the foregoing unlawful or inequitable conduct depriving Plaintiff of the opportunity to purchase lower-priced generic versions of the At Issue Drug(s) and forcing it to pay higher prices for the At Issue Drugs, Defendants have been unjustly enriched in violation of the common law of Texas.

1626. Defendants unlawfully overcharged Plaintiff Harris County, who made purchases of or reimbursements for the At Issue Drug(s) in Texas at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for the Issue Drug(s), which revenue resulted from anticompetitive prices paid by Plaintiff Harris County, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of Plaintiff Harris County. It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

1627. As a result of Defendants' misconduct, an amount of money and Defendants' unjust enrichment should be disgorged and returned to Plaintiff Harris County in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION

### Civil Conspiracy
### (Against All Defendants)

1628. Plaintiff re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

1629. This cause of action is brought against all Defendants for their participation in an overarching conspiracy to fix, raise and/or stabilize the prices of all At Issue Drugs.

1630. This cause of action is also brought against the groups of Defendant-participants in each of the drug-specific conspiracies alleged above. A chart detailing which Defendant participated in each of the drug-specific conspiracies is attached hereto as **Appendix B**.

1631. Defendants' conduct described herein constitutes a civil conspiracy and aiding and abetting each other to violate the Texas Free Enterprise and Antitrust Act, the

Texas Deceptive Trade Practices Act and to commit the torts of fraud, unjust enrichment and money had and received. In furtherance of their conspiracy, Defendants have undertaken efforts to eliminate competition in the generic drug market. As a direct result of the overt acts taken in furtherance of Defendants' conspiracy, Plaintiff Harris County has suffered damages in an amount to be proven at trial. Defendants are all jointly and severally liable for the actions taken in furtherance of their joint conduct.

## IX.   APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION

1632.  Plaintiff re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

1633.  After Defendants have been cited to appear and answer, Plaintiff requests the Court to enter a temporary injunction pursuant to the Texas DTPA, TEX. BUS. & COM. CODE §17.50(B)(2), to enjoin Defendants, their agents, employees, and attorneys, together with all persons in concert with them, from engaging in anticompetitive and unlawful conduct, including continuing to artificially inflate the prices of their At Issue Drugs and to affirmatively misrepresent and/or conceal and suppress material facts concerning their artificially inflated prices.

1634.  Plaintiff further requests that, following a trial on the merits in this case, the Court enter a permanent injunction enjoining Defendants from their unlawful scheme pursuant to the Sherman Act, 15 U.S. Code § 26, TFEAA, TEX. BUS. & COM. CODE § 15.21(B) and the Texas DTPA, TEX. BUS. & COM. CODE § 17.50(B)(2).

## X.   CONDITIONS PRECEDENT

All conditions precedent have been performed, have occurred, or have been excused.

366

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff Harris County respectfully prays:

A.   That this Court enter judgments against Defendants and in favor of Plaintiff Harris County for violations of federal laws, state laws and legal standards invoked herein;

B.   That this Court award Plaintiff Harris County monetary relief, including damages, restitution, disgorgement and/or all other available legal and equitable monetary remedies available under the federal and state laws set forth in this Complaint and the general equitable powers of this Court, to be trebled with interest and all exemplary and/or punitive damages that may be awarded, as necessary to remedy the harm from Defendants' acts described in this Complaint; and

C.   That this Court issue a preliminary and permanent injunction enjoining Defendants from continuing to engage in their unlawful conduct.

D.   Plaintiff further prays that Plaintiff recover its attorneys' fees, all costs of suit, prejudgment and post judgment interest and for such other and further relief to which Plaintiff may show itself entitled at law or equity.

## XII.   JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff respectfully demands a trial by jury on all issues so triable.

Dated: March 1, 2020

Respectfully submitted,

**OFFICE OF HARRIS COUNTY
ATTORNEY, VINCE RYAN**

*/s/ Vince Ryan*
Vince Ryan
Harris County Attorney
Texas Bar No. 17489500
Robert Soard
First Assistant Harris County Attorney
Texas Bar No. 18819100
Terence L. O'Rourke
Special Assistant Harris County Attorney
Texas Bar No. 15311000
Pegi S. Block
Assistant Harris County Attorney
Texas Bar No. 02498250
Suzanne Bradley
Assistant Harris County Attorney
Federal ID No. 24567
Texas Bar No. 00793375
1019 Congress, 15th Floor
Houston, Texas 77002
Telephone: (713) 274-5121
Facsimile: (713) 437-4211
Vince.Ryan@cao.hctx.net
Robert.Soard@cao.hctx.net
Terence.ORourke@cao.hctx.net
Pegi.Block@cao.hctx.net
Suzanne.Bradley@cao.hctx.net

**LAW OFFICE OF RICHARD SCHECHTER, P.C.**

*/s/ Richard Schechter*
Richard Schechter
Texas Bar No. 17735500
1 Greenway Plaza, Suite 740
Houston TX 77046-0102
Telephone: 713-623-8919
Facsimile:  713-622-1680
richard@rs-law.com
**THE CICALA LAW FIRM PLLC**

*/s/ Joanne Cicala*
Joanne Cicala
Texas Bar No. 24052632

368

Joshua T. Wackerly
Texas Bar No. 24093311
101 College Street
Dripping Springs, Texas 78620
Telephone: (512) 275-6550
Facsimile: (512) 858-1801
joanne@cicalapllc.com
josh@cicalapllc.com

**BAKER • WOTRING LLP**

*/s/ Debra Tsuchiyama Baker*
Debra Tsuchiyama Baker
Texas Bar No. 15089600
Earnest W. Wotring
Texas Bar No. 22012400
John Muir
Texas Bar No. 14630477
David George
Texas Bar No. 00793212
700 JPMorgan Chase Tower
600 Travis Street
Houston, Texas  77002
Telephone:     (713) 980-1700
Facsimile:     (713) 980-1701
dbaker@bakerwotring.com
ewotring@bakerwotring.com
jmuir@bakerwotring.com
dgeorge@bakerwotring.com

**HOLLINS LAW GROUP PLLC**

*/s/ Christopher G. Hollins*
Christopher G. Hollins
Texas Bar No. 24090168
Aysia N. Mayo-Gray
Texas Bar No. 24109256
5832 Highway 6 North
Houston, Texas 77084
Telephone:     346.980.4600
Facsimile:     346.980.4610
c.hollins@hollinslawgroup.com
a.mayo-gray@hollinslawgroup.com

***ATTORNEYS FOR PLAINTIFF***